JOSÉ GRANADOS NAVEDO, candidato a la ALCALDÍA del MU-
NICIPIO DE SAN JUAN, por el PARTIDO NUEVO PROGRE-
SISTA, demandante y recurrente, v. MARCOS A.
RODRÍGUEZ ESTRADA, PRESIDENTE de la COMISIÓN ES-
TATAL DE ELECCIONES, ETC., demandados y recurridos.

*Números:* CE-89-30     *Resueltos:* 22 de junio de 1989
RE-89-67
RE-89-68

2

4

*Alex González, Carlos Canals Mora* y *Antonio Montalvo Nazario,* abogados del recurrente; *David Rivé Rivera, Julia M. Santiago De la Cruz* y *Mariano Canales Delgado,* abogados de Marcos A. Rodríguez Estrada, recurrido; *Rafael Escalera Rodríguez, José Ángel Rey, Lino J. Saldaña, Elba Rosa Rodríguez Fuentes* y *Melva Quintana,* abogados de Héctor Luis Acevedo y Eudaldo Báez Galib, recurridos; *Manuel D. Herrero García,* de *Bufete Herrero,* abogado de Francisco González Rodríguez, recurrido; *Sabino Cotto Cruz,* abogado de Hiram Meléndez Rivera, recurrido.

EL JUEZ ASOCIADO SEÑOR ORTIZ emitió la opinión del Tribunal.

Estos recursos consolidados presentan serias, importantes y complejas interrogantes en torno a la relación entre los partidos políticos, sus candidatos y los electores. Nos corresponde, además, sentar pautas sobre la naturaleza del procedimiento judicial de impugnación del resultado de una elección. Arts. 6.014 y 6.015 de la Ley Electoral de Puerto Rico (en adelante Ley Electoral), 16 L.P.R.A. secs. 3274 y 3275. Todo ello dentro del marco de una decisión que desestimó, sin oír toda la prueba, la impugnación por el candidato derrotado —por veintinueve (29) votos— de la certificación de Alcalde electo de la Ciudad Capital de nuestra isla.

# I

■ Como denominador común para la correcta y justa adjudicación de estas controversias, tenemos que ser conscientes de que uno de los derechos más preciados de nuestra ciudadanía es el derecho al sufragio, pilar de nuestro sistema democrático. Para ello nos guían principios claramente establecidos, como las atinadas expresiones del ex Juez Presidente Señor Negrón Fernández en *Partido Nuevo Progresista v. J.E.E.*, 96 D.P.R. 961, 962–963 (1968):

> Estos recursos presentan una controversia política que viene al foro judicial de un foro político-administrativo —la Junta Estatal de Elecciones— cuyas decisiones deben fundarse en la vigencia plena del estado de Derecho y en la protección de los derechos políticos y sociales que entran en juego en la administración de la Ley Electoral, y no en preferencias políticas —a pesar de su organización eminentemente política.
>
> En la función del juzgar, ya sea en juntas y otros organismos administrativos con atribuciones cuasi-judiciales, como en el foro propiamente judicial, es a los hombres del Derecho a quienes corresponde superar, más que nunca —con ponderado juicio y libertad de conciencia en sus determinaciones judiciales— las histerias públicas que las pasiones políticas generan, asumiendo la responsabilidad de reafirmar los derechos del hombre en el orden jurídico-constitucional, para dar al imperio de la Ley sentido válido de utilidad social.[1]

---

[1] Aunque en *Rivera v. Juez Presidente*, 96 D.P.R. 487 (1968), resolvimos que la actuación del Juez Presidente en la apelación de las decisiones del Superintendente General de Elecciones bajo las disposiciones del procedimiento especial establecido en la Sec. 13d de la antigua Ley Electoral, 16 L.P.R.A. sec. 19, no era de naturaleza judicial y, por ende, no revisable por los tribunales, dichas decisiones son de incalculable valor para comprender y analizar cuál es el derecho electoral que rige en nuestra jurisdicción. Véanse, por vía de ejemplo: *Giménez v. J.E.E.*, 96 D.P.R. 943 (1968); *Alvarado v. J.E.E.*, 100 D.P.R. 1049 (1972); *Calderón, Jr. v. J.E.E.*, 100 D.P.R. 1069 (1972).

Con estas guías pasamos a exponer el historial del caso, los hechos no controvertidos, las cuestiones de derecho planteadas y la naturaleza del remedio que debemos proveer.

El candidato a la Alcaldía de San Juan por el Partido Nuevo Progresista (P.N.P.) recurre ante esta Curia para que revisemos una sentencia parcial y una final del Tribunal Superior, en las que dicho tribunal desestimó la impugnación de la certificación emitida el 7 de diciembre de 1988 por la Comisión Estatal de Elecciones (en adelante Comisión Estatal) que declara electo al candidato del Partido Popular Democrático (P.P.D.), el Lcdo. Héctor Luis Acevedo. Sometida la transcripción de todos los testimonios vertidos ante el foro de instancia, y una vez la partes presentaron sus respectivos alegatos, celebramos vista oral el 29 de marzo de 1988 y, concluida esa sesión, nos retiramos para resolver el asunto en sus méritos.

Los comicios electorales del pasado 4 de noviembre de 1988 se celebraron mediante el sistema de votación de colegio abierto y en un ambiente caracterizado por un alto sentido de participación democrática.

Entre los electores hubo un grupo que acudió a las urnas al amparo de un procedimiento especial aprobado por la Comisión Estatal y refrendado por este Tribunal. *P.N.P. y P.I.P. v. Rodríguez Estrada*, 122 D.P.R. 490 (1988). Este procedimiento especial, aprobado escasamente unos días antes de las elecciones, permitió que votaran cerca de dieciocho mil (18,000) electores que alegaron y presentaron prueba de tener derecho a estar en las listas electorales. A estos electores se les requería que hicieran una declaración jurada impresa en un sobre especial en el que depositaban su voto. Entonces, el elector tenía que firmar la lista de electores y los representantes de los partidos procedían a añadirlo a sus listas. Se entintaba el dedo al elector y se le entregaba dos (2) papeletas con un sobre. El funcionario retenía la tarjeta electoral y el boleto de autorización para votar.

8

Luego de emitido el voto, el elector colocaba las papeletas en el sobre y se le informaba que su voto no iba a ser adjudicado en el colegio, sino por la Comisión Estatal después de haber verificado que tenía derecho a votar.

El sobre se sellaba, frente al elector, con una cinta adhesiva especial y se colocaba dentro de un sobre más grande identificado con el número de precinto y unidad. Este sobre se sellaba una vez se hubiesen contado y certificado todos los electores añadidos a mano que votaron mediante dicho procedimiento. *Exhibit* 49, Reglamento para votos añadidos a mano. Se transportaba con todos los materiales del Colegio de Votación al Coliseo Roberto Clemente, donde la Comisión Estatal se había instalado.

■ Luego de que todos los votantes acudieron a las urnas, la Comisión Estatal comenzó el proceso de conteo de votos. En esta fase preliminar no se adjudicaban las papeletas protestadas y aquellas que correspondían a los electores que habían utilizado el proceso de voto añadido a mano. Sin embargo, debido al mandato de la Ley Electoral[2] la Comisión Estatal declaró de manera preliminar al señor Granados Navedo como Alcalde de San Juan con un margen de victoria de alrededor de trescientos (300) votos.

■ Como el margen a favor del señor Granados Navedo era menor de la mitad del uno por ciento (1%) de los votos emitidos, y a tenor con el Art. 6.011 de la Ley Electoral, 16 L.P.R.A. sec. 3271, el Lcdo. Héctor Luis Acevedo, candidato a alcalde por el P.P.D., solicitó a la Comisión Estatal un recuento de los precintos electorales comprendidos en el Municipio de San Juan. Este proceso, que es más riguroso que un

---

(2) La Ley Electoral de Puerto Rico, en su Art. 6.007 (16 L.P.R.A. sec. 3267), requiere que se informen los resultados preliminares de las elecciones no más tarde de setenta y dos (72) horas siguientes al día de la elección. *P.P.D. v. Barreto Pérez*, 110 D.P.R. 376 (1980).

escrutinio general, requería el examen de las Actas de Colegio y el cotejo de cada papeleta emitida. Art. 6.011 de la Ley Electoral, *supra*; Regla 70(3)b del Reglamento Oficial de las Elecciones Generales de 1988 (en adelante Reglamento de Elecciones de 1988).

■ La Comisión Estatal no estaba autorizada a certificar a ningún candidato hasta tanto no se llevara a cabo el escrutinio general previsto en la ley. Art. 6.008 de la Ley Electoral, 16 L.P.R.A. sec. 3268. Éste consistía en intervenir con aquellas papeletas que no habían sido adjudicadas y con aquellas papeletas protestadas para tomar una determinación en cuanto a la validez del voto emitido. Además, se examinaban las Actas de Colegio.

Ante la Comisión Estatal se encontraba la solicitud de recuento del candidato Acevedo. Además, tenía la obligación de hacer un escrutinio general. Confrontada con esta realidad, decidió que el recuento y el escrutinio general se celebrarían simultáneamente, ya que el recuento incluía de por sí un escrutinio y así lo disponía la ley. Regla 70(7) del Reglamento de Elecciones de 1988.

El recuento comenzó el 14 de noviembre de 1988. Se establecieron mesas de escrutinio compuestas por un empleado de la Comisión Estatal —que no tenía voto— y por un representante de cada uno de los partidos políticos que presentaron candidatos a la Alcadía de San Juan. Había una junta de supervisores para cada diez (10) mesas compuestas por un supervisor de cada partido político. Además, había una junta de supervisores generales con un supervisor general por cada partido político. Esta junta estaba a cargo de los supervisores de mesa. También había un director de escrutinio sin funciones adjudicativas y una subcomisión electoral que supervisaba el proceso. Ésta estaba compuesta por los Comisionados Electorales Alternos de los tres (3) partidos políticos. Regla 67-A del Reglamento de Elecciones de 1988.

El proceso de adjudicación de una papeleta comenzaba en las mesas de escrutinio. Si había consentimiento de todos los integrantes de la mesa, el voto se adjudicaba. De no existir unanimidad, se sometía la controversia a los supervisores de mesa, quienes también debían emitir una decisión unánime. A falta de éstos, se acudía a los supervisores generales. De no existir consenso entre ellos, el próximo paso era acudir a los Comisionados Electorales Alternos, quienes debían decidir la controversia unánimemente. El último escalón en esta escalera era someter el caso a la Comisión Estatal. Si entre los Comisionados Electorales no había consenso, le correspondía resolver la controversia al Presidente de la Comisión Estatal de acuerdo con la ley. Art. 1.006(e) de la Ley Electoral, 16 L.P.R.A. sec. 3014.

El proceso de investigación de los votos añadidos a mano era especial.[3] La investigación de estos votos se llevó a cabo en un área particular del Coliseo designada para ello. Se fotocopiaban los sobres que contenían las papeletas de cada elector y su información electoral. El original de cada sobre, con sus papeletas en el interior, se guardaba bajo llave en un archivo especial que correspondía a los tres (3) partidos políticos.

La investigación se iniciaba en las computadoras de la Comisión Estatal. Terminada la etapa de búsqueda en los terminales, se procedía a hacer una investigación a base del material disponible en los archivos de la Comisión Estatal que no había sido añadido a la información disponible en las computadoras, las listas de votación de 1984, los listados de excluidos, los listados de inclusiones, las órdenes de los tribunales y cualquier otro documento disponible.

En la primera etapa de la búsqueda, un setenta por ciento (70%) de los electores añadidos a mano aparecieron como

---

[3] En San Juan se investigaron cuatro mil doscientos (4,200) electores que votaron mediante el procedimiento de añadidos a mano.

electores activos. Determinado su *status* como electores activos, se pasaba a una mesa en la que se cotejaba el libro de exclusiones. De haber fundamentos para exclusión, según definidos en los Arts. 2.023 y 2.023-A de la Ley Electoral, 16 L.P.R.A. secs. 3073 y 3073a, se cancelaba su derecho al voto. Si no existía ninguna exclusión y era un elector activo, se pasaba el récord a la Junta Especial de Añadidos a Mano (en adelante Junta Especial),(4) quien hacía un listado de todos los récord con derecho al voto. El listado pasaba a los funcionarios de los partidos, quienes procedían a abrir los archivos y a traer los expedientes a la Junta Especial. Ésta abría los sobres y depositaba las papeletas en las urnas manteniendo siempre la secretividad del voto. Luego de depositado el voto en la urna, éste seguía su curso normal.

El treinta por ciento (30%) restante que no aparecía como elector activo en la información obtenida por las computadoras, se investigaba a través de todos los documentos en poder de la Comisión Estatal. En esa investigación se consideraban las resoluciones recibidas de los tribunales, en casos en que los electores habían acudido a ellos para defender su derecho al voto.

Al terminar la investigación de todos los electores que votaron añadidos a mano, algunos funcionarios descubrieron casos de electores que, debido a errores en la búsqueda en las computadoras, habían aparecido como excluidos y una nueva búsqueda reflejaba que eran electores activos.

El 4 de diciembre los Comisionados Electorales de los tres (3) partidos políticos unánimemente decidieron reinvestigar todos los electores excluidos, alrededor de seiscientos cuarenta (640). La reinvestigación reveló que alrededor de

---

(4) Esta Junta Especial de Añadidos a Mano estaba compuesta por el Sr. Ramón Bauzá, representante del P.N.P., el Sr. Andrés Miranda, representante del P.I.P. y el Sr. Iván Algarín, representante del P.P.D.

catorce (14) electores habían sido privados erróneamente de su derecho al voto.

El señor Bauzá Escobales (representante del P.N.P.) planteó en la Junta Especial que también era necesaria una reinvestigación de los electores inactivos. Éstos eran alrededor de seiscientos cuarenta (640). Como la propuesta no logró la unanimidad requerida en la Junta Especial, la reinvestigación no se realizó. El 7 de diciembre el señor Bauzá, mediante memorando, rindió un informe a la Comisión Estatal donde explicaba lo acontecido. En la Comisión Estatal no se discutieron los planteamientos vertidos en dicho memorando ni se tomó ninguna determinación al respecto.

Para el 7 de diciembre a las 4:00 de la tarde quedaban por investigar nueve (9) casos de electores añadidos a mano que había presentado el Comisionado Electoral del P.N.P. para reinvestigación. En la investigación inicial, esos casos habían sido rechazados y la Junta Especial había determinado que no tenían derecho al voto. El Comisionado Electoral del P.N.P. no estuvo de acuerdo con la determinación de la Junta Especial y pidió una reconsideración de la decisión.

Además de los nueve (9) casos antes mencionados, quedaba por resolver el problema de los doscientos siete (207) votos llamados "arrestados". Estas papeletas eran de electores que habían votado añadidos a mano en seis (6) unidades de San Juan. De la prueba documental surge que en una de las unidades había más papeletas que electores debidamente registrados. En otro colegio faltaban noventa y dos (92) papeletas para corresponder a ciento trece (113) electores añadidos a mano. En todos los colegios afectados faltaron sobres y los funcionarios mezclaron todas las papeletas, imposibilitando la identificación de las papeletas de los electores que la investigación determinó que podían votar.

Sometido el asunto a la consideración de la Comisión Estatal, el señor González, Comisionado Electoral del P.N.P., se opuso a la solicitud del licenciado Baéz Galib, Comisio-

nado Electoral del P.P.D., de que no se adjudicaran los votos. Por el contrario, pedía que éstos fueran contabilizados. El licenciado Meléndez, Comisionado Electoral del P.I.P., sometió su voto por escrito. Este voto no está incluido en los autos. Por no existir unanimidad, correspondió al Presidente de la Comisión Estatal decidir el asunto. Emitió una resolución el 7 de diciembre de 1988, donde anulaba los doscientos siete (207) votos emitidos.

Ese mismo día, a las 7:00 P.M., se procedió a certificar como Alcalde electo de la Ciudad Capital al Lcdo. Héctor Luis Acevedo por un margen de veintinueve (29) votos. El Comisionado Electoral del P.N.P. se opuso a la certificación. Alegó que no se había adjudicado un número indefinido de papeletas. Sin embargo, por un acuerdo previo de la Comisión Estatal,(5) se estableció que cuando el número de papeletas no adjudicadas no alteraba el resultado de la elección procedía la certificación del candidato. Así se hizo en este caso.

El 19 de diciembre de 1988, a tenor con el Art. 6.014 de la Ley Electoral, *supra*, el Sr. José Granados Navedo presentó en el Tribunal Superior un escrito de impugnación.(6) En sín-

---

(5) El 6 de diciembre de 1988 la Comisión Estatal de Elecciones (en adelante Comisión Estatal), mediante acuerdo unánime, había resuelto certificar a aquellos candidatos cuando el número de papeletas por adjudicar no alterara el resultado. Además, en la propia certificación constaba que ésta no incluía el voto del número de papeletas pendiente de adjudicación que, de ser adjudicadas, no alteraban el resultado. Sin embargo, esta era una disposición estándar que aparece en varias de las certificaciones.

(6) Ya el 14 de diciembre el Sr. José Granados Navedo había acudido al Tribunal de Distrito de Estados Unidos para el Distrito de Puerto Rico con el propósito de obtener la descertificación del Lcdo. Héctor L. Acevedo. También habían acudido ante ese foro un número de electores a quienes no se había adjudicado el voto. A solicitud de los demandados, el Tribunal de Distrito federal se abstuvo de entender en la reclamación al amparo de las normas de abstención establecidas en *Railroad Comm'n v. Pullman Co.*, 312 U.S. 496 (1941), pues se planteaban allí cuestiones de derecho puertorriqueño no resueltas sobre cuyo fundamento podía el Tribunal Superior de Puerto Rico disponer de las reclamaciones del candidato

tesis, alegaba que no se habían adjudicado todos los votos, que no se había terminado el escrutinio general, que quince (15) papeletas con doble marca habían sido indebidamente adjudicadas por el Presidente de la Comisión Estatal, que una papeleta de candidatura (*write-in*) a su favor había sido caprichosamente excluida y que se adjudicó erróneamente al Alcalde de Bayamón una papeleta que le correspondía a él. Como remedio, solicitaba que se anulara la adjudicación de los dos mil quinientos cincuenta y siete (2,557) votos conocidos como "contaminados",(7) que se ordenara a la Comisión Estatal evaluar el reclamo de todos los electores a quienes preliminarmente no se les adjudicó el voto y que se adjudicaran las papeletas con iniciales.(8)

Contestado el escrito de impugnación por todos los demandados, celebrada una conferencia con antelación al juicio y terminado el período de descubrimiento de prueba, el tribunal comenzó la vista el 31 de diciembre de 1988. Al inicio de la vista se marcó la evidencia a ser presentada. Luego de concluido este proceso, el licenciado Rodríguez Estrada fue llamado como testigo. En su declaración, se remitió mayormente a los documentos producidos por la Comisión Estatal.

El próximo testigo de la parte demandante fue el Sr. Ramón Bauzá Escobales. Éste describió sus funciones en la Comisión Estatal y, especialmente, el proceso de investigación y adjudicación de los votos de los electores añadidos a mano.

---

y de los electores sin necesidad de pasar juicio sobre sus reclamaciones bajo la Constitución de Estados Unidos.

(7) En este caso, papeletas de electores debidamente cualificados para votar se mezclaron en los colegios con aquellas papeletas de electores que votaron añadidos a mano. Por tanto, no se puede identificar qué papeletas pertenecían a cada grupo de electores. Estas papeletas fueron adjudicadas en las mesas especiales con el consentimiento unánime de todos los partidos.

(8) En el dorso de estas papeletas aparecen unas iniciales adicionales a las de los funcionarios de colegio. El señor Granados Navedo alega que las iniciales son del elector que las colocó allí debido a las instrucciones erróneas de los funcionarios.

Al discutir la situación sobre las papeletas arrestadas, surgió que en algunos colegios había más papeletas que electores y que en otros faltaban papeletas. El abogado de la parte demandante pidió al señor Bauzá que declarara, a base de sus conocimientos, si ciertos electores tenían derecho a votar y que se admitiera en evidencia una prueba que tendía a demostrar que se había privado a los electores de su derecho al voto injustificadamente. La representación legal de la parte demandada objetó, alegando que el señor Bauzá no era un perito y que el criterio de revisión en casos de impugnación era el de revisión a base de juicio *de novo*. Por lo tanto, lo que se requería era pasar la misma prueba que desfiló ante la agencia administrativa, pero ante un nuevo juzgador. Además, argumentó que el candidato impugnador no tenía legitimación (*standing*) para reclamar el derecho a votar de terceros.[9] A esto se opuso el abogado del señor Granados Navedo por razón de que al pleito de impugnación sí podía traer cualquier evidencia disponible, aunque hubiese sido presentada ante el foro administrativo. El juez resolvió que procedía traer la prueba que había tenido ante su consideración la Junta Especial y, entonces, el tribunal resolvería.

En la vista continuaron los problemas procesales y sobre la admisibilidad de evidencia que intentaba presentar la parte demandante. Las partes sometieron memorándum de derecho. El juez de instancia, mediante Resolución y Sentencia Parcial de 9 de enero de 1989, dictaminó que:

(1) La prueba desfilada no derrotaba la presunción de corrección de las determinaciones unánimes de la Junta Especial.

---

[9] Los electores que comparecieron al foro federal a reclamar sus derechos fueron invitados a comparecer en el pleito de impugnación. Mediante escrito presentado el 28 de diciembre de 1988, y firmado por el Lcdo. Harvey B. Nachman, éstos denegaron la "invitación" hecha y expresaron que no tenían ningún interés en unirse al pleito de impugnación como parte.

(2) Existe una relación tan estrecha, un nexo vinculante entre el Comisionado Electoral o sus subalternos, y el candidato de su partido que, por ende, las determinaciones unánimes a todos los niveles obligan al candidato.

(3) El candidato demandante no tiene legitimación para reclamar los derechos electorales de terceros. Desestimó la demanda de impugnación en cuanto a todas aquellas alegaciones que impugnaban determinaciones unánimes de la Comisión Estatal o sus subdivisiones, a las que reclamaban derechos de los electores.

Continuó la vista en su fondo. La parte demandante intentó enmendar sus alegaciones para incluir la adjudicación de los doscientos siete (207) votos arrestados. Dicha acción se debió a lo dispuesto en la sentencia parcial emitida, donde se sostuvo que no se podían cuestionar decisiones unánimes y, por lo tanto, no procedía la anulación de los dos mil quinientos cincuenta y siete (2,557) votos contaminados. Alegaba el señor Granados que la Comisión Estatal tenía que ser congruente al tomar sus determinaciones y que procedía la adjudicación de los votos arrestados. Como la referida "enmienda" fue planteada vencido el término para hacerlo el tribunal, mediante Resolución de 17 de enero, no la permitió.

Se suscitó una controversia en torno a si la resolución del Tribunal Superior, en el caso de las papeletas con iniciales, constituía cosa juzgada en la acción de impugnación por el vínculo existente entre el P.N.P. y su candidato a alcalde. Luego de oír las teorías de las partes, el Tribunal Superior dictó sentencia parcial el 17 de enero de 1989 y desestimó la alegación de que las papeletas con iniciales constituían cosa juzgada.

Solamente quedaba por resolver el asunto de las papeletas con doble marca. Aunque la disposición en los méritos de la controversia no alteraba el resultado de la elección, el

tribunal le dio la oportunidad a la parte demandante de pasar la prueba a esos efectos. Ésta decidió no presentar la prueba y atenerse al efecto que pudiera tener, en su día, la sentencia emitida por el tribunal. El 2 de febrero de 1989 el Juez Carlos Polo emitió una opinión y sentencia donde se "desestim[ó] dicha causa de acción por académica e inconsecuente, según fuera solicitado por las partes en corte abierta". Opinión y sentencia de 2 de febrero de 1989, pág. 6.

El demandante recurrió oportunamente a este Foro mediante una solicitud de revisión a la sentencia parcial de 9 de enero, una solicitud de revisión y *certiorari* de la resolución y sentencia parcial de 17 de enero de 1989, y una solicitud de revisión de la sentencia de 2 de febrero de 1989. Consolidamos todos los recursos. Procedemos al análisis, discusión y resolución de los planteamientos esbozados por las partes.

## II

Antes de entrar en la discusión de los temas específicos traídos por las partes, es preciso reconocer y sentar la norma sobre la naturaleza del procedimiento especial de impugnación del resultado de una elección.

Mediante la Ley de 7 de marzo de 1906, que quedó vigente luego de aprobarse la Ley Núm. 79 de 25 de junio de 1919, se estableció un procedimiento especial ante la Corte de Distrito, hoy Tribunal Superior, para que el candidato impugnador hiciera los reclamos pertinentes. En lo que nos concierne, la ley disponía que: "El escrito del impugnador deberá especificar los fundamentos en que se apoyare, y los hechos esenciales expuestos en él deberán ser de tal naturaleza que, de probarse, basten para cambiar el resultado de la elección." 1906 Leyes de Puerto Rico 59. Idéntico procedimiento fue seguido al aprobarse la Ley Núm. 72 de 4 de

mayo de 1931. La Sec. 9 de la referida ley, vigente hasta 1974,[10] establecía que:

Cuando de las pruebas practicadas apareciere que los funcionarios o directores de la elección negaren el privilegio de votar a un número de electores capacitados, cuyos votos, de haberse admitido, habrían alterado materialmente el resultado de la elección, el tribunal declarará nula la elección y ordenará a los respectivos funcionarios que dispongan nueva elección para llenar el cargo controvertido, la cual elección se llevará a cabo según lo dispuesto por las leyes electorales de la Isla. 1931 Leyes de Puerto Rico 455.

Después de aprobarse el Código Electoral de 1974, Ley Núm. 1 de 13 de febrero de 1974, se cambió el foro de impugnación del Tribunal Superior al Tribunal Electoral allí establecido, luego a la Junta Revisora Electoral —Ley Núm. 4 de 20 de diciembre de 1977 (16 L.P.R.A. sec. 3001 *et seq.*)— y ahora ha vuelto a ser el Tribunal Superior. Las decisiones en estos casos eran y son revisadas directamente por este Tribunal. Todas estas leyes tenían un requisito común, que es exponer bajo juramento la razón o razones en que fundasen las mismas, las cuales deben ser de tal naturaleza que, de probarse, bastarían para cambiar el resultado de la elección. También tenían en común que los únicos con capacidad para entablar la acción eran los candidatos derrotados. Véase *Domenech v. Moret*, 13 D.P.R. 99 (1907.)

■ Hay una estrecha relación entre el proceso de impugnación del resultado de la elección y la revisión de las decisiones de la Comisión Estatal. Arts. 6.014 y 1.016 de la Ley Electoral, 16 L.P.R.A. secs. 3274 y 3016a. En cuanto a este último, decidimos en *P.N.P. v. Rodríguez Estrada, Pres. C.E.E.*, 123 D.P.R. 1, 30–31 (1988), que:

---

[10] El Art. 7.089 del Código Electoral proveía que si el Tribunal Electoral no podía decidir cuál de los candidatos resultó electo, ordenaría una nueva elección. Esta redacción se mantuvo en la ley vigente, 16 L.P.R.A. sec. 3275.

Téngase en mente que el Art. 1.016 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3016a, le impone la obligación al Tribunal Superior de celebrar vista en su fondo, recibir evidencia y hacer sus propias determinaciones de hecho y conclusiones de derecho al revisar las decisiones de la C.E.E. No se trata, por lo tanto, de una mera revisión limitada a cuestiones de derecho. Se trata en realidad de un juicio *de novo*. Véase *Vélez Quiñones v. Srio. de Instrucción*, 86 D.P.R. 755 (1962). Este momento era apropiado y oportuno para que los peticionarios presentaran prueba sobre las alegaciones en cuestión, incluso evidencia que no fue presentada ante la C.E.E. Sin embargo, como ya señalamos, ello no se hizo. (Énfasis suprimido.)

Estamos ante la misma situación. El Art. 6.014 de la Ley Electoral, *supra*, establece que hay que presentar prueba para sostener las alegaciones.

Aunque en instancia hubo alguna confusión sobre la extensión del juicio *de novo*, la mayoría de los abogados y el juez estaban de acuerdo en que en el mismo podía y debía desfilar toda la prueba que fuera admisible en evidencia.

Establecido que en el juicio *de novo* las partes pueden presentar toda la prueba pertinente a los motivos de impugnación, pasamos a considerar el alcance de la revisión judicial.[11]

▮ Tanto la dinámica organizacional de la Comisión Estatal —controlada por los partidos políticos— como la forma particular en que se toman allí las decisiones exigen la aplicación del criterio de revisión judicial más riguroso. Las decisiones de la Comisión Estatal están sujetas a las presiones e intereses partidistas. Ello lo propicia la propia estructura del organismo. En estas circunstancias, la Legislatura tuvo

---

[11] La preocupación de que el procedimiento se convierta en uno de recuento no es válida. Aunque amplio, el mismo está limitado a los hechos que sean necesarios para demostrar que la Comisión Estatal erró al certificar a uno de los candidatos. No es un recuento voto por voto.

fundamentos legítimos para disponer que en el escrutinio de las determinaciones tomadas la revisión judicial sea abarcadora. Véanse: L.L. Jaffe, *Judicial Control of Administrative Action*, Little, Brown and Company, 1965, págs. 621–623; L.L. Jaffe, *Judicial Review: Question of Fact*, 69 Harv. L. Rev. 1020, 1054 (1956). Si la Asamblea Legislativa hace clara su intención de ampliar la revisión judicial, los tribunales deben aceptar esta responsabilidad. L.L. Jaffe y N. Nathanson, *Administrative Law: Cases and Materials*, 4ta ed., Little, Brown and Company, 1976, pág. 958.

▮ Si tratándose de una revisión de una decisión de la Comisión Estatal la ley exige un juicio *de novo*, la función judicial en una acción de impugnación no puede ser menos amplia. En los procesos de impugnación el tribunal no solamente debe hacer sus propias determinaciones de hecho, sino que además debe considerar cualquier evidencia admisible ofrecida por cualquier parte, aunque dicha prueba nunca haya estado en el récord administrativo. El deber del tribunal es precisamente establecer un récord adecuado del cual se puedan hacer las determinaciones de hecho correspondientes. De este modo, a su vez, se facilita nuestra tarea de revisión judicial, la cual de por sí es compleja y delicada en los casos electorales.

▮ El tribunal debe, en aquellos casos en que la determinación dependa principal o exclusivamente de una cuestión de derecho electoral especializado, guardar la usual deferencia al organismo administrativo y tiene que considerar, además, la presunción de que una persona en posesión de un cargo público fue elegida o nombrada en la forma debida. Regla 16(14) de Evidencia, 32 L.P.R.A. Ap. IV; *Santa Aponte v. Srio. del Senado*, 105 D.P.R. 750 (1977). Debe utilizar el derecho electoral sustantivo el cual, a su vez, está supeditado y responde al derecho y jurisprudencia constitucio-

nal aplicable. Lo importante es que el tribunal oiga, considere y resuelva a base de toda la prueba admisible que tengan a bien presentar las partes, y luego aplique el derecho teniendo en cuenta que el derecho al voto no debe ser menoscabado o desalentado. *Rivera v. Gobernador*, 121 D.P.R. 558 (1988).

## III

■ Ya hemos visto que los partidos políticos controlan el proceso electoral a nivel de la Comisión Estatal. *P.N.P. y P.I.P. v. Rodríguez Estrada*, supra. Pero la dificultad con el enfoque restrictivo que en instancia se le dio al procedimiento de impugnación es que traslada este control más allá de la Comisión Estatal a la esfera judicial. Como cuestión práctica, de prevalecer la decisión recurrida, los candidatos derrotados no tendrían causa de acción alguna o motivos para impugnar la certificación. Ello debido a que directa o indirectamente todos los motivos de impugnación están o fundamentados en las decisiones unánimes de los representantes de los partidos o dependen, para su correcta adjudicación, del análisis de los derechos de los electores, lo cual también veda la decisión de instancia. Este enfoque restrictivo es claramente contrario a la jurisprudencia vigente, según recogida en *P.S.P. v. Com. Estatal de Elecciones*, 110 D.P.R. 400, 406–407 (1980):

> La Ley Electoral aprobada en 1977 crea un organismo denominado Comisión Estatal de Elecciones, cuya estructura básica administrativa y decisional responde a una visión de un sistema electoral político contencioso en que se detectan tres notas sobresalientes: (1) impone a los partidos políticos la responsabilidad de estructurar e inspeccionar todos los procedimientos de naturaleza electoral a regir en los procesos eleccionarios; (2) que la formulación e implementación de ese mandato se logren mediante el consenso unánime de los partidos; y (3) que de ese proceso se ejerza la mutua fiscalización partidista.

Nuestra Constitución y la Ley Electoral admiten que la participación de los partidos políticos es esencial para el sistema democrático. Sin ella, difícilmente se podría poner en marcha en una elección el aparato oficial gubernamental. Como dijimos en *Dávila* v. *Secretario de Estado*, 83 D.P.R. 186, 193–194 (1960):

"Comenta Bruce que una de las lecciones severas a ser aprendidas en una democracia es que ningún mecanismo automático, mucho menos constituciones, cartas orgánicas y leyes pueden asegurar permanentemente la eficiencia y efectividad del gobierno por el pueblo. Para éste, muchas fuerzas deben ponerse en movimiento fuera de la estructura constitucional para efectuar la vital conexión entre el pueblo y sus organismos gobernantes. Es a través de partidos políticos que no solamente la opinión pública se traduce en acción, sino que un continuo enlace entre las autoridades gobernantes y los componentes del estado se mantiene. Los partidos siempre han estado fuera de la estructura del gobierno, sin embargo ellos han constituido su sangre, su carne y su sistema nervioso. Aparte de una conciencia pública sana y activa, aparte de la educación moral y política de un pueblo, aparte de los vehículos de publicidad, —prensa, radio, las plataformas,— que se combinan para mantener al pueblo unido e informado, un hecho se ha reconocido desde el principio como absolutamente esencial a una democracia eficiente: el partido político moderno."

Ahora bien, aun lo enorme de su importancia no desvirtúa el hecho de que los partidos políticos constituyen un medio y no un fin. El sujeto principal de la arquitectura moderna constitucional-electoral tutelado es el elector individual. El partido no es el elemento ultimador, sino un vehículo de expresión individual que se suma a otros para resultar y viabilizar la expresión colectiva ciudadana. Así, toda ley de actualidad regulatoria de la franquicia electoral se ha encaminado hacia el reconocimiento de la "prevalencia de los derechos electorales del ciudadano *sobre los derechos* y prerrogativas de *todos* los partidos y agrupaciones políticas". ([Énfasis del Juez Asociado Señor Negrón García.]) Art. 2.001(11) (16 L.P.R.A. sec. 3051(11)). Al final de cuentas, este derecho individual es el verdadero destinatario y receptor del sistema, por lo cual es

de incuestionable interés público salvaguardarlo contra las posibles injusticias que de vez en cuando el choque de intereses de los partidos puede generar. (Escolio omitido.)

██ Independientemente de la decisión política tomada en la Comisión Estatal, los que impugnan una elección deben tener derecho y, en el proceso de impugnación, capacidad para cuestionar dichas decisiones y tratar de demostrar que las mismas no son válidas por infringir la Constitución y las leyes. Únicamente con este enfoque es que puede cobrar virtualidad el proceso de impugnación. Bajo ese prisma no cabe pensar y menos decidir a base de criterios de la obligatoriedad de la regla de unanimidad o de falta de capacidad para invocar los derechos de los electores.[12]

## IV

El tribunal le negó capacidad al señor Granados Navedo para reclamar derechos de electores al resolver que solamente los ciudadanos que emitieron votos no adjudicados pueden recurrir a los tribunales a reclamar la vindicación de sus derechos. Además, razonó el magistrado que como los electores que eran parte en el litigio pendiente en el foro federal rehusaron ser partes en este pleito, el candidato no los podía representar.

---

[12] Nuestra posición no contradice la realidad de que los partidos políticos son consustanciales con nuestro sistema democrático y republicano de gobierno. *P.I.P. v. C.E.E.*, 120 D.P.R. 580 (1988), voto particular del Juez Presidente Señor Pons Núñez. Reconocemos que los partidos políticos son los vehículos de la voluntad electoral y, por ende, de la democracia misma. *García Passalacqua v. Tribunal Electoral*, 105 D.P.R. 49 (1976), opinión concurrente del Juez Asociado Señor Rigau. Ello no puede, sin embargo, usurpar, derogar e inutilizar los derechos constitucionales y estatutarios de los restantes integrantes del sistema, a saber, los electores y los candidatos. La prelación entre uno y otro derecho es obvia. Como recientemente se reiterara en *Board of Estimate v. Morris*, 489 U.S. 688, 693 (1989):

"As Daniel Webster once said, 'the right to choose a representative is every man's portion of sovereign power.'" Después de todo, las restricciones que se le imponen a los candidatos pueden violar la Constitución por su efecto derivativo sobre el derecho al voto. *Hutchinson v. Miller*, 797 F.2d 1279 (4to Cir. 1986).

El enfoque del tribunal es erróneo.([13]) Lo que el impugnador solicita es que se le reconozca su derecho a que se le adjudique los votos de estos electores a su favor. Es sólo para esos fines que el tribunal tiene que pasar juicio sobre si los electores individuales fueron indebidamente excluidos o no. Ese fue precisamente el mecanismo que aprobamos en *P.P.D. v. Admor. Gen. de Elecciones*, 111 D.P.R. 199 (1981). Allí, a los fines de adjudicar los derechos de los candidatos, fuimos caso por caso a examinar la situación particular de cada elector.

Aunque, ante planteamientos constitucionales, hemos permitido que una parte invoque derechos de terceros ausentes —*Noriega v. Gobernador*, 122 D.P.R. 650 (1988); *Pueblo v. Hernández Colón*, 119 D.P.R. 891 (1987); *E.L.A. v. P.R. Tel. Co.*, 114 D.P.R. 394 (1983); *Zachry International v. Tribunal Superior*, 104 D.P.R. 267 (1975)— en este caso no es necesario resolver este punto. El propio candidato ha manifestado que no interesa representar a los electores.

■ El tribunal erró al no reconocerle capacidad al candidato señor Granados Navedo para presentar el testimonio de sus electores y al no admitir la prueba documental que iba dirigida a demostrar que estos cuarenta y ocho (48) electores que votaron a favor del señor Granados Navedo fueron impropiamente excluidos. Estos electores aparentemente son parte del grupo de mil doscientos (1,200) electores inactivos que el señor Bauzá solicitó que se reinvestigara. Luego de explicar la situación factual, el tribunal resolvió que:

> La Junta Especial para determinar si las papeletas (todas recusadas) emitidas por personas que no aparecían en las

---

([13]) No estamos resolviendo que la Comisión Estatal debió haber hecho una expedición de pesca para buscar más electores capacitados en la lista de mil doscientos (1,200). Lo que resolvemos es que el candidato tiene el derecho a la oportunidad de demostrar en el juicio *de novo* que estos electores tenían derecho a votar y que sus votos deben adjudicarse a su favor. Le corresponde, entonces, al tribunal resolver ambas cuestiones.

listas oficiales fueron emitidas por elector con derecho o por ciudadano sin derecho a votar. La misma fue creada por unanimidad en el seno de la CEE y a ella se le encomendó la función de determinar si los votos fueron o no emitidos por electores[,] todo ello dentro del marco de la Ley.

Salvo candidatos independientes, las candidaturas a los diferentes escaños son presentados por los partidos políticos, artículos 4.001 y siguientes de la Ley Electoral. Los partidos políticos son los que tienen derecho a presentar o no candidatos para los distintos cargos electivos según lo determine el partido.

Existe una relación tan estrecha entre Comisionado, partido y candidato de ese partido que es forzoso concluir que existe un nexo vinculante entre el Comisionado o sus subalternos y el candidato, por ende las determinaciones unánimes a todos los niveles, piedra angular del sistema, obliga al candidato. Caso Núm. CE-89-30, *Exhibit* I, pág. 9.

Los candidatos tienen derecho a presentar la prueba testifical pertinente para demostrar que los acuerdos en éstos y otros casos individuales sobre los cuales las partes presenten prueba no eran válidos. Hay una relación de causa y efecto entre el reconocimiento de los derechos de los electores y los del candidato favorecido por sus votos.

## V

Se plantea si en la investigación y determinación del derecho a votar de los electores añadidos a mano hay que seguir el procedimiento adversativo establecido por la ley y por la jurisprudencia sobre recusación de un elector. Veamos.

El Art. 5.031 de la Ley Electoral, 16 L.P.R.A. sec. 3234, dispone que:

Todo elector o inspector que tuviere motivos fundados para creer que una persona que se presente a votar lo hace ilegalmente por razón de no ser la persona que dice ser, haber votado en otro colegio, estar inscrito en más de un colegio, tener una orden de exclusión en su contra, estar pendiente de adju-

dicación su derecho a votar en ese precinto, no ser ciudadano de los Estados Unidos de América y no tener la edad para votar, podrá recusar su voto por los motivos que lo hicieren ilegal a virtud de las disposiciones de este Subtítulo, pero dicha recusación no impedirá que el elector emita su voto. En el caso de recusación por edad, será deber del recusador traer consigo, y entregar a la Junta de Colegio, un certificado de nacimiento ·o acta negativa que indique la ausencia de edad para votar de dicho elector.

En el caso de la recusación por ausencia de ciudadanía será necesario que el recusador tenga consigo y entregue a la Junta de Colegio una Certificación del organismo competente indicando que el recusado no es ciudadano de los Estados Unidos de América.

Las papeletas de todo elector cuyo voto se recuse deberán marcarse al dorso con la palabra "recusado", seguida de una breve anotación firmada por la persona o el inspector del colegio que hace la misma, exponiendo la razón de tal recusación, el número de Tarjeta de Identificación Electoral de la persona afectada, el municipio, precinto y número de colegio electoral. Si el elector recusado niega su recusación, deberá hacerlo bajo su firma y juramento al dorso de las papeletas pero si no la negare su voto no se contará y será nulo. La Comisión enviará a cada Colegio de Votación un modelo de recusación para orientar a la Junta de Colegio de Votación, cómo cumplimentar una recusación.

Resolvimos en *P.P.D. v. Admor. Gen. de Elecciones*, supra, págs. 227–233, que:

La recusación es un entredicho contra la validez del voto. Si bien no lo anula de primera intención, su propósito es precisamente anularlo. Y porque se hace en el colegio de votación, en el momento en que el elector se propone recibir la papeleta electoral, marcarla y echarla en la urna, constituye una obstrucción de ese proceso a que el elector se ve sometido. Ello es irritante y en nada ayuda a mantener el clima de tranquilidad, paz y sosiego deseable en un momento de tanta trascendencia para el sistema democrático como lo es el momento en que el ciudadano va a expresar su voluntad.

La recusación de un elector tiene el resultado de violar la secretividad del voto, una de las condiciones que deben ser

garantizadas por ley conforme lo ordena el Art. II, Sec. 2 de la Constitución, tantas veces citado. Es así porque al recusarse a un elector ha de identificarse la papeleta en que vota, de manera que pueda luego descontarse su voto si a la postre se decidiese que debe anularse. La identificación se hace, según dispone la Ley Electoral en su Art. 5.034 (16 L.P.R.A. sec. 3234), de la siguiente manera: "La papeleta de todo elector cuyo voto se recuse deberá marcarse al dorso con la palabra 'Recusado', seguida de una breve anotación firmada por la persona o el inspector de colegio que hace la misma, exponiendo la razón de tal recusación, *el número de tarjeta de identificación electoral de la persona afectada,* el municipio, precinto y número de colegio electoral. Si el elector recusado niega su recusación, deberá hacerlo *bajo su firma y juramento al dorso de la papeleta,* pero si no la negare, su voto no se contará y será nulo". ([Énfasis del Juez Asociado Señor Irizarry Yunqué].)

Bajo el sistema mixto de votación dispuesto para las pasadas elecciones por la Ley Núm. 3 de 8 de septiembre de 1980, de colegio abierto por la mañana y cerrado desde las 3:00 de la tarde, se agudizó un poco más el problema para aquellos electores que no tenían una tarjeta de identificación electoral al presentarse a votar, aun si aparecían inscritos. En tal caso debían presentar una declaración jurada y, si se negaban a ello, se les recusaba, indicándose al dorso de la papeleta, entre otras cosas, *"el nombre del elector,* su número de identificación electoral", etc., y su voto no se adjudicaría en el escrutinio del Colegio. Ley Núm. 3 de 8 de septiembre de 1980, Sec. 9(a). La disposición se transcribe *in extenso* en *P.S.P., P.P.D., P.I.P.* v. *Romero Barceló,* supra, en la opinión disidente del Juez Asociado Señor Negrón García. La posibilidad de que el citado sistema mixto de votación se prestara a que se violara el derecho al voto secreto fue uno de los fundamentos de dicha disidencia. Véase escolio 14, *ante.*

Considerada la naturaleza fundamental del derecho al voto y el hecho de que la recusación ha de permitir que se conozca cómo vota el elector recusado, las disposiciones de ley que permiten y reglamentan la recusación, tanto en cuanto a los fundamentos en que pueda basarse como en cuanto al procedimiento para ello, deben ser de estricto cumplimiento. Sola-

mente así puede cumplirse la obligación constitucional de garantizar el derecho al sufragio "universal, igual, directo y secreto" y de proteger al ciudadano "contra toda coacción en el ejercicio de la prerrogativa electoral". Constitución, Art. II, Sec. 2.

. . . . . . . .

Finalmente, el elector debe tener amplia oportunidad de defender su voto. La Ley Electoral consagra entre los derechos y prerrogativas de los electores "garantía a cada persona del derecho al voto, igual, libre, directo y secreto". Art. 2.001, inciso 2 (16 L.P.R.A. sec. 3051(2)). Ello está en armonía con el mandato constitucional. Para que esa garantía sea efectiva, el elector cuyo voto se impugna debe tener derecho a contradecir la recusación, Art. 5.034 (16 L.P.R.A. sec. 3234), y a comparecer y ser oído en la vista en que se examine y pueda adjudicarse la procedencia de la recusación. A ese fin, debe ser citado con suficiente antelación y de manera efectiva. No debe bastar, a este efecto, un mero diligenciamiento negativo de una citación. Debe quedar demostrado que se hicieron esfuerzos razonables para notificarle. El valor de un voto no puede hacerse depender de unas diligencias incompletas que en ocasiones son hechas por personas que pudieran tener mucho interés en que dicho voto no se cuente.

Lo expresado no quiere decir que el elector no tenga obligaciones que cumplir para hacer valer su voto, una vez se le recusa. Ya nos hemos referido al Art. 5.034 de la Ley Electoral, 16 L.P.R.A. sec. 3234, que dispone la manera de recusar a un elector y que requiere que "[s]i el elector recusado niega su recusación, deberá hacerlo bajo su firma y juramento al dorso de la papeleta, pero si no la negare, su voto no se contará y será nulo". Conforme a esta disposición, el elector no puede cruzarse de brazos. Si no niega la recusación en el momento en que es hecha y ésta expone hechos que, de ser ciertos, constituyen motivo válido para anular su voto, éste no se contará y será nulo. (Énfasis en el original y escolios omitidos.)

La controversia ante nos es si dichas garantías procesales se debieron haber ofrecido a nivel de la Comisión Estatal a los electores que votaron bajo el procedimiento espe-

cial. El demandante recurrente insiste en que antes de rechazar los votos de los añadidos a mano la Comisión Estatal debió notificar mediante edicto, o de otra manera, a los votantes cuyas papeletas fueron rechazadas para oír sus argumentos, recibirlos y adjudicarlos. Como no lo hizo, alega que correspondía al tribunal brindarles esa oportunidad y oírlos como testigos. Caso Núm. CE-89-30, Solicitud de Revisión, pág. 14.

Por su parte, el candidato Acevedo y el Comisionado Electoral del P.P.D. sostienen que:

> Debemos señalar, por último, que contrario a lo que aduce el recurrente, el procedimiento para la adjudicación de papeletas de añadidos a mano no se rige por el procedimiento aplicable a papeletas recusadas que se adoptó en *Molina v. Barreto Pérez*, 110 D.P.R. 513 (1980); y en *P.P.D. v. Admor. Gen. de Elecciones*, 111 D.P.R. 199, 231–233 (1981). Reiteramos que el recurrente no planteó ante la Junta Especial ni ante la Comisión ni ante el Tribunal Superior la cuestión de si era necesario un proceso de índole adversativo para adjudicar y contar las papeletas de los añadidos a mano. Si fuese necesario ese proceso adjudicativo, cosa que negamos, el derecho de reclamarlo pertenecería exclusivamente a los electores afectados y no al recurrente, quien carece de capacidad jurídica para reclamar los derechos de terceros electores en este pleito de impugnación de elección. Alegato de los recurridos, pág. 46.

Tienen razón en su planteamiento de que esta cuestión no se le planteó oportunamente a la Comisión Estatal antes de certificarse el resultado de la elección. Tampoco se hizo una alegación clara y específica en la demanda de impugnación. Ello, unido al hecho de que concedemos el remedio solicitado en este recurso, a saber, que los electores afectados puedan testificar en el tribunal para sostener su derecho a votar y a que se les cuente su voto, sería suficiente para no resolver este punto. Pero para beneficio del tribunal de instancia y de las partes debemos sentar algunas directrices.

Un examen en conjunto de nuestra decisión en *P.N.P. y P.I.P. v. Rodríguez Estrada*, supra, del procedimiento para votar añadido a mano, etc., promulgado por todos los partidos políticos y del acuerdo post eleccionario que creó una junta especial para dilucidar el *status* de elector de estos votantes revela que en ningún momento se consideró concederle a estos electores la gama de derechos estatutarios y jurisprudenciales antes señalados. En todo momento se trató y se consideró esto como un procedimiento sui géneris.

Al considerar y validar la decisión de la Comisión Estatal, expresamos que:

Determinada la validez del método usado para la adopción de la propuesta de 1ro de octubre de 1988, nos resta determinar la legalidad del procedimiento en ella estipulado y la viabilidad práctica del mismo.

El señalamiento que a primera vista parecería tener más validez, no nos convence. Argumenta el Comisionado Electoral de P.P.D. que la recusación del elector es necesaria para poder implantar el acuerdo de referencia, que las causales de recusación están taxativamente provistas por el Art. 5.031 de la Ley Electoral de Puerto Rico, *supra*, y que la causa en este caso es *"no estar en las listas y poseer una T.I.E."* (tarjeta de identificación electoral), en cuanto a la cual nada dispone dicho Art. 5.031.

Nótese que la propuesta, según enmendada por el comisionado Meléndez *dispone que el "voto no se adjudicará en el colegio electoral"* y que una de las causales de recusación que establece el Art. 5.031 de la Ley Electoral de Puerto Rico, *supra*, es *"estar pendiente de adjudicación su derecho [el del elector] a votar en ese precinto . . .".* No es, pues, la causal de recusación la apuntada por el comisionado del P.P.D., sino la que se establece en el Art. 5.031, *supra*, puesto que el resultado del procedimiento aprobado es dejar pendiente de adjudicación el derecho del elector a votar en ese precinto.

Se aduce también que el procedimiento adoptado priva a los ciudadanos del derecho a recusar al elector por otras causales. No tiene tal consecuencia ese procedimiento. Adviértase que la única razón por la cual se puede invocar el mismo es que el

nombre del elector no aparezca en las listas electorales "*por error atribuible al organismo electoral*" y que, además, mediante la declaración jurada que se le exige, en efecto, el elector tiene que acreditar su capacidad para votar en el lugar en que pretende hacerlo. Si acredita esa capacidad mediante la declaración jurada, no existiría otra causal de recusación, de que se esté privando a los ciudadanos. (Énfasis suplido.) *P.N.P. y P.I.P. v. Rodríguez Estrada*, supra, págs. 502–503.

De su texto surge que nos referíamos al derecho sustantivo aplicable. No fijábamos pautas por no estar planteado y por ser prematuro, sobre el procedimiento a seguir.

No hay que devolver el caso a la Comisión Estatal para que inicie un procedimiento de notificación, vista y decisión en los mil doscientos (1,200) casos individuales. Los derechos se dilucidarán en el tribunal donde las partes deben establecer, por la preponderancia de la prueba, la capacidad de los electores para votar y que las decisiones de no adjudicar estos votos fueron erróneas.

## VI

*La doctrina de cosa juzgada y su aplicación al planteamiento sobre la validez de las papeletas con iniciales*

En su Sentencia Parcial de 17 de enero de 1989 el tribunal desestimó las alegaciones relacionadas con las papeletas en cuyos dorsos los electores escribieron iniciales y otras marcas. Para ello aplicó la doctrina de cosa juzgada y resolvió que entre este pleito y el que dio lugar a nuestra decisión en *P.N.P. v. Rodríguez Estrada, Pres. C.E.E.*, supra, existe indentidad de partes, de cosas y de causas. Específicamente resolvió que entre el P.N.P. (recurrente en el primer caso) y el candidato Granados Navedo (demandante en este caso) había tales vínculos de solidaridad por la identidad de interés entre el partido y el candidato que no había fundamento para descartar la doctrina. Al estar presentes los

otros requisitos, desestimó de plano esta parte de la acción.[14]

A los fines de resolver, reiteramos que "[l]a presunción de cosa juzgada no aplica inflexiblemente, cuando de hacerlo se derrotaría un principio de política pública o los fines de la justicia". *Piñero Crespo v. Gordillo Gil*, 122 D.P.R. 246, 257 (1988). Véanse: *P.I.P. v. C.E.E.*, 120 D.P.R. 580 (1988); *G.A.C. Fin. Corp. v. Rodríguez*, 102 D.P.R. 213 (1974); *Millán v. Caribe Motors Corp.*, 83 D.P.R. 494 (1961); *Pérez v. Bauzá*, 83 D.P.R. 220 (1961).

En *P.I.P. v. C.E.E.*, supra, págs. 603–606, abundamos al respecto de la forma siguiente:

> Examinemos primeramente una cuestión de orden procesal. Como expresáramos, el Tribunal Superior resolvió que aunque *P.I.P. v. E.L.A.*, supra, constituía cosa juzgada para efectos del presente caso, no debía aplicar la doctrina por razones de interés público. Actuó correctamente el tribunal a quo.
>
> Bajo un análisis rigurosamente civilista estaban presentes las identidades procesales necesarias para que prosperara la defensa. Ciertamente se cumplía el primer requisito, esto es, identidad de cosa u objeto. La cosa *es el "objeto o materia sobre la cual se ejercita la acción". Lausell Marxuach v. Díaz de Yáñez*, 103 D.P.R. 533, 535 (1975). Sólo la parte dispositiva de la sentencia pasa en autoridad de cosa juzgada al nuevo proceso. O sea, la declaración de que existe o no existe el derecho. E. Gómez Orbaneja, *Derecho Procesal Civil*, 7ma ed., Madrid, Artes Gráficas y Ediciones, 1975, Vol. 1, pág. 401.
>
> La cosa o el objeto en el presente pleito es exactamente el mismo que fue tema del primer pronunciamiento en *P.I.P. v. E.L.A.*, supra. Es decir, la constitucionalidad de la utilización de fondos públicos para llevar a cabo las primarias presidenciales autorizadas por la Ley Núm. 6 [de 24 de septiembre de 1979, según enmendada, 16 L.P.R.A. sec. 1321 *et seq.*].

---

[14] El tribunal inicialmente había anunciado que no iba a resolver a base de la doctrina de cosa juzgada y sí por la prueba que desfilara ante él. T.E., págs. 142–143. Los abogados del P.P.D. también habían expuesto en su memorándum que la doctrina de cosa juzgada no era aplicable. Luego, ante los planteamientos del Presidente de la Comisión Estatal, cambiaron de posición.

También está presente el requisito de identidad de causa. En *A & P Gen. Contractors* v. *Asoc. Caná*, 110 D.P.R. 753, 765 (1981), definimos la causa como "el motivo de pedir" o el *"fundamento capital, el origen de las acciones"*. En este caso el P.I.P. solicita un interdicto para que se prohíba el uso de fondos en la celebración de las primarias presidenciales que autoriza la Ley Núm. 6, *supra*, sobre la base de que tal uso infringe el Art. VI, Sec. 9 de la Constitución, *supra*. Idéntica alegación y pedimento contiene la demanda en el caso de autos.

Igualmente hay identidad de personas y legitimación. No hay controversia sobre que el demandante apelante en ambos pleitos, el P.I.P., es jurídicamente hoy el mismo que ayer. El hecho de que su Presidente Rubén Berríos Martínez representara al P.I.P. en el pleito anterior no es decisivo, ya que allí compareció como una parte nominal. *Mercado Riera* v. *Mercado Riera*, 100 D.P.R. 940, 949 (1972). En el pasado hemos adoptado un enfoque pragmático en la interpretación del requisito de identidad de partes para propósitos de la doctrina de cosa juzgada. Véase *Pol Sella* v. *Lugo Christian*, 107 D.P.R. 540, 549 (1978). También hemos utilizado el concepto de *"parte realmente interesada"*. El Estado Libre Asociado es la parte con verdadero interés en este pleito en defender la constitucionalidad del uso de fondos públicos para sufragar las primarias presidenciales autorizadas por la Ley Núm. 6, *supra*. No se quebranta dicha identidad porque en el lado pasivo de la demanda hoy figuren litigantes que no fueron parte en el primer pleito. *González* v. *Méndez et al.*, 15 D.P.R. 701, 718 (1909); *De León* v. *Colón*, 42 D.P.R. 22, 28 (1931); L. Prieto-Castro, *Tratado de Derecho Procesal Civil*, 2da ed. rev., Pamplona, Ed. Aranzadi, 1985, T. 1, pág. 800 *et seq.*

Por último, aunque la sentencia en *P.I.P.* v. *E.L.A.*, supra, fuera dictada por un tribunal dividido, la misma es final y concluyente entre las partes, por lo que constituye cosa juzgada en este pleito. *Junta Insular de Elecciones* v. *Corte*, 63 D.P.R. 819, 832–835 (1944).

No obstante lo anterior, en el pasado hemos reconocido límites a la doctrina, especialmente en aquellos casos que están permeados de consideraciones de orden público. *Pérez* v. *Bauzá*, 83 D.P.R. 220 (1961); *Millán* v. *Caribe Motors Corp.*,

83 D.P.R. 494 (1961); *Suárez Fuentes* v. *Tribunal Superior*, 88 D.P.R. 136, 151 (1963); *Feliciano Ruiz* v. *Alfonso Develop. Corp.*, 96 D.P.R. 108 (1968). Es de incuestionable interés público que este Tribunal pase juicio sobre la constitucionalidad de la nueva Ley de Primarias Presidenciales Compulsorias. Ante las circunstancias específicas que produjeron la decisión de *P.I.P.* v. *E.L.A.*, supra, y el hecho de que esta situación es capaz de repetirse, resolvemos que se sirven mejor los fines de la justicia si no aplicamos la doctrina de cosa juzgada a este caso. El Tribunal Superior, animado igualmente por consideraciones eminentemente prácticas, declaró sin lugar la defensa. Confirmamos su actuación. (Énfasis suplido y escolio omitido.)

Al igual que allí, aquí hay un interés público apremiante de que se ventilen finalmente los derechos del candidato, que se cuenten los votos válidamente emitidos y que se anulen aquellos emitidos ilegalmente. Para ello, hay que darle una oportunidad al elector de explicar las razones que tuvo para poner las referidas iniciales o marcas en su papeleta. Ello, de por sí, derrota la aplicación de la doctrina de cosa juzgada, independientemente del tenue vínculo procesal entre el candidato y su partido.[15]

Atendida la cuestión procesal, veamos los méritos del planteamiento sobre la validez de las papeletas con iniciales.

En *P.N.P.* v. *Rodríguez Estrada, Pres. C.E.E.*, supra, confirmamos la sentencia del Tribunal Superior mediante la cual se desestimó el recurso de revisión instada por el P.N.P., que impugnaba la decisión de la Comisión Estatal que anuló —en el recuento de la votación llevada a cabo en el Municipio de San Juan— aquellas papeletas que tuviesen en

---

[15] Consciente del posible planteamiento sobre cosa juzgada, en el esc. 11 de nuestra opinión adelantamos que, "[p]or prudencia judicial, en esta opinión no tratamos el tema de la certificación del candidato a Alcalde de San Juan, pues ello no está ante nos y, además, es objeto de un pleito separado presentado y pendiente de dilucidarse ante el Tribunal Superior". *P.N.P.* v. *Rodríguez Estrada, Pres. C.E.E.*, 123 D.P.R. 1, 39 (1988).

su parte posterior las iniciales del elector. Resolvimos, en primer término, que la Comisión Estatal tiene la facultad de anular papeletas que alegadamente contengan las iniciales del elector. Confirmamos la sentencia, ya que el partido recurrente no presentó ni probó sus alegaciones. En lo pertinente, señalamos que:

Si bien el voto está resguardado por una presunción de validez y de legalidad, *P.P.D. v. Admor. Gen. de Elecciones*, 111 D.P.R. 199 (1981), esa presunción no es pertinente al caso que nos ocupa. Obviamente, tal presunción se refiere a aquel voto emitido de modo regular, donde prima facie se haya acatado la ley. Mas cuando de la propia faz de la papeleta surge que la misma contiene alguna irregularidad que contraviene la ley y los reglamentos aplicables, no es procedente invocar dicha presunción. No se puede presumir lo que la simple vista niega. En estos casos la propia papeleta evidencia la irregularidad. Por lo tanto, es sobre el elector que recae el peso de la prueba en este caso. *Le corresponde a éste demostrar que actuó de buena fe y que fue inducido a error por la orientación confusa de los funcionarios de colegio.* Ello fue precisamente lo que los peticionarios declinaron hacer en la vista de este caso en el Tribunal Superior al renunciar a presentar prueba.

Resultaría, por otra parte, improcedente colocar sobre la comisión el peso de la prueba en los casos en que se invaliden o se anulen papeletas por el fundamento en cuestión, puesto que ello podría requerir de la C.E.E. tener que descorrer el velo de secretividad que cubre el ejercicio del voto de aquellos electores cuyas iniciales puedan ser compatibles con las que aparezcan en las papeletas. ¿Cómo saber si las iniciales J.P.R. estampadas en una papeleta corresponden a Juan Pérez Rodríguez o a José Pagán Rivera, o a cualquier otra persona con tales iniciales? Eso sólo lo conoce la persona que estampó las iniciales y aquella a quien podría ir dirigido el mensaje. De manera que, si se interpretara que el modo legal y constitucional de anular un voto *por este fundamento* es mediante la concesión de unas garantías procesales previas al elector cuyo voto fuera a anularse, tales como citación, oportunidad de ser oído, pruebas caligráficas, etc., tendrían que ser citados e interrogados todos los electores de ese colegio; no sólo aquellos

cuyos nombres puedan responder a las iniciales contenidas en la papeleta. Considérese que cualquier persona en el colegio pudo haber hecho marcas o iniciales en su papeleta aun cuando su nombre no concuerde con las mismas. Ello acarrearía, obviamente, el peligro de la pérdida de la secretividad del voto de esos electores. Por lo complicado y prolongado de la pesquisa podría hacerse inoperante la protección a la secretividad que garantiza la ley.

*De ahí que el elector o partido que impugne dicha anulación es al que le corresponde establecer o probar lo que a bien tenga para sostener o restituir la validez de su voto.* (Énfasis suplido y en el original.) *P.N.P. v. Rodríguez Estrada, Pres. C.E.E.,* supra, págs. 27–29.

Si bien dicha sentencia no impide, como cosa juzgada, la alegación del candidato, los criterios allí expuestos tienen fuerza de precedente. A ellos debe atenerse el tribunal de instancia al considerar y evaluar la prueba admisible que ofrezcan las partes.

Para concluir, en este asunto se presume que la decisión de la Comisión Estatal es válida. Le corresponde al afectado presentar la prueba que relata en sus alegaciones.

## VII

*Si proceden las enmiendas a las alegaciones solicitadas por el recurrente*

A los fines de una cabal comprensión del problema fáctico y jurídico involucrado, citamos íntegramente la decisión del Presidente de la Comisión Estatal que se impidió impugnar en instancia:

Se sometió a la consideración de la Comisión Estatal de Elecciones (CEE) la solicitud del Lic. Eudaldo Báez Galib, Comisionado Electoral del Partido Popular Democrático (PPD) a los efectos de que se anulen todas las papeletas consideradas durante el actual escrutinio del municipio de San Juan como votos "arrestados".

Sometida la cuestión planteada a votación, el Sr. Francisco González, Jr., Comisionado Electoral del Partido Nuevo Pro-

gresista (PNP), se opuso a la solicitud [*a contrario sensu*] solicitó, a su vez, que se adjudicaran dichos votos. El Lcdo. Hiram Meléndez Rivera, Comisionado Electoral del Partido Independentista Puertorriqueño (PIP), emitió su voto por escrito. Al no haber unanimidad de votos de los Comisionados Electorales en la decisión corresponde al Presidente adjudicar la controversia planteada.

En los Precintos 1, 2 y 3 del Municipio de San Juan hubo respectivamente 27, 46 y 17 casos de electores correspondientes a varias unidades electorales o centros de votación de dichos precintos que los funcionarios de colegio, a pesar de que incluyeron los nombres, así como, las circunstancias personales y electorales de los mismos en un listado especial, depositaron las papeletas votadas por esos electores en un sobre o grupos de sobres sin la identificación correspondiente. Como consecuencia de lo anterior, una vez, se determine si los electores en cuestión están o no cualificados para votar, es imposible determinar qué papeleta votada pertenece a qué elector.

Las papeletas, a que hemos hecho referencia no están mezcladas con las papeletas regulares de los elecotres cualificados que aparecían en las listas electorales y que votaron en los colegios donde ocurrió la situación ante nuestra consideración. Se desconoce el contenido de las papeletas en controversia, ya que las mismas no han sido escrutadas.

En cuanto al Precinto 4 (Residencial Nemesio Canales), por iniciativa de los coordinadores se abrió un colegio adicional "Colegio 8" y se autorizó a votar mediante el sistema de "añadidos a mano" a ciento diez y siete (117) electores. En este caso, no se cumplió con ninguno de los requisitos establecidos en el procedimiento autorizado, excepto que se verificó que el elector tenía la Tarjeta de Identificación Electoral y que no aparecía en las listas de exclu[i]dos.

Las papeletas votadas se depositaron en una urna y se hizo un escrutinio y adjudicación cuyo resultado arrojó una ventaja de aproximadamente diez y siete (17) votos para el candidato a José Granados Navedo.

Los nombres y circunstancias de los electores fueron inclu[i]dos en una lista especial. Los coordinadores que administraron este colegio adicional fundamentaron, su actuación en

que no tenían los materiales correspondientes para cumplir con el procedimiento establecido.

Como consecuencia de lo anterior, resulta imposible identificar el voto emitido por el elector con pleno derecho del elector inhabilitado para votar.

Los Comisionados Electorales acordaron que sólo se enviarían al colegio de los añadidos a mano cincuenta (50) sobres para colocar los de los electores que realizaron dicho procedimiento. Posteriormente al surgir problemas con la escasez de material los Comisionados Electorales directamente instruían a los funcionarios la forma de resolver dicha situación.

Los funcionarios y coordinadores de Colegio son seleccionados y adiestrados por los propios partidos políticos.

El Hon. Tribunal Supremo en el caso de *P.N.P. [y P.I.P.] v. Rodríguez Estrada*, 88-JTS-128 autorizó el voto de electores debidamente identificados con su tarjeta electoral, pero exclu[i]dos de las listas electorales por error atribuible a la Comisión cumpliendo con el procedimiento establecido a esos fines. Véase Anejo 1.

El procedimiento especial anteriormente mencionado establece en síntesis lo siguiente:

1. El reclamo del elector a nivel de la Junta de Unidad Electoral.

2. La búsqueda de dicho elector en las listas de precinto, colegio y en las listas de exclusiones legítimas para determinar si efectivamente el elector había sido dejado fuera de las listas electorales del día de las elecciones.

3. El otorgamiento de un boleto especial autorizando al elector a acudir al último colegio de votación para votar añadido a mano en una lista especial.

4. El entintado del elector, la prestación de una declaración jurada, la anotación en un sobre especial de todas las circunstancias personales y electorales del ciudadano votante, guardando allí las papeletas votadas por el elector, la perforación y retención de la Tarjeta de Identificación Electoral, finalmente, la entrega de las papeletas de votación con la salvaguarda de mantener dichas papeletas separadas y no adjudicar las mismas en el colegio electoral a los fines de verificar con posterioridad y durante el escrutinio general, la capacidad electoral del ciudadano votante mediante la investigación correspondiente en los expedientes y archivos de la Comisión.

El 29 de octubre de 1988 la Comisión adopta el "Procedimiento para votar añadido a mano en las Elecciones Generales 8 de noviembre de 1988, aquellos electores que reclamen su derecho al voto y no aparezcan en las listas oficiales de votación, conforme a lo establecido por el Honorable Tribunal Supremo en su decisión".

El Tribunal Supremo en su decisión al determinar la legalidad y viabilidad del procedimiento contemplado para permitir el voto de los electores añadidos a mano expresó y citamos:

"El señalamiento que a primera vista parecería tener más validez, no nos convence. Argumenta el Comisionado Electoral del P.P.D. que la recusación del elector es necesaria para poder implantar el acuerdo de referencia, que las causales de recusación están taxativamente provistas por el Artículo 5.031 de la Ley Electoral, [*supra*], y que la causal en este caso es 'no estar en las listas y poseer una T.I.E.[']'" (tarjeta de identificación electoral) la cual no está contemplada en dicho Artículo 5.031.

Nótese que la propuesta, según enmendada por el Comisionado Meléndez "contempla que el voto no se adjudicará en el colegio electoral" y que una de las causales de recusación que contempla ese Artículo 5.031 es "... estar pendiente de adjudicación su derecho (el del elector) a votar en ese precinto ...". No es pues la causal de recusación la apuntada por el Comisionado del P.P.D., sino la contemplada en el Artículo 5.031, puesto que el resultado del procedimiento aprobado es dejar pendiente de adjudicación el derecho del elector a votar en ese precinto.

Se aduce también que el procedimiento adoptado priva a los ciudadanos del derecho a recusar al elector por otras causales. No tiene tal consecuencia ese procedimiento. *Adviértase que la única razón por la cual se puede invocar el mismo es que el nombre del elector no aparezca en las listas electorales "por error atribu[i]ble al organismo electoral", y que además, mediante la declaración jurada que se le exige, en efecto, el elector tiene que acreditar su capacidad para votar en el lugar en que pretende hacerlo. Se acredita esa capacidad mediante la declaración jurada, no existiría otra causal de recusación, de que se est[é] privando a los ciudadanos."* [É]nfasis suplido.

El permitir que se cuente el voto de los electores en controversia equivaldría a que electores no cualificados para votar

puedan decidir una elección vulnerándose la voluntad de los electores cualificados para votar.

El procedimiento establecido va dirigido a garantizar la seguridad, integridad y secretividad del voto por lo que es de estricto cumplimiento.

De adjudicarse los votos de las papeletas en controversia le restarían ser[i]amente credibilidad y certeza [al] resultado electoral contraviniendo a lo expresado en la Constitución del Estado Libre Asociado y a la declaración de propósitos de la Ley Electoral.

La Ley Núm. 4 del 20 de diciembre de 1977 enmendada [y] conocida como la Ley Electoral de Puerto Rico no provee mecanismo alguno sobre la situación en controversia, ni podría contemplarse el que se permitiera a estos electores emitir su voto nuevamente, ya que se estaría actuando en contrave[n]sión a la Ley Electoral[, *supra*].

Por todo lo antes mencionado se anulan los votos emitidos por los electores añadidos a mano conocidos como "arrestados". Caso Núm. CE-89-30, *Exhibit* I, págs. 26–30.

Una vez se resolvió que el impugnador no tenía capacidad para cuestionar las decisiones unánimes ni para representar o reclamar los derechos de los electores, el demandante solicitó permiso para enmendar las alegaciones de su solicitud a los fines de solicitar que se adjudicaran las doscientas siete (207) papeletas denominadas "arrestadas".

El tribunal rechazó este pedido bajo el razonamiento siguiente:

Se nos solicita autorización para enmendar las alegaciones principalmente aquellas relacionadas con la solicitud de eliminar 2[,]557 papeletas ya adjudicadas.

Para mayor claridad transcribimos a continuación las partes pertinentes de esas alegaciones:

"De este grupo de 2[,]557 votos surge un margen de ventaja a favor del candidato del PPD de 325 votos, según consta de los propios documentos de la CEE. Ambas situaciones se encuentran en igual estado de 'contaminación' y por ello este Honorable Tribunal debe aplicar *el mismo criterio de invalidez para ambos grupos de papeletas.* ([É]nfasis suplido[.])

Esta 'contaminación' surge por la imposibilidad de identificar el voto emitido por el elector con pleno derecho, del voto emitido por el elector inhabilitado para votar."

"Permitir que se cuente el voto de las 2[,]557 papeletas 'contaminadas' equivaldría a que electores no cualificados para votar puedan decidir la elección mancillándose la voluntad de los electores con pleno derecho al voto."

"La anulación de los 2[,]557 votos equivaldría a que el candidato del PNP José Granados Navedo tenga que ser declarado como el candidato electo ya que le restaría la cantidad neta de 325 votos [al] candidato del PPD Héctor Luis Acevedo Pérez dándole una ventaja en esos momentos a José Granados Navedo de 296 votos."

Lo anterior es reproducido de las *alegaciones juradas por José Granados Navedo*. Las expresiones citadas no forman parte de la súplica. Están contenidas en la página 5 de la demanda jurada por José Granados Navedo. Se pretende ahora enmendar por los abogados las alegaciones juradas por su representado. Se arguye que se trata de alegaciones en la alternativa, normalmente ello es permitido pero, en casos como el presente en que las alegaciones tienen que ser juradas no puede permitirse alegaciones contradictorias que podrían propiciar la comisión de perjurio. La liberalidad en la interpretación de las alegaciones no nos puede llevar tan lejos.

Para sostener la solicitud de enmienda a las alegaciones la parte demandante arguye que procede la enmienda a las alegaciones en virtud de las disposiciones de la Regla 13.2 de Procedimiento Civil. La enmienda solicitada fue oportunamente objetada y no está basada en la prueba desfilada. No se trata aquí de que se haya sometido a juicio cuestiones no suscitadas en las alegaciones sino cuestiones contrarias a las alegaciones formuladas bajo juramento según lo requiere la ley. No estamos, pues, ante la situación contemplada en la Regla 13.2. No se nos solicita enmendar las alegaciones para conformarlas a la prueba, ya que no ha desfilado testimonio alguno que provea fundamentos para que se solicite dicha enmienda. M[á]s bien se trata de enmendar alegaciones para evadir el efecto que sobre ellas produce una sentencia parcial.

La liberalidad en la autorización de enmiendas no puede anteponerse a las disposiciones de la Ley Electoral que

exi[g]e la juramentación de la demanda y establece plazo para radicar la impug[n]ación de certificación, artículo 6.014.

Debemos considerar, adem[á]s, el hecho de que el presente procedimiento no es uno ordinario, sino más bien de naturaleza especial. La ley específicamente dispone que la demanda debe: 1) ser jurada; 2) contener alegaciones que de ser aprobadas cambie el resultado de la elección impug[nada,] y 3) ser radicada dentro de los diez días de la certificación. En otras jurisdicciones se ha resuelto que las enmiendas sustanciales deben someterse dentro del plazo que establece la ley. *HANSON v. GARLAND COUNTY ELECTION COM'N.*, 712 S.W.2d 288, (1986); *DURR v. WASHINGTON COUNTY*, 339 S.W.2d 444 [(1960)].

Los abogados del demandante, José Granados Navedo pretenden enmendar la demanda tardíamente, sin juramento y en forma conflictiva con sus alegaciones originales para conformarla con las alegaciones que previamente hiciera el mismo demandante en el caso Civil Núm. 88-2025 (JAF) ante la Corte de Distrito Federal para el Distrito de Puerto Rico.

Debemos señalar que a los ciudadanos que comparecieron como demandantes en el caso 88-2025 (JAF) en el foro federal se les notificó a través de sus abogados la disponibilidad del Tribunal de conceder la intervención en el presente pleito. Sus abogados tuvieron conocimiento del conflicto entre las alegaciones ante el foro federal y las planteadas en este pleito. Ello fue indicado en nuestra orden número 11, copia de la cual fue notificada a los abogados que radicaron la acción ante el foro federal.

No existe vínculo de solidaridad entre el PNP o su candidato y los electores que escribieron sus iniciales al dorso de las papeletas, *GRIFFIN v. BURNS*, 570 [F.2d] 1065 [(1er Cir. 1978)], no tienen los mismos derechos, ni los mismos intereses. Es obvio, al examinar las alegaciones de la demanda en este caso, que el interés del demandante no es el de proteger los derecho[s de] lo[s] electores, sino [el de] promover su candidatura, por ello solicitó se anularan 2[,]557 votos adjudicados. (Véase alegaciones transcritas).

A pesar de que dimos oportunidad para intervenir en el presente caso a los demandantes en el foro federal, éstos con el consejo de sus abogados, expresamente declinaron intervenir

para reclamar sus derechos electorales en este foro con las consecuencias que ello conlleve. *GRIFFIN*, *supra*. (Énfasis en el original.) Caso Núm. RE-89-67, *Exhibit* I, págs. 2–5.

█ Al analizar la cuestión no debemos olvidar que la Regla 13.1 de Procedimiento Civil, 32 L.P.R.A. Ap. III, establece la norma de que el permiso para enmendar las alegaciones "se concederá liberalmente cuando la justicia así lo requiera". Los tribunales tienen amplia discreción para conceder el permiso aun en etapas avanzadas del procedimiento. *Pérez Cruz v. Hosp. La Concepción*, 115 D.P.R. 721 (1984).

Examinemos la demanda para determinar, en primer término, si realmente estamos hablando de una enmienda a las alegaciones. El impugnador alegó que:

III. Por orden del Tribunal Supremo de Puerto Rico del 20 de octubre de 1988 ([*P.N.P. y P.I.P. v. Rodríguez Estrada*], 88 JTS 128) los electores a quienes se le[s] había emitido su tarjeta de elector permanente se les permitía votar sujeto[s] a ciertas condiciones que establecerían la el[e]gibilidad de cada elector. Esto obedecía a que un número de electores habían sido excluidos de las listas electorales porque alegadamente se habían mudado de sus residencias, o habían fallecido o que por alguna otra razón habían sido eliminados de las listas electorales.

Conforme a la determinación del Tribunal Supremo de Puerto Rico antes citada el elector que acudía a su colegio para ejercer su derecho al voto y no se encontraba en las listas electorales, se presentaba a un colegio electoral especial e informaba las razones por la[s] cual[es] defendía su derecho al sufragio y éstas se registraban en una tarjeta amarilla. En ese momento se añadía a mano el nombre del elector al final de la lista regular del colegio. El elector emitía su voto y luego esta papeleta se ponía en un sobre especial, suministrado por la CEE, conjuntamente con la evidencia que el elector presentó reclamando su derecho al voto. La CEE no emitió suficientes sobres para algunos de los colegios y en otros no se enviaron ningunos sobres.

Como resultado de dicha falta de sobres seis (6) unidades separadas improvisaron por acuerdo de los funcionarios, de la siguiente manera:

Cuando se acabaron los sobres para los votos de los electores, sujetos a la determinación de su el[e]gibilidad, se pusieron estos en un s[o]lo sobre donde las papeletas fueron separadas de la evidencia que acompañaba a la misma para determinar la el[e]gibilidad del elector. Como consecuencia de lo anterior 207 papeletas fueron colocadas en seis (6) sobres aparte de la evidencia que sometiese el elector en defensa de su el[e]gibilidad. Estas 207 papeletas fueron "arrestadas" y anuladas por la CEE por considerar que habían sido mezcladas de tal forma que no se podía diferenciar entre aquellos electores que tenían derecho a votar de aquellos que no lo tenían.

En catorce (14) otras unidades donde el número de sobres no fue suficiente para todos los electores a los que se les permitió votar añadidos a mano, sujeto a las restricciones impuestas por el Tribunal Supremo de Puerto Rico, los inspectores de los tres (3) partidos participantes en dichas elecciones (PNP, PPD, PIP), decidieron colocar estas papeletas en la urna utilizada generalmente por los electores que no tenían la obligación de establecer su el[e]gibilidad al voto. En dichas urnas se encuentran 2[,]557 papeletas mezcladas, de aquellos electores regulares que no tenían la obligación de cumplir con el mandato del Tribunal Supremo de Puerto Rico, con aquellas papeletas de electores que por la evidencia que presentaron etablecían su el[e]gibilidad al voto.

La condición de los 207 votos "arrestados" y no adjudicados en los sobres es idéntica a là condición de los 2[,]557 votos en las urnas adjudicados, por lo cual ambos grupos de papeletas votadas están igualmente "contaminadas". Esto es por un sinnúmero de papeletas de electores cuya el[e]gibilidad para ejercer el derecho al voto no ha sido ni podrá ser nunca establecida en ambas situaciones.

De este grupo de 2[,]557 votos surge un margen de ventaja a favor del candidato del PPD de 325 votos, según consta de los propios documentos de la CEE. Ambas situaciones se encuentran en igual estado de "contaminación" y por ello este Honorable Tribunal debe aplicar el mismo criterio de invali-

dez para ambos grupos de papeletas. Esta "contaminación" surge por la imposibilidad de identificar el voto emitido por el elector con pleno derecho, del voto emitido por el elector inhabilitado para votar.

Permitir que se cuente el voto de las 2[,]557 papeletas "contaminadas" equivaldría a que electores no cualificados para votar puedan decidir la elección mancillándose la voluntad de los electores con pleno derecho al voto.

La anulación de los 2[,]557 votos equivaldría a que el candidato del PNP José Granados Navedo tenga que ser declarado como el candidato electo ya que le restaría la cantidad neta de 325 votos [al] candidato del PPD Héctor Luis Acevedo Pérez dándole una ventaja en estos momentos a José Granados Navedo de 296 votos.

Como consecuencia de lo anterior queda establecido el requisito impuesto por el Artículo 6.014 (16 LPRA 3274) de la Ley Electoral al efecto de que los hechos alegados bastarían para cambiar el resultado de la elección. (Escolios omitidos.) Caso Núm. CE–89–30, *Exhibit* I, págs. 16–18.

En sus alegaciones de derecho sostuvo que:

[A l]os electores [les fue] negad[a] la igual protección de las leyes, ya que en algunos casos se contó el voto de electores inelegibles, mientras que el voto de electores elegibles fue inv[a]lidado. La exclusión de electores elegibles de la franquicia electoral está prohibida por la Constitución del ELA y la Ley Electoral de Puerto Rico, según enmendada por la Ley Número 35 de 30 de mayo de 1984.

Los actos de los demandados y sus representantes, han privado a los electores, al demandante y a todas otras personas en condiciones similares de sus privilegios e inmunidades garantizados por las leyes del ELA. Caso Núm. CE–89–30, *Exhibit* I, págs. 21–22.

Es en la súplica que se pide expresamente que se anule la adjudicación de dos mil quinientos cincuenta y siete (2,557) votos emitidos, los cuales se encuentran contaminados. De manera que, si se circunscribe a las alegaciones, se verá que su contención es que la decisión de no contar los votos arrestados viola el principio de uniformidad que rige la ley y niega

la igual protección de las leyes garantizada por nuestra Constitución. O sea, para que el tribunal considerara la legalidad de la decisión sobre los doscientos siete (207) votos arrestados era innecesario enmendar la demanda. Ya la materia y el planteamiento legal estaban incorporados allí. El problema con que se confrontaron el demandante y el tribunal es que la súplica se limitaba a pedir que no se adjudicaran los dos mil quinientos cincuenta y siete (2,557) votos contaminados. Al fracasar este intento es que reitera su contención de que los votos arrestados deben contarse al igual que los contaminados.(16)

En *Corrada v. Asamblea Municipal*, 79 D.P.R. 365 (1956), opinión del Tribunal emitida por el Juez Asociado Señor Saldaña, la Asamblea Municipal de Morovis declaró vacantes los cargos de tres (3) asambleístas. Rómulo Corrada y los otros dos (2) asambleístas presentaron una petición de *certiorari* ante el Tribunal Superior, la cual fue declarada con lugar. Al rechazar un planteamiento de que se había utilizado el procedimiento equivocado, reiteramos la norma uniforme de que son los hechos alegados y la prueba presentada, y no el título o súplica de la demanda, los que constituyen el fundamento determinante de la existencia de una causa de acción.

Bajo las circunstancias presentes y atendido el alto interés público del asunto, con sus ribetes constitucionales, mayor validez cobra el válido reclamo que hicimos en *Sánchez v. Eastern Air Lines, Inc.*, 114 D.P.R. 691, 694–695 (1983):

En *Santiago Cruz* v. *Hernández Andino*, 91 D.P.R. 709, 712 (1965), expresamos que la norma general de que en apelación

---

(16) Los demandados sostienen que hay una controversia de hecho sobre el número de votos contaminados y el número de electores no capacitados cuyos votos fueron adjudicados en este grupo. Los demandados tendrán la oportunidad de demostrar cuál es la realidad al respecto.

no resolveremos cuestiones no planteadas en primera instancia no es un dogma inquebrantable, que "la arcaica teoría de que un apelante nunca puede variar en apelación su teoría del caso . . . sólo constituye un ritualismo incompatible con la exigencia de fallar los casos en sus méritos". Véanse: *Piovanetti v. Vivaldi*, 80 D.P.R. 108, 122 (1957); *Morales Mejías v. Met. Pack. & Ware. Co.*, 86 D.P.R. 3 (1962); *Dávila v. Valdejully*, 84 D.P.R. 101, 104 (1961); *Coll v. Picó*, 82 D.P.R. 27, 38 (1960); Note, *Raising New Issues on Appeal*, 64 Harv. L. Rev. 652 (1951).

La Regla 43.6 de Procedimiento Civil, equivalente a la 54(c) federal, expresa que:

"Toda sentencia concederá el remedio a que tenga derecho la parte a cuyo favor se dicte, aun cuando ésta no haya solicitado tal remedio en sus alegaciones. . . ."

Tal regla no anula, por supuesto, las disposiciones de la 10.8, mas atiende el principio de hacer justicia a la luz de los hechos de cada caso y el derecho aplicable, aun cuando la teoría jurídica que se haya escogido esté equivocada.

El tribunal erró al no conformar dichas directrices con la norma básica de que se debe, por lo menos, tratar de que el litigante pueda reclamar que se llegue a un resultado justo.

Al reanudar el proceso, el tribunal deberá oír toda la prueba pertinente sobre la forma, la manera y las razones que hubo para que el proceso desembocara en el problema de los llamados votos contaminados y arrestados. Una vez el tribunal oiga a los funcionarios electorales que permitieron, siguieron o implantaron esta práctica irregular y sepa el número exacto de los electores afectados, incluso cuántos de los que votaron bajo el sistema de añadidos a mano tenían derecho a acogerse a dicho sistema, estará en posición de resolver si se deben contar o no todos los votos contaminados y los votos arrestados. Podrá, además, utilizar la Regla 29 de Evidencia, 32 L.P.R.A. Ap. IV. Al reanudar el juicio deberá oír prueba sobre la forma en que se compilaron las estadísticas que aparecen recogidas en el *Exhibit* 42, titulado *Estadísticas sobre status de los paquetes de materiales arrestados.*

Deberá prestarse particular atención a la explicación que ofrezcan los funcionarios de las unidades y de los colegios sobre las razones por las cuales en la Unidad 29 del Precinto 2 sólo aparecen veintiún (21) juegos de papeletas y ciento trece (113) récord de electores que votaron añadidos a mano, y en el Colegio 8 de la Unidad 3 del Precinto 4 sólo aparecen cincuenta y ocho (58) récord de los ciento diecisiete (117) casos de electores que votaron.

## VIII

*Votos de doble marca y otras alegaciones no adjudicadas por el tribunal*

El tribunal no adjudicó, por ser innecesario, las alegaciones sobre la validez de la decisión del Presidente de la Comisión Estatal que anuló quince (15) papeletas por contener éstas marcas dobles. Tampoco pasó juicio sobre la validez de una papeleta de candidatura (*write-in*) y una papeleta de un confinado.

Al recibir el mandato, el tribunal oirá la prueba pertinente sobre estas materias y hará la determinación pertinente.

## IX

*Conclusión*

Por las razones antes señaladas, el tribunal incidió al desestimar la demanda. Aparte de los fundamentos expresados en esta opinión en torno a los planteamientos específicos e individuales y el derecho electoral y constitucional que prevalece, la decisión de desestimar se aparta de la norma general que ve con ojos críticos la desestimación de un pleito sin que se diluciden en el juicio todas las alegaciones. Como hemos dicho en múltiples ocasiones, a los fines de disponer de una moción de desestimación tienen que to-

marse como ciertos los hechos bien alegados. *Ramos v. Marrero*, 116 D.P.R. 357 (1985); *First Fed. Savs. v. Asoc. de Condómines*, 114 D.P.R. 426 (1983). Únicamente se desestimará una acción si el promovente no tiene derecho a ningún remedio bajo cualesquiera hechos que él pueda probar en el juicio. *Candal v. C.T. Radiology Office, Inc.*, 112 D.P.R. 227 (1982).

## X

*Remedio a concederse*

De haber sido este un caso de derecho privado, no habría otra alternativa que la de revocar la sentencia desestimatoria, devolver el caso a instancia para que continúe el desfile de la prueba del demandante y la que estimen necesario ofrecer los demandados, y que el tribunal resuelva los méritos de la controversia.

Dada la situación procesal en que está este caso, ese es el remedio justo, adecuado y procedente. Aquí la parte promovente no tuvo, debido a las decisiones de instancia que hoy hemos revocado, la oportunidad de desfilar toda su prueba. Por otro lado, los demandados no han ejercido su derecho a contrainterrogar al señor Bauzá, a los otros testigos que pueda presentar el impugnador y a presentar su prueba. Estaríamos afectando el debido proceso de las partes —especialmente a Acevedo Pérez— si resolvemos el caso en sus méritos sin darle una oportunidad de presentar su prueba. La oportunidad de presentar prueba a su favor es uno de los elementos de debido proceso de ley antes de privar a una parte de un interés protegido constitucionalmente. J.E. Nowak, R.D. Rotunda y J.M. Young, *Constitutional Law*, 3ra ed., Ed. West Publishing Co., 1986, págs. 483–492.

La naturaleza del procedimiento obliga a los tribunales a permitirle al impugnador presentar toda la prueba y

los argumentos de derecho para probar que hay razones suficientes para cambiar el resultado de la elección. Si se controvierte la presunción de validez de la elección, el candidato certificado cuya elección se impugna tiene el derecho a demostrar, a base de la totalidad de la prueba testifical y documental, que la prueba no es suficiente ni se ha establecido como cuestión de derecho que se debe cambiar el resultado de la elección. Esto incluye probar sus defensas afirmativas(17) mediante la repregunta, sus propios testigos o prueba documental.

El tribunal de instancia es quien tiene que resolver, luego de oír la prueba y analizar el derecho aplicable, cuántos de los electores añadidos a mano que no se les contó su voto tenían derecho a votar por haber sido excluidos por razones atribuibles a la Comisión Estatal, si la Comisión Estatal erró en todos o en algunos de los casos en que anuló las papeletas con iniciales, si erró en la forma en que se adjudicaron las llamadas papeletas de doble marca, si hubo error al adjudicar las papeletas contaminadas(18) y cuántos de los denominados "votos arrestados" pertenecen a electores que no tenían derecho al voto. A los fines de atender el reclamo de uniformidad del impugnador, el tribunal deberá determinar las circunstancias y las razones por las cuales se tomaron las

---

(17) Entre las defensas afirmativas planteadas por los recurridos sobre la cual tendrían derecho a presentar prueba, está la de que aun de ser ciertos los hechos alegados en la demanda el demandante no podría prevalecer, ya que "el número de votos que debió adjudicarse a favor de Héctor Luis Acevedo Pérez [(candidato impugnado)] y no se hizo, supera el número de votos que según la demanda dejaron de adjudicarse en perjuicio del demandante José Granados Navedo". Defensa Afirmativa Núm. 2 de las Contestaciones a la demanda de los codemandados Eudaldo Báez Galib y Héctor Luis Acevedo.

(18) En estos casos deberá determinar cuántas de estas papeletas son de electores añadidos a mano que tenían el derecho a votar, cuántos estuvieron válidamente excluidos y cuántos eran electores regulares. Una vez haga el desglose de los votos de los electores regulares, los que tenían derecho a votar añadidos a mano y los que debieron haber sido excluidos, podrá determinar matemáticamente cómo este asunto afecta el resultado de la elección.

decisiones sobre las papeletas arrestadas y contaminadas que, de su faz, se apartan de las claras instrucciones y reglas adoptadas para regir el procedimiento de electores añadidos a mano. Una vez determine el número de electores afectados por la decisión de adjudicar o no los votos arrestados o contaminados, podrá resolver si los mismos son suficientes para cambiar el resultado de la elección.[19]

Ante el récord inconcluso ante nos, no podemos determinar si bajo el prisma de uniformidad debe darse un trato igual a ambas situaciones. No estamos en posición, en este momento, de decidir si se deben adjudicar todas las papeletas contaminadas y todas las arrestadas; si, por el contrario, no se debe adjudicar ninguna, o si es correcta la actuación de la Comisión Estatal de adjudicar las contaminadas y no adjudicar las arrestadas. Una vez el tribunal haga esta determinación podrá resolver si tiene ante sí suficientes elementos de juicio para decidir cuál de los dos (2) candidatos (Acevedo o Granados Navedo) resultó electo.

Además, si en este recurso adjudicamos la elección a uno de los candidatos u ordenamos una nueva elección estaríamos utilizando el mecanismo de sentencia sumaria de la Regla 36 de Procedimiento Civil, 32 L.P.R.A. Ap. III, sin el beneficio de la oposición de las partes contrarias. Ello a pesar de que los demandados reclaman ante nos que existen controversias sobre hechos esenciales.

Lo anterior, de ordinario, sería suficiente para darle finiquito a este asunto y devolver el caso a instancia para que atienda los méritos del recurso ante sí. Pero dado el interés público involucrado, y en consideración a que se ha traído ante nuestra atención dicha alternativa, debemos resolver si procede en este momento ordenar una nueva elección.

---

[19] De presentarse prueba al respecto, deberá determinar si hubo fraude en alguna parte del proceso y a quién es atribuible. Recuérdese que el fraude no se presume.

Reconocemos que por ser cada caso y controversia un prisionero de sus hechos y circunstancias particulares, no necesariamente son determinantes las expresiones o consideraciones que hemos utilizado en otros casos. Sin embargo, resultan persuasivas para este caso las expuestas por el compañero Juez Asociado Señor Negrón García, en su opinión concurrente, en *P.P.D. v. Admor. Gen. de Elecciones*, supra, págs. 328–329:

En cuanto a la alternativa de conceder una nueva elección, el razonamiento y motivos que animan esa recomendación, aunque loable, es contraria a la doctrina prevaleciente sobre el trasfondo circunstancial que imperativamente debe existir para tal remedio. Starr, *Federal Judicial Invalidation as a Remedy for Irregularities in State Elections*, 49 N.Y.U.L. Rev. 1092 (1974).

También vuelve a inyectar en el país las excitaciones, rivalidades y animosidades que caracterizan la contienda pública y tiende a perturbar la paz comunitaria, estabilidad y seguridad de las instituciones. Es un remedio extremo que implícitamente y por unanimidad este Tribunal declinó en abono de devolver al pueblo confianza, finalidad y tranquilidad en el proceso de las urnas —ante la impugnación de la certificación del cargo de Gobernador predicada también, entre otras, en el estrecho margen electoral— aún estando todos conscientes del siguiente escenario fáctico:

"No se puede debatir seriamente que el desarrollo de las recientes elecciones no estuvo a la altura deseada ni exento de muchas de las fallas que tradicionalmente, en mayor o menor grado, agobian y caracterizan el proceso. El estrecho margen de votos entre los partidos principales —en un sistema cuya ley y estructura no estaban diseñadas para esa eventualidad y un país cuya ciudadanía no estaba acostumbrada a ello— ha contribuido al desasosiego y malestar. La tardanza inevitable que implica la relevancia que entonces toman las irregularidades inevitables y naturales habidas en un proceso que conlleva la movilización, participación y decisión de más de un millón y medio (1,5000,000) de personas, y la importancia que a cada voto potencial determinado partido político le atribuye,

forman parte del medio ambiente, premisas intangibles y otros factores en que se debaten los reclamos de las partes en estos recursos. *Tomamos conocimiento judicial de que en estas elecciones hubo exclusiones indebidas de electores de las listas, dobles inscripciones, errores o falta de procesamiento en las solicitudes de transferencia de precinto y otras más. . . . P.S.P. v. Comisión Estatal de Elecciones, supra.*" (Énfasis en el original.)

En esta etapa del proceso no tenemos hechos suficientes para resolver que no podemos decidir cuál de los candidatos resultó electo, única alternativa que dispone el estatuto para ordenar una elección. Art. 6.015 de la Ley Electoral, *supra*.[20] Es al tribunal de instancia al que le corresponde la delicada y difícil tarea de resolver, luego de determinar cuáles y cuántos de los votos deben ser rechazados o adjudicados, si el demandante ha demostrado que los dictámenes a su favor cambian el resultado de la elección, si aun en la situación de que prevalezca parcialmente no se altera el resultado, o si por el contrario hay que acudir al remedio drástico

---

[20] Que dispone lo siguiente:

"La radicación ante el Tribunal Superior de una acción de impugnación del resultado de una elección, no tendrá el efecto de impedir que la persona sea certificada como electa y tome posesión del cargo y desempeñe el mismo. En el caso de los Senadores y Representantes, de haberse presentado a tiempo algún escrito de impugnación, no se certificará la elección del candidato impugnado hasta que el Tribunal resuelva dicha impugnación, lo cual se hará no más tarde del día 1ro. de enero siguiente a una elección general, o de los sesenta (60) días siguientes a la celebración de una elección especial.

"En el caso de una elección de candidato a cargos que no fuesen de Senador o de Representante, si se suscitare una impugnación parcial o total de la votación entre dos o más candidatos para algún cargo o cargos, y el Tribunal no pudiera decidir cu[á]l de ellos resultó electo, ordenará una nueva elección en el precinto o precintos afectados, la cual se celebrará de acuerdo a las normas reglamentarias que a tales efectos se prescriban." 16 L.P.R.A. sec. 3275.

Al decir el legislador que "no pudiera decidir" no se refiere al caso de un empate. Esto está dispuesto en el Art. 6.010 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3270, que establece, en lo pertinente:

"En caso de empate entre dos o más candidatos, la Comisión procederá a llevar a cabo una nueva elección entre los candidatos empatados que hubieren obtenido el mayor número de votos."

de ordenar una nueva elección. Pasemos a la experiencia estatal en estos asuntos.

Como norma general, se ha resuelto en la mayoría de las jurisdicciones estatales de Estados Unidos que, en casos de impugnación, se concederá el remedio de una nueva elección únicamente cuando ocurran irregularidades de tal naturaleza que impidan determinar con certeza cuál fue el resultado de la elección. A tenor con esta norma, una de las instancias en que se ha determinado que procede una nueva elección es aquella en que se han rechazado o anulado votos legales o se han emitido y contado votos ilegales en cantidad suficiente para variar el resultado de la elección, y que debido a esto dicho resultado no concuerda con la voluntad del electorado o dicha voluntad no puede determinarse debido a la incertidumbre que rodea todo el proceso.

Por el contrario, se ha resuelto que en casos en que pueda determinarse con certeza cuál fue la voluntad del electorado o cuál fue el candidato con mayor número de votos legales, no habrá de ordenarse una nueva elección aun cuando hubiese habido irregularidades durante el proceso.

Dado el hecho de que la determinación de si procede o no una nueva elección ha de tomarse caso a caso, y luego de un examen de la totalidad de las circunstancias de cada caso en particular, *Rizzo v. Bizzell*, 530 So. 2d 121, 128 (1988); *In Re 1984 Maple Shade General Election*, 497 A.2d 577, 592 (N.J. 1985), pasemos a analizar una serie de casos representativos de las distintas jurisdicciones estatales.

En *In Re 1984 Maple Shade General Election*, supra, caso en que catorce (14) electores no pudieron ejercer su derecho al voto por irregularidades con las máquinas de votación durante el proceso, el Tribunal Superior de Nueva Jersey resolvió, luego de examinar la totalidad de las circunstancias, que el número de electores legales rechazados era suficiente para variar el resultado de la elección, por lo que era necesario dejar sin efecto dicha elección y ordenar una

nueva elección. Señaló el tribunal que no era necesario probar a favor de quién se habrían emitido estos votos. Véase *Application of Moffat*, 361 A.2d 74 (N.J. 1976).

En *Buonanno v. Distefano*, 430 A.2d 765 (R.I. 1981), el Tribunal Supremo de Rhode Island resolvió que procedía la celebración de una nueva elección, ya que debido al mal funcionamiento de las máquinas de votación existía una gran probabilidad de que los resultados de la elección no reflejasen la voluntad del electorado y que los mismos podían haber sido distintos de no haber sido por las irregularidades ocurridas. Esta nueva elección estaría limitada a los distritos donde ocurrieron las irregularidades.

En *O'Neal v. Simpson*, 350 So. 2d 998 (1977), se resolvió que dado el hecho de que alrededor de setenta (70) votos de un precinto tuvieron que ser anulados, dichos votos ilegales eran suficientes para variar el resultado de la elección, ya que la diferencia entre los candidatos fue de doce (12) votos, por lo que procedía la celebración de una nueva elección. Se descartó la alternativa de no contar los votos de ese precinto, pues la misma tendría el efecto de privar del derecho al voto a un gran número de electores legales.

En *Application of Bonsanto*, 409 A.2d 290 (N.J. 1979), la división apelativa del Tribunal Superior de Nueva Jersey revocó una sentencia sumaria dictada a favor del candidato ganador. El tribunal resolvió que existía controversia de hechos en cuanto a la legalidad de ciertos votos y que los mismos, de ser ilegales y excluidos, hubiesen variado el resultado de la elección. El tribunal señaló que cuando las irregularidades sean de tal naturaleza que impidan determinar con certeza quién recibió la mayoría de los votos legalmente emitidos, la elección debe anularse.

En *Akizaki v. Fong*, 461 P.2d 221 (Haw. 1969), el Tribunal Supremo de Hawaii resolvió, al revocar al tribunal de instancia, que debido a que se habían mezclado votos ausentes válidos con votos ausentes inválidos no había manera de deter-

minar cuál fue el resultado de la elección, por lo que procedía la celebración de una nueva elección. Señaló el Tribunal que la determinación del tribunal de instancia de no contar ninguno de los votos ausentes, para así eliminar los diecinueve (19) votos ausentes ilegales, tendría un efecto demasiado drástico sobre el derecho de los electores que votaron válidamente.

En *McCavitt v. Registrars of Voters of Brockton*, 434 N.E.2d 620 (1982), donde siete (7) votos de electores ausentes que no cumplieron sustancialmente con el procedimiento prescrito por ley para votos ausentes fueron incluidos en el total de votos emitidos, existía duda de cuál era el verdadero resultado de la elección, por lo que procedía la celebración de una nueva elección.

En *Ippolito v. Power*, 241 N.E.2d 232, 233–234 (1968), donde el margen de victoria fue de únicamente diecisiete (17) votos y alrededor de cien (100) votos no eran válidos debido a irregularidades en el proceso, la Corte de Apelaciones de Nueva York expresó, al confirmar la decisión de conceder una nueva elección, que:

> While it is troubling to require new election for irregularities without evidence of fraud or other intentional misconduct, ignoring such irregularities would undoubtedly create the likelihood that skillfully manipulated "irregularities" would be used to mask corrupt practices. It is better to keep the standards high, even at the cost of penalizing some voters and candidates for the failures of election inspectors, than to increase the opportunities for fraud without possibility or likelihood of discovery. And the statute is explicit in directing that irregularities, as well as fraud, may justify the direction of a new election.

No obstante, en *Rizzo v. Bizzell*, supra, aun cuando hubo una serie de violaciones a estatutos e irregularidades en el proceso, la Corte Suprema de Mississippi resolvió que no era necesario celebrar una nueva elección, ya que podía determi-

narse con certeza cuál había sido la voluntad de los electores. El Tribunal encontró probado que, aun cuando se descalificaran los votos ilegalmente emitidos, el resultado de la elección no habría de variar. A su vez, las irregularidades ocurridas, aunque serias, no ameritaban una nueva elección dado el balance de intereses involucrados.

Así mismo, en *Matter of Levens*, 702 P.2d 320 (Kan. 1985), el Tribunal Supremo de Kansas dispuso que no debe anularse una elección a menos que se demuestre que el resultado de la misma es contrario a la voluntad del electorado, o que dicha voluntad no puede determinarse con certeza debido a las irregularidades o incertidumbres del proceso. El Tribunal devolvió el caso a instancia para que se determinara si el voto en controversia era o no un voto ilegal y si tenía el efecto de variar el resultado de la elección.

En *Miller v. Hill*, 698 S.W.2d 372 (1985), se resolvió que en una elección donde se han emitido votos ilegales, el candidato que impugna debe probar la existencia de votos ilegales en la elección impugnada y que el resultado habría sido distinto y correcto de no haberse contado esos votos. El Tribunal encontró que el tribunal de instancia abusó de su discreción al determinar que el número de alegados votos ilegales afectó el resultado de la elección y al ordenar una nueva elección, ya que no existía evidencia alguna de la existencia de estos alegados votos ilegales.

En *Application of Moffat*, supra, el Tribunal señaló que cuando la impugnación se fundamenta únicamente en que se han recibido votos ilegales, el candidato que impugna debe demostrar no sólo que los votos eran suficientes para variar el resultado de la elección, sino también demostrar, en lo posible, a favor de quién se emitieron. De probarse a favor de quién se emitieron los votos ilegales, prevalecería la impugnación y, al restarse esos votos, no habría necesidad de ordenar una nueva elección. Véase *LaCaze v. Johnson*, 310 So. 2d 86 (1974). Esto podría probarse con el testimonio de los elec-

tores que emitieron votos ilegales, que a diferencia de los electores válidos a quienes no se les puede obligar a revelar por quién votaron, no les cobija este derecho. *McCavitt v. Registrars of Voters of Brockton,* supra; *O'Neal v. Simpson,* supra.

En estos casos, en ausencia de fraude no es suficiente que el candidato derrotado demuestre que se adjudicaron votos emitidos ilegalmente, sino que se requiere que pruebe afirmativamente a favor de quién fueron adjudicados y demuestre así que la anulación de éstos cambiaría el resultado de la elección. Ello podría probarse con el testimonio de los electores que votaron de forma ilegal. A éstos, contrario a lo que sucede con los electores plenamente capacitados, no les cobija el derecho a mantener en secreto su voto. De no cumplirse con lo anterior, la impugnación no procede aun cuando se haya establecido que en la elección se adjudicaron votos emitidos ilegalmente. *A contrario sensu,* de cumplir el candidato impugnador con los requisitos indicados, se reducirán dichos votos en la proporción correspondiente. Esta norma responde al interés público apremiante de impartir finalidad, estabilidad y certeza al proceso electoral.

El Art. II, Sec. 2 de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, consagra el derecho al sufragio universal, igual, directo y secreto. Como medida procesal para garantizar dicha secretividad, la Regla 29 de Evidencia, *supra,* establece el privilegio de no divulgación del voto político. Dicha regla dispone:

> Toda persona tiene el privilegio de no divulgar la forma en que votó en una elección política, a menos que se determinare que dicha persona hubiera votado ilegalmente. 32 L.P.R.A. Ap. IV, R. 29.

En torno al alcance de este privilegio, señala el Prof. Ernesto L. Chiesa:

. . .[E]l alcance del privilegio, más que de la regla 29 ó de la propia Ley Electoral, depende del derecho constitucional, pues se trata de un privilegio de rango constitucional. Artículo II, Sección 2 de la Constitución del Estado Libre Asociado de Puerto Rico. Se ha entendido que este privilegio no es más que un corolario del principio constitucional de la secretividad del voto. De poco serviría la secretividad del voto al momento de su emisión en las urnas, si posteriormente el elector votante quedara obligado a revelar cómo votó. La excepción relativa al voto ilegal es evidente. Las consideraciones de política pública . . . no están presentes para el caso del voto ilegal. Sin embargo, el *votante ilegal* podría invocar el privilegio contra la autoincriminación bajo las circunstancias apropiadas. (Énfasis en el original.) E.L. Chiesa, *Práctica Procesal Puertorriqueña: Evidencia*, San Juan, Pubs. J.T.S., 1984, Vol. I, Cap. V, pág. 134.

A tenor con lo dispuesto en dicha regla, ningún elector que haya emitido su voto legalmente puede ser obligado a testificar en corte con relación al contenido de su voto. Ahora bien, si el elector emitió su voto de manera ilegal, dicho privilegio no le es de aplicación, por lo que sí podría presentarse prueba en cuanto al contenido de su voto. Por lo tanto, en un caso como el de autos, en que se impugna la certificación de un candidato por irregularidades en el proceso —que incluyen la adjudicación de votos emitidos ilegalmente— sería admisible el testimonio de los electores que votaron ilegalmente para probar a favor de quién se emitieron dichos votos ilegales. Esto siempre y cuando el elector no reclame válidamente el privilegio a la no autoincriminación.

Igual norma han adoptado las jurisdicciones estatales de Estados Unidos que poseen un privilegio de no divulgación del voto similar al nuestro. Allí se ha resuelto —en casos de impugnación de la certificación de un candidato electoral en que se han adjudicado votos emitidos ilegalmente— que de establecerse la ilegalidad del voto los tribu-

nales pueden obligar al elector que votó ilegalmente a testificar a favor de quién emitió su voto. De esta forma puede cumplir el candidato impugnador con el requisito de probar que se adjudicaron votos ilegales suficientes para variar el resultado y a favor de quién se emitieron los mismos. *Matter of Levens*, supra, pág. 325; *McCavitt v. Registrars of Voters of Brockton*, supra, pág. 629; *Belcher v. Mayor of City of Ann Arbor*, 261 N.W.2d 56, 58 (1978); *O'Neal v. Simpson*, supra; *Application of Moffat*, supra, pág. 78; *Application of Murphy*, 243 A.2d 832, 835 (1968); *In Re Sugar Creek Local School District*, 185 N.E.2d 809 (1962); *Oliphint v. Christy*, 299 S.W.2d 933 (1957).

■ También se ha permitido, en algunos casos, que cualquier persona con el conocimiento necesario (*requisite knowledge*) pueda testificar a favor de quién votó el elector. *Matter of Levens*, supra, pág. 325. Por último, se ha resuelto que es admisible también evidencia circunstancial, mediante la cual pueda justa y razonablemente inferirse a favor de quién se emitieron dichos votos. Entre las circunstancias a tomar en consideración están la afiliación partidista del elector, la relación entre éste y el candidato, o la relación entre el elector y otras personas activamente interesadas en adelantar la causa de algún candidato. *Application of Murphy*, supra, págs. 835–836. Véase, además, 26 Am. Jur. 2d 348.

■ Por otro lado, en circunstancias en las que se han anulado votos de electores debidamente cualificados, la norma general esbozada por los diferentes tribunales estatales exige un criterio de prueba menos riguroso. En estas situaciones sólo se exige que el candidato derrotado demuestre que el número de votos anulados es suficiente para variar el resultado de la elección de haberse emitido éstos a su favor. Es decir, cuando de estos casos se trata, no es necesario que el candidato impugnador demuestre afirmativamente a

favor de quién dichos votos fueron emitidos. Sólo se requiere que pruebe que de haberse adjudicado los mismos el resultado pudo haber sido diferente. Obviamente ello presupone que dichos votos fueron indebidamente anulados. *In Re 1984 Maple Shade General Election*, supra; *Rizzo v. Bizzell*, supra; *Buonanno v. Distefano*, supra; *O'Neal v. Simpson*, supra; *LaCaze v. Johnson*, supra; *Application of Murphy*, supra. Por ser compatibles con nuestro derecho electoral, adoptamos las referidas normas estatales.

Aunque no son obligatorias, resultaría beneficioso para el tribunal de instancia examinar las diferencias de enfoque que hay en las cortes federales, dependiendo de si hay un *patent and fundamental unfairness* o se trata de un *garden variety election disputes*. Véanse: *Curry v. Baker*, 802 F.2d 1302 (11mo Cir. 1986); *Griffin v. Burns*, 570 F.2d 1065 (1er Cir. 1978); *Hutchinson v. Miller*, 797 F.2d 1279 (4to Cir. 1986). En ese foro, el análisis está regido por principios de equidad. *Soules v. Kauaians for Nukolii Campaign Committee*, 849 F.2d 1176 (9no Cir. 1988).

Como criterio común, al resolver el tribunal debe también tener en mente que "no toda irregularidad en el proceso electoral puede dar lugar a la confiscación del voto. Para que esto suceda, la irregularidad debe ser de tal naturaleza que afecte la justedad e igualdad del proceso electoral". *P.P.D. v. Admor. Gen. de Elecciones*, supra, pág. 241.

## XI

*Epílogo*

Hoy hemos revocado, por unanimidad, la sentencia desestimatoria objeto de este recurso. Estamos de acuerdo en que el juez de instancia erró en su análisis de los derechos consti-

tucionales, electorales y procesales aplicables.[21] No hay diferencia sustancial entre los miembros del Tribunal sobre los fundamentos que justifican dicho resultado, incluso sobre la naturaleza del juicio *de novo* y las normas y criterios que deben guiarnos al analizar el procedimiento de impugnación de una elección. De haber alguna diferencia, estimamos que mayormente es de énfasis en el análisis de los problemas y en las normas a seguir.

La diferencia obvia es en la contestación a las interrogantes de "¿por qué?" y "¿para qué?" se devuelve el caso al tribunal de instancia. La mayoría entiende que, ante un juicio inconcluso en el que el impugnador no pudo presentar toda su prueba y los demandados no han tenido oportunidad de presentar la suya, el único método adjudicativo justo y viable es devolver el caso a instancia para que sea allí donde se hagan las determinaciones de hechos procedentes y se resuelvan todas las cuestiones de derecho a tenor con las normas aquí expuestas y las que pueda el tribunal entender aplicables.

No podemos descartar la posibilidad de que, aun después de oír toda la prueba, el tribunal de instancia y nosotros tengamos que ordenar una nueva elección. Ello debido al problema de los votos "contaminados y arrestados". Pero ese riesgo no nos autoriza a incurrir en el peligro mayor de adjudicar el pleito sin tener ante nos la totalidad de los hechos y de las circunstancias. No debemos ni podemos convertirnos en un tribunal de jurisdicción original para ventilar todas las controversias y, menos aún, adjudicar un gran número de

---

[21] No empece lo anterior, tenemos que reconocer que muchos de los planteamientos que tuvo ante sí son noveles. El tribunal a quo actuó con un sentido de responsabilidad ejemplar. Uno de los problemas es que las partes trataron de utilizar en el tribunal el control partidista que predomina en la Comisión Estatal. Véase, sobre este aspecto, a S. Quiñones García, *Los antecedentes de la distribución interpartidista del poder en la estructura administrativa de la Comisión Estatal de Elecciones*, LVII (Núms. 3–4) Rev. Jur. U.P.R. 317 (1988).

votos individuales sin que las partes hayan tenido la oportunidad de rebatir las determinaciones que al respecto hace la disidencia.

Nos preocupa a todos el tiempo que pueda tomar el juicio *de novo* en instancia. Pero entendemos que las partes y el juez pueden tomar sabias y atinadas medidas para aligerar los procedimientos. Al establecer hoy las normas a seguir, se evita el dedicar tiempo precioso a las cuestiones de derecho.[22] Por otro lado, como bien señala la disidencia, toda o la mayor parte de la prueba documental son documentos públicos. Claramente los abogados deben estipular su admisibilidad para luego orientar al tribunal sobre su efecto a base de la prueba testifical y del derecho aplicable.

Sin menoscabar sus responsabilidades éticas y profesionales, los abogados de las partes pueden estipular gran parte de la prueba testifical u ofrecerla como prueba acumulativa.[23]

Para evitar dilaciones, el tribunal debe reagrupar las partes a los fines de establecer que un solo abogado por grupo pregunte o plantee las cuestiones de derecho.[24]

Para terminar, al devolver el caso a instancia sólo nos guía el principio rector de que no debemos apartarnos del procedimiento estatuido para que, a fin de cuentas, se haga una determinación correcta que refleje fiel y finalmente la intención y votación de todo el electorado del Municipio de San Juan. Después de todo, "[l]o vital es el triunfo de la de-

---

[22] En la transcripción de evidencia del juicio hay centenas de páginas dedicadas a argumentos legales y a la admisibilidad de la evidencia, lo cual no podrá repetirse.

[23] Por ejemplo, el testimonio de los funcionarios electorales.

[24] Es obvio que los demandantes Granados Navedo y el Comisionado Electoral señor González están en un solo grupo. Por los demandados, el licenciado Acevedo Pérez y el Comisionado Electoral señor Báez Galib son una sola parte. El Presidente de la Comisión Estatal es mayormente una parte nominal cuya participación en el proceso del desfile de la prueba no debe ser muy extensa.

mocracia en todos los lugares de Puerto Rico". *Santos v. Comisión Estatal de Elecciones,* 111 D.P.R. 351, 356 (1981).

*Se dictará sentencia de conformidad.*

El Juez Presidente Señor Pons Núñez emitió opinión concurrente y de conformidad, a la cual se une el Juez Asociado Señor Hernández Denton. La Juez Asociada Señora Naveira de Rodón emitió opinión concurrente y de conformidad, a la cual se une el Juez Asociado Señor Hernández Denton. El Juez Asociado Señor Alonso Alonso emitió opinión concurrente y de conformidad. El Juez Asociado Señor Rebollo López emitió opinión concurrente y disidente. El Juez Asociado Señor Negrón García emitió opinión disidente.

—O—

Opinión concurrente y de conformidad del Juez Presidente Señor Pons Núñez, a la cual se une el Juez Asociado Señor Hernández Denton.

Estamos conformes con la opinión del Tribunal en el presente caso, mediante la cual se devuelve el caso al tribunal de instancia para ofrecer la oportunidad al recurrente José Granados Navedo y al recurrido Héctor L. Acevedo de presentar ante dicho tribunal —de acuerdo con las reglas allí expuestas— la prueba que tengan para sustentar sus alegaciones. Deseamos, sin embargo, señalar nuestra particular inquietud sobre los siguientes aspectos.

En primer lugar, nos preocupa especialmente la situación referente a las llamadas *papeletas arrestadas.* No solamente se trata de una mezcla de papeletas y de documentos acreditativos del derecho a votar de los electores, sino que además se da la circunstancia de que en un colegio existen más papeletas que electores (Unidad 3 del Precinto 4) y, en otro, más electores que papeletas (Unidad 29 del Precinto 2). Ante esta situación, deben realizarse todos los esfuerzos posibles por

obtener una explicación para lo sucedido y fijar las responsabilidades que pudieren corresponder, pues la situación apunta hacia una de las prácticas más lesivas a la integridad del proceso electoral. Nadie debe beneficiarse de las mismas ni de la imposibilidad de adjudicar los votos que esta situación puede acarrear.

En segundo lugar, no podemos aceptar como alternativa viable la celebración de una nueva elección general. Nuestro criterio es que dicho remedio es contrario a lo vislumbrado por la Asamblea Legislativa —para la situación a que nos enfrentamos— al adoptar el Art. 6.015 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3275. En dicho artículo expresamente se dispone, en lo pertinente, que "si se suscitare una *impugnación parcial o total* de la votación entre dos o más candidatos para algún cargo o cargos, *y el Tribunal no pudiera decidir cu[á]l de ellos resultó electo, ordenará una nueva elección en el precinto o precintos afectados . . .*". (Énfasis suplido.) Es, por tanto, una elección limitada en el precinto o precintos afectados lo previsto por la Asamblea Legislativa para situaciones como parece ser la presente. Adviértase que la Ley Electoral de Puerto Rico *dispone una nueva elección general sólo en casos de empate*. Véase el Art. 6.010 de la Ley Electoral, 16 L.P.R.A. sec. 3270. Esa no es la situación planteada en este caso.

Adicionalmente, entendemos que una elección general en San Juan tendría un efecto devastador, porque representaría la anulación de los votos (*disenfranchisement*) de más de doscientos mil (200,000) electores que el 8 de noviembre de 1988 acudieron a las urnas a ejercer válidamente la franquicia electoral, todo ello como consecuencia de errores o irregularidades de las cuales no pueden ser responsabilizados. Además de privar del voto a aquellos que lo emitieron válidamente el 8 de noviembre de 1988, y que por las razones que fueren no puedan acudir a emitirlo en la nueva elección, dicho proceso requeriría otra vez la movilización de más de

doscientas mil (200,000) personas que ya ejercieron válidamente su voto e "inyectar[ía] en el país las excitaciones, rivalidades y animosidades que caracterizan la contienda pública y tiende a perturbar la paz comunitaria, estabilidad y seguridad de las instituciones". *P.P.D. v. Admor. Gen. de Elecciones*, 111 D.P.R. 199, 329 (1981), opinión concurrente del Juez Asociado Señor Negrón García.

Reconocemos que una elección limitada en ciertos precintos electorales acarrea también problemas precisamente como resultado del pequeño número de electores que tendrían derecho a acudir a la misma. Puede válidamente sostenerse que ello impondría una inmensa presión sicológica sobre dichos electores y los expondría a presiones externas indebidas más fuertes de las que actúan cuando el número de electores es mayor. Sin embargo, no creemos que dicha situación pueda diferenciarse de la que pudiera darse en elecciones llevadas a cabo en municipios donde el número de electores es pequeño. Después de todo, ¿qué diferencia puede haber entre una nueva elección limitada, por ejemplo, a los colegios y unidades electorales donde ocurrió el problema de las llamadas "papeletas arrestadas" y decretar elecciones en Maricao, Las Marías o Culebra en un caso en que ello fuere necesario para determinar el vencedor en una elección para Gobernador? Nótese que en dichos municipios votaron en las pasadas elecciones para candidatos a Alcalde tres mil seiscientos cuarenta y cuatro (3,644), cuatro mil novecientos setenta y nueve (4,979) y ochocientos treinta y tres (833) electores respectivamente, mientras que el total de electores que votaron en los colegios y unidades electorales en que ocurrió la anomalía de las llamadas "papeletas arrestadas" asciende a más de cinco mil (5,000) electores. Por lo tanto, ¿no estamos hablando de sustancialmente el mismo número de electores? Entonces, ¿es que la impugnación de una elección del candidato a Gobernador no puede decidirse

ordenando una elección especial en el precinto o precintos en que se ocasione el problema que da lugar a la impugnación?

El remedio de ordenar una elección, general o limitada, en todo caso confronta problemas y peligros ineludibles. Sin embargo, ante la disyuntiva de una u otra, en caso de que los tribunales no puedan decidir cuál de los candidatos resultó electo una vez depurados los hechos, entonces se debe atender la letra clara de la Ley Electoral de Puerto Rico y ordenar una nueva elección en el precinto o precintos afectados. En balance, es la mejor alternativa, pues atenuaría el inevitable impacto que toda elección tiene de avivar, propagar, agudizar las desavenencias ya imperantes y contribuir a aumentar el desasosiego y malestar que esta situación ha generado en la ciudadanía de San Juan.

Sin embargo, es de rigor señalar que el remedio propuesto por otros compañeros Jueces distinguidos de este Tribunal *fue expresamente rechazado por el impugnador recurrente Granados Navedo, quien también de forma específica solicitó que se devuelva el caso al tribunal de instancia.* A esos efectos, en la vista oral que se celebrara en este Tribunal su abogado, Lcdo. Alex González, expresó a preguntas de varios de los distinguidos compañeros Jueces:

HON. JUEZ ALONSO:
Compañero, ¿cuál es la posición del compañero sobre si este Tribunal debe ordenar una nueva elección en las unidades en particular en [las] que ha habido problemas?

*LCDO. GONZALEZ:*
Bueno, Señoría, *yo creo que del análisis de la evidencia que hay una nueva elección no sería necesaria.*

HON. JUEZ ORTIZ:
Sería innecesaria.

*LCDO. GONZALEZ:*
*Sí, innecesaria.*

HON. JUEZ ALONSO:
En las unidades en particular donde ha habido problemas.

*LCDO. GONZALEZ:*

Porque la evidencia que hay para que el elector comparezca y convalide su voto es amplia y es eficaz.

HON. JUEZ ALONSO:

Y en términos de cuál es la posición del compañero de si el Tribunal debe considerar la posibilidad de considerar una nueva elección para San Juan, a la totalidad de San Juan, no ya para las unidades en controversia.

*LCDO. GONZALEZ:*

*Yo no lo consideraría ni se lo recomendaría al Tribunal que lo hiciera.*

HON. JUEZ HERNANDEZ DENTON:

O sea, de prevalecer su posición, sus argumentos ante este foro el remedio que usted considera que nosotros debemos adoptar es cuál exactamente.

*LCDO. GONZALEZ:*

El remedio, Señoría, que nosotros solicitamos es que se cuenten los votos. *Que se le permita al Sr. Granados Navedo pasar su prueba que consta en parte.*

HON. JUEZ HERNANDEZ DENTON:

Que se devuelva al foro de instancia para que se le permita pasar la prueba.

*LCDO. GONZALEZ:*

*Que se devuelva al foro de instancia a pasar la evidencia que nosotros teníamos disponible para pasar en aquel momento.* (Énfasis suplido.) T.E. Supremo, págs. 24–26.

Véase, también, que la propia representación legal del recurrente Granados Navedo indica, al coincidir con la opinión del Tribunal, que la prueba sólo consta *"en parte"*. Devolviendo el caso al foro de instancia se podrá obtener un cuadro completo de lo sucedido que permita decidir cuál es el remedio a que tienen derecho las partes. Hay que concederle a ambas partes la oportunidad de presentar toda su prueba y, a base de los hechos que se estimen probados, determinar el remedio apropiado. Como regla general, *y en ausencia de factores tales como los que pudiesen estar presentes en el*

*caso de las papeletas arrestadas*, si el resultado del análisis de toda la prueba fuere un empate es entonces que procedería ordenar una nueva elección general. 16 L.P.R.A. sec. 3270. Si a base de dicho análisis no se pudiera decidir cuál de los candidatos resultó electo, entonces se debe ordenar una elección en el precinto o precintos afectados.

*En fin, contrario a la impresión que parecen proyectar las opiniones disidentes, este Tribunal ha atendido los reclamos del recurrente Granados Navedo en la decisión que emite hoy y coincide con él, en cuanto al remedio solicitado, sobre su posición en contra de que ordenemos una nueva elección y en cuanto a su apreciación de que es necesario devolver el caso para que se pueda ofrecer toda la prueba de que disponen las partes.*

*Lo que no debe hacer este Tribunal es, por un lado, concluir que existe evidencia para declarar a uno de los candidatos vencedor y, por otro lado, propugnar una elección general. Con todo respeto, ello nos parece contrasentido.*

—O—

Opinión concurrente y de conformidad emitida por la Juez Asociada Señora Naveira de Rodón, a la cual se une el Juez Asociado Señor Hernández Denton.

Puesto en su justa perspectiva este es un caso que, aunque emocionalmente volátil por sus matices políticos, se reduce en alzada a determinar lo siguiente: (1) si el tribunal de instancia resolvió correctamente las cuestiones de derecho en las cuales fundamentó la desestimación de la demanda y (2) de llegar a la conclusión que se equivocó, entonces lo que procede no sólo en estricta juridicidad y derecho, sino en equidad y justicia, es devolver el caso al foro de instancia para que, dentro del proceso adversativo de un juicio *de novo*, ambas partes tengan la oportunidad de presentar la prueba que tengan disponible para probar sus alegaciones o

defensas, ya fuere ésta anteriormente presentada ante la Comisión Estatal de Elecciones (C.E.E.) o no.

Pretender, en este Foro, resolver las cuestiones de hecho con sólo la prueba de una de las partes sin darle oportunidad a la otra de rebatirla y de presentar prueba de sus defensas, equivaldría a ignorar los principios más básicos y elementales de nuestro sistema adversativo, eje central y filosófico del sistema de impartir justicia que impera en nuestra jurisdicción, y arrumbar la columna vertebral del debido proceso de ley que garantiza nuestra Constitución. Nos oponemos a este intento. No importa cuán laudable y moralistas sean sus propósitos —el fin jamás justifica los medios— tenemos fe en nuestro sistema adversativo de derecho rogado.[1] Por plasmar la opinión de la mayoría estos principios es que le hemos dado nuestro voto de conformidad.[2]

Al devolverse el caso al foro de instancia podrían ocurrir una (1) de dos (2) cosas: (1) de poder probar las partes sus alegaciones no sería necesario celebrar nuevas elecciones y podría declararse ganador al candidato que efectivamente obtuvo la mayor cantidad de votos en los comicios pasados, y (2) si, por otro lado, luego de desfilada *toda* la prueba de *ambas partes* se llega a la lamentable conclusión de que no es

---

[1] Como principio cardinal de debido proceso de ley constitucional, la importancia de la determinación de los hechos, luego de brindarle a *todas* las partes la oportunidad de controvertir la prueba presentada por la parte contraria y presentar la que tuviere disponible para sustanciar sus alegaciones, no puede ni debe subestimarse. Después de todo, es sobre los hechos así determinados que se aplican las normas de derecho.

Cabe señalar que ni en instancia ni ante este Tribunal la parte demandante solicitó, como remedio provisional hasta tanto se resolviese el caso en los méritos, que se dejase sin efecto la certificación hecha por la Comisión Estatal de Elecciones (C.E.E.) del candidato Héctor Luis Acevedo como Alcalde electo para el Municipio de San Juan.

[2] En una ocasión el Juez Asociado del Tribunal Supremo de Estados Unidos, Harry A. Blackmun, expresó lo siguiente en relación con las opiniones disidentes: "It is much easier to write a biting dissent than a constructive majority opinion". R.A. Teflar, *Appelate Judicial Opinions*, West Publishing Co., 1974, pág. 203.

posible determinar quién obtuvo la mayor cantidad de votos sin que se menoscabe el derecho al voto de algunos de los electores, entonces tanto el tribunal de instancia como este Tribunal estarían en mejor posición para determinar cuál sería el remedio más justo y apropiado si las partes deciden recurrir en alzada. También, al devolver el caso a instancia, se habrían agotado todos los medios que tienen los tribunales a su alcance para evitar anularle el voto a aproximadamente doscientos mil (200,000) votantes que de manera válida acudieron a las urnas y emitieron sus votos en los comicios pasados para Alcalde de San Juan, resultado inevitable al ordenarse unas elecciones generales en San Juan.

Cabe señalar, además, que de los autos del caso surge que un grupo de electores a los cuales no se les había contado su voto optaron por presentar demanda para impugnar el resultado de la elección en el foro federal. El tribunal de instancia expresamente invitó a estos electores a intervenir en el presente caso. Éstos hicieron comparecencia especial, declinando la invitación. En relación con el efecto de una sentencia sobre personas que no han sido partes en el procedimiento, el Tribunal Supremo de Estados Unidos recientemente expresó:

> All agree that "[i]t is a principle of general application in anglo-American jurisprudence that one is not bound by a judgment in personam in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." . . . This rule is part of our "deep-rooted historic tradition that everyone should have his own day in court." . . . A judgment or decree among parties to a lawsuit resolves issues as among them, but it does not conclude the rights of strangers to those proceedings.
>
> .　　.　　.　　.　　.　　.　　.　　.
>
> Joinder as a party, rather than knowledge of a lawsuit and an opportunity to intervene, is the method by which potential parties are subjected to the jurisdiction of the court and bound by a judgment or decree. (Énfasis suplido.) *Martin v. Wilks*, 490 U.S. 755, 761–765 (1989).

Tomando en consideración estas normas procesales estimamos conveniente que, al regresar el caso al foro de instancia, se ausculte la deseabilidad de que a los electores que de alguna forma se le pudiera afectar su derecho al voto sean unidos como partes, de manera tal que todo lo relacionado con la impugnación de la elección para Alcalde del Municipio de San Juan pueda ventilarse en un solo pleito. Véase Regla 16 de Procedimiento Civil, 32 L.P.R.A. Ap. III. Indudablemente existe un interés público apremiante en la más pronta adjudicación de esta controversia sin menoscabar el derecho de todas las partes a un juicio justo e imparcial. Esto implica el que las partes tengan la oportunidad de presentar toda su prueba, luego de lo cual el tribunal aplicará las normas de derecho en consideración a los hechos que estime probados.

Nos preocupa, también, que a un grupo de electores que por error de los funcionarios electorales fueron excluidos de las listas de votantes y a los cuales mediante procedimiento especial garantizamos el derecho al sufragio se les pueda, durante el proceso de la vista en su fondo del caso en instancia, menoscabar su derecho a la secretividad del voto y a la intimidad, atributos éstos característicos y primarios de todo sistema democrático. Art. II, Secs. 1 y 2, Const. E.L.A., L.P.R.A., Tomo 1; *P.N.P. y P.I.P. v. Rodríguez Estrada*, 122 D.P.R. 490 (1988). Estos electores, al optar por valerse del procedimiento especial para poder participar en los pasados comicios electorales, tuvieron que hacer una divulgación limitada de su voto para uso oficial de los funcionarios electorales. También tuvieron que someter documentación acreditativa de su capacidad como votantes. Cabe señalar que no son partes en este pleito ni fueron testigos en los procedimientos en instancia y puede que al devolverse el caso no sean llamados como testigos, aunque se utilicen los documentos como prueba documental.

No nos cabe la menor duda que, al ir a ejercer su derecho al voto, los electores que utilizaron el procedimiento especial

y fueron añadidos a las listas de votantes abrigaban la razonable expectativa de que su voto, demostrativo de sus preferencias políticas, no sería generalmente divulgado y mucho menos publicado. Ciertamente, tanto los votos como los documentos sometidos por los electores que optaron por el procedimiento especial establecido en *P.N.P. y P.I.P. v. Rodríguez Estrada*, supra, son documentos públicos que pueden utilizarse en cualquier procedimiento legítimo, como lo es el de impugnación del resultado de la contienda electoral para el Municipio de San Juan. Sin embargo, por su naturaleza, en estos documentos y en las circunstancias que los producen han quedado inextricablemente entrelazados derechos constitucionales de gran arraigo e importancia para nuestro sistema democrático de gobierno. Coexisten en evidente traslapo, la secretividad del voto, el derecho a la intimidad y el derecho al debido proceso de ley que produce un juicio justo. Se impone, pues, que el tribunal de instancia, al amparo de sus facultades para regular los procedimientos y al analizar el concepto de documento público en relación con el voto de estos electores y los documentos accesorios sometidos para evaluar su elegibilidad, haga una escala o gradación respecto al acceso y uso que permitirá. También deberá regular su divulgación y brindar así la máxima protección a todos los intereses en conflicto.

Ante estas circunstancias, en la opinión disidente del Juez Asociado Señor Negrón García[3] se hace alusión a

---

[3] Todas las opiniones emitidas hoy concurren en que el tribunal de instancia se equivocó al desestimar de forma sumaria la acción de impugnación de la certificación como Alcalde electo para el Municipio de San Juan del candidato Héctor Luis Acevedo; difieren, sin embargo, en cuanto a los fundamentos y al remedio.

En relación con opiniones disidentes en general, creo apropiadas las palabras del gran jurista Roscoe Pound quien, al referirse a éstas, expresó:

"[T]here is a responsibility in writing dissenting opinions. . . . The opinions of the judge of the highest court of a state are no place for intemperate denuncia-

estos votantes solamente por sus iniciales, protegiendo así su identidad y, por consiguiente, su derecho a la secretividad del voto y a su intimidad sin perjudicar el derecho de candidato impugnador a un juicio justo con la garantía del debido proceso de ley.

Antes de finalizar quisiéramos hacer constar que nos apena grandemente que el Juez de mayor antigüedad en este Tribunal haya tenido que recurrir a lenguaje inflamatorio y provocador para refutar la posición de la mayoría. La razón nunca ha necesitado de estas armas. El auténtico jurista esgrime la circunspección, la serenidad en el análisis y el saludable control de la pasión y de la vehemencia. De otra manera, la mente y el espíritu crítico desbordado no sólo nublan el entendimiento, sino que, además, recorren sin rumbo y límites los confines del conocimiento.

Lamentamos que se hayan malinterpretado nuestras observaciones y sugerencias.(4) Siempre se debe ser consciente que en el "afán de volitivamente aproximarnos al ideal de hacer *justicia*", pueden subsistir diferencias inevitables, pero cuando éstas tienen una alta probabilidad de provocar a la violencia se debe ejercer cautela. Sólo cuando sea imposible de evitar se justificaría el uso de este mecanismo para comunicar una idea.

---

tion of the judge's colleagues, violent invective, attributings of bad motives to the majority of the court, and insinuations of incompetence, negligence, prejudice, or obtuseness of fellow members of the court. . . . To justify an elaborate dissenting opinion the question of law should be one of at least considerable importance. To justify a denunciatory dissenting opinion, if denunciation of his colleagues by a judge can be justified at all, the question of law should be one of exceptional importance and the errors pointed out should be of the gravest nature. . . . [T]he opinion of the judge of the highest court should express his reason, not his feelings." R. Pound, *Cacoethes Dissentiendi: The Heated Judicial Dissent*, 39 A.B.A.J. 794, 795 (1953).

(4) Quisiéramos aclarar que todo lo que planteamos en el Pleno del Tribunal fue nuestra preocupación por que el lenguaje que consideramos inflamatorio y provocador en la *opinión disidente del Juez Asociado Señor Negrón García* fuera a generar violencia de parte de ciertos sectores.

Siempre hemos concebido al Tribunal Supremo como una institución que, por su naturaleza y a pesar de las inevitables discrepancias que puedan existir entre sus integrantes, viene obligado a sentar ejemplo de mesura y conciliación con el debate sosegado y de altura que siempre debe caracterizar las actuaciones de todos sus miembros.

Por último, quisiéramos evocar el siguiente pensamiento de Castán Tobeñas sobre la justicia:

> No es la justicia una idea simple, de contornos claros e inequívoca. Su misma elevación en el horizonte de los ideales y valores humanos hace que la veamos a través de sentidos y aspectos muy variados. J. Castán Tobeñas, *La idea de Justicia: su trayectoria doctrinal y la problemática de sus contenidos*, Madrid, Ed. Reus, 1968, pág. 10.

—O—

Opinión concurrente y de conformidad emitida por el Juez Asociado Señor Alonso Alonso.

A los fines de que quede meridianamente clara mi posición, deseo expresar mi opinión de conformidad con la opinión mayoritaria de este Tribunal emitida por voz del Juez Asociado Señor Ortiz. Creo que es lo que en buena técnica adjudicativa procede en derecho a nivel apelativo. Además, resulta lo más justo y lo que, como indica el Juez Presidente Señor Pons Núñez, el peticionario, Sr. José Granados Navedo, solicitó expresamente de este Tribunal.

Comparto, además, las expresiones hechas por la Juez Asociada Señora Naveira de Rodón.

—O—

Opinión concurrente y disidente emitida por el Juez Asociado Señor Rebollo López.

La opinión mayoritaria que hoy emite el Tribunal en el presente caso parece aclarar y resolver la controversia plan-

teada, *pero no lo logra*; parece hacer verdadera justicia, *pero no consigue alcanzar la ansiada meta*; parece cumplir con la función que nos encomienda e impone nuestra Constitución, *pero desafortunadamente no lo hace.* ¿Palabras fuertes? Definitivamente sí. ¿Merecidas? Igualmente creemos que sí. Veamos por qué.

Es correcto que el Tribunal revoca las sentencias recurridas. Ello, sin embargo, no debe causar sorpresa alguna. Como veremos, ante los graves y elementales errores de derecho cometidos por el tribunal de instancia, *realmente no existía otra alternativa.*

No hay duda que, de primera intención, impresiona un tanto el propósito que, según expresado en la opinión mayoritaria, mueve o anima al Tribunal a devolver el caso al foro de instancia, esto es, brindarle a las partes la oportunidad de presentar toda su prueba ante dicho foro. Convenientemente se omite decir y discutir, sin embargo, el hecho de que dicho trámite resulta *totalmente innecesario* en el presente caso por cuanto el Tribunal, *en estos momentos*, tiene ante sí prueba suficiente y confiable que sin lugar a dudas demuestra que resulta *judicialmente imposible* determinar quién es el ganador en la contienda electoral por la Alcaldía de San Juan, por lo que devolver el caso al foro de instancia es algo completamente superfluo que meramente retarda el remedio judicial inevitable: *la celebración de una nueva elección en San Juan, ya sea ésta general o parcial.*

La decepción y el desencanto con la opinión mayoritaria llega a su grado máximo posible cuando nos percatamos del hecho de que —*al devolver el caso al foro de instancia e imponerle unas condiciones al recurrente Granados Navedo con las cuales ni él ni persona alguna puede cumplir*— el Tribunal hace virtualmente imposible que se le haga justicia a aquél que, asistido de la razón, acudió a nuestras puertas a reclamarla con la ilusión de que la misma le sería

concedida. *En fin, aun cuando la opinión mayoritaria emitida parece hacer justicia, lo.cierto es que la niega.*

Concurrimos con el Tribunal en que procede, sin lugar a dudas, la *revocación* de las sentencias[1] que en el presente caso dictara el Tribunal Superior de Puerto Rico, Sala de San Juan.[2] Ahora bien, aplicando normas jurisprudenciales de reciente confección en nuestra jurisdicción en materia de derecho electoral, en busca de esa tranquilidad de espíritu que anhelamos tener cuando ya no ocupemos el delicado e importante cargo que humildemente hoy desempeñamos y, sobre todo, conscientes del impacto nocivo y perjudicial que sobre este pueblo, de firme tradición democrática, tendrá la decisión que hoy se emite, nos vemos obligados *a disentir del remedio judicial* que una mayoría de los integrantes del Tribunal dispone.

Dicho remedio no sólo es *erróneo e improcedente*[3] —dadas las circunstancias particulares presentes en el caso— sino que el mismo resulta ser *injusto, confuso e impermisiblemente restrictivo.*

## I

Como es de todos conocido, luego de celebrarse las elecciones generales en Puerto Rico el 8 de noviembre de 1988 la Comisión Estatal de Elecciones, en cumplimiento de las disposiciones del Art. 6.007 de la vigente Ley Electoral de Puerto Rico,[4] informó que en relación con la contienda por la Alcaldía de San Juan los resultados preliminares de dichos

[1] En relación con el caso de epígrafe, se emitieron a nivel de instancia *tres* (3) sentencias, a saber: el 9 y 17 de enero y el 2 de febrero de 1989.

[2] Hon. Carlos E. Polo, Juez Superior.

[3] La propia representación legal del recurido Lcdo. Héctor Luis Acevedo Pérez rechazó —en la vista oral celebrada ante este Tribunal— la alternativa de devolver el caso al tribunal de instancia *como algo que era difícil de concebir e implantar.* Véanse las págs. 71–73 de la transcripción de dicha vista oral.

[4] 16 L.P.R.A. sec. 3267.

comicios demostraban que el candidato José Granados Navedo del Partido Nuevo Progresista aventajaba al candidato del Partido Popular Democrático, Lcdo. Héctor Luis Acevedo Pérez, por aproximadamente trescientos (300) votos. El licenciado Acevedo Pérez, al amparo de las disposiciones del Art. 6.011 de la Ley Electoral de Puerto Rico,[5] solicitó de la Comisión Estatal de Elecciones que realizara un *recuento* de los votos emitidos en los cinco (5) precintos electorales de San Juan. Realizado el mismo, y no existiendo unanimidad entre los Comisionados Electorales de los tres (3) partidos políticos en cuanto a quién había prevalecido, el 7 de diciembre de 1988, a solicitud del Comisionado Electoral del Partido Popular Democrático, el Presidente de la Comisión Estatal de Elecciones procedió a certificar como alcalde electo de San Juan al licenciado Acevedo Pérez. El señor Granados Navedo radicó en tiempo ante el Tribunal Superior de Puerto Rico, Sala de San Juan, una demanda mediante la cual impugnó la antes mencionada certificación, ello conforme dispone el Art. 6.014 de la vigente Ley Electoral de Puerto Rico.[6]

Como expresáramos anteriormente, en el presente caso el tribunal de instancia emitió *tres* (3) sentencias. Mediante la primera de ellas —aplicando la llamada "regla de la unanimidad"[7] y resolviendo, en adición, que el recurrente José Granados Navedo no podía reclamar los derechos de los electores que por él habían votado, esto es, que no tenía capacidad jurídica (*standing*) para ello— el 9 de enero de 1989 di-

---

[5] 16 L.P.R.A. sec. 3271.

[6] 16 L.P.R.A. sec. 3274.

[7] Al amparo de la misma, resolvió que Granados Navedo *no* podía cuestionar judicialmente las *decisiones unánimes* tomadas por los Comisionados Electorales o los subalternos de éstos a todos los niveles del proceso electoral. Ello significa, naturalmente, que el candidato impugnado sólo podía cuestionar las decisiones del Presidente de la Comisión Estatal de Elecciones, las cuales eran el resultado precisamente de la falta de unanimidad entre dichos comisionados.

cho foro denegó la solicitud de Granados Navedo de que se anularan dos mil quinientos cincuenta y siete (2,557) votos, emitidos en catorce (14) colegios de diferentes precintos, que Granados alegaba estaban "contaminados" por haberse entremezclado votos emitidos por electores que aparecían en las listas de votación con papeletas de electores "añadidos a mano" sin que se hubiera determinado que estos últimos eran electores cualificados. En adición, rehusó dilucidar las alegaciones de Granados Navedo respecto a un sinnúmero de votos, no adjudicados, emitidos por los llamados electores "añadidos a mano", autorizados los mismos a votar por la decisión que emitiéramos en *P.N.P. y P.I.P v. Rodríguez Estrada*, 122 D.P.R. 490 (1988).

El 17 de enero de 1989 el foro de instancia emitió una resolución y una segunda sentencia. Mediante la resolución denegó una petición de Granados Navedo para que se adjudicaran doscientos siete (207) votos emitidos en seis (6) colegios exclusivamente por electores "añadidos a mano", algunos de los cuales eran electores cualificados y otros no, que no habían sido adjudicados en virtud de una decisión a esos efectos emitida por el Presidente de la Comisión Estatal de Elecciones y que, debido a ello, las partes denominaron "votos arrestados". La razón para así decidir del foro de instancia fue que la petición referente a las "papeletas arrestadas" no había sido objeto de alegación específica en la demanda de impugnación radicada. El foro de instancia, mediante la sentencia que dictara en la fecha antes mencionada, se negó a adjudicar a favor de Granados Navedo unas papeletas en las cuales, alegadamente debido a instrucciones erróneas o confusas de los funcionarios de ciertos colegios de votación, los electores habían estampado sus iniciales. Razonó que en relación a dicho asunto era de aplicación la doctrina de "cosa juzgada", en virtud de la decisión emitida en *P.N.P. v. Rodríguez Estrada, Pres. C.E.E.*, 123 D.P.R. 1 (1988).

El 2 de febrero de 1989, el tribunal de instancia dictó su tercera y última sentencia. En la misma, luego de ratificar todos sus anteriores dictámenes, desestimó la solicitud de Granados Navedo de que se anularan unas quince (15) papeletas de "doble marca"[8] —las cuales el Presidente de la Comisión Estatal de Elecciones había adjudicado a favor del recurrido Acevedo Pérez— por el fundamento de que dicho asunto era inconsecuente al no variar el resultado de la elección.

Inconforme, naturalmente, con las sentencias emitidas por el tribunal de instancia, Granados Navedo recurrió en tiempo ante este Tribunal en revisión de las mismas. Expedimos los tres (3) autos de revisión radicados y consolidamos los mismos.

## II

Es obvio que las referidas sentencias no pueden prevalecer. Resulta innecesario extenderse mucho sobre ello. Veamos.

Sostener, como correcto, el razonamiento del tribunal de instancia de que el candidato a un puesto electivo que impugne el resultado de una elección no puede, bajo ninguna circunstancia, cuestionar las decisiones que en forma unánime se hayan tomado a todos los niveles de la Comisión Estatal de Elecciones *es concederle la característica de "final y firme" a esas determinaciones administrativas, convirtiendo en un ejercicio de futilidad el procedimiento de impugnación judicial a que tiene derecho un candidato derrotado.* No hay duda de que dicha regla —como expresáramos en *P.S.P v. Com. Estatal de Elecciones*, 110 D.P.R. 400 (1980)— tiene su uso, justificación y obligatoriedad en el pro-

---

[8] Papeletas que contenían una "X" bajo dos (2) insignias o partidos distintos.

ceso de determinar los ganadores de unos comicios electorales. Ahora bien, las determinaciones que en forma unánime se toman por los representantes de los distintos partidos políticos en un escrutinio resultan obligatorias, a lo sumo, en tanto y en cuanto las mismas no contravengan la Constitución, las leyes o los reglamentos aplicables. *P.S.P. v. Com. Estatal de Elecciones*, ante, pág. 412.

Respecto a la capacidad jurídica (*standing*) del recurrente Granados Navedo para reclamar los derechos de los electores que votaron por él, realmente resulta difícil de entender y aceptar el razonamiento del foro de instancia que lo llevó a decidir en la negativa. Llana y sencillamente el candidato derrotado que impugna una elección tiene que tener ese derecho, porque de lo contrario, *resultaría inoperante e ilusorio el derecho, o la causa de acción, de impugnar la elección que le concede el citado Art. 6.014 de la vigente Ley Electoral de Puerto Rico.* Una de las formas que dicho candidato tiene de probar que fue él quien prevaleció en la elección celebrada es precisamente demostrando que la Comisión Estatal de Elecciones erró al negarse a adjudicar votos emitidos por electores que lo favorecieron a él. Para así poder demostrarlo, ese candidato tiene, o hay que concederle, capacidad jurídica para reclamar el derecho al voto de esos electores.

La negativa del tribunal de instancia de dilucidar la corrección de la decisión emitida por el Presidente de la Comisión Estatal de Elecciones —negándose a adjudicar los llamados "votos arrestados"— por el fundamento de que como ello no había sido objeto de alegación en la demanda de impugnación, la solicitud de enmienda a esos efectos resultaba tardía e improcedente, tampoco puede prevalecer. Para llegar a dicha conclusión sólo resulta necesario una simple lectura de las alegaciones contenidas en la referida demanda. *De la misma incuestionablemente surge que el "asunto de las papeletas arrestadas" efectivamente fue objeto de alega-*

*ción específica.* Realmente no había necesidad de solicitar la enmienda de la demanda a esos efectos, como equivocadamente intentó hacer la representación legal del recurrente Granados Navedo a nivel de instancia.

Erró igualmente el tribunal de instancia al negarse a resolver el planteamiento de las papeletas con iniciales de los electores, fundada su negativa en que era de aplicación la doctrina de "cosa juzgada" en virtud de nuestra decisión en *P.N.P. v. Rodríguez Estrada, Pres. C.E.E.*, ante. Baste decir que en el supuesto de que la misma técnicamente fuera aplicable al presente caso —lo cual es dudoso— debió recordar, y aplicar, la abundante jurisprudencia que sostiene *el elemental principio* de que dicha doctrina no resulta procedente en casos en que existe un alto interés público de que se diluciden los derechos de las partes y cuando se frustrarían los fines de la justicia de aplicarse la misma. *P.I.P. v. C.E.E.*, 120 D.P.R. 580 (1988); *Pagán Hernández v. U.P.R.*, 107 D.P.R. 720 (1978).

### III

Lo erróneo de las sentencias emitidas por el foro de instancia nunca ha estado en controversia. De hecho, *ninguno* de los integrantes de este Tribunal ha tenido duda alguna sobre ello. Desde un principio *todos* estábamos convencidos que no existía otra alternativa que revocar dichas sentencias.

La controversia ha sido otra: *¿qué hacer al revocar?* ¿Se debe ordenar una nueva *elección general*? ¿Conviene más la celebración de una *elección parcial* en los colegios de votación afectados por la llamada "contaminación" de las papeletas? ¿Resulta procedente, por el contrario, *devolver el caso al foro de instancia* para que éste reciba *prueba adicional* a la que ya consta en autos y, entonces, resuelva si puede determinar el ganador o si lo procedente es ordenar una nueva elección?

Las primeras dos (2) alternativas conllevan no sólo la aceptación por parte de este Tribunal de la inhabilidad o imposibilidad de la Rama Judicial para resolver cuál de los candidatos obtuvo el mayor número de votos en la contienda por la Alcaldía de San Juan, sino que dichas alternativas requieren la descertificación del licenciado Acevedo Pérez como Alcalde y el nombramiento de un alcalde interino hasta que se certifique, y tome posesión del cargo, el ganador de la nueva elección. Somos conscientes de que lo anterior resulta ser un tanto difícil de aceptar para algunos de los integrantes del Tribunal, entre otras razones, por el fundamento de que dicho remedio es uno drástico y el mismo conlleva una admisión de "incapacidad" judicial.

La tercera de las alternativas, por el contrario, promueve el "agotamiento" al máximo de los recursos existentes en busca de una "solución judicial" y, en adición, permite que el licenciado Acevedo Pérez continúe por un considerable período de tiempo ostentando el cargo de, y actuando como, Alcalde de San Juan con los beneficios políticos obvios que ello representa mientras se dilucidan ante el Tribunal Superior, Sala de San Juan, los procedimientos correspondientes. A dicho período de tiempo hay que añadirle, naturalmente, el tiempo que tomarán los subsiguientes procedimientos apelativos ante este Tribunal.

Por otro lado, no puede olvidarse el hecho de que, luego de terminados los procedimientos a nivel estatal, comenzarán los mismos a nivel federal, el cual foro tiene jurisdicción sobre la materia por estar envuelta la posible violación de derechos bajo la Constitución de los Estados Unidos. Allí y ante un tribunal de instancia, como lo es la Corte de Distrito Federal para el Distrito de Puerto Rico, las partes tendrán que volver a presentar prueba testifical y documental, luego de lo cual recaerá sentencia. La misma, sea cual fuere, seguramente será revisada ante la Corte de Apelaciones de los Estados Unidos para el Primer Circuito. Ello significa que

en el presente caso probablemente contaremos con dos (2) decisiones —posiblemente incompatibles entre sí— emitidas por dos (2) tribunales apelativos, esto es, la del Primer Circuito y la de este Tribunal. No podemos dejar de mencionar, por último, que ambas decisiones son revisables ante el Tribunal Supremo de los Estados Unidos, cuya decisión pondría fin a la controversia.

La decisión mayoritaria que hoy emite el Tribunal promueve —errónea e innecesariamente, como explicaremos más adelante en detalle— que persista *por un período de tiempo indefinido y considerable* el estado de desasosiego e incertidumbre que existe entre nuestra ciudadanía respecto a quién en realidad resultó electo alcalde por los electores de la Ciudad Capital de Puerto Rico. Debe quedar meridianamente claro, sin embargo, que no objetamos el remedio judicial —de devolver el caso al tribunal de instancia— que provee en el día de hoy la Mayoría meramente a base, o por razón, del extenso período de tiempo que tomará resolver esta controversia. *Si consideráramos que de este modo se le hace mejor justicia a nuestro pueblo, no lo objetaríamos.* Después de todo, el factor tiempo, *de ordinario*, no debe ser determinante cuando de hacer justicia se trata.

*Lo objetamos por cuanto somos del criterio que el remedio judicial provisto es erróneo. Ello por tres (3) fundamentos principales:*

En *primer* lugar, no se trata del mero pasar del tiempo. De lo que realmente se trata es que *durante ese considerable e indefinido período de tiempo* que transcurrirá antes de que finalmente se pueda hacer una determinación judicial —asumiendo que ello sea factible— sobre quién es el candidato ganador, *la ciudad de San Juan, y sus residentes, estarán sufriendo graves y evidentes perjuicios.*

En *segundo* lugar, dicho curso decisorio resulta ser equivocado por razón de que el Tribunal cuenta *en estos momentos* con los elementos de juicio suficientes para resolver

que es jurídicamente imposible determinar el ganador y que, en consecuencia, *resulta inevitable la celebración de una nueva elección en San Juan.*

*Por último,* objetamos vehementemente el remedio provisto por la Mayoría por razón de que el mismo va "acompañado" *de unas normas y directrices que son palpablemente confiscatorias, injustas y confusas,* lo cual quebrantará la fe que este pueblo tiene en su sistema democrático de gobierno y en sus tribunales de justicia.

## IV

Mantener al Lcdo. Héctor Luis Acevedo Pérez como Alcalde de San Juan durante el término de tiempo que le tome a los tribunales, *tanto estatales como federales,* llevar a cabo los extensos procedimientos judiciales antes mencionados, representa —independientemente de las cualidades personales, profesionales y administrativas que éste posea— un castigo inmerecido para los residentes de San Juan.

La posición actual del licenciado Acevedo Pérez *se asemeja a la de un "interinato" por tiempo indefinido y extenso.* Los integrantes de este Tribunal tenemos la obligación de ser realistas. No podemos darnos el lujo de encerrarnos en el edificio sin ventanas en que diariamente laboramos y negarnos a mirar más allá de sus portones e ignorar las realidades del mundo que nos rodea y los efectos que tienen las decisiones que emitimos.

Tenemos que ser conscientes de, y tomar en consideración, las consecuencias nefastas que tendrá el "interinato" que decreta la opinión mayoritaria emitida. Mientras exista y subsista esa incertidumbre e interrogante sobre su "permanencia" como Alcalde de San Juan, al licenciado Acevedo Pérez se le hará sumamente difícil, sino imposible, reclutar personal idóneo que le asista en la alcaldía; esto es, personas capacitadas que estén en disposición de abandonar sus actuales encomiendas y venir al Municipio de San Juan a traba-

jar, desconociendo si el que los reclutó, y del que depende su trabajo, permanecerá o no en su cargo.

Mientras dure ese "interinato", el licenciado Acevedo Pérez tendrá que enfrentarse, *desde una posición débil e inestable,* no sólo a una Asamblea Municipal, controlada por el partido político de oposición, sino que a los distintos representantes laborales de los trabajadores del referido municipio, conscientes tanto los Asambleístas Municipales como los líderes laborales que se enfrentan a un alcalde que no está seguro en su cargo y que por ello resulta especialmente vulnerable a sus demandas y requerimientos, sean éstos justos o no. Ello inevitablemente desembocará, entre otros, en controversias estériles e innecesarias entre la Asamblea Municipal y el licenciado Acevedo Pérez, cada cual tratando de demostrar ante sus correligionarios "quién manda en San Juan", lo cual indefectiblemente les llevará a la radicación de innumerables demandas ante nuestros tribunales de instancia.(9) En adición a lo anteriormente expuesto, tendremos la situación de miles de empleados del Municipio de San Juan cuya eficiencia y actitud personal en el descargo de sus distintas obligaciones inevitablemente se verá afectada por la inseguridad que causa el desconocimiento de quién en realidad será el Alcalde de San Juan. Todo lo anteriormente expresado no sólo tendrá el efecto de paralizar los trabajos administrativos a nivel de la Alcaldía de San Juan, de ocupar innecesariamente el tiempo del licenciado Acevedo Pérez y su cuerpo de ayúdantes, sino que tendrá la nefasta consecuencia de interrumpir y afectar los servicios esenciales que brinda dicho municipio.

¿Quién sufre las consecuencias de la situación antes descrita? Ciertamente no los integrantes de este Tribunal. Los

---

(9) Tomamos conocimiento judicial de que ya de hecho el licenciado Acevedo Pérez y la Asamblea Municipal de San Juan se encuentran en curso de colisión respecto al asunto del "paseo peatonal" y la "retención y despido" de empleados municipales.

que verdaderamente sufren el impacto directo de esta situación lo son los residentes humildes de la Ciudad Capital de Puerto Rico quienes, al acudir a las distintas dependencias municipales en busca de ayuda médica y de otra índole, con toda probabilidad se enfrentarán a una fuerza laboral, desmoralizada y preocupada con su propio futuro, que ni tan siquiera contará con los materiales y equipos necesarios y básicos para descargar responsablemente sus obligaciones, consecuencia ello de la lucha fraticida entre el Alcalde y los Asambleístas Municipales de San Juan.

El remedio judicial de devolver el caso al foro de instancia provisto por el Tribunal en la opinión mayoritaria que hoy emite, *¿conlleva meramente el "pasar del tiempo" antes de que finalmente sepamos el ganador en San Juan o, por el contrario, significa el mismo graves perjuicios para los residentes de San Juan?* La contestación parece ser obvia.

## V

Si a esa grave situación de descalabro administrativo, laboral y de servicios en San Juan que promueve el remedio judicial que hoy dispone el Tribunal *le añadimos el hecho incuestionable de que dicho curso decisorio es realmente innecesario*, tenemos que la decisión mayoritaria que se emite es señal de una miopía judicial por parte de este Tribunal que resulta difícil de entender.

¿Por qué consideramos superfluo el remedio dispuesto por la opinión mayoritaria de devolver el caso al foro de instancia? ¿En qué nos basamos para hacer tal aseveración? Llana y sencillamente debido a que dada la situación —y el número o cuantía— de los "votos arrestados" y las "papeletas contaminadas" y la exigua mayoría de veintinueve (29) votos del licenciado Acevedo Pérez, somos del criterio que

ningún tribunal([10]) podrá determinar a ciencia cierta cuál de los dos (2) candidatos en controversia prevaleció en San Juan en las elecciones celebradas el 8 de noviembre de 1988. Si ello —como lo demostraremos a continuación— es así y este hecho lo podemos determinar en estos momentos desde este estrado apelativo, ¿qué razón puede existir para no ordenar desde hoy mismo una nueva elección —sea ésta general o parcial— en San Juan y de esta forma evitarle a sus residentes los graves perjuicios que sufrirán mientras subsiste esta situación de incertidumbre? A nuestra manera de ver las cosas, no existe razón jurídica alguna que impida que el Tribunal así actúe en el día de hoy.

Recordemos que las llamadas "papeletas contaminadas" se refieren a un total de dos mil quinientos cincuenta y siete (2,557) papeletas emitidas en catorce (14) colegios pertenecientes a diferentes precintos —la adjudicación de las cuales a nivel de colegio el día de las elecciones generales arrojó una mayoría de doscientos cincuenta y cuatro (254) votos para el licenciado Acevedo Pérez— entre las cuales *se encuentran mezclados aproximadamente doscientos cincuenta (250) votos emitidos por electores "añadidos a mano"*,([11]) algunos de los cuales son electores cualificados y otros no, cuyos votos o papeletas no pueden ser identificados. Las llamadas "papeletas arrestadas" consisten en doscientos siete (207) votos, no adjudicados al presente como consecuencia de una decisión a esos efectos del Presidente de la

---

([10]) Ni el Tribunal Superior de Puerto Rico, Sala de San Juan, ni la Corte de Distrito Federal para el Distrito de Puerto Rico, ni la Corte de Apelaciones de los Estados Unidos para el Primer Circuito, ni este Tribunal, ni el Tribunal Supremo de los Estados Unidos.

([11]) La cifra de doscientos cincuenta (250) votos surge *de documentos oficiales* —tales como los informes y actas de incidencias preparadas en los colegios de votación y las actas levantadas durante el proceso de recuento— relativas las mismas a los catorce (14) colegios de donde proceden las dos mil quinientas cincuenta y siete (2,557) "papeletas contaminadas", *los cuales documentos fueron presentados, y admitidos, en evidencia ante el tribunal de instancia.*

Comisión Estatal de Elecciones, *emitidos exclusivamente por electores "añadidos a mano",* algunos de los cuales son electores cualificados y otros no, los votos de los cuales resulta igualmente imposible de identificar.

Debe mantenerse presente que durante el *recuento* llevado a cabo por la Comisión Estatal de Elecciones en los cinco (5) precintos electorales de San Juan se contabilizaron, según cómputos de la referida comisión, aproximadamente cuatro mil doscientos (4,200) electores "añadidos a mano". Al ser cotejados los mismos en las mesas especiales designadas a esos propósitos en el Coliseo Roberto Clemente, con el fin de ser adjudicadas durante el *proceso de recuento* que celebrara la Comisión Estatal de Elecciones, se validaron aproximadamente el setenta (70) por ciento de dichos votos, *determinándose en consecuencia que el treinta (30) por ciento de los mismos habían sido emitidos por electores no cualificados.* La cifra de cuatro mil doscientos (4,200) no incluye los doscientos siete (207) "votos arrestados" ni los doscientos cincuenta (250) votos mezclados entre las "papeletas contaminadas", todos los cuales —aproximadamente cuatrocientos cincuenta y siete (457) votos— fueron emitidos por electores "añadidos a mano". *Ello significa que en San Juan votaron un gran total de cuatro mil seiscientos cincuenta y siete (4,657) electores "añadidos a mano".*

Los científicos sociales suelen utilizar *las estadísticas* para describir un fenómeno social estudiado y para formular generalizaciones o proyecciones a propósito de una determinada "población" sobre la base de una "muestra" extraída de la misma. H.M. Blalock, *Estadística Social,* México, 1966, pág. 16. Al generalizar, se extienden las implicaciones teóricas de los hallazgos para que sirvan como soluciones a eventos semejantes. F. Arias Galicia, *Introducción a la técnica de investigación en ciencias de la administración y del comportamiento,* México, Ed. Trillas, 1972, págs. 173–180. Al estudiar la "muestra representativa" de la unidad de ob-

servación se pueden inferir propiedades o características del "universo o población total" y hacer proyecciones. *Mientras más grande es la muestra representativa, mayor el grado de confiabilidad en las predicciones o proyecciones y menor el margen de error en las mismas.* E. Babbie, *The Practice of Social Research*, 3ra ed., California, Wadsworth Publishing Co., 1983, pág. 141 y ss.; J. Lee Rodgers y otros, *Infering a Mayority from a Sample: The Sawtoothed Function Phenomenon*, 30 Behav. Sci. 127–133 (1985).

En el presente caso la "muestra representativa", consistente la misma de las cuatro mil doscientas (4,200) papeletas examinadas por la Comisión Estatal de Elecciones durante el recuento llevado a cabo, constituye el noventa (90) por ciento del "universo o población total", esto es, del gran total de cuatro mil seiscientos cincuenta y siete (4,657) electores "añadidos a mano" que votaron en San Juan. Los por cientos resultantes del examen de las cuatro mil doscientas (4,200) papeletas —setenta (70) y treinta (30) por ciento— pueden y deben ser aplicados a los doscientos siete (207) "votos arrestados" y los aproximadamente doscientos cincuenta (250) votos añadidos a mano que fueron mezclados con, y forman parte de, los dos mil quinientos cincuenta y siete (2,557) "votos contaminados" *con el propósito de poder determinar cuántos de esos cuatrocientos cincuenta y siete (457) electores son electores cualificados y cuántos no.* El resultado de dicha proyección es uno *enteramente confiable* por cuanto la "muestra representativa" —cuatro mil doscientos (4,200)— prácticamente constituye el "universo o población total" estudiada de cuatro mil seiscientos cincuenta y siete (4,657).

Al así aplicar dichos por cientos, tenemos que se puede *estadística, razonable y lógicamente inferir* que de esos cuatrocientos cincuenta y siete (457) votos, aproximadamente trescientos veinte (320) pertenecen a electores cualificados y ciento treinta y siete (137) a electores no cualificados. *No hay que ser muy perspicaz para darse cuenta de*

*que los votos emitidos por ciento treinta y siete (137) electores, los cuales no sabemos a favor de quién votaron, constituyen un número suficiente para variar el resultado de una elección que se adjudicó por veintinueve (29) votos.*

Ese *denominador común* existente entre las "papeletas arrestadas" y las "papeletas contaminadas" —*esto es, el hecho de que en los dos (2) grupos hay votos emitidos por electores no cualificados cuyas papeletas no pueden ser identificadas y cuyo total de votos, dada la exigua mayoría del licenciado Acevedo Pérez, puede decidir la elección*— es lo que demuestra lo erróneo de *las posiciones contradictorias* que respecto a cada uno de dichos grupos de papeletas asumió el Presidente de la Comisión Estatal de Elecciones, esto es, negarse a adjudicar las "papeletas arrestadas" y, por el contrario, no actuar y anular las "papeletas contaminadas".

El fundamento que originalmente expuso el licenciado Rodríguez Estrada, al negar la adjudicación de las "papeletas arrestadas", *realmente es correcto en derecho.* Como él acertadamente expusiera en la resolución por escrito que a esos efectos emitiera, permitir "que se cuente el voto de los electores en controversia equivaldría a que electores no cualificados para votar puedan decidir una elección", de esa forma vulnerándose la voluntad de los electores efectivamente cualificados para hacerlo; sobre todo en un caso como el presente en que la ventaja de votos de un candidato sobre el otro es mínima y los votos "contaminados" emitidos por electores no cualificados sobrepasan esa ventaja.

Dicho fundamento, sin embargo, *igualmente exigía y requería* que el Presidente de la Comisión Estatal de Elecciones actuara respecto a la petición del Comisionado Electoral de Partido Nuevo Progresista relativa a los "votos contaminados" —los cuales habían sido adjudicados a nivel de colegio— *y anulara los mismos*; ello debido a que, como hemos visto, entre el total de las dos mil quinientas cincuenta y siete (2,557) papeletas emitidas en los mencionados catorce

(14) colegios se encuentran mezclados un número de votos, emitidos por electores *no* cualificados, *los cuales igualmente vulneran la voluntad de los electores cualificados, y pueden variar el resultado de la elección en San Juan.* De manera que la *alternativa de contar* los votos emitidos por electores no cualificados *no es jurídicamente aceptable ni en el caso de las "papeletas arrestadas" como tampoco para el caso de las "papeletas contaminadas". Welch v. McKenzie,* 592 F. Supp. 1549 (D. Miss. 1984); *Reynolds v. Sims,* 377 U.S. 533 (1964).

*La alternativa contraria,* esto es, *la de no contar* ni las doscientas siete (207) "papeletas arrestadas" ni las dos mil quinientas cincuenta y siete (2,557) "papeletas contaminadas" *tampoco resulta jurídicamente procedente y aceptable.* Llana y sencillamente se estaría atentando contra, y anulando, el derecho constitucional al sufragio de más de dos mil (2,000) electores cualificados por razones ajenas a esos electores y debido a errores y fallas del organismo electoral —y sus representantes— encargado precisamente de garantizarle el derecho al voto a esos electores. *Reynolds v. Sims,* ante.

*Es claro que esta encrucijada inevitablemente nos lleva a decretar el remedio judicial de una nueva elección en San Juan —ya sea la misma general o parcial— al amparo de las disposiciones del Art. 6.015 de la vigente Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3275.*(12) La opinión mayoritaria, resistiéndose incomprensiblemente a seguir dicho curso decisorio, sutil y tímidamente le "sugiere" al tribunal

---

(12) Dicha disposición legal, en lo pertinente, dispone que:

"En el caso de una elección de candidato a cargos que no fuesen de Senador o de Representante, si se suscitare una impugnación parcial o total de la votación entre dos o más candidatos para algún cargo o cargos, *y el Tribunal no pudiera decidir cu[á]l de ellos resultó electo,* ordenará una nueva elección en el precinto o precintos afectados, la cual se celebrará de acuerdo a las normas reglamentarias que a tales efectos se prescriban." (Énfasis suplido.) 16 L.P.R.A. sec. 3275.

de instancia que explore la alternativa o posibilidad de resolver que procede mantener la adjudicación de las dos mil quinientas cincuenta y siete (2,557) "papeletas contaminadas" —donde el licenciado Acevedo Pérez tiene una ventaja de doscientos cincuenta y cuatro (254) votos— y deniegue la adjudicación de las doscientas siete (207) "papeletas arrestadas" bajo el "fundamento" de que las situaciones son "distintas"; ello, alegadamente, debido a que en la primera situación la "contaminación" se debió a *un mero* "error" de los funcionarios de los colegios concernidos, y en el caso de las "papeletas arrestadas" la contaminación ocurrió como consecuencia de irregularidades o fraude.

La improcedencia obvia de la antes mencionada "sugerencia" o posición radica en el hecho de que si es que en realidad hubo fraude en relación con las llamadas "papeletas arrestadas", *el mismo no puede perjudicar los derechos del candidato Granados Navedo ni los de los electores cualificados que votaron en dichos colegios.* De haber habido fraude, éste obviamente fue cometido por los funcionarios de los colegios en controversia, los cuales eran los únicos que el día de las elecciones podían "desaparecer o añadir" papeletas de dichos colegios; personas que eran funcionarios, o representantes, de la propia Comisión Estatal de Elecciones, *por cuyas actuaciones, repetimos, no deben responder o pagar los candidatos ni los electores.*

Si como hoy *correctamente* se ha decidido en la opinión mayoritaria, al rechazar la obligatoriedad de la llamada "regla de la unanimidad", de que las decisiones o acuerdos tomados por los funcionarios de la Comisión Estatal de Elecciones a todos los niveles *no obligan ni perjudican* a los candidatos aun cuando dichos acuerdos hayan sido unánimes, *procede que nos preguntemos*: ¿cómo es posible que se perjudique un candidato a un puesto electivo *por un acto ilegal o fraudulento cometido por alguno de los funcionarios* —representantes de la Comisión Estatal de Elecciones—

que laboraron el día de las elecciones en dichos colegios? En otras palabras, ¿cómo es posible que se le prive a esos electores cualificados de San Juan de su derecho al voto y a Granados Navedo de los votos emitidos a su favor en esos colegios por esos electores cualificados debido a actos ilegales o fraudulentos de funcionarios de esos colegios, con los cuales actos ellos no tuvieron nada que ver? La contestación, *nuevamente*, parece ser obvia.[13]

En resumen, habiendo demostrado que este Tribunal cuenta en estos momentos con evidencia que sostiene que en las elecciones generales celebradas el 8 de noviembre de 1988 en la Ciudad de San Juan se emitieron un número considerable de votos por electores *no* cualificados, que resulta imposible determinar cómo votaron los mismos,[14] y siendo el número de dichos votos suficientes para variar el resultado de la elección celebrada, *resulta obvio que el curso decisorio correcto lo es el ordenar la celebración de una nueva elección en San Juan, ya sea general o parcial,* por cuanto devolver el caso a instancia es meramente prolongar lo inevitable ya que ningún tribunal podrá determinar a ciencia cierta cuál de los candidatos prevaleció en dicha contienda electoral. *Eversole v. Wood,* 754 S.W.2d 27 (1988); *Jackson v. Action for Boston Com. Dev.,* 525 N.E.2d 411 (1988); *Foulkes v.*

---

[13] A esos efectos, debe recordarse que en el caso de las quince (15) papeletas de "doble marca" —en el cual el Presidente de la Comisión Estatal de Elecciones determinó, a base del testimonio del perito que contratara, que efectivamente "alguien" había cometido fraude al estampar en dichas papeletas una segunda marca (X)— el licenciado Rodríguez Estrada no sólo *no* anuló las referidas papeletas, sino que las adjudicó a favor del licenciado Acevedo Pérez. *Resulta forzoza la conclusión de que el mero hecho de que haya habido fraude en un colegio en particular no conlleva la anulación de los votos que hayan sido emitidos legalmente en el mismo.*

[14] Como discutiremos y demostraremos a continuación, la propuesta, o directriz, del Tribunal de que el candidato Granados Navedo deberá demostrar cómo votaron los electores no cualificados no sólo resulta ser impráctica, sino absurda.

*Hays*, 537 P.2d 777 (Wash. 1975); *In re Application of Dorgan*, 210 A.2d 67 (N.J. 1965).

## VI

Como máximos intérpretes de la Constitución y las leyes del Estado Libre Asociado de Puerto Rico, los integrantes de este Tribunal tenemos la obligación de "pautar el derecho" en nuestra jurisdicción. Cumplimos con esa función o encomienda principal únicamente cuando las normas y guías que establecemos en las decisiones que emitimos son claras y precisas, consistentes, armoniosas entre sí y, sobre todo, justas. ¿Cumple con esos criterios la opinión mayoritaria emitida en el presente caso, en especial, el remedio judicial que se dispone en la misma? Aun cuando nos causa incomodidad el decirlo y señalarlo, entendemos que no.

A nuestra manera de ver las cosas, una simple lectura y examen de la decisión mayoritaria emitida es todo lo que se necesita para llegar a la obvia conclusión de que la misma lo que hace es establecer guías confusas e imprecisas, las cuales son difíciles de armonizar entre sí, y que resultan inconsistentes y contradictorias con decisiones recientes sobre la materia. Ello tiene el efecto, naturalmente, no sólo de hacer que la decisión emitida sea una errónea y de causar una enorme confusión a nivel de instancia, sino de afectar injustamente los derechos del candidato impugnador y los de los electores que participaron en la elección celebrada y que totalmente desconocen, al día de hoy, que sus votos no fueron adjudicados por la Comisión Estatal de Elecciones.

Tenemos, como ejemplo de lo primeramente señalado, que la opinión mayoritaria emitida, al intentar establecer, para beneficio y guía del tribunal de instancia, *la norma sobre la naturaleza del procedimiento especial de impugnación del resultado de una elección,* expresa que el procedimiento a celebrarse ante el referido foro lo es el de "juicio *de novo*", donde las partes podrán "presentar toda la prueba

pertinente a los motivos de impugnación", donde el tribunal vendrá obligado a hacer sus propias determinaciones de hechos y conclusiones de derecho, y donde la "función judicial" será una "amplia" y "abarcadora". Ello no obstante, y a pesar de que expresamente se reconoce que tanto "la dinámica organizacional de la Comisión Estatal —controlada por los partidos políticos— como la forma particular en que se toman allí las decisiones exigen la aplicación del criterio de revisión judicial más riguroso", se instruye al foro de instancia para que guarde la "usual deferencia" que los tribunales le deben a las decisiones emitidas por los organismos administrativos. Opinión mayoritaria, págs. 19–20. ¿En qué quedamos? *Si es que se trata de un organismo sujeto a fuertes presiones políticas y sus decisiones son el producto de dichas presiones, ¿cómo es posible que las mismas merezcan deferencia?* Realmente dichas directrices son, cuando menos, contradictorias entre sí y deben causar una gran confusión a nivel de instancia.

Por otro lado, incurriendo en *una inconsistencia que resulta imposible de aceptar* y utilizando, en justificación de la misma, un lenguaje —"de cuando dije no dije y dije pero no dije lo que dije"— que hace que recordemos los famosos monólogos de Cantinflas, *el Tribunal ahora resuelve que cuando en P.N.P. v. Rodríguez Estrada, Pres. C.E.E.,* supra, *establecimos que los votos a ser emitidos por los electores "añadidos a mano" eran "votos recusados" realmente no establecimos ni resolvimos eso.* No obstante los esfuerzos que se hacen en la opinión mayoritaria que hoy se emite con el propósito de negarlo, lo cierto es que en el antes citado caso de *P.N.P. v. Rodríguez Estrada, Pres. C.E.E.,* claramente establecimos que *el procedimiento en cuanto a estos votos se regía por el que establece el Art. 5.031 de la vigente Ley Electoral de Puerto Rico,* 16 L.P.R.A. sec. 3234, cuya disposición legal, específica y particularmente, precisamente

prescribe el procedimiento a seguirse en la *recusación* de un voto.

Realmente resulta sorprendente la actuación del Tribunal. A un lego en derecho no se le puede exigir responsabilidad, y sujetarlo a unas consecuencias, por el uso de un término legal en particular por cuanto dicha persona realmente no tiene, en la mayor parte de las ocasiones, conciencia del significado jurídico del término que utiliza. La situación es diferente, sin embargo, cuando el que se expresa es el organismo judicial de mayor jerarquía en nuestra jurisdicción: este Tribunal. Se supone que sus integrantes conozcan el significado, connotaciones y consecuencias legales de los términos jurídicos que utilizan en sus decisiones. El pasado 20 de octubre de 1988, mediante una opinión, este Tribunal calificó de "voto recusado" el voto a ser emitido en las elecciones generales a ser celebradas el 8 de noviembre de 1988 por los llamados electores "añadidos a mano" en el contexto de la vigente Ley Electoral de Puerto Rico. Hoy, sorpresivamente, se reniega de esa actuación judicial.

*¿Cuál es la importancia de que el voto emitido por un elector "añadido a mano" en las elecciones generales celebradas el pasado 8 de noviembre de 1988 sea considerado como un "voto recusado"?* Como veremos, la misma es de importancia fundamental no sólo para el elector que emitió el voto, sino para el candidato impugnador del resultado de la elección para un cargo en particular.

Si se califica el mismo como un "voto recusado", conforme la decisión que este Tribunal emitiera en *P.P.D. v. Admor. Gen. de Elecciones*, 111 D.P.R. 199, 232 (1981), el voto *no* puede ser anulado sin que *antes* el Estado le provea al elector una "amplia oportunidad de defender su voto", consistente la misma en que el elector deberá ser citado para la celebración de una vista ante la Comisión Estatal de Elecciones donde tendrá derecho a presentar prueba en apoyo de la validez de su voto. Ello significa, naturalmente, no sólo que

el trámite, y los gastos, de localizar y citar a todos los electores "añadidos a mano" serán de cuenta del Estado —y no del candidato— *sino que la Comisión Estatal de Elecciones, en caso de que dichos votos puedan variar el resultado de la elección, no puede emitir certificación oficial alguna declarando ganador a un candidato hasta tanto se diluciden en las vistas correspondientes la validez de los votos así recusados.*

De este Tribunal haber ratificado hoy lo que efectivamente decidió el 20 de octubre de 1988 —esto es, que los votos emitidos por los electores "añadidos a mano" son votos "recusados"— *ello hubiera significado que la certificación expedida por el Presidente de la Comisión Estatal de Elecciones declarando ganador en San Juan al licenciado Acevedo Pérez es una prematura y sin validez alguna por cuanto dicha Comisión no le brindó la oportunidad a esos electores de defender su voto no adjudicado.*

Por otro lado, la opinión mayoritaria emitida *resulta ser particularmente injusta con el recurrente Granados Navedo* cuando —al devolver el caso al foro de instancia para, alegadamente, brindarle la oportunidad a éste de demostrar que entre los votos ya adjudicados y contados se encuentran votos emitidos por electores no cualificados, cuyos votos pueden variar el resultado de la elección— requiere de éste no sólo que pruebe el hecho de la existencia en sí de estos votos y de que los mismos son suficientes para variar el resultado de la elección —hechos que, como hemos visto, podemos determinar desde ahora— sino que "pruebe afirmativamente a favor de quién fueron [dichos votos] adjudicados . . .". Opinión mayoritaria, pág. 58.

En adición a la labor que ello presupone por parte del señor Granados Navedo de identificar en las listas los electores no cualificados que votaron y de localizar y citar, a su costo, a dichos electores para que comparezcan al tribunal, dicha directriz parte de la premisa ilusoria que estas per-

sonas —que subrepticiamente burlaron el proceso eleccionario votando ilegalmente por el licenciado Acevedo Pérez— estarán ahora en disposición no sólo de incriminarse públicamente e ir a prisión por delito grave,(15) sino de perjudicar al licenciado Acevedo Pérez por cuanto, al así hacerlo, le restarán un voto a éste. Nosotros los jueces no podemos ser tan ingenuos como para creer cosas que nadie más creería, *Pueblo v. Luciano Arroyo*, 83 D.P.R. 573, 582 (1961), ni para pensar que algunas personas estarían dispuestas a hacer cosas que probablemente nadie haría.

## · VII

La conciencia judicial del juzgador debe tener "memoria". La misma es necesaria no sólo para evocar los principios y normas pertinentes dimanantes de los precedentes obligatorios, sino para recordar —finalizada la función como juez y al pasar juicio, en unión a nuestros juzgadores, sobre el curso decisorio que seguimos en nuestra carrera judicial— los efectos y consecuencias que sobre este noble pueblo tuvieron las decisiones que emitimos, esto es, cuán sabias fueron las mismas. El ser conscientes, mientras desempeñamos el cargo, de que la memoria nunca nos permitirá olvidar las consecuencias de nuestras actuaciones judiciales tiene el efecto de hacernos ahora más conscientes y celosos de nuestros deberes y obligaciones.

La mayoría del Tribunal pierde de vista cuáles son esos deberes y obligaciones. Nuestro *deber* era revocar las sentencias emitidas por el tribunal de instancia; nuestra *obligación y misión* es proveer *un remedio justo y adecuado* a la

---

(15) Dispone, *en lo pertinente*, el Art. 8.026 de la vigente Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3376, que toda persona "que sin derecho a votar lograre hacerlo . . . incurrirá en *delito grave* y convicta que fuere será sancionada con *pena de reclusión* por un término mínimo de un (1) año y máximo de tres (3) años". (Énfasis suplido.)

controversia planteada *independientemente* de que el mismo haya sido solicitado o no por la parte recurrente. El intento de disfrazar lo realizado sosteniendo que la fundamentada crítica a la opinión mayoritaria emitida es fuerte y punzante, y que se le ha concedido al recurrente Granados Navedo todo lo que éste ha solicitado, resulta verdaderamente lastimoso. *No puede pretender gozar de inmunidad ni hace justicia el juzgador que, al conceder un remedio, lo condiciona de tal forma que el mismo resulta imposible de alcanzar. No existe mayor injusticia que la que se comete a nombre de la justicia por el foro judicial por cuanto no existe revisión posible de la misma.*

Las normas jurisprudenciales y principios jurídicos aplicables al presente caso son claros. Las consecuencias de la *no* aplicación de los mismos son obvias y nefastas. La "memoria" que debe latir en la conciencia judicial de cada uno de nosotros se encargará de evitar que *no* las olvidemos.

—O—

Opinión disidente del Juez Asociado Señor Negrón García.

Por herencia paterna y viviencias propias sabemos que juzgar en un tribunal colegiado, más que debate intelectual y forense, es lucha interna de conciencias y espíritus en el insaciable afán de volitivamente aproximarnos al ideal de hacer *justicia.*

Como preámbulo, unas aclaraciones. En estos recursos, al igual que en cualesquiera otros saturados de intereses y pasiones político-partidistas, *no enjuiciamos* las cualidades personales de los protagonistas principales José Granados Navedo y Héctor L. Acevedo Pérez, ni tampoco los méritos de cuál de los dos está más capacitado para, en el mejor interés público, ser Alcalde del Municipio de San Juan. *Sólo*

*juzgamos sus derechos y prerrogativas constitucionales.* Lo primero, el *pasado* 8 de noviembre de 1988 fue objeto de votación individual *parcializada* en las urnas; lo segundo, pertenece al *presente*, a nuestra jurisdicción apelativa *neutral* que, por antonomasia, es obligación judicial.

Y en esta última esfera —la adjudicativa— nuestra óptica jurisprudencial autóctona siempre ha sido "daltoniana" y sus horizontes más amplios. Incuestionablemente, nuestra misión primordial por excelencia —de carácter indelegable— es determinar *"si se plantea alguna violación de derechos constitucionales de los electores,* que los organismos oficiales no hubieren podido resolver y que requiera el ejercicio de nuestra función *como guardianes de los derechos garantizados* por la Constitución del Estado Libre Asociado de Puerto Rico. . . . Lo vital es que triunfe el pueblo entero de Puerto Rico; que no se reduzca la calidad de su democracia ni se mancille la limpieza de sus procesos electorales; que se respeten escrupulosamente nuestra Constitución y nuestras leyes". (Énfasis suplido.) *P.P.D. v. Barreto Pérez*, 110 D.P.R. 376, 387 (1980).

La opinión mayoritaria del Tribunal no cumple con esa encomienda. Tampoco lo logran las opiniones concurrentes y de conformidad, específicamente sus críticas por vía de escolios. "La ingenuidad no resiste al tiempo; la experiencia se va formando lentamente de desengaños." Azorín, *El Político*, Colección Austral, pág. 37. Y es que "nos hallamos ante una parcela cuyo cultivo está encomendado al Juez, como profesional, y del que no puede desentenderse transfiriendo a otro la responsabilidad de sus decisiones . . .". F. Soto Nieto, *Compromisos de Justicia*, Madrid, Ed. Montecorvo, 1977, pág. 21. La etapa de las alegaciones en este caso ya transcurrió. No cabe, pues, invocarse un debido proceso de ley en *abstracto* y, además, como razón para devolverlo al tribunal de instancia, dar una oportunidad a las partes para presen-

tar prueba y a la vez *ignorar toda la prueba testifical y documental ya presentada por éstas.*

Al estar en mejor posición que dicho foro, *curiosamente la mayoría del Tribunal no ha querido adjudicar ni una sola papeleta o siquiera examinar uno de los cientos de documentos producidos por Granados Navedo.* ¿Puede justificarse esa inexplicada omisión como medio para lograr un fin? En la opinión sólo se mencionan el *Exhibit* 49 de ambas partes (opinión mayoritaria, pág. 8) y el *Exhibit* 42 (íd., pág. 47) correspondiente a los demandados Báez Galib y Acevedo Pérez. ¿Es eso realmente "equidad y justicia"? Si lo es, ¿para quién? "Cuando de aquilatar la prueba se trata es difícil a veces trazar una línea demarcadora entre cuestiones de hecho y cuestiones de derecho. *Las pruebas son hechos pero su análisis pone en movimiento, además de la experiencia del juzgador, su conocimiento de Derecho para así llegar a una solución justa de la controversia."* (Énfasis suplido.) *Pueblo v. Carrasquillo Carrasquillo,* 102 D.P.R. 545 (1974).

*Como demostraremos, existe suficiente evidencia de ambas partes para declarar a Granados Navedo, por diez y seis (16) votos, numéricamente vencedor en la elección para el cargo de Alcalde de San Juan.* Aun así, se ha optado por simplemente devolver el caso al foro de instancia con unas interpretaciones y directrices que, a poco examinemos, *son sumamente restrictivas, atentan contra la igual protección de las leyes y menoscaban el derecho al sufragio.* Más que una *decisión,* ese curso de acción mayoritario propiamente es producto de una *indecisión.* Profetizamos que, a la postre, en unos meses el caso retornará a este Foro y la mayoría tendrá entonces —tardíamente y con unas implicaciones negativas comiciales para Granados Navedo que pudieron evitarse— resolver lo que "en este momento" (opinión mayoritaria, pág. 51) ha rehusado: *ordenar una nueva elección.*

Para una mejor exposición, en vista de los innumerables planteamientos y las complejidades del caso —apartándonos de la metodología clásica— hemos subdividido este disenso en varios temas centrales y unido al final sus apéndices.(1)

| (1) | Temas | Páginas |
|---|---|---|
| I | Trámites y dictámenes del Tribunal Superior | 104–107 |
| II | Antecedentes | 107–120 |
| III | Cambio en la Ley Electoral de Puerto Rico; impacto en la revisión judicial | 120–125 |
| IV | Principios aplicables | 125–127 |
| V | Etapas del proceso post eleccionario | 127–133 |
| VI | Juicio *de novo*; su alcance y efectos | 133–142 |
| VII | Admisibilidad de los documentos, papeletas, archivos y transcripciones de las deliberaciones y acuerdos de la Comisión Estatal | 143–145 |
| VIII | Capacidad y legitimidad (*standing*) de Granados Navedo; su alcance | 146–152 |
| IX | Acuerdos unánimes; regla general, sus excepciones y efectos | 152–157 |
| X | Admisibilidad de expedientes y papeletas de electores añadidos a mano y el debido proceso de ley | 157–163 |
| XI | Causa de acción fundada en electores añadidos a mano "rechazados" por la Junta Especial o la Comisión Estatal | 163–201 |
| XII | Papeleta de nominación directa (*write-in*) | 201–203 |
| XIII | Papeletas con doble marca | 203–215 |
| XIV | Causa de acción de papeletas con iniciales | 216–232 |
| XV | Otras papeletas válidas no adjudicadas | 233–235 |
| XVI | Papeletas contaminadas no arrestadas | 235–242 |
| XVII | Revocación de sentencia; gravedad de errores | 242–244 |
| XVIII | Enmienda a la súplica o remedio | 244–251 |
| XIX | Papeletas contaminadas arrestadas; resolución del Presidente de la Comisión Estatal de no contarlas | 251–263 |
| XX | Inaplicabilidad al caso de la doctrina federal de irregularidades ordinarias (*garden variety*) | 263–265 |
| XXI | Alternativas excluyentes | 265–273 |
| XXII | Nueva elección: parcial o total | 273–281 |
| XXIII | Parámetros de la nueva elección; descertificación de Acevedo Pérez; candidatos y electores a participar | 281–283 |
| XXIV | Deficiencias del sistema electoral; efectos negativos en el derecho al voto | 284–289 |
| XXV | Conclusiones | 290–297 |

# I

*Trámites y dictámenes del Tribunal Superior*

El 19 de diciembre de 1988 Granados Navedo —candidato a Alcalde por el Partido Nuevo Progresista (P.N.P.) para el Municipio de San Juan en las elecciones de 8 de noviembre de 1988— impugnó ante el Tribunal Superior, Sala de San Juan (Hon. Carlos E. Polo), la certificación de elección expedida por la Comisión Estatal de Elecciones (en adelante Comisión Estatal) el 7 de diciembre de 1988 a favor de Acevedo Pérez, candidato por el Partido Popular Democrático (P.P.D.).(2) La certificación fue emitida por el Presidente de la Comisión Estatal de Elecciones (en adelante Presidente de la Comisión), Lcdo. Marcos A. Rodríguez Estrada. No medió unanimidad entre los Comisionados Electorales,

---

*Apéndices*

A.  Papeleta nominación directa (*Write-in*)
B.  Papeletas de doble marca anuladas por el Presidente de la Comisión Especial el 2 de diciembre de 1988
C.  Análisis de las papeletas con iniciales al dorso, protestadas y no adjudicadas por la Comisión Estatal
D.  Otras papeletas válidas no adjudicadas
E.  Papeletas ilustrativas de deficiencias en el sistema electoral; efectos negativos en el derecho al voto

(2) Desde el 14 de diciembre Granados Navedo había instado tres (3) acciones —*Granados Navedo v. Acevedo*, Núm. 88–2023; *Carmona O'Neill v. Rodríguez Estrada*, Núm. 88–2024, y *Osorio Vélez v. Rodríguez Estrada*, Núm. 88–2025— contra los mismos demandados en la Corte de Distrito de Estados Unidos para el Distrito de Puerto Rico. Su propósito era obtener la descertificación de Acevedo Pérez como Alcalde de San Juan. En cada acción se unieron como demandantes un número de electores que reclamaron que sus votos emitidos en las elecciones de 8 de noviembre no habían sido adjudicados por varios motivos.

A solicitud de los demandados, dicha corte se abstuvo de entender en esas reclamaciones al amparo de las normas de abstención enunciadas en *Railroad Comm'n v. Pullman Co.*, 312 U.S. 496 (1941).

El posible desenlace de esas acciones no rige nuestra decisión. Salvo su mención por razón de los trámites habidos en el tribunal de instancia, rehusamos adentrarnos en el campo de la especulación.

pues el Comisionado Electoral del P.N.P., Francisco González Rodríguez, votó en contra.

En síntesis, Granados Navedo alegó que la certificación fue apresurada, parcializada y nula, y solicitó del tribunal que invalidara dos mil quinientos cincuenta y siete (2,557) votos emitidos en catorce (14) unidades electorales *contaminadas*; que adjudicara a su haber unas papeletas con iniciales al dorso de los electores que siguieron instrucciones confusas y erróneas de los funcionarios de colegios; que anulara quince (15) papeletas con doble marca adjudicadas a favor del P.P.D.; que adjudicara a su favor por lo menos treinta (30) votos de electores rechazados por la Comisión Estatal arbitrariamente, y que adjudicara también un (1) voto por nominación directa (*write-in*), más otro de un confinado. Pidió, una vez concluido esos trámites, una nueva certificación que lo declarara electo.

Oportunamente los demandados contestaron. En términos generales, aceptaron algunas alegaciones y negaron otras. Además, levantaron varias defensas. Acevedo Pérez alegó, en la alternativa, que los votos que la Comisión Estatal hubiese dejado de adjudicar a su favor "supera el número de votos que según la demanda dejaron de adjudicarse en perjuicio del demandante José Granados Navedo".

Se celebraron varias vistas y se suscitaron distintos incidentes procesales. *Durante las mismas, las partes estipularon la admisibilidad de numerosos documentos e identificaron muchos más. Granados Navedo presentó como testigos al Presidente de la Comisión, licenciado Rodríguez Estrada, y a su Primer Vicepresidente, Ramón Bauzá Escobales.*

El 9 de enero de 1989 el tribunal (Hon. Carlos E. Polo, Juez) dictó una primera resolución y sentencia parcial. Declaró *inadmisibles* cuarenta y ocho (48) piezas documentales identificadas relacionadas con papeletas recusadas de ciudadanos elegibles cuyos nombres fueron añadidos a mano du-

rante las elecciones. Fundó su criterio en que Granados Navedo estaba impedido de cuestionar por primera vez en dicho pleito aquellas adjudicaciones unánimes de la Comisión Estatal en las que estuvo debidamente representado por el Comisionado Electoral o por cualquier otro funcionario subalterno que representara los intereses del P.N.P. Sostuvo que sólo podría cuestionar, en juicio *de novo*, aquellas determinaciones del Presidente de la Comisión en las que no medió unanimidad entre los Comisionados Electorales. Dictaminó, además, que Granados Navedo no tenía capacidad jurídica (*standing*) para reclamar los derechos electorales de terceros, es decir, los derechos de aquellos ciudadanos que votaron a su favor y cuyos votos no fueron adjudicados por dictamen unánime de la Junta Especial de Añadidos a Mano (en adelante Junta Especial). Como consecuencia, desestimó de plano las alegaciones de Granados Navedo relativas a los ciudadanos que emitieron votos luego de que sus nombres fueran añadidos a las listas en virtud de lo resuelto en *P.N.P. y P.I.P. v. Rodríguez Estrada*, 122 D.P.R. 490 (1988), y denegó la anulación (*disfranchisement*) de dos mil quinientos cincuenta y siete (2,557) votos supuestamente *contaminados* y la adjudicación a su favor de un voto emitido por un confinado que se adjudicó en Bayamón, más uno clasificado como de nominación directa (*write-in*).

Posteriormente, mediante Resolución de 19 de enero de 1989, reiteró esos pronunciamientos y rechazó una solicitud de Granados Navedo de que se contaran y adjudicaran doscientos ocho (208) votos *arrestados* y su reclamo en torno a dos (2) papeletas votadas "en blanco". En igual fecha, mediante otra sentencia parcial, desestimó como *cosa juzgada* las alegaciones sobre las papeletas con las iniciales de los electores a su dorso fundado en lo resuelto en *P.N.P. v. Rodríguez Estrada, Pres. C.E.E.*, 123 D.P.R. 1 (1988).

Finalmente, el 2 de febrero dictó una sentencia definitiva en la cual reafirmó sus anteriores resoluciones y, además,

desestimó por "académico e inconsecuente" las alegaciones referentes a quince (15) papeletas "de doble marca".

Inconforme, Granados Navedo apeló oportunamente todos esos dictámenes ante este Foro. Expedimos y, por razones obvias, los consolidamos. El 29 de marzo celebramos vista oral[3] a la cual comparecieron las partes y sus abogados, y argumentaron sus posiciones con la participación activa de los restantes Jueces de este Tribunal. T.E. Supremo, págs. 1–181.

## II

*Antecedentes*

Las elecciones generales en Puerto Rico se celebraron el 8 de noviembre de 1988 bajo la supervisión de la Comisión Estatal. En lo concerniente al cargo de Alcalde del Municipio de San Juan —dentro del plazo de setenta y dos (72) horas provisto en el Art. 6.007 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3267— la Comisión Estatal informó que los resultados preliminares favorecían a Granados Navedo. Como el margen de diferencia era menos de la mitad del uno por ciento (.5%) de la totalidad de los votos emitidos para ese cargo, Acevedo Pérez —al amparo del Art. 6.011 de esta ley, 16 L.P.R.A. sec. 3271— solicitó un recuento en los cinco (5) precintos electorales comprendidos en dicho municipio.

El recuento comenzó el 14 de noviembre de 1988. Se efectuó a tenor con el Reglamento Oficial de las Elecciones Generales de 1988 (en adelante Reglamento de Elecciones de 1988) promulgado por la Comisión Estatal el 23 de mayo de

---

[3] A los fines de una precisa y escrupulosa exposición, hemos clasificado la prueba documental consignando el número de *exhibit* o identificación, y quién la produjo. Como existen tres (3) transcripciones de procedimientos distintos, las identificaremos a base de su cronología y foro de origen: Comisión Estatal (T.E. Comisión, pág. —); Tribunal Superior (T.E. Superior, pág. —), y Tribunal Supremo (T.E. Supremo, pág. —).

1988. A su amparo, se establecieron mesas de escrutinio compuestas por un funcionario de la Comisión Estatal —sin voto— y un representante de cada uno de los tres (3) partidos que presentaron candidatos para Alcalde de San Juan. Por cada diez (10) mesas había una Junta de Supervisores de Mesa. Además, se creó una Junta de Supervisores Generales a cargo de los Supervisores de Mesa. Cada junta tenía un representante por partido. Finalmente, se designó un Director de Escrutinio, sin funciones adjudicativas, y una Subcomisión Electoral para la supervisión de todo el proceso compuesta por los Comisionados Electorales Alternos de los tres (3) partidos políticos que compitieron para la Alcaldía de San Juan. Regla 67-A del Reglamento de Elecciones de 1988.

El recuento y el escrutinio general requerido por el Art. 6.008 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3268, se llevaron a cabo simultáneamente. Regla 70(7) del Reglamento de Elecciones de 1988. El escrutinio general consiste normalmente del examen de las Actas de Colegio, pero el recuento conlleva el cotejo de las Actas de Colegio y el examen de papeleta por papeleta. Regla 70(3)(b) del Reglamento de Elecciones de 1988.

Bajo este organigrama de trabajo, en el recuento de la Comisión Estatal el proceso de adjudicación de cada papeleta votada para el cargo de Alcalde de San Juan comenzaba en las mesas. Las decisiones eran adoptadas con el consenso unánime de los representantes de los tres (3) partidos políticos. Si no había consenso sobre la adjudicación de un voto en particular, se sometía a los Supervisores de Mesa, quienes también decidían por unanimidad. Si ahí no se lograba esa unanimidad, correspondía entonces decidirlo a los Supervisores Generales. Si todavía en esa etapa no se lograba el consenso, intervenían entonces los Comisionados Electorales Alternos de los partidos políticos, a quienes también se les requería unanimidad. A falta de ésta, el asunto se sometía y se decidía en la Comisión Estatal. Regla 69(1) del Regla-

mento de Elecciones de 1988. De subsistir desacuerdo entre los Comisionados Electorales de los partidos en el seno de la Comisión Estatal, por mandato de ley decidía su Presidente, el licenciado Rodríguez Estrada.

Además de esta metodología de labores y patrón decisorio, y como consecuencia de nuestra opinión en *P.N.P. v. Rodríguez Estrada, Pres. C.E.E.*, supra —en que determinamos válida una enmienda reglamentaria para garantizar que los electores que el día de las elecciones no aparecieran en las listas electorales incompletas pudieran votar añadidos a mano, sujeto al trámite de recusación y a la verificación ulterior de que eran electores cualificados excluidos erróneamente de las listas— y en vista de que los votos así emitidos *no* serían adjudicados en los Colegios de Votación, la Comisión Estatal estableció un procedimiento especial para canalizar esas investigaciones.

A tal efecto, autorizó al Primer Vicepresidente, Bauzá Escobales (P.N.P.), a que en unión al Secretario de la Comisión Estatal de Elecciones (en adelante Secretario de la Comisión) (P.P.D.) y del Segundo Vicepresidente (P.I.P.), establecieran el procedimiento. Según sugerido por Bauzá Escobales, el procedimiento se ilustró en un flujograma (*flow chart*) que oportunamente fue aprobado por la Comisión Estatal. *Exhibit* 140, demandante. A base de ese flujograma, el Secretario de la Comisión expuso por escrito el procedimiento, aunque ello nunca fue sometido a la Comisión Estatal. El flujograma aprobado regiría la investigación.

El flujograma sufrió varias modificaciones durante el proceso. Éstas fueron acordadas por la Junta Especial, creada por la Comisión Estatal el 17 de noviembre de 1988 con el propósito de conducir y dirigir el proceso de investigación del derecho al voto de estos electores. T.E. Superior, págs. 640–641. Ello respondió a una solicitud de Bauzá Escobales a la Comisión Estatal. En síntesis, la mencionada Junta Especial estaba integrada —al igual que todos los organismos su-

bordinados de la Comisión Estatal— por un representante de cada uno de los partidos políticos (Bauzá Escobales por el P.N.P., Iván Algarín por el P.P.D. y Andrés Miranda por el P.I.P.).

La Comisión Estatal delegó en la Junta Especial la facultad de decidir, por unanimidad, *todo* lo concerniente a la investigación y determinación del derecho de los electores que fueron añadidos a mano. T.E. Supremo, págs. 107–108. Esa amplia delegación fue de "alcance ilimitado", según Báez Galib y Acevedo Pérez. Alegato de los recurridos, pág. 8.

Para el proceso de investigación del derecho de los electores que fueron añadidos a mano se asignó un área de mesas especiales. La Junta Especial realizó la tarea fundándose únicamente en una fotocopia de los sobres individuales que en su exterior exponían las circunstancias del elector. Se investigaron en San Juan los récord de más de cuatro mil doscientos (4,200) electores y se recopilaron sus resultados en unos expedientes de investigación individuales. Se acudió a varias fuentes de investigación, a saber, el computador de la Comisión Estatal contentivo de la información de cada elector a través de varios terminales; el material documental obrante en los archivos de la Comisión Estatal que aún no hubiera entrado al computador; los documentos del cuatrienio, incluso las listas y actas de votación de 1984, las listas de *excluidos* y las listas de *inclusiones*; los documentos de determinada área disponibles en Secretaría, y otros documentos existentes en la sede oficial de la Comisión Estatal.

La investigación *a través de los impresos del terminal del computador* validó el derecho a votar de entre un sesenta y ocho (68) por ciento a un setenta (70) por ciento de los votantes añadidos a mano el día de las elecciones. Los restantes casos —treinta (30) por ciento a treinta y dos (32) por ciento— no validados en los terminales del computador, pasaron al área de récord y constancias documentales de la Comisión Estatal. La investigación documental —que tomó in-

numerables días de trabajo— rindió como fruto positivo que aproximadamente del veinticinco (25) por ciento al treinta (30) por ciento de los casos pendientes —del treinta (30) por ciento al treinta y dos (32) por ciento que no aparecían con derecho en los terminales del computador— fueron validados.

Según expuesto, la Junta Especial era el organismo que, de ordinario, finalmente decidía si un elector añadido a mano tenía derecho a votar en las elecciones. Algunos casos fueron remitidos por ésta a la Comisión Estatal, quien los aceptó o rechazó. El Expediente de Investigación consistía de una primera *Hoja de Control* que contenía espacios para consignar el nombre, número de tarjeta electoral y demás circunstancias del elector pertinentes a la investigación. En la *Hoja de Control* se anotaban las áreas donde se había completado la investigación documental. Si aparecía algún documento que acreditaba ese derecho, se le anejaba copia. De lo contrario, se hacía constar la negativa en el impreso (*Hoja de Control*). Estos impresos de investigación así cumplimentados se devolvían entonces a la mesa de añadidos a mano para que la Junta Especial tomara la determinación final sobre el derecho al voto de cada elector.

La evidencia indica que al 3 de diciembre de 1988 se había concluido la investigación de la totalidad de los cuatro mil doscientos (4,200) electores bajo el procedimiento antes descrito. A base del mismo, la Junta Especial determinó que no tenían derecho al voto y rechazó los casos de mil doscientos ochenta (1,280) electores. El Comisionado Electoral del P.N.P., González Rodríguez, pidió que se reinvestigaran algunos de estos casos.

Al anochecer de 3 de diciembre, debido a que inicialmente algunas investigaciones no se habían completado, se presentaron a la Junta Especial cuatro (4) o cinco (5) casos de los rechazados originalmente por inactivos y que, luego de reexaminados en los terminales del computador, quedaba

acreditado el derecho al voto del elector. T.E. Superior, págs. 532–533. También, desde los inicios y durante el proceso de investigación, llegaron a dicha Junta Especial ciertos documentos, como resoluciones de los tribunales de justicia, que autorizaban a votar a algunos electores. Estos eran mayormente casos de *excluidos*. La Secretaría de la Comisión Estatal de Elecciones los había obtenido y circulado a las áreas de investigación durante el proceso. Se desconocía si algunas de esas resoluciones judiciales enviadas a la Comisión Estatal correspondían a electores rechazados por estar *inactivos* o por haber sido *excluidos*. Cabe notar que para estas elecciones generales se clasificaron como *excluidos* a los electores que no tenían derecho al voto por razones dispuestas por la ley, tales como recusación por domicilio, incapacidad o muerte. Como *inactivos* se clasificaron a los que no votaron en las elecciones de 1984 y no reactivaron su condición de electores hábiles mediante una inscripción u otra transacción equivalente.

Ante esta situación, la Junta Especial acordó reinvestigar *todos* los rechazados por razón de *exclusión*, que eran aproximadamente la mitad de los mil doscientos ochenta (1,280) rechazados. Además, el 5 de diciembre se abrieron sobres de electores rechazados (excluidos e inactivos) con miras a localizar evidencia que hubiera estado en poder del elector al momento de votar, ya que el procedimiento requería que aquellos que hubieran obtenido una resolución judicial acreditadora de su derecho la depositaran en el sobre individual con su papeleta y tarjeta electoral.

La reinvestigación de los seiscientos (600) casos originalmente rechazados, clasificados como *excluidos*, también tuvo resultados positivos. De doce (12) a catorce (14) casos fueron validados.

En cuanto a la ampliación de la reinvestigación a la otra mitad de los rechazados —clasificados como *inactivos*— no hubo acuerdo unánime en la Junta Especial. El funcionario

Algarín, del P.P.D., se opuso. *Por tal razón, esos casos de inactivos no fueron reinvestigados.* Inconforme con esa negativa, la mañana del 6 de diciembre Bauzá Escobales la informó directamente a la Comisión Estatal por memorando. Solicitó autorización y orden para reinvestigar los casos rechazados como *inactivos* por falta de unanimidad, esto es, "debido a que un miembro de la *Junta [Especial]* no está de acuerdo con que se lleve a cabo esta revisión". Indentificación 74, demandante; *Exhibit* 50. La Comisión Estatal se negó a darle crédito y no tomó acción alguna al respecto. Sin fundamentar razones, dio por *no recibida* esa solicitud. T.E. Superior, pág. 262.

A modo de paréntesis y desde una perspectiva judicial, en la medida en que la Junta Especial —por delegación ilimitada— tenía que adoptar sus acuerdos por unanimidad, la inacción de la Comisión Estatal constituyó una variante *impermisible* dentro del esquema legal y reglamentario vigente al no intervenir ni resolver el planteamiento y "tranque" en la Junta Especial. *El resultado fue que quedó en un limbo jurídico el trámite recomendado por Bauzá Escobales.*

Sobre este particular, *advertimos que antes de la decisión desestimatoria del foro de instancia Granados Navedo pudo producir prueba para sustanciar sus alegaciones* de que algunos electores fueron *erróneamente* clasificados como *inactivos*, esto es, al momento de expedirse la certificación había demostrado que éstos tenían derecho a votar. *En las circunstancias apuntadas, no se justificó la actuación de la Comisión Estatal y erró el tribunal al sostener la corrección de esas determinaciones a base del criterio de acuerdo unánime en la Junta Especial.*

Aparte de lo expuesto, durante el recuento se detectaron doscientas siete (207) papeletas votadas por electores que no aparecían en las listas electorales y que habían votado a base del método de añadidos a mano. Formaban parte de otros

cuatro mil doscientos (4,200) electores que así lo hicieron por virtud de la enmienda al reglamento y nuestra decisión en *P.N.P. y P.I.P. v. Rodríguez Estrada,* supra. En esencia, ese procedimiento requería que una vez el elector suscribiera una declaración jurada y votara en su papeleta, los funcionarios del colegio la depositaran en un *sobre especial* junto con la tarjeta de identificación electoral del elector y la evidencia acreditativa del derecho al voto que éste tuviera en su poder. Dicho voto, a ser recusado, se investigaría en la Comisión Estatal y, eventualmente, se adjudicaría si el elector estaba autorizado a emitirlo.

Estas doscientas siete (207) papeletas, por falta de material, errores, inadvertencias y acciones de algunos funcionarios de seis (6) colegios en determinados precintos, fueron depositadas y *mezcladas* en uno o varios sobres sin que se relacionaran con las tarjetas electorales y sin que pudiera identificarse la papeleta que correspondía a cada elector. *Debido a este error, era y es imposible adjudicar los votos válidamente emitidos y anular los votos correspondientes a los electores no cualificados, esto es, sin derecho a votar.*

Advertida la Comisión Estatal de esa situación, previa discusión al efecto, instruyó a las mesas de recuento y a la Junta Especial que se *abstuvieran* de adjudicar los sobres en los que estuvieran mezcladas las papeletas inidentificadas de electores añadidos a mano. De ese modo pospuso emitir juicio sobre la validez de las papeletas. Esa orden dio margen a que estas doscientas siete (207) papeletas fueran interna y públicamente denominadas *papeletas arrestadas.*

Según las alegaciones de Granados Navedo, el recuento también reveló que en catorce (14) colegios electorales dos mil quinientas cincuenta y siete (2,557) papeletas, *algunas* correspondientes a un número indeterminado de electores añadidos a mano que podían o no tener derecho a votar, también fueron mezcladas con las papeletas de electores cualifi-

cados que aparecían en las listas oficiales. A esta situación la denominó como *papeletas contaminadas*.

No fue hasta el 7 de diciembre de 1988 que el Comisionado Electoral González Rodríguez planteó la cuestión de estas papeletas a la Comisión Estatal. Hasta ese momento esas papeletas se habían remitido directamente a las mesas de recuento y, por unanimidad de los representantes de todos los partidos, se habían adjudicado y contabilizado. La diferencia esencial entre estas papeletas *contaminadas* no arrestadas y las doscientas siete (207) *arrestadas* es que estas últimas corresponden exclusivamente a electores añadidos a mano. Sin embargo, en lo que atañe a la correlación de los electores con sus papeletas, la situación es la misma. Por haberse mezclado en las urnas no es posible identificar cuál papeleta pertenece a cada elector. O sea, se desconoce y es *imposible* determinar si los votos adjudicados por esas papeletas a favor de Granados Navedo y de Acevedo Pérez fueron emitidos por electores cualificados.

Además, durante el recuento, el 2 de diciembre el Presidente de la Comisión, a solicitud del Comisionado Electoral licenciado Báez Galib y con la oposición del Comisionado Electoral González Rodríguez, luego de practicarse una investigación y presentarse prueba testifical, documental y pericial, adjudicó íntegramente al P.P.D. quince (15) papeletas municipales del Precinto 4, Unidad 9, Colegio 3, en las cuales aparecía una marca bajo la insignia del P.P.D. y otra bajo la insignia de otro partido.

El proceso de recuento continuó hasta el 7 de diciembre. Ese día el candidato del P.P.D., Acevedo Pérez, aventajaba a Granados Navedo por sólo veintinueve (29) votos.

La reunión de la Comisión Estatal convocada para la mañana fue pospuesta para la 1:00 P.M., con miras a darle oportunidad al Comisionado Electoral González Rodríguez de estar presente. Después, éste le comunicó al Presidente de la Comisión, licenciado Rodríguez Estrada, que no le era posi-

ble asistir antes de las 3:00 P.M. Ante esa situación se comenzó la reunión según pautada. De la transcripción se desprende claramente —aun cuando hay partes en que no se identifica al interlocutor— que ocurrió un intenso y acalorado debate entre el Comisionado Electoral Báez Galib y el Primer Vicepresidente Bauzá Escobales en relación con unas manifestaciones que este último hizo a la prensa y que el primero consideró impropias y parcializadas. Identificación 70, demandante; T.E. Comisión, págs. 5–7 y 27–55.

Oportunamente arribó el Comisionado Electoral González Rodríguez. Luego de otros incidentes colaterales, el Comisionado Electoral del P.P.D., licenciado Báez Galib, le solicitó dos (2) dictámenes a la Comisión Estatal. Uno, que se *reconsiderara* la determinación adoptada por la Comisión Estatal el 29 de noviembre para que se revisaran las papeletas adjudicadas en el recuento por los funcionarios de mesa en los Precintos 1, 2 y 3 —quienes las habían anulado por aparecer marcas bajo más de una insignia (papeletas de doble marca)— por entender que esa revisión era contraria a la Regla 69 del Reglamento de Elecciones de 1988. Además, que se anularan todas las papeletas conocidas como votos *arrestados*. Esta última petición —que había sido pospuesta a su ruego— era crucial, ya que estos doscientos siete (207) votos *arrestados* podían determinar el resultado de la elección.

La Comisión Estatal entendió en ambas solicitudes. Respecto a la *reconsideración* de Báez Galib, por no haber unanimidad, intervino el Presidente de la Comisión y la declaró con lugar. Como consecuencia, denegó el pedido del Comisionado Electoral González Rodríguez (P.N.P) y se paralizó la revisión de las *papeletas de doble marca* anuladas unánimemente por los funcionarios de mesa en los Precintos 1, 2 y 3 de San Juan por razón de doble marca. *Exhibit* 37, demandante; T.E. Superior, págs. 471–473 y 479.

En cuanto a las *papeletas arrestadas*, el Comisionado Electoral del P.P.D. votó a favor de su propia propuesta de que se anularan. El Comisionado Electoral del P.I.P., Meléndez Rivera, consignó por escrito que deberían anularse, pero en vista del escaso margen de diferencia —veintinueve (29) votos equivalentes a .01%— plasmó su criterio de que procedía una elección *limitada a esos colegios* como único medio justo para declarar al verdadero vencedor. T.E. Superior, pág. 341; Identificación 70, demandante; T.E. Comisión, págs. 84–85. Por su parte, el Comisionado Electoral del P.N.P., González Rodríguez, se opuso a esta última propuesta y expuso que en una elección especial los electores en cuestión podrían ser indebidamente influenciados o atemorizados. Votó a favor de que se validaran y adjudicaran las papeletas arrestadas. Pidió, de anularse las mismas, que se le diera la oportunidad de examinar catorce (14) unidades electorales (colegios) en las que, a su juicio, las papeletas también estaban *mezcladas* (contaminadas) y que, por haber pasado directamente a las mesas de escrutinio, no se habían arrestado. Identificación 70, demandante; T.E. Comisión págs. 88–89.

Ausente la unanimidad entre los Comisionados Electorales, el Presidente de la Comisión, licenciado Rodríguez Estrada, acogió la propuesta del P.P.D. y decidió anular esos votos arrestados. *Exhibit* 38, demandante. En su Resolución de 7 de diciembre de 1988 —que será objeto de un ponderado análisis ulterior— expuso, entre otras razones, que en una elección tan cerrada "permitir que se cuente el voto de los electores en controversia equivaldría a que electores no cualificados para votar puedan decidir una elección vulnerándose la voluntad de los electores cualificados para votar". Caso Núm. CE-89-30, *Exhibit* I, págs. 29–30.

Además de esta resolución, por falta de unanimidad el Presidente de la Comisión, licenciado Rodríguez Estrada, también falló nuevamente en contra de las pretensiones del

Comisionado Electoral del P.N.P. de que se adjudicaran nueve (9) casos de electores añadidos a mano. El derecho al voto de estos electores inicialmente había sido investigado y rechazado unánimemente por la Junta Especial, aunque González Rodríguez, como representante del P.N.P., solicitó su reinvestigación y produjo documentos al efecto. T.E. Superior, págs. 327–328 y 468–469. Además, mencionó que quería presentar un "montón" de casos más. Íd., pág. 328. El Presidente de la Comisión, licenciado Rodríguez Estrada, estimó *que aun adjudicándolos a Granados Navedo* los mismos no eran suficientes para descontar la ventaja de Acevedo Pérez, que entonces era de veintinueve (29) votos. Íd.; Identificación 70, demandante; T.E. Comisión, pág. 109.

En cuanto al planteamiento del Comisionado Electoral González Rodríguez, que pide tiempo para examinar las catorce (14) unidades electorales de *papeletas contaminadas no arrestadas*, el récord taquigráfico *no revela acuerdo de la Comisión Estatal o de la resolución* del Presidente de la Comisión Rodríguez Estrada al respecto. Sí se desprende que Báez Galib —a pesar de las objeciones del Comisionado Electoral del P.N.P.— pidió que se certificara la elección de Acevedo Pérez y, horas después, el Presidente de la Comisión emitió y suscribió la certificación al efecto. Identificación 70, demandante; T.E. Comisión, pág. 95.

De lo expuesto surge que el Presidente de la Comisión, licenciado Rodríguez Estrada, optó por expedir sin ulterior trámite o gestión investigativa la certificación —al declararle sin lugar las distintas solicitudes del Comisionado Electoral González Rodríguez (P.N.P.)— a base de que los votos que pudieran arrojar esas gestiones no serían suficientes para cambiar el resultado. Debemos puntualizar que la propia certificación, a modo de *nota*, reconoció *que no se había finalizado el recuento, es decir, fue cualificada.* Se aclaró que el resultado de votos escrutados *no* incluía un número indefinido de "papeletas *pendientes de adjudicación*

*en la Comisión o de electores añadidos a mano que se encuentran pendientes de ser adjudicadas conforme a la Ley,* antes de que *finalice* el Escrutinio General[,] *pero que por su cantidad no afectará el resultado expresado en esta Certificación"*. (Énfasis suplido.) Caso Núm. CE-89–30, *Exhibit* I, pág. 25. Como oportunamente veremos, *esta conclusión es errónea y afecta radicalmente la validez de la certificación favorable a Acevedo Pérez.*

Luego, uno de los Comisionados Electorales —no se identifica cuál— solicitó infructuosamente "de la Comisión y del Secretario que se proced[iera] a hacer una *publicación a todas las personas cuyos votos añadidos a mano no se le[s] ha adjudicado y las razones por qué no se les adjudicó* finalmente, cuyo voto se canceló y no se le ha adjudicado, y que si en algún momento ellos deciden llegar (sic) algún tipo *de acción directamente al Tribunal,* para solicitar que su voto se adjudique, pues que puedan tomar la decisión". (Énfasis suplido.) Íd., pág. 99. No aparece acción alguna de la Comisión Estatal o de su Presidente sobre este extremo.

Resumimos nuestra insatisfacción con la decisión adoptada hoy por la mayoría del Tribunal. Para ello, nos remontamos a los inicios de esta década y citamos los pensamientos de protesta de uno de los protagonistas de entonces y del presente:

> *El que unas elecciones sean cerradas no indica que necesariamente tenga que haber dudas sobre la legitimidad de unos resultados. Lo que sí es que resalta la importancia crucial de todos los elementos del sistema electoral que pudieran causar una diferencia en los resultados. En el proceso electoral esos elementos lo representan la ley electoral, los administradores del proceso de votación, el escrutinio y los foros que dilucidan controversias electorales.*
>
> .        .        .        .        .        .        .        .        .
>
> *Estas circunstancias impiden que ofrezca mi voto para que se declaren como finales unos resultados carentes de cer-*

*teza moral. La honestidad del proceso electoral no puede ser vulnerada por argumentos de comodidad.*

El abuso de poder que vivimos durante esos años en la manipulación de los asuntos electorales queda como una página desgraciada en nuestra historia, la cual quedará abierta a los descubrimientos de cada día.

El reto del futuro en superar ese día trágico y devolverle al país un sistema electoral que le permita al que triunfe reclamar su victoria con legitimidad y al que pierde aceptarlo sin reserva.

*Al que permanece inmutable ante la injusticia y busca excusas para evitar confrontarla tarde o temprano resulta en su cómplice o en su víctima.*

Por ello voto en contra que se declare finales estos resultados. *Serán resultados oficiales, pero no finales*. (Énfasis suplido.) H.L. Acevedo, *Las elecciones de 1980 en Puerto Rico*, 43 (Núm. 3) Rev. C. Abo. P.R. 471, 484–485 (1982).

## III

*Cambio en la Ley Electoral de Puerto Rico; impacto en la revisión judicial*

De entrada, con estos antecedentes se imponen unas reflexiones mínimas en torno a unos de esos elementos, el método decisorio institucional, producto de un cambio muy importante en la Ley Electoral de Puerto Rico y su impacto en la función revisora de los tribunales.

El Art. 1.006(e) de la actual Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3014(e), dispone que todo acuerdo de la Comisión Estatal "deberá ser aprobado por unanimidad de los votos de los Comisionados presentes . . .". Consagra un mecanismo vigente desde hace varias décadas en nuestra jurisdicción. Según el mismo, ausente esa unanimidad, la cuestión "será decidida, en pro o en contra por el Presidente cuya decisión se considerará como la decisión de la Comisión Estatal . . .". Íd.

En *P.S.P. v. Com. Estatal de Elecciones*, 110 D.P.R. 400, 412–415 (1980) —frente a un ataque de inconstitucionalidad

fundado en que esa sola intervención y decisión *a posteriori* del entonces Administrador, hoy Presidente de la Comisión, lesionaba el cardinal principio democrático de adjudicación por mayoría— sostuvimos su validez. Nuestra razón de decidir fue fundada en la *premisa básica* de que dicho funcionario era el "custodio y representante del interés individual y público —frente al netamente político partidista— . . .". Íd., pág. 407. Arribamos a esa conclusión en vista de que la Asamblea Legislativa, al crear y definir en 1977 los requisitos del cargo, escrupulosamente visualizó que recayera en un elector residente "de reconocida capacidad profesional, probidad moral, conocimientos o interés, en los asuntos de naturaleza electoral", pero sobre todo, proveyó cautelarmente que "dicha persona no podr[ía] haber sido miembro de un organismo directivo central o municipal de un partido político, ni haber ocupado cargo público electivo alguno dentro de los ocho (8) años anteriores a su nombramiento". Art. 1.005 de la Ley Núm. 4 de 20 de diciembre de 1977, Leyes de Puerto Rico, pág. 645.

A tal efecto dijimos: "No es necesaria una elaboración exhaustiva para comprender que el interés del Estado en que *el proceso electoral no quede en manos exclusivas de los intereses de los partidos políticos* —con las pasiones, desavenencias y problemas que ello a veces acarrea— es de suficiente valía como para mitigar y *derrotar el reclamo a base de la tesis de una fórmula de votación estrictamente basada en una mayoría n[u]m[é]rica simple. A ello responde la posición y facultad de decisión del Administrador.*" (Énfasis suplido y escolio omitido.) *P.S.P. v. Com. Estatal de Elecciones,* supra, pág. 415.

Notamos, sin embargo, que bajo la actual Ley Electoral de Puerto Rico esa delicada y balanceada infraestructura conceptual decisoria —de separar discretamente al Presidente de la Comisión de una pública y comprobada afiliación política— quedó sustancialmente *obliterada* en virtud de

unas enmiendas. Así, el Art. 1.009 vigente de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3005, preceptúa que el Presidente de la Comisión *será* del "*partido* cuyo candidato a Gobernador hubiere obtenido el mayor número de votos en la elección inmediatamente precedente". *En otras palabras, por interdicto legislativo, el Presidente de la Comisión tiene que poseer la cualidad de afiliado al partido político que controla el Poder Ejecutivo.*

Hemos buscado la justificación de este cambio radical. La enmienda aparentemente nació en la Comisión Especial para la Revisión del Proceso Electoral de Puerto Rico (C.E.R.P.E.). En el Informe de la Comisión para la Revisión del Proceso Electoral de Puerto Rico de 17 de marzo de 1982 (en adelante Informe), C.E.R.P.E. reconoció, en materia electoral, la existencia de dos (2) patrones legislativos, y que en "ambos diseños se intenta librar la administración electoral del *control* del Gobierno *o de un partido político*". (Énfasis suplido.) Informe, pág. 12. Compatible con ese enfoque, para la dirección del proceso electoral adoptó "el sistema de participación y balance por los partidos [políticos]". Íd., pág. 13. A esos efectos, se convirtió a la Comisión Estatal en el organismo director y rector, y a su Presidente en el oficial ejecutivo para implantar sus acuerdos. En cuanto al nombramiento, recomendó el criterio partidista a "fin de facilitar su selección por los Comisionados Electorales y sus relaciones con otros organismos gubernamentales, *el Presidente será un simpatizante del partido principal de la mayoría*". (Énfasis suplido.) Íd., pág. 14.

Es evidente, pues, que al enmendarse la ley y exigirse una *absoluta afinidad política* entre el Presidente de la Comisión y el partido del Primer Ejecutivo, *se obtuvo un resultado distinto al propósito perseguido de liberar el sistema electoral del control de un partido político*. Se trastocó todo el sensitivo balance que existía antes de esta enmienda apuntalado en un solo voto y en un solo representante por cada

partido político. Así, el elemento decisorio final y determinante pasó potencialmente, por conducto del Presidente de la Comisión, de forma peligrosa a manos del Primer Ejecutivo.

Ello no pasó desapercibido. El entonces Comisionado Electoral del P.I.P., Lcdo. David Noriega Rodríguez, en su voto explicativo unido al informe de C.E.R.P.E., críticamente señaló: "*De ahí que el Proyecto de Ley consagra que el Partido que gana las elecciones: controla el Organismo Central a través del Presidente*, obtiene la mejor posición en la Papeleta y recibe más dinero del Fondo Electoral en su partida de la transportación". (Énfasis suplido.) Informe, págs. 65–66.

La cuestión es trascendental. No basta con recordar una vez más la doctrina tradicional. Nuestra inquietud no es exclusiva. Requiere una profunda reflexión que ataje el mal en su raíz. Recientemente, en *P.N.P. y P.I.P. v. Rodríguez Estrada*, supra, pág. 532, el Juez Asociado Señor Ortiz, en su opinión concurrente y disidente, sostuvo "que la decisión legislativa avalada por este Tribunal *está predicada en la presunción de que el Presidente de la C.E.E. siempre actuará conforme a su afiliación política*, más preocupante resulta ser la decisión adoptada hoy". (Énfasis suplido.)

Si bien el concepto de unanimidad e intervención del Presidente de la Comisión nació originalmente con unos propósitos laudables definidos, la situación que rige ahora es distinta. Hoy es una falacia sostener que existe un balance real en la composición de la Comisión Estatal. Menos, afirmar que el interés público está debidamente representado por su Presidente. El requisito de identidad política del Presidente de la Comisión con el Primer Ejecutivo destruyó esa concepción original y nos pone de frente a la figura de *juez-parte* en las decisiones electorales y en el umbral del eterno dilema: ¡*partidocracia o democracia*!

Es innegable esa realidad. Al momento de celebrarse las pasadas elecciones, el control de la Rama Ejecutiva correspondía al P.P.D., y su Presidente, el licenciado Rodríguez Estrada, al jurar el cargo era y es simpatizante de dicho partido. T.E. Superior, pág. 228. Por otro lado el P.P.D., al igual que los otros partidos políticos, estaba representado por su Comisionado Electoral con voz y voto.

Las consecuencias jurídicas de esta afiliación y clara identidad política entre el Presidente de la Comisión y el Comisionado Electoral que representa al partido en el poder (P.P.D.) son manifiestas. Arguyendo que ese diseño sea constitucional —no ha habido planteamiento al efecto— *obviamente impone sobre los tribunales un ejercicio cautelar y riguroso al examinar la juridicidad de decisiones —como en el caso de autos— adoptadas por el Presidente de la Comisión a instancias y coincidentes con el Comisionado Electoral que representa su propio partido político. Ese enfoque judicial es necesario, independientemente de las cualidades de la persona que ocupa el cargo.* El nuevo diseño estatutario ya no nos permite caracterizar su voto por disposición de ley simplemente como uno "que *no* representa un interés partidista en la Comisión Estatal de Elecciones y sí el interés público". (Énfasis suplido.) *P.S.P. v. Com. Estatal de Elecciones*, supra, pág. 415.

Bajo este prisma realista es que nos corresponde evaluar cuidadosa y serenamente los planteamientos que Granados Navedo adujo en su impugnación ante el ilustrado tribunal de instancia y que reproduce ante este Foro apelativo. En esa misión somos conscientes de que "[g]raves son los *peligros* de los Jueces en su función. Sus limitaciones pueden conducirle al recurso pasivo a la letra de la Ley, *trampa juridicista* en la que la norma suplanta a la justicia, convirtiendo al hombre en mero centro de imputación de normas o sujeto de derecho. *Se produce la deshumanización de la justicia.* Pero también, en el polo opuesto, puede despeñarse por la

*sustitución subjetiva* tanto de la realidad sobre la que actúa como de los parámetros axiológicos de justicia". (Énfasis suplido.) R. de Marino, *La independencia de los tribunales, garantía de su función*, 2 Rev. Der. Proc. 439 (1988).

IV

*Principios aplicables*

Las distintas controversias planteadas en los recursos de epígrafe requieren una referencia a los principios electorales de nuestro acervo constitucional, estatutario y administrativo que sirven de trasfondo conceptual y determinan los méritos de los planteamientos y derechos reclamados.

Ninguno de estos principios son nuevos. Todos, expresa o implícitamente, fueron incorporados hace tiempo a nuestro ordenamiento. *Sólo es menester intentar rescatarlos del estado de hibernación en que judicialmente han caído.*

*Primero*, las elecciones se ganan o se pierden contando —no anulando— votos. *Segundo*, existe —o al menos existía— una tendencia judicial de superar escollos en la dinámica del sufragio electoral. *P.S.P. v. Com. Estatal de Elecciones*, supra. *Tercero*, debemos cumplir con el mandato fundamental de que sólo "'. . . se declarará electo aquel candidato para un cargo que obtenga un *número mayor de votos* que el obtenido por cualquiera de los demás candidatos para el mismo cargo' (énfasis nuestro), Art. VI, Sec. 4, Constitución E.L.A. . . .". *P.P.D. v. Admor. Gen. de Elecciones*, 111 D.P.R. 199, 320 (1981), opinión concurrente del Juez Asociado Señor Negrón García. Y *cuarto*, el Poder Judicial no puede endosar interpretaciones restrictivas ni refrendar determinaciones administrativas confiscatorias del derecho al voto fundados en "normas, trámites y prácticas laxas de los funcionarios que en materia electoral están directamente encargados de conducir y vigilar en el día de las elecciones su impl[a]ntación". Íd., págs. 323–324.

Al hacerlo nos anima el pensamiento vocacional de que la *"lógica jurídica no se puede desconectar de los factores humanos y circunstancias personales de los encargados de*

*aplicar la Ley*. La objetividad debe ser entendida debidamente, pues ésta no se pierde al actuar al calor de la llama que enciende el sentimiento de justicia. *Un protagonista del Derecho no puede permanecer insensible como mero espectador ante el drama que punza e incide en la intimidad de las conciencias que han de sobreponerse a los avatares y variaciones que la vida presenta, sabiendo reaccionar, en cada caso, en la forma que la Ley exige con tal de ver implantado en la sociedad un orden fundado en la Justicia"*. (Énfasis suplido.) C. Onecha Santamaría, *La Vocación Jurídica*, XCV (Núm. 1) Rev. Gen. Leg. Jur. 5, 14–15 (1987). (Énfasis suplido y en el original.) *P.N.P. v. Rodríguez Estrada, Pres. C.E.E.*, supra, págs. 42–43, opinión disidente.

A modo de recordatorio, también es menester situar en su verdadera dimensión la naturaleza, casi sagrada, del voto. En *P.S.P. v. Com. Estatal de Elecciones*, supra, págs. 405–407, dijimos que:

La Constitución del Estado Libre Asociado de Puerto Rico, en su Art. II, Sec. 2, reconoce expresamente el derecho al "sufragio universal, igual, directo y secreto . . .". Marca así la huella indeleble del postulado mayor plasmado en el Preámbulo, que enfatiza el carácter democrático de nuestra sociedad donde el poder político emana del Pueblo y se ejerce con arreglo a la voluntad manifiesta en las urnas. Complementan este mandato las disposiciones sobre igual protección de las leyes y la salvaguarda contra el discrimen por razones políticas. También es de linaje constitucional la amplia facultad que posee la Asamblea Legislativa para regular el proceso electoral.

Dentro de ese margen hemos reconocido como objetivos lícitos y apremiantes toda reglamentación que, sin obstaculizar innecesariamente el voto, propenda a la realización de un proceso electoral justo, ordenado, libre de fraude, honesto e íntegro. *P.S.P., P.P.D. y P.I.P. v. Romero Barceló*, 110 D.P.R. 248 (1980); *P.N.P. v. Tribunal Electoral*, 104 D.P.R. 741 (1976). En la consecución de estos derroteros, el establecimiento de normas y reglas uniformes que propicien la estabilidad, confianza y certeza en cuanto a la adjudicación correcta de toda papeleta es esencial. *P.P.D. v. Barreto Pérez*, 110 D.P.R. 376 (1980). Ni la potestad legislativa de reglamentar como tam-

poco el derecho al sufragio pueden operar bajo un esquema de disposiciones legislativas arbitrarias o en irrestringidos reclamos de electores; no son valores que se implementan en términos absolutos.

. . . . . . . .

. Ahora bien, aun lo enorme de su importancia no desvirtúa el hecho de que los partidos políticos constituyen un medio y no un fin. *El sujeto principal de la arquitectura moderna constitucional-electoral tutelado es el elector individual.* El partido no es el elemento ultimador, sino un vehículo de expresión individual que se suma a otros para resultar y viabilizar la expresión colectiva ciudadana. Así, toda ley de actualidad regulatoria de la franquicia electoral se ha encaminado hacia el reconocimiento de la "prevalencia de los derechos electorales del ciudadano *sobre los derechos* y prerrogativas de *todos* los partidos y agrupaciones políticas". (Bastardillas nuestras.) Art. 2.001(11) (16 L.P.R.A. sec. 3051(11)). Al final de cuentas, este derecho individual es el verdadero destinatario y receptor del sistema, por lo cual es de incuestionable interés público salvaguardarlo contra las posibles injusticias que de vez en cuando el choque de intereses de los partidos puede generar. (Énfasis suplido y escolio omitido.)

No es necesario mucho esfuerzo mental para aceptar que, una vez empapado el jurisprudente de estas nociones, toda interpretación judicial debe promover una dinámica para que los encargados de ponerla en vigor a través de la estructura organizacional de la Comisión Estatal garanticen el sufragio. Examinemos, pues, someramente las distintas etapas del proceso de adjudicación de votos, la certificación y el recurso judicial de impugnación.

V

*Etapas del proceso post eleccionario*

La ley vislumbra cinco (5) etapas: (1) comienzo del cómputo a nivel local; (2) resultado parcial preliminar; (3) escrutinio general; (4) recuento, y (5) certificación. *P.P.D. v. Barreto Pérez*, supra.

El *cómputo a nivel de colegio* se inicia una vez termina la votación. En el mismo colegio los funcionarios proceden a separar y clasificar las papeletas. Art. 6.001 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3261. Si hay acuerdo unánime, las adjudican. De lo contrario, la papeleta se considera no adjudicada y se remite a la Comisión Estatal para ulterior evaluación. Art. 6.002 (16 L.P.R.A. sec. 3262). Tampoco se adjudican en esta etapa las papeletas protestadas, las cuales también se envían a la Comisión Estatal. Art. 6.004 (16 L.P.R.A. sec. 3264).

Respecto al voto recusado, la regla general es que si el elector no contesta la recusación su voto será nulo y, por tanto, no se contará. Art. 5.031 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3234. Si el elector, bajo su firma y juramento la niega, su voto se contará, salvo que la papeleta fuere también protestada o no adjudicada. Art. 6.003 (16 L.P.R.A. sec. 3263).

El *resultado parcial* lo dispone el Art. 6.007 de la Ley Electoral de Puerto Rico, *supra*, que ordena a la Comisión Estatal emitir el resultado preliminar de la elección "no más tarde de las setenta y dos (72) horas siguientes al día de la elección . . .". Adviértase que este resultado preliminar incluye los votos recusados adjudicados en los colegios por tener una contradeclaración, pero no incluye las papeletas no adjudicadas ni las protestadas.

El *escutrinio general* lo manda el Art. 6.008 de la Ley Electoral de Puerto Rico, *supra*. La Comisión Estatal interviene con las papeletas no adjudicadas y las protestadas, y las adjudica o rechaza. El artículo visualiza que se adjudiquen las papeletas recusadas según aparecen reflejadas en las actas del colegio cumplimentadas el día de las elecciones. En esta etapa se juzga la validez de cada papeleta recusada de acuerdo con el fundamento de la recusación y los documentos electorales. La Ley Electoral de Puerto Rico no dispone vistas evidenciarias para determinar si el recusador o

el recusado tenían razón. Tampoco permite que en el escrutinio se introduzca prueba extrínseca que asista a la Comisión Estatal en esta determinación. Dicho organismo está autorizado a abrir los sobres de las papeletas recusadas y observar si de la faz de la recusación y de la contradeclaración debió o no adjudicarse la papeleta recusada. Dicho de otro modo, antes de la certificación la Comisión Estatal no tiene facultad para utilizar prueba extrínseca para pasar juicio sobre la veracidad de la recusación y de la contradeclaración. En resumen, en el escrutinio general la Comisión Estatal cumple únicamente la función de contar los votos.

El *recuento* visualizado en el Art. 6.011 de la Ley Electoral de Puerto Rico, *supra*, permite que cuando el escrutinio general arroje una diferencia entre dos (2) candidatos de cien (100) votos o menos, o de la mitad del uno por ciento (.5%) de los votos totales para esa posición —lo que sea menor— cualquiera de los candidatos puede pedir a la Comisión Estatal que trascienda las hojas de cotejo y abra los paquetes de material electoral para que todas las papeletas vuelvan a contarse. Esta petición tendrá el efecto de una impugnación y el resultado de ese recuento se tomará como verdadero. Este Art. 6.011, *supra*, nada dispone sobre las papeletas recusadas. Por ende, prevalece la regla general consignada en el Art. 6.003 de la Ley Electoral de Puerto Rico antes aludido:

> Si a un elector lo recusan y por cualesquiera motivos no la contesta, sería ilógico sostener que aun así puede votar sin que la ley contemple unas consecuencias. Lo menos que podemos reconocer es que el negarlo bajo firma y juramento adelanta el interés predominante, pues es una norma que contiene suficiente vínculo de racionalidad y lógica, al indicar un acto mínimo afirmativo de la persona recusada, rodeando y perpetuando, mediante un trámite sencillo y rápido, la legitimidad y veracidad del acto, promoviendo la posibilidad y permitiendo que sea *adjudicado el voto en la Comisión Estatal hasta donde le acompañaría la presunción de idoneidad que*

*nació con su inscripción original.* Esa presunción lógicamente no ha quedado destruida por razón de esa negativa. (Énfasis suplido.) *P.S.P. v. Com. Estatal de Elecciones,* supra, pág. 444.

Al abrirse los paquetes para realizar el recuento, repetimos, sólo puede pasarse juicio sobre la suficiencia de la recusación y de la contradeclaración. En este sentido continúa *vigente* la esencia de nuestros pronunciamientos emitidos en *Molina v. Barreto Pérez,* 110 D.P.R. 513, 516–517 (1980):

En el esquema dispuesto por la Ley Electoral, los Arts. 5.034 y 6.003 regulan todo lo concerniente al proceso de recusación de papeletas y remiten su adjudicación a la Comisión Estatal de Elecciones. El primero de esos artículos establece el procedimiento a seguirse el día de las elecciones y el segundo preceptúa las reglas para la posterior adjudicación de las papeletas así recusadas. De su lectura e interacción con las demás disposiciones de la ley relativas a la adjudicación de toda papeleta, percibimos que, como regla general, el concepto de "adjudicación" significa el examen de la papeleta, la constatación de los candidatos en ella votados y la contabilización del voto así emitido a favor de dichos candidatos. *En contraste, en el caso de una papeleta recusada, el término adquiere una distinta significación. Así, una papeleta recusada constituye un ataque a la legalidad del voto, y su validez —total o parcial— dependerá entonces de la comprobación de la certeza de los fundamentos invocados para tal recusación.* Es ineludible concluir, pues, que en cuanto a éstas, debe distinguirse entre la adjudicación del voto desde el punto de vista puramente formal o de contabilidad —a favor de quién fue votada la papeleta— y el punto de *vista sustantivo o de fondo,* esto es, *si fue o no votada ilegalmente la papeleta por no reunir el elector todos los requisitos que le hubiesen habilitado como tal.*

En virtud de esa diferencia y conceptualización advertimos que la adjudicación sustantiva o en su fondo de una papeleta recusada *es un proceso por naturaleza distinto al trámite ordinario y normal seguido durante el escrutinio eleccionario. Exige la existencia de una mecánica de adjudicación plena-*

*ria que trasciende la faz de la papeleta, de índole adversa-*
*tiva, rodeada de las garantías mínimas del debido proceso de*
*ley tales como notificación al elector, citación de testigos y*
*desfile y apreciación de prueba, ante la Comisión Electoral o*
*su examinador.* Tal proceso ni esquema fue establecido por
dicha Comisión que, como hemos visto, era el foro primario
administrativo con jurisdicción, según la ley, para dilucidar en
su fondo tales papeletas. (Énfasis suplido.)

Bajo la actual Ley Electoral de Puerto Rico no se esta-
bleció un trámite ni una mecánica de adjudicación plenaria
para los votos recusados el día de las elecciones. Tampoco la
Comisión Estatal lo diseñó. Es evidente, pues, que al sernos
planteados en el caso de autos los efectos y las consecuencias
jurídicas de esa omisión, estamos ante un asunto de compe-
tencia exclusiva de los tribunales que nos corresponde adju-
dicar como cuestión *pura de derecho.*

Finalmente, la etapa culminante ante la Comisión Estatal
es el producto de todo el proceso que se plasma en la *certifi-*
*cación.* Finalizado el conteo de *todos* los votos —sea en vir-
tud del escrutinio general a través de las actas, más la adju-
dicación de papeletas protestadas y no adjudicadas, o me-
diante el recuento y examen de las papeletas— la Comisión
Estatal certificará los resultados y declarará electo para
cada cargo al candidato que haya recibido el mayor número
de votos. A tal efecto, expedirá como constancia un *certifi-*
*cado de elección.* Art. 6.009 de la Ley Electoral de Puerto
Rico, 16 L.P.R.A. sec. 3269. Este certificado pone punto final
al escrutinio o al recuento, según sea el caso. Antes de emi-
tirse, la Comisión Estatal debe haber cumplido su obligación
de pasar juicio sobre las *papeletas protestadas y las no adju-*
*dicadas,* corregir errores aritméticos y, en los casos en que
hay recuento, revisar las papeletas adjudicadas por las
Juntas de Colegio.

Esta *certificación,* más que un simple documento, es una
recopilación de todos los votos que, *conforme a derecho,* de-

bieron contarse por la Comisión Estatal. Refleja las operaciones del escrutinio general o del recuento. Obviamente no está fundada en un proceso adversativo que haya trascendido la faz de los documentos electorales. Descansa en la presunción de validez que acompaña a cada voto emitido. En los votos recusados, la presunción de legitimidad impugnada por la acción del recusador queda restablecida con la contradeclaración que, bajo juramento, presta el elector. *P.P.D. v. Barreto Pérez*, supra.

La certificación, no obstante, no significa que la *validez de cada voto esté definitivamente adjudicada*. Cuando el candidato derrotado, según el escrutinio general o el recuento, considere que ocurrieron irregularidades que de probarse alterarían el resultado de la elección, puede instar una acción de impugnación conforme a lo dispuesto en el Art. 6.014 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3274. En esa acción puede cuestionar la validez de los votos que, conforme a la Ley Electoral de Puerto Rico, debían ser contados o anulados. Ello incluye los votos recusados que contengan una contradeclaración y los votos protestados. En esa etapa judicial —juicio *de novo*, cuyos contornos precisaremos después— su cuestionamiento puede estar fundado en prueba extrínseca o cualesquiera planteamientos de derecho apropiados.

El Art. 6.014 de la Ley Electoral de Puerto Rico antes mencionado concede al Tribunal Superior jurisdicción original para considerar las impugnaciones. Aunque el precepto es lacónico, para que pueda instarse la impugnación es *necesario* que la Comisión Estatal haya certificado los resultados. Antes *no* puede incoarse la acción. *Sánchez Fuentes v. C.E.E.*, 123 D.P.R. 102 (1989), opinión concurrente y disidente.

Según expuesto, el Art. 6.003 de la Ley Electoral de Puerto Rico, *supra*, requiere que se cuente el voto recusado siempre que contenga la contradeclaración del elector reque-

rida por el Art. 5.031 de dicha ley, *supra*. Su segundo párrafo prescribe que si "posteriormente a una elección se demostráre que una papeleta recusada fue votada por una persona o elector sin derecho a votar en ella, la Comisión ordenará la anulación de su voto así como la rectificación del escrutinio". 16 L.P.R.A. sec. 3263.

En vista de que la ley no provee la investigación del voto recusado más allá de la faz de la papeleta, el escrutinio sólo habrá concluido cuando se cuenten todos los votos que deben adjudicarse o anularse conforme la faz de la papeleta y los documentos electorales. *Bajo este esquema legal, la única forma de un candidato demostrar que un elector —cuyo voto fue recusado— no tenía derecho a emitir el sufragio es el procedimiento de impugnación. Idéntico trámite se sigue respecto a los votos anulados, sean por recusación, protesta o decisión de la Comisión Estatal, uno de sus organismos o su Presidente.*

Con esta perspectiva en mente, examinemos primeramente el ámbito del juicio *de novo*. Después analizaremos los distintos señalamientos de error levantados por Granados Navedo para seguir, en lo posible, su orden lógico.

## VI

*Juicio "de novo"; su alcance y efectos*

El Art. 1.016 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3016, dispone en lo pertinente a una demanda de impugnación que el "Tribunal Superior celebrará una *vista en su fondo, recibirá evidencia* y formulará las determinaciones de hecho y conclusiones de derecho que correspondan". (Énfasis suplido.) Exploremos sus contornos.

El récord taquigráfico del tribunal de instancia refleja que en las vistas se suscitó una extensa polémica sobre la naturaleza e impacto evidenciario del procedimiento. En sus comienzos no hubo problema alguno. Tanto el tribunal como los abogados de las partes coincidieron en que se trataba

—en nombre y apellido— de un juicio *de novo*. Sin embargo, a lo largo del litigio —y aun en los alegatos ante este Foro— se manifestó un curioso patrón de inconsistencias en cuanto a su concepción y alcance.

Notamos que esas discrepancias afloraban cuando la representación legal de Granados Navedo preguntaba a los testigos sobre los trámites habidos ante la Comisión Estatal o intentaba someter evidencia documental allí originada. De ese modo, a base de la postura que asumiera finalmente el tribunal en cuanto a determinado planteamiento, se resolvía su admisibilidad. Esta dinámica forense es natural. Obviamente está motivada por el interés particular de cada litigante en prevalecer. Tampoco es nueva. Ya en *P.S.P. v. Com. Estatal de Elecciones*, supra, pág. 409 esc. 4, habíamos dicho: "Los alegatos en los recursos ante nuestra consideración ilustran esta proposición. Así, advertimos que según la ganancia electoral que mediante determinado señalamiento de error e interpretación se puede lograr, los partidos políticos comparecientes nos proponen, sin reparo alguno en posiciones antagónicas e inconsistentes adoptadas en otros escritos, un enfoque restrictivo o liberal, la aplicación o no de la doctrina de incuria (*laches*), y otros".

La cuestión amerita una breve exposición y aclaración. Comprender que *táctica forense* no es equivalente a *técnica jurídica* nos ayuda a juzgar con mayor ecuanimidad. "La justicia no es sólo pleito. No se reduce al proceso, donde tienen ocasión, a veces lucida, de manifestarse la técnica, la preparación, cuando no la argucia. Ganar un pleito 'a favor de la letra' suele ser fácil. Hacer prevalecer la justicia 'contra la letra', apoyado en la razón, es mejor ocasión de éxito profesional, en el que no se trata de declarar equivocada a la ley, sino de algo más profundo." P. Fernández Viagas, *Togas para la Libertad*, Córcega, Ed. Planeta, 1982, pág. 257.

El Lcdo. Rafael Escalera Rodríguez —coabogado de Acevedo Pérez— inició el debate al objetar una pregunta del

Lcdo. Alex González —uno de los abogados de Granados Navedo— dirigida al Presidente de la Comisión, licenciado Rodríguez Estrada, en torno a una sesión investigativa celebrada por la Comisión Estatal el 21 de noviembre sobre las papeletas de doble marca. El licenciado Escalera Rodríguez adujo que se estaba presentando prueba nuevamente y que "la evidencia que desfiló ante la Comisión e[ra] totalmente irrelevante". T.E. Superior, págs. 300–301. En una etapa más adelantada del litigio se refirió al procedimiento de impugnación como "una *revisión* instada por el candidato de la culminación de las decisiones administrativas que le afectan". (Énfasis suplido.) Íd., pág. 650. Concluyó que "la única prueba que podemos admitir y considerar aquí, es aquella prueba de los casos que se le presentaron a la Comisión, de los señalamientos de error que se le hicieron a la Comisión y que la Comisión tomó una determinación sobre ello". Íd., pág. 652.

El Lcdo. José Ángel Rey —coabogado de Báez Galib— por su parte postuló que *podría traerse* prueba que se hubiese presentado ante la Comisión Estatal mediante el testimonio de testigos. En cuanto a la admisibilidad de las transcripciones con declaraciones de esos testigos, condicionó su aserto. Expuso que aunque podría utilizarse la transcripción de los procedimientos en la Comisión Estatal, sólo podría hacerse como prueba de impugnación y no como prueba directa. T.E. Superior, pág. 304. Acto seguido, el licenciado Escalera Rodríguez reiteró "que el r[é]cord de la prueba que desfiló ante la Comisión es irrelevante aquí . . .". Íd., pág. 305.

Más adelante el tribunal expuso su posición. Concluyó que la prueba podría ser la misma o distinta, pero que sólo examinaría la que ante él se presentara en el juicio *de novo*. T.E. Superior, págs. 307–309. Luego medió una aclaración del Lcdo. David Rivé —abogado del Presidente de la Comisión— en torno a las dos (2) maneras de revisar una actua-

ción administrativa: *la tradicional* (o evidencia sustancial) mediante revisión del récord que tuvo ante sí el organismo administrativo y el juicio *de novo*. Íd., págs. 309–310. El licenciado Rey, contrario a su idea anterior, argumentó que en el juicio *de novo* no podría traerse evidencia que no tuvo ante sí la Comisión Estatal. A su entender, el elemento definidor del juicio *de novo* era la garantía de la figura de un nuevo juzgador con la encomienda de pasar juicio sobre la misma evidencia que tuvo el organismo administrativo. Íd., págs. 310–311.

Ante estas variadas posturas, el tribunal otra vez intervino y planteó que en "el juicio [*de novo*], a base de la misma prueba, desfilada nuevamente, el Tribunal resuelve si la conclusión, no si la prueba, no si la base. . .". T.E. Superior, pág. 311. Para ilustrar ese concepto, a modo de ejemplo dio el caso del Tribunal de Distrito donde en época pasada, por no haber fiscal, el juez actuaba en doble capacidad. "All[í] no se eleva transcripción, no se eleva nada, el detalle de lo que ocurrió no se eleva, sino que los mismos testigos van y declaran nuevamente ante el nuevo Juez, y el nuevo Juez dice a base de la prueba desfilada ante m[í], confirmo, revoco o modifico al Tribunal inferior." Íd. Concluyó que "[s]e recibe la *misma prueba,* los *mismos testigos* y se llega a una conclusión que puede ser *igual o distinta*". (Énfasis suplido.) Íd., pág. 312.

A esta altura del debate, la intervención de uno de los abogados del Comisionado Electoral González Rodríguez parece dar la clave de la naturaleza sui géneris de este juicio *de novo*. El Lcdo. Manuel Herrero García insistió en que el Presidente de la Comisión "tendría que testificar sobre todos los hechos que ocurrieron allí, *no sobre su análisis*, pero sobre los hechos que ocurrieron allí que [é]l vi[o] y que presenció, la prueba . . .". (Énfasis suplido.) T.E. Superior, pág. 313.

Sobre este *particular*, el tribunal dictaminó que en un juicio *de novo* no se "cita al Juez para que declare". T.E.

Superior, pág. 313. El licenciado Herrero García reiteró que el caso era muy particular y que los codemandados Báez Galib y González eran partes. Íd., pág. 314.

Subsiguientemente, el tribunal formuló una teoría excluyente: "Yo repito que los compañeros se lean lo que es un juicio [*de novo*], [*vis-à-vis*], lo que es una apelación de récord. Es como si no hubiera ocurrido nada en el proceso administrativo. Eso es un juicio [*de novo*], como si allá no hubiera ocurrido nada. Es como en el campo dicen borrón y cuenta nueva, y aquí estamos usando el juicio [*de novo*] y revisando la determinación administrativa, *y es o lo uno o lo otro*". (Énfasis suplido.) T.E. Superior, págs. 475–476.

Ante este Foro apelativo, la posición escrita de los abogados de Báez Galib y de Acevedo Pérez es algo diferente a la que propusieron en la vista en instancia. Con corrección y mayor exactitud, señalan:

El carácter de juicio [*de novo*] que tiene el pleito de impugnación de elección, claro está, no quiere decir que las partes pueden hacer caso omiso de los procedimientos y adjudicaciones que se llevaron a cabo en la Comisión. Lo único que significa un juicio [*de novo*] es que el tribunal no viene obligado por la prueba que desfiló en la agencia, pudiendo recibir prueba nueva y debiendo llegar a sus propias conclusiones, respecto a las cuestiones que la ley le encomienda decidir en una acción de impugnación de elección. El juicio [*de novo*] no convierte a la Comisión en una institución superflua. Cf. *Vélez Quiñones v. Srio. de Instrucción*, 86 D.P.R. 755 (1962); y *Ayala Alicea v. E.L.A.*, [118 D.P.R. 507 (1987)]. Alegato de los recurridos, pág. 46.

Como muy bien indicó el licenciado Herrero García, estamos ante un proceso muy *peculiar*. Su planteamiento iba dirigido a cualificar las expresiones del tribunal de instancia, en cuanto a que en el juicio *de novo* no declara el juzgador que tuvo ante sí la controversia. La aclaración procedía. *No podemos olvidar que, bajo el esquema adjudicativo de la Ley Electoral de Puerto Rico, el Presidente de la Comisión*

*puede ser protagonista de unos hechos —y por ende testigo potencial de los mismos (T.E. Superior, pág. 394)— y además, en las circunstancias en que interviniere por no haber unanimidad entre los Comisionados Electorales, convertirse en juez y parte.* Definitivamente ello no representa la situación típica que configura el derecho penal o administrativo, donde el adjudicador —juez u oficial examinador— no es total o parcialmente protagonista, actor o participante en los hechos que dan motivo a la controversia que él mismo adjudica.

Las incidencias del debate antes reproducido nos obligan a pronunciarnos brevemente sobre la naturaleza del juicio *de novo* y los elementos que lo diferencian de otros procedimientos de revisión judicial. Tal definición es esencial por su impacto en cuanto a la admisibilidad de los documentos y transcripciones de las reuniones deliberativas e investigaciones y determinaciones de la Comisión Estatal y sus organismos delegados, la aplicabilidad o no de la doctrina de cosa juzgada e impedimento colateral por sentencia, y además, sobre el ejercicio eficaz de nuestra función revisora.

Como punto de partida tenemos la regla general preceptiva de que las determinaciones de hecho de las agencias administrativas —que estén apoyadas en evidencia sustancial— son concluyentes para los tribunales. Bajo este enfoque clásico o tradicional, el juicio independiente y evaluativo de los tribunales es limitado. De ordinario, en ausencia de una disposición estatutaria, los procedimientos de *revisión* judicial están restringidos a lo que surja del récord del procedimiento llevado a cabo en la agencia administrativa o en el tribunal de instancia. Esto implica que el foro judicial revisor no podrá recibir nueva evidencia.

La revisión *de novo*, que no debe confundirse con un juicio *de novo*, se caracteriza por un enfoque intermedio. El propio estatuto que la autoriza limita expresamente la revisión a la evidencia sometida ante el tribunal administrativo.

El organismo revisor no recibe nueva evidencia, sino que sopesa otra vez la evidencia desfilada y compilada por el organismo administrativo para examinar si las determinaciones de hecho, más que razonables, son correctas. S.G. Bryer y R.B. Stewart, *Administrative Law and Regulatory Policy*, Boston, Little, Brown & Co., 1985, págs. 202–204 y 216–217; D.P. Rothschild y C.H. Koch, Jr., *Fundamentals of Administrative Practice and Procedure*, Virginia, Michie Bobbs-Merrill, 1981, págs. 726–727; Nota, *De Novo Judicial Review of Administrative Agency Factual Determinations Implicating Constitutional Rights*, 88 (Núm. 7) Colum. L. Rev. 1483 (1988); V.S. Netterville, *Judicial Review: The "Independent Judgement" Anomaly*, 44 (Núm. 2) Calif. L. Rev. 262, 278–279 (1956).

Existe, además, una corriente que se aparta de la regla general de revisión y le reserva a los foros judiciales una amplia facultad para ejercer su juicio independiente. Esta excepción aplica cuando se trata de un juicio *de novo*, de génesis estatutaria, o cuando se demuestra que los procedimientos no cumplieron con los requisitos del debido proceso de ley.

El juicio *de novo* se diferencia del juicio o vista previa ante un tribunal o agencia administrativa por razón de la evidencia recibida, hechos considerados, asuntos o controversias levantadas y, claro está, los remedios o cursos de acción a seguir.

Conscientes de esta dicotomía, bajo nuestra Ley Electoral, "juicio *de novo*" significa dilucidar nuevamente el asunto. En ese sentido, la impugnación de una elección, más que una simple revisión del récord administrativo de un procedimiento anterior en la Comisión Estatal, consiste de un enjuiciamiento amplio y completo de las controversias. Puede, por ende, producirse *nueva* prueba documental y testifical. Pero ciertamente el juzgador no puede hacer caso omiso de ese récord y negar la admisibilidad de prueba refe-

rente a los procedimientos y hechos acaecidos en dicho organismo administrativo.

Por estas mismas consideraciones, en estas instancias y por excepción, no cabe recurrir y aplicar la doctrina de cosa juzgada o impedimento colateral por sentencia. Véanse: *American Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 9 (5to Cir. 1974); *Matter of Kjos*, 346 N.W.2d 25, 29–30 (1984); *Freedom Sav. and Loan Ass'n v. Way*, 757 F.2d 1176, 1180 (11mo Cir. 1985); 1B *Moore's Federal Practice* Sec. 0.416 [3.–2], págs. 523–524.

En resumen, un juicio *de novo* en acciones de impugnación de candidato implica que todos los extremos pertinentes y relativos a las alegaciones y causa de acción están abiertos a la consideración del tribunal revisor como si se planteara por primera vez. Son anchas, pues, las puertas del recinto judicial para recibir y adjudicar aquellos planteamientos relacionados con la causa de acción. En materia probatoria puede desfilarse nueva prueba y, además, cabe toda evidencia documental —transcripciones de reuniones de la Comisión Estatal, etc.— si se demuestra su pertinencia.

Bajo este prisma y desde este estrado apelativo, distinto al tribunal de instancia y a la mayoría del Tribunal, las hemos mantenido abiertas. Con vista a los documentos elevados con los autos originales —con dedicación y estudio— hemos arribado a nuestras propias determinaciones en cuanto a aquellas controversias que tratan sobre prueba documental. *P.P.D. v. Admor. Gen. de Elecciones*, supra. En su evaluación, estamos en la misma posición que el foro de instancia. *Torres Arzola v. Policía de P.R.*, 117 D.P.R. 204, 213 (1986); *Pueblo v. Uriel Álvarez*, 112 D.P.R. 312, 318 (1982); *Castrillo v. Maldonado*, 95 D.P.R. 885, 889 (1968); *West India Mach. v. Srio. de Hacienda*, 89 D.P.R. 115 (1963); *Central Igualdad, Inc. v. Srio. de Hacienda*, 83 D.P.R. 45 (1961).

Una última aclaración al respecto. En conformidad con el Art. 1.017 de la Ley Electoral de Puerto Rico, 16 L.P.R.A.

sec. 3016b, la función revisora de este Tribunal está limitada a "cuestiones de derecho". Ese ámbito de revisión pautado legislativamente es similar al que constantemente ejercemos al considerar decisiones en otros tipos de procesos civiles, criminales o administrativos.

En tales instancias la norma no nos descualifica. Reiteradamente hemos resuelto que constituye *una cuestión de derecho* precisamente evaluar si las *determinaciones de hecho* están sostenidas por la prueba. *Pueblo v. Cabán Torres*, 117 D.P.R. 645, 653 (1986); *Ruiz v. San Juan Racing Assn.*, 102 D.P.R. 45, 52 (1974); *Pueblo v. Carrasquillo Carrasquillo*, 102 D.P.R. 545, 552 (1974); *Rodrigo v. Tribunal Superior*, 101 D.P.R. 151, 154–155 (1973); *López v. Junta Planificación*, 80 D.P.R. 646, 672 (1958); *Villaronga, Com. v. Tribl. de Distrito*, 74 D.P.R. 331, 345 (1953); *Ortega v. Com. Industrial*, 73 D.P.R. 191, 194 (1952).

La opinión mayoritaria, después de caracterizar como amplio el juicio *de novo* dispuesto en la Ley Electoral de Puerto Rico en acciones de impugnación como la de autos, resuelve que en "aquellos casos en que la determinación dependa *principal o exclusivamente de una cuestión de derecho electoral especializado*", el tribunal de instancia *deberá* "guardar la usual deferencia al organismo administrativo . . .". (Énfasis suplido.) Opinión mayoritaria, pág. 20.

*Es incomprensible y errónea esa directriz al foro de instancia*. Discrepamos. Ese aserto categórico, si bien está en consonancia con la clásica doctrina de deferencia a los organismos administrativos apuntalada en sus experiencias y conocimientos especializados (*expertise*) en determinada materia —*M & V Orthodontics v. Negdo. Seg. Empleo*, 115 D.P.R. 183, 188–189 (1984); *Quevedo Segarra v. J.A.C.L.*, 102 D.P.R. 87, 96 (1974); *Román v. Superintendente de la Policía*, 93 D.P.R. 685 (1966)— se abstrae de la naturaleza del derecho aquí en juego y de las características particulares de la Comisión Estatal. Tampoco cualifica ni identifica cuáles son los

"casos en que la determinación dependa principal o exclusivamente de una cuestión de derecho electoral especializado . . .". Opinión mayoritaria, pág. 20.

Esa visión es contraria al tratamiento jurisprudencial brindado en casos de naturaleza electoral que tocan íntimamente el derecho constitucional al voto. *P.N.P. v. Tribunal Electoral*, 104 D.P.R. 1, 10 (1975). Ello responde a que la Comisión Estatal es un organismo administrativo —según lo reconoce la propia opinión mayoritaria— que está sujeta a "presiones e intereses partidistas" (opinión mayoritaria, pág. 19) y, además, que las decisiones de su Presidente —afiliado al partido que controla el Poder Ejecutivo— son el resultado de una peculiar función dual de *juez-parte*.

No estamos, pues, ante la típica agencia administrativa que por su pericia y especialidad es acreedora a la "usual deferencia" *en cuestiones de derecho*. Así, en el pasado, en situaciones similares a la que hoy nos enfrentamos, sin vacilaciones hemos cumplido con el deber judicial indelegable de adjudicar las controversias constitucionales. Por esta razón muy sabiamente el legislador denominó la intervención judicial "juicio *de novo*" y lo dotó de un ancho ámbito procesal y sustantivo. No debemos confundir este procedimiento con uno de revisión *de novo*. Menos, crear del vacío un nuevo enfoque de revisión que, en su aplicación, cercena el ámbito jurisdiccional del Poder Judicial.

Según demostraremos, la opinión mayoritaria está apuntalada en una malentendida deferencia hacia la Comisión Estatal en materia de "derecho electoral especializado" y en una presunción evidenciaria de que Acevedo Pérez fue elegido en forma debida. Ello realmente responde a la visión limitada de revisión *de novo* y no a la de juicio *de novo*. Bajo la misma, *la suerte de Granados Navedo ante el tribunal de instancia está fatalmente sellada.*

# VII

*Admisibilidad de los documentos, papeletas, archivos y transcripciones de las deliberaciones y acuerdos de la Comisión Estatal*

El Art. 1.008 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3016, en lo pertinente y como regla general, dispone que "todos los récords, escritos, documentos, archivos y materiales de la Comisión serán considerados como *documentos públicos* y podrán ser examinados por cualquier comisionado o persona interesada". (Énfasis suplido.) Por otro lado, su Art. 1.006(c) impone a la Comisión Estatal el deber de mantener constancia fiel y exacta de sus reuniones y acuerdos. Dispone que:

(c) Se tomarán las minutas de cada reunión y se presentarán éstas en la siguiente reunión para la aprobación de la Comisión. *Se llevará un récord taquigráfico y/o magnetofónico de los trabajos, debates y/o deliberaciones de la Comisión. El récord se transcribirá a la mayor brevedad posible, una vez requerido por cualquier miembro de la Comisión, certificándose luego de ser transcrito.* (Énfasis suplido.) 16 L.P.R.A. sec. 3014(c).

Estos preceptos reflejan el carácter público de los récord taquigráficos, archivos, escritos, etc. de la Comisión Estatal. Como tales, para fines evidenciarios —una vez identificados y establecida su pertinencia— bajo la Regla 71 de Evidencia, 32 L.P.R.A. Ap. IV, eran y son documentos admisibles como excepción a la regla de prueba de referencia. Regla 65(H) de Evidencia, 32 L.P.R.A. Ap. IV. La confiabilidad especial que gozan dichos documentos es el fundamento de su admisibilidad. Los mismos constituyen evidencia prima facie de los hechos en ellos consignados. E.L. Chiesa, *Práctica Procesal Puertorriqueña: Evidencia*, San Juan, Pubs. J.T.S., 1985, Vol. I, págs. 418 y 439; *Pueblo v. Millán Meléndez*, 110 D.P.R. 171 (1980); *Atiles Moreu, Admor. v. McClurg*, 87 D.P.R. 865 (1963); *Negrón v. Corujo*, 67 D.P.R. 398 (1947).

Bajo esta categoría es obvio que, de jure, todas las transcripciones de las reuniones, los acuerdos y las resoluciones de la Comisión Estatal o de su Presidente eran y son admisibles. En este extremo *erró* el foro de instancia al negarse a admitir, por considerarlos *irrelevantes*, los récord y las transcripciones de las reuniones de la Comisión Estatal durante el recuento (Identificaciones 66 a 71, demandante) independientemente de que las mismas tuvieran algunas lagunas debido a dificultades en la grabación. T.E. Superior, págs. 316 y 318. La pertinencia de esos documentos a las alegaciones de la demanda es tan obvia que no amerita ulterior elaboración. Esa *admisibilidad y pertinencia* no debe confundirse con su valor y efecto probatorio.

De paso, resulta altamente intolerable e inexplicable que la Comisión Estatal no haya adoptado las medidas técnicas y salvaguardas necesarias para cumplir con este mandato legislativo. *¿Cómo es posible que un área tan importante y sensitiva adolezca de esta deficiencia?*

De igual modo eran admisibles las papeletas, los distintos expedientes, los sobres, las listas, las actas, los documentos, los impresos del terminal del computador de la Comisión Estatal y demás piezas debidamente *identificadas* contentivas de los documentos y trámites relacionados con aquellos electores que votaron, incluso los acogidos al sistema de inserción manual de sus nombres en las listas y demás escritos confeccionados durante el escrutinio y recuento.

Hemos tomado estas identificaciones —cuya legitimidad no está en entredicho— como prueba presentada y no aceptada por el foro de origen. El procedimiento seguido por la representación legal de Granados Navedo así lo configura claramente. El mismo es equivalente a una oferta formal de prueba. De este modo, resulta claro que tales identificaciones constituyen documentos ofrecidos y no admitidos que forman parte del récord y autos originales elevados. Nos ha permitido desde este estrado apelativo evaluar su importan-

cia y valor probatorio para así determinar si dicha prueba justificaba un resultado distinto. Véase Chiesa, *op. cit.*, pág. 28.

Nos referimos específicamente a la admisibilidad de las identificaciones 1, 2, 3, 4 y 5, demandante (maletines que contienen *todas* las papeletas anuladas en *blanco* y las *protestadas no adjudicadas* por la Comisión Estatal, por distintos motivos, incluso iniciales de electores); las identificaciones 6-36 y 39-55, demandante (expedientes de los electores que votaron añadidos a mano, algunos de los cuales contienen sus papeletas, tarjetas de identificación electoral, tarjetas de permiso para votar y otros documentos rechazados por la Junta Especial); las identificaciones 37 y 38, demandante (maletines del material de votos arrestados); las identificaciones 57 y 58 (papeleta de nominación directa, *write-in*); la identificación 59, demandante (papeleta del Precinto 12, Unidad 7, Colegio de Toa Baja); la identificación 60, demandante (exposición de perito John F. McCarthy), y las identificaciones 72-140, demandados (certificaciones del Secretario de la Comisión sobre acuerdos, expedientes de varios electores, sus declaraciones juradas, distintos sobres, hojas de consultas y el flujograma de 14 de noviembre de 1988).

Toda esta evidencia presentada por Granados Navedo y Acevedo Pérez, y cuya admisibilidad —según lo acepta la mayoría— es incuestionable (opinión mayoritaria, pág. 63), conjuntamente con la testifical, ha sido objeto de nuestro más esmerado examen, estudio y evaluación. A la luz de la misma y de las orientaciones de las partes, sin necesidad de trámite ulterior, hemos logrado reconstruir el presente mosaico electoral cuya obra está taraceada principalmente de vidrios rojos y azules.

## VIII

*Capacidad y legitimidad ("standing") de Granados Navedo; su alcance*

El tribunal de instancia resolvió, a la luz de la norma establecida en *Zachry International v. Tribunal Superior*, 104 D.P.R. 267 (1975), y reiterada en *E.L.A. v. P.R. Tel. Co.*, 114 D.P.R. 394 (1983), que el candidato impugnador no tenía capacidad jurídica para reclamar la vindicación de derechos de terceros. *Otra vez incidió.*

Más allá de la abstracta teoría política, en nuestra panorámica constitucional el ejercicio del voto no es otra cosa que un mandato inspirado en la confianza del candidato. En esencia, por sus *efectos* apareja una función representativa jurídica.

La capacidad de un candidato derrotado para en su demanda de impugnación invocar a nombre propio el *valor* del voto de los electores que lo endosaron en las urnas está cimentada en el derecho al sufragio, principio inherente a nuestro sistema democrático de gobierno. Constituye el mandato legal —expreso y tácito— que desde los inicios, lógica y naturalmente, deriva todo voto a favor de un candidato o partido político. "Puede admitirse que el derecho al voto lleva consigo el derecho a que ese voto se cuente en favor de los candidatos para quienes fué depositado." *Martínez v. Junta Insular de Elecciones*, 43 D.P.R. 413, 425 (1932).

Como tal, en casos de impugnaciones electorales en los tribunales, implica legitimidad (*standing*) para reclamar los efectos de ese voto, ya sea a través del candidato o mediante la comparecencia directa del elector. *Cualquier otra conclusión tornaría en mítico e ilusorio el sufragio. A título de interpretación, no podemos alejarnos de esa doctrina constitucional. Rehusamos divorciar y cercenar los derechos de Granados Navedo o de Acevedo Pérez de los de aquellos electores que los respaldaron.*

Esta interpretación no es privativa nuestra. La misma fue expuesta hace tiempo por el Tribunal Supremo de Estados Unidos al decidir que "los derechos de los electores y los derechos de los candidatos no son susceptibles a una clara separación; las leyes que afectan a los candidatos, al menos teóricamente, *siempre tienen un efecto correlativo sobre los electores*". (Traducción y énfasis nuestros.) *Bullock v. Carter*, 405 U.S. 134, 143 (1972). "Al evaluar las restricciones impuestas a un candidato, es esencial examinar con prisma realista la extensión y naturaleza de su *impacto* sobre los electores." (Énfasis suplido.) Íd. Por ende, "al considerar el criterio de revisión judicial apropiado, no carece de apoyo la identificación [(*identifying*)] de los intereses de los candidatos con los de los electores". *Clough v. Guzzi*, 416 F. Supp. 1057, 1066 (D. Mass. 1976). Después de todo, "es difícil desunir los respectivos derechos de los electores y los candidatos, y al analizar las limitaciones impuestas a los candidatos, los tribunales deben evaluar su impacto sobre los electores, *véase, e.g., Anderson v. Celebrezze*, 460 U.S. 780, 786–788, 103 S.Ct. 1564, 1568–1569, 75 L.Ed.2d 547 (1983) . . .". (Traducción y énfasis nuestros.) *Bachur v. Democratic Nat. Party*, 836 F.2d 837, 840 (4to Cir. 1987).

Pero hay más. *El marco conceptual inmerso en toda acción judicial de impugnación —por su cardinal importancia para nuestra herencia democrática— es hacer valer la pureza de los resultados comiciales y reivindicar los votos de todo elector.* "Si como resultado de unas irregularidades eleccionarias se declara erróneamente ganador a un candidato, *está en juego algo más que la frustración del candidato perdedor; la cuidadanía habrá perdido la habilidad de imponer su voluntad a través del proceso electoral.* Por ende, aseverar que una demanda de impugnación es simplemente un procedimiento adversativo entre el candidato perdedor y el ganador oficialmente certificado es malinterpretar la *raison d'être* de una demanda de impugnación y desmere-

cer la importancia que la Legislatura ha estimado en la certeza de las elecciones. *Una demanda de impugnación, como repetiremos, es una acción mediante la cual el candidato impugnador cuestiona propiamente la realización de la elección.* Al presentar esa impugnación el candidato *habla por todo el electorado, tratando de asegurar que todo el proceso democrático haya funcionado adecuadamente y que la voluntad del electorado se ha cumplido.*" (Énfasis suplido y en el original, y traducción nuestra.) *Foster v. Evert,* 751 S.W.2d 42, 43–44 (1988).

No es convincente, pues, la conclusión del tribunal de instancia de que Granados Navedo no tiene capacidad (*standing*) para apoyar su impugnación en los derechos constitucionales de los electores que votaron a su favor. Sobre este extremo, los argumentos de los recurrentes Acevedo Pérez y Báez Galib tampoco son persuasivos. Aducen que "no existe un solo elector que hubiera acudido ante la Comisión [Estatal] en momento alguno a reclamar ante ésta los derechos que pretende esgrimir el demandante, y ni siquiera a alegar que su derecho al sufragio hubiera sido perjudicado de forma alguna". Alegato de los recurridos, pág. 22.

Este razonamiento es circularmente erróneo. ¿Cómo podían comparecer esos electores si nunca se les notificó el rechazo y la anulación de sus votos por la Junta Especial o Comisión Estatal? ¿Cómo, si ignoraban ese hecho, puede pretenderse que acudieran a la Comisión Estatal a reclamarlo? Más aún, con respecto a las doscientas siete (207) papeletas llamadas *arrestadas,* ¿en qué momento pudieron haberlo hecho los electores si precisamente fue el mismo 7 de diciembre —horas antes de que Acevedo Pérez fuera certificado— que el Presidente de la Comisión, licenciado Rodríguez Estrada, a ruego del Comisionado Electoral Báez Galib (P.P.D.), decidió anularlas? Estas interrogantes nos suplen la contestación. Explican satisfactoriamente las razones para que ni uno solo de los electores cuyas papeletas y votos

fueron arrestados y anulados —y otros votos que Granados Navedo reclamó— no acudieran antes a la Comisión Estatal a vindicar sus derechos. *Simplemente nunca fueron notificados. Desconocían que habían sido despojados de sus votos.* ¿Desde cuándo el derecho al voto es renunciable por ignorancia?

Más grave aún, tampoco el propio tribunal de instancia notificó mediante edictos u otro medio análogo eficaz a los electores sobre el procedimiento judicial, aun cuando determinó que Granados Navedo no tenía capacidad para invocar sus derechos. Sólo hizo un *novel* llamado a través de sus abogados a unos electores que habían acudido al foro federal. *Ello no es suficiente ni subsana las infracciones al debido proceso de ley.*

Aun bajo los criterios científicos de *Zachry International v. Tribunal Superior*, supra, procedía. Allí resolvimos que "'[e]xisten cuatro factores que el Tribunal toma en cuenta al determinar la capacidad para invocar los derechos de otros: (1) el interés del litigante; (2) la naturaleza del derecho invocado; (3) la relación existente entre el litigante y las terceras personas; y (4) la factibilidad de que los terceros puedan hacer valer tales derechos en una acción independiente y . . . [u]na decisión concediendo o negando capacidad en un caso en particular dependerá de la existencia o no de tales factores'". Íd., pág. 272.

Además, allí adelantamos que el principio rector de los tribunales en casos en que se planteen derechos de terceros será el ejercicio de su discreción en uno u otro sentido, depende de la trascendencia del derecho afectado y de la importancia de los intereses en conflicto. Después, en *Com. de la Mujer v. Srio. de Justicia*, 109 D.P.R. 715 (1980), reiteramos ese enfoque. Subsiguientemente, en *E.L.A. v. P.R. Tel. Co.*, supra, expresamos que la tendencia actual es decididamente hacia la *liberalización* y *simplificación* de las normas que rigen la capacidad para demandar (*standing*).

Bajo este prisma doctrinario, y por el interés público que reviste la cuestión, es innegable la capacidad y legitimidad activa de Granados Navedo para reclamar derechos de terceros. Nos explicamos.

Primero tiene, obviamente, un interés legítimo y directo en la cuestión. R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, San Juan, Ed. C. Abo. P.R., 1986, Vol. I, pág. 132. Está en controversia la elección al cargo de Alcalde de la ciudad de San Juan en la cual él es uno de los candidatos.

Segundo, no existe discusión sobre la naturaleza fundamental del derecho invocado. El ejercicio del sufragio constituye la piedra angular de nuestro sistema democrático. Distinto a la Constitución federal, *en Puerto Rico el derecho al voto está protegido constitucionalmente* mediante un mandato directo de la Asamblea Constituyente, preceptivo de que las *"leyes garantizarán* la expresión de la voluntad del pueblo mediante el sufragio universal . . .". (Énfasis suplido.) Art. II, Sec. 2, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 261. *Esta particularidad aumenta sustancialmente el diámetro de la lupa judicial puertorriqueña en materia electoral.*

Aunque el tribunal de instancia reconoció en su Sentencia de 2 de febrero de 1989 (Caso Núm. RE-89-88, *Exhibit* I, pág. 4) que "[n]o existe en la Constitución de los Estados Unidos una cláusula similar", aun así —en apoyo de sus dictámenes— inexplicablemente citó casos federales expositivos de que esa Constitución no confiere a ningún ciudadano el derecho al sufragio y que el derecho al voto per se no está constitucionalmente protegido.

Tercero, la relación existente entre Granados Navedo como candidato demandante y las terceras personas cuyos derechos invoca es muy estrecha. Ciertamente, reclama los derechos de aquellos electores que votaron por él y de otros que muy bien pudieron haberlo hecho.

Cuarto, de las cuarenta y ocho (48) piezas documentales objetadas y erróneamente decretadas inadmisibles por el tribunal de instancia —identificaciones 6-36 y 39-55, demandante— *sólo* unas cuantas correspondían a demandantes en el foro federal (Caso Núm. 88-2023). Por ende, no es posible que todos los restantes electores, *como otros terceros concernidos*, comparecieran al Tribunal Superior a reclamar sus derechos.

Como anteriormente expusimos, a esos otros electores nunca se les notificó válidamente la anulación de sus votos, ni en el momento de efectuarse ni al expedirse la certificación el 7 de diciembre. ¿Cómo pretender que en el corto término de diez (10) días que fija la Ley Electoral de Puerto Rico —Art. 2.001 (16 L.P.R.A. sec. 3051, *in fine*)— para estas acciones pudieran comparecer a impugnarla bajo "la capacidad para iniciar o promover cualesquiera acciones legales al amparo de [la] Declaración de Derechos y Prerrogativas de los Electores . . ."?

La única solución pragmática, constitucional y justa es que el candidato impugnador pueda reclamar *los efectos de los votos de los electores que lo endosaron*. Aquí, Granados Navedo lo hizo en su demanda. En esa gestión judicial legítimamente puede presentar los expedientes y documentos relacionados con esos electores y, de ser necesario, presentar como testigos a aquellos que voluntariamente quieran comparecer.

A la luz de los valores verdaderamente en juego, la capacidad de Granados Navedo para invocar el *"jus tertii"* es incuestionable. Las razones que tradicionalmente se han esgrimido para justificar la determinación de incapacidad para el reclamo de derechos de terceros no están presentes en el caso de autos. No albergamos dudas de que Granados Navedo está en condiciones de argumentar adecuadamente los derechos de esos electores. Éstos, a su vez, no se encuentran en posición ideal para hacerlos valer.

Esta capacidad fue reconocida hace años en nuestro repertorio jurisprudencial. Así, en *P.P.D. v. Admor. Gen. de Elecciones*, supra, este Tribunal no tuvo reparos en acoger y atender en sus méritos una demanda de impugnación del candidato perdidoso Samuel Cepeda (P.P.D.) sin que tuvieran que unirse como partes indispensables los electores que lo endosaron. Específicamente, revocamos la decisión de la Comisión Estatal de anular los votos de los electores Héctor Ramírez Aponte y María Morales Meléndez —emitidos a favor de dicho candidato del P.P.D.— ante su alegación de que esa determinación "priva[ba] al elector de su derecho al voto y al candidato y el partido *del efecto de su ejercicio*". (Énfasis suplido.) *Peticiones ante la Junta de Revisión Electoral*, Párrafo 7, Casos Núms. JR-80-280 y JR-80-283 de 18 y 19 de diciembre de 1980. Si sobre este extremo la Ley Electoral de Puerto Rico sigue siendo la misma, ¿qué razón justificaría apartarnos de esa jurisprudencia y aplicar una norma distinta al caso de autos? Sinceramente, no existe una sólida base doctrinaria para variarla judicialmente y establecer distinciones donde no las hay.

Aclarada la capacidad y legitimidad (*standing*) de Granados Navedo para reclamar la validez de los votos de los electores que lo endosaron, examinemos la corrección de la conclusión del tribunal de instancia relativa al impedimento para hacerlo *por razón de la regla general sobre acuerdos unánimes*.

## IX

*Acuerdos unánimes; regla general, sus excepciones y efectos*

En *P.S.P. v. Com. Estatal de Elecciones*, supra —con miras a "evitar planteamientos de sorpresa, cambios posteriores para obtener ventajas, asegurando la estabilidad, certeza y pulcritud comicial" (íd., págs. 412–413)— refren-

damos la adopción de normas reglamentarias previas y el descargo de las labores de la Comisión Estatal en el escrutinio o recuento, por delegación, a través del establecimiento de mesas con representantes de cada partido político mediante el criterio de votación unánime. Íd., págs. 414–417. No obstante aclaramos que, para que esa delegación fuera válida, la misma tenía que estar sujeta a "criterios predeterminados" de la Comisión Estatal (íd., pág. 417), pues en último análisis lo verdaderamente importante era y es "que el producto final sea depurado y rubricado por la autoridad final correspondiente". Íd. Bajo un criterio de uniformidad, como "regla general, entonces, un Comisionado no puede desatenderse y hacer caso omiso de los acuerdos y reglas válidas adoptadas previamente por unanimidad". Íd., pág. 410. Finalmente, esa visión sirvió de nota de cierre en su proyección prospectiva cuando dijimos que:

> La importancia que reviste para la democracia y el imperio de la ley la recta observancia, en lo posible, de la regla previamente aprobada no debe subestimarse ni debilitarse. A nivel constitucional representa las aspiraciones y derechos de todo un pueblo, a nivel legislativo el interés de quienes temporalmente —a veces potencialmente candidatos a reelección— ostentan la confianza del pueblo; y a nivel de la Comisión los intereses de los partidos políticos. *Sin embargo, no es una norma de imperativos absolutos susceptible de aplicarse, como solución mágica, a toda situación que surja. S[ó]lo procederá en aquellos casos en que el resultado final sea justo, equitativo, balanceado y jurídicamente correcto. Nunca podrá servir de norma para conculcar derechos, menos de la naturaleza aquí envuelta.* (Énfasis suplido.) *P.S.P. v. Com. Estatal de Elecciones*, supra, págs. 446–447.

Reafirmamos el sustrato de esos pronunciamientos. Ahora bien, *unanimidad* no es sinónimo de *uniformidad*, de *legalidad* y, menos, de *concluyente*. No todo acuerdo unánime de la Comisión Estatal o de uno de sus cuerpos delegados goza de modo *absoluto* de esas características. Como excepción, sobre cualesquiera acuerdos pesan las limita-

ciones "dimanantes de la Constitución, o de la Ley, o de un reglamento previamente aprobado". *P.S.P. v. Com. Estatal de Elecciones,* supra, pág. 412. No puede ser de otro modo.

Bajo la regla de unanimidad, no cabe sostener la anomalía de acuerdos disímiles o diferentes para situaciones básicamente iguales. Cuando la Comisión Estatal actúa y delega sus funciones no puede pretender separarse de las acciones de sus organismos subordinados. En sus proyecciones tridimensionales —como cuerpo colegiado y miembros entre sí, en su relación con el Presidente, y en las funciones que delega— *su mano derecha no puede ignorar lo que hace la izquierda.* La Comisión Estatal no puede generar una paternidad múltiple de esa índole o convertirse en la *hidra* de muchas cabezas de la mitología griega.

En nuestros precedentes judiciales aflora la premisa subyacente de que la conducta vinculante tiene que ser jurídicamente eficaz y válida. Por lo tanto, si el acuerdo unánime celebrado por los Comisionados Electorales o sus cuerpos delegados es nulo, ilegal o inconstitucional, el mismo puede ser cuestionado, atacado o impugnado sin que ello constituya una violación a la regla vinculante de unanimidad.(4)

---

(4) En su alegato ante nos, Báez Galib y Acevedo Pérez argumentan que "suponiendo (*ex argumenti gratia*) que no fuese aplicable la doctrina de cosa juzgada, el recurrente Granados estaría impedido por la doctrina de los actos propios ('nadie puede ir válidamente contra sus propios actos') de impugnar los acuerdos a que llegó a través del representante de su partido político ante la Junta Especial. Esa doctrina ha sido reconocida reiteradamente por nuestra jurisprudencia en la que se equipara al [*estoppel*]. Véanse, entre otros, *Lausell Marxuach v. Díaz de Yáñez,* [103 D.P.R. 533,] 537–538 [1975]; *Int[.] General Electric v. Concrete Builders,* 104 D.P.R. 871, 876–879 (1976)[,] y *Velilla v. Pueblo Supermarkets, Inc.,* 111 D.P.R. 585, 587–589 (1981). Tiene, como indicó este alto Tribunal en *Int[.] General Electric [v. Concrete Builders],* supra, [pág. 877], '. . . fundamento y raíz en el principio general de Derecho que ordena proceder de buena fe en la vida jurídica[.] Es de perfecta aplicación a los hechos que concurren en el caso de autos". Alegato de los recurridos, pág. 34.

No tienen razón. "La conducta vinculante o primera debe ser jurídicamente eficaz. Por lo tanto, si esta primera conducta es inválida se puede volver lícitamente contra ella . . . ." A. Borda, *La teoría de los actos propios,* Buenos Aires,

También, en cuanto a ciertos acuerdos adoptados previamente por unanimidad, *consistente e invariablemente* hemos resuelto que ello no impide que un comisionado electoral, por razón de "discrepancias *bona fide* sobre la interpretación o alcance de una regla o acuerdo así aprobado, plantee en ese limitado contexto el asunto ante la Comisión, para que se actúe afirmativamente . . . . '[L]a misma vara de medir debe usarse en ambos casos'". *P.S.P. v. Com. Estatal de Elecciones*, supra, pág. 410.

Resolver que la regla de unanimidad es de carácter absoluto, *erga omnes* y vinculante en todo caso, imposibilitaría la administración del sistema electoral con la participación seria y responsable de los funcionarios de colegio y demás representantes de los partidos. ¿Qué funcionario se atrevería a dar su consentimiento en una situación dudosa, sabiendo que con ello estaría maniatando inexorablemente a su partido y a todos sus candidatos? Esta pregunta nos lleva a la interrogante medular del asunto: ¿cómo propiciar y fomentar que los acuerdos, a todo nivel, sean justos y legales? La respuesta ya existe en la jurisprudencia citada. Lo lógico, razonable y constitucional es condicionar la regla de unanimidad a que los acuerdos estén fundados en criterios de *legalidad*.

Para entender la razonabilidad y dinámica de este enfoque basta recordar, en el caso de autos, la solicitud del licenciado Báez Galib de 7 de diciembre. En esa fecha pidió a la Comisión Estatal que *reconsiderara* su determinación anterior de 29 de noviembre —que éste había refrendado— en torno a la revisión de las papeletas de doble marca anuladas unánimemente por los funcionarios de mesa de los Precintos 1, 2 y 3 de San Juan. El Presidente de la Comisión accedió. *Exhibit* 37, demandante.

---

Ed. Abeledo-Perrot, 1987, pág. 73. Véanse: R.H. Compagnucci de Caso, *La doctrina de los propios actos y la declaración tácita de voluntad*, 1985-A Rev. Jur. Arg. La Ley 1002 (1985); L.M. Vives, *La doctrina de los actos propios*, 1987-B Rev. Jur. Arg. La Ley 953 (1987).

También, la historia y otros precedentes electorales son aleccionadores. Igual sucedió en el caso *P.S.P. v. Com. Estatal de Elecciones*, supra (Recurso 0-80-646). Allí, el entonces Comisionado Electoral Acevedo Pérez (*P.P.D.*) pidió a la Comisión Estatal que adjudicara como válidas las papeletas votadas por los electores fuera del cuadrante de la insignia del P.P.D. ("pavazos"). En revisión, revocamos la negativa del Administrador y de la Junta Revisora Electoral *aun cuando el propio Acevedo Pérez previamente había suscrito y aprobado* el 12 de noviembre de 1980 la Regla 11 del Escrutinio que decretaba *nulas* tales marcas. Íd., págs. 425–435.

También en el mismo caso (Recurso 0-80-647) —promovido por el P.N.P.— sostuvimos que la Regla 60 del Reglamento para las Elecciones Generales de 1980 (en adelante Reglamento de Elecciones de 1980), aprobado el 1ro de octubre —sobre la adopción de acuerdos por mayoría y no por unanimidad— era ilegal y que el P.N.P. *no estaba impedido de cuestionarla aunque había votado a favor de esa enmienda. P.S.P. v. Com. Estatal de Elecciones*, supra, págs. 416–418.

Una nota adicional. Resolver que no se pueden cuestionar aquellas decisiones unánimes tomadas en la Comisión Estatal equivale realmente a renunciar a nuestra función judicial revisora. "Reconocerle este poder implícito a la Junta Insular *es convertirla en el tribunal más poderoso de Puerto Rico.*" (Énfasis suplido.) *Partido Popular v. Junta Insular Elecciones*, 63 D.P.R. 296, 332 (1944), opinión del Juez Asociado Señor Todd, Jr.

Asimismo convertiríamos en *incontrovertible —jure de jure*— la presunción de corrección de las determinaciones administrativas de la Comisión Estatal. Los peligros de ese enfoque de *infalibilidad electoral* son evidentes.

Expondríamos al naufragio los derechos de electores en un área de por sí sensitiva y cuyo organismo, de facto en las decisiones cruciales, está bajo la égida de un funcionario afi-

liado y simpatizante del partido del Primer Ejecutivo. Y, además, estableceríamos una norma carente de sustancia adjudicativa propia. Ello es así si recordamos que la regla descansa sólo en la unanimidad —que es un criterio cuantitativo— y no toma en cuenta necesariamente criterios de orden cualitativo, a saber, si tales determinaciones son conformes a la Constitución, a la ley y a los reglamentos. Porque, en última instancia, la norma rectora en estos asuntos no es precisamente la unanimidad, sino la observancia de un cauce adecuado para proteger el derecho constitucional al voto y, en caso de su anulación, que se haya garantizado al elector el debido proceso para defenderlo. En otras palabras, en el caso de autos la unanimidad no puede de ninguna manera subsanar las violaciones a los derechos constitucionales, legales o reglamentarios de los electores que votaron por Granados Navedo. Igual enfoque se impone en cuanto a los que favorecieron a Acevedo Pérez.

En resumen, erró el ilustrado foro de instancia al eregir ab initio como obstáculo procesal y sustantivo la barrera absoluta de la regla de unanimidad. Bajo esta óptica concentrémonos en los méritos de las distintas alegaciones de Granados Navedo.

## X

*Admisibilidad de expedientes y papeletas de electores añadidos a mano y el debido proceso de ley*

Con estos precedentes judiciales y criterios jurídicos en mente evaluamos la admisibilidad de las papeletas presentadas por Granados Navedo y rechazadas por el tribunal de instancia. Las mismas son parte de miles de votos depositados en las urnas en las pasadas elecciones en virtud de la enmienda al Reglamento de Elecciones de 1988, sancionada por este Tribunal en *P.N.P. y P.I.P. v. Rodríguez Estrada,* supra. Esta enmienda estableció un procedimiento especial

mediante el cual se le permitió votar a aquellas personas que, aunque no aparecían como electores hábiles en las listas electorales, presentaron evidencia y alegaron su derecho a votar. Estos votos, por su propia naturaleza y por el pronunciamiento unánime de este Tribunal, serían *votos recusables*. No podría ser de otro modo. La recusación estaría fundada en un cuestionamiento desde "el punto de vista sustantivo o de fondo, esto es, si fue o no votada ilegalmente la papeleta por no reunir el elector todos los requisitos que le hubiesen habilitado como tal". *Molina v. Barreto Pérez*, supra, pág. 516.

Coincidimos en que la Comisión Estatal podía delegar en una junta especial la misión de determinar la cualificación de los electores añadidos a mano. De hecho, nuestro mandato judicial requería la revisión minuciosa de todos los documentos de la Comisión Estatal antes de determinar si más de dieciocho mil (18,000) electores cualificaban para votar bajo ese sistema. Sin embargo, esa delegación no podía ser ilimitada ni el proceso concluir ahí. A todos los electores rechazados, aunque su impugnación fuese unánime, debió notificárseles dicha determinación en algún momento posterior para que tuvieran la oportunidad de defender sus votos. Repetimos, como expresáramos en *Molina v. Barreto Pérez*, supra, págs. 516–517, "la adjudicación sustantiva o en su fondo de una papeleta recusada es un proceso por naturaleza distinto al trámite ordinario y normal seguido durante el escrutinio eleccionario. Exige la existencia de una mecánica de adjudicación plenaria que trasciende la faz de la papeleta, de índole adversativa, rodeada de las garantías mínimas del debido proceso de ley tales como notificación al elector, citación de testigos y desfile y apreciación de prueba, ante la Comisión Electoral o su examinador".

*No podemos ahora exigir menos*. Sobre la recusación, dijimos en *P.P.D. v. Admor. Gen. de Elecciones*, supra, pág. 227, que "es un entredicho contra la validez del voto. Si

bien no lo anula de primera intención, su propósito es precisamente anularlo". Añadimos que "[c]onsiderada la naturaleza fundamental del derecho al voto y el hecho de. que la recusación ha de permitir que se conozca cómo vota el elector recusado, las disposiciones de ley que permiten y reglamentan la recusación, tanto en cuanto a los fundamentos en que pueda basarse como en cuanto al procedimiento para ello, deben ser de estricto cumplimiento". Íd., pág. 229.

Y, finalmente, concluimos que *"el elector debe tener amplia oportunidad de defender su voto.* La Ley Electoral consagra entre los derechos y prerrogativas de los electores 'garantía a cada persona del derecho al voto, igual, libre, directo y secreto'. Art. 2.001, inciso 2 (16 L.P.R.A. sec. 3051(2)). Ello está en armonía con el mandato constitucional. Para que esa garantía sea efectiva, el elector cuyo voto se impugna debe tener derecho a contradecir la recusación, Art. 5.034 (16 L.P.R.A. sec. 3234), *y a comparecer y ser oído en la vista en que se examine y pueda adjudicarse la procedencia de la recusación. A ese fin, debe ser citado con suficiente antelación y de manera efectiva.* No debe bastar, a este efecto, un mero diligenciamiento negativo de una citación. Debe quedar demostrado que se hicieron esfuerzos razonables para notificarle. El valor de un voto no puede hacerse depender de unas diligencias incompletas que en ocasiones son hechas por personas que pudieran tener mucho interés en que dicho voto no se cuente". (Énfasis suplido.) *P.P.D. v. Admor. Gen. de Elecciones,* supra, págs. 232–233.

Para justificar la ausencia total de este debido proceso de ley, Báez Galib y Acevedo Pérez sostienen que la Comisión Estatal no tenía que notificarle a los votantes rechazados, ya que las papeletas de votos añadidos a mano no eran "recusadas" y, al rehusarlas la Junta Especial, no se estaba anulando su voto. Aducen que sólo se determinaba que el elector no estaba autorizado a votar fuera de la lista. Alegato de los recurridos, págs. 39–40.

El argumento de que tales papeletas no eran recusables choca directamente contra la conclusión del Juez Presidente Señor Pons Núñez en *P.N.P. y P.I.P. v. Rodríguez Estrada*, supra. Esta conclusión fue producto de un análisis a la luz de la enmienda al reglamento introducida por el Comisionado Electoral Meléndez Rivera (P.I.P.) que, en lo pertinente, disponía:

> "Se le entregará la papeleta de votación, se le entintará como corresponde a todo votante y *antes de depositar su voto será recusado. Dicha recusación tendrá que ser contradeclarada* mediante la firma bajo juramento, siguiendo el procedimiento de recusació[n] de una *declaración jurada* en la cual el elector explica: (1) que es un elector con derecho a votar y (2) que su nombre ha sido excluido de las listas electorales por error atribuible a organismo electoral y (3) que el elector no ha votado durante el período de votación, el cual entendemos comienza desde el domingo antes, ni por medio del voto adelantado, ni por medio de voto ausente ni de ninguna otra forma en ningún colegio electoral en la Isla de Puerto Rico, [en lo] referente a la elección de los cargos electivos del 8 de noviembre de 1988.
>
> [Dicha *declaración jurada* se incorporará a los materiales pertinentes del colegio, *junto a la papeleta electoral así recusad[a]* . . . y dicho voto no se adjudicará en el colegio electoral y se enviará al proceso de escrutinio general.]" (Énfasis suplido.) *P.N.P. y P.I.P. v. Rodríguez Estrada*, supra, pág. 498.

Y así fue entendido e implantado por la Comisión Estatal. Aunque *dicho organismo no notificó ni publicó los derechos de los electores a tono con este procedimiento* (T.E. Superior, págs. 106–107), mediante Memorando de 29 de octubre de 1988 éste, *por unanimidad* (incluso el *endoso* del Presidente de la Comisión Rodríguez Estrada), internamente describió e instruyó a las comisiones locales, juntas y subjuntas de unidad y de colegio que "[p]ara efectos de recusación bastará la hecha encima del sobre, *que no requiere ser contradeclarada*". *Exhibit* 49, ambas partes, pág. 4. La razón para esta determinación es sencilla. En el procedimiento establecido,

antes de la recusación el elector suscribía una *declaración jurada*, la cual por sus términos tenía esa *equivalencia*. Lo determinante *no es el orden ni cuándo se llenase el impreso, sino la naturaleza del acto y que se verificase esa declaración jurada y la recusación.*

La pretendida dicotomía esgrimida por los demandados Báez Galib y Acevedo Pérez en cuanto a que la Junta Especial no anulaba el voto, sino que simplemente determinaba que el elector no estaba autorizado a votar, representa un legítimo esfuerzo de un *Iustitia* erudito y un ingenioso juego de palabras, que no logra superar la *viva realidad de que el resultado neto de la actuación de la Junta Especial era que dicho voto no se adjudicaba, esto es, quedaba invalidado.*

La opinión mayoritaria resuelve, en relación con el procedimiento establecido por la Comisión Estatal para votar añadidos a mano, que "en ningún momento se consideró concederle a estos electores la gama de derechos estatutarios y jurisprudenciales antes señalados. En todo momento se trató y se consideró esto como un procedimiento sui géneris". Opinión mayoritaria, pág. 30. Nada más lejos de la verdad. En esta conclusión está la raíz del mal.

*Esta mixtificación de conceptos es una inconcebible y evidente regresión en la escala de valores y trato igual a los derechos ciudadanos.* Al así hacerlo, la mayoría del Tribunal ha creado electores de *primera clase* —por estar en las listas— y otros de *segunda clase* —omitidos de las mismas— por razón de los errores en la maquinaria electoral. *Constitucionalmente el enfoque es impermisible.* Bajo esas categorías, no podemos establecer limitaciones y resolver que los electores de *primera clase* son acreedores a mayores oportunidades y a un debido proceso de ley distinto al que se le concede a los electores de *segunda clase.* Si en *P.N.P. y P.I.P. v. Rodríguez Estrada*, supra, rehusamos a priori esa dicotomía, menos podemos establecerla a posteriori. T.E. Supremo, págs. 77–78. De prevalecer ese enfoque restric-

tivo, tendríamos que *anular todos los votos de los electores añadidos a mano*. Íd., págs. 83–90.

Un examen minucioso de la prueba desfilada refleja que a alrededor de mil doscientos ochenta (1,280) electores se les rechazó el voto. La Junta Especial determinó que su exclusión de las listas estuvo conforme con lo establecido en la Ley Electoral de Puerto Rico, o por estar clasificados como inactivos, *sin que se les notificara tal determinación. Así lo aceptan las partes*. T.E. Supremo, págs. 9 y 91. En ausencia de esfuerzo alguno para que esos electores tuvieran conocimiento de la anulación de su voto, tenemos que concluir que la actuación de la Comisión Estatal —o de la Junta Especial— fue de naturaleza confiscatoria y que les privó de la oportunidad y debido proceso de ley para probar la legalidad de sus actos. *No puede prevalecer.*

Y es que no podemos olvidar que el "rasgo definidor que impulsa el derecho al debido proceso de ley exige que de alguna manera la persona concernida sea tomada en cuenta cuando han de realizarse adjudicaciones o tomarse acciones gubernamentales, legislativas o ejecutivas que puedan adversamente afectarle. (1)".[5] *Pueblo v. Bou Nevárez*, 111 D.P.R. 179, 189 (1981), opinión concurrente.

En este extremo, la opinión mayoritaria nuevamente resuelve bajo un supuesto *erróneo*, a saber, de que la "cuestión no se le planteó oportunamente a la Comisión Estatal antes

---

[5] Este esc. 1 dispone:

"Muy instructivo estimamos el análisis del Profesor Tribe en su obra *American Constitutional Law*, Mineola, New York, Foundation Press, 1978, sec. 10-7, pág. 501 *et seq*. En el curso del mismo, cita las orientadoras palabras del Juez Frankfurter:

'. . . la validez y autoridad moral de una conclusión en gran medida depende de la manera en que se llegó a ella. . . . Ningún instrumento mejor ha sido diseñado para arribar a la verdad que el ofrecer a una persona en peligro de sufrir una pérdida seria, notificación del caso en su contra y oportunidad para enfrentarlo. Tampoco se ha encontrado una mejor manera para generar el sentimiento tan importante para un gobierno popular, de que se ha hecho justicia.' (Traducción nuestra.)" *Pueblo v. Bou Nevárez*, 111 D.P.R. 179, 189 esc. 1 (1981).

de certificarse el resultado de la elección". Opinión mayoritaria, pág. 29. Según antes expusiéramos, uno de los Comisionados Electorales pidió a la Comisión Estatal que se notificara a los electores rechazados para que, si lo deseaban, acudieran directamente al Tribunal. Identificación 70, demandante; T.E. Comisión, pág. 95.

Ese curso decisorio no nos impide entrar de lleno y adjudicar la cuestión.

## XI

*Causa de acción fundada en electores añadidos a mano "rechazados" por la Junta Especial o la Comisión Estatal*

Para resolver en buena juridicidad si la prueba presentada por Granados Navedo es suficiente y demostró sus alegaciones de que la Comisión Estatal directamente —o a través de la Junta Especial— erró al excluir determinados electores cualificados que votaron por él bajo el procedimiento de añadidos a mano, debemos primero remitirnos a la declaración de Bauzá Escobales, evaluarla posteriormente a la luz de unos principios evidenciarios aplicables y, finalmente, pasar juicio y dictaminar los casos en particular. En esa tarea hemos ponderado principios de raíces constitucionales, administrativas y evidenciarias que, como veremos, se entremezclan con importantes argumentos prácticos y de sentido común.

En su testimonio, Bauzá Escobales explicó que la Comisión Estatal conservaba su registro electoral en un computador con varios terminales de acceso. Se preparaban microfichas de esos récord y de las listas o impresos del computador. La lista principal denominada "Alfa-Colegio" incluía, en orden alfabético, todos los electores asignados a los diferentes colegios. Determinado número de colegios componían la *unidad electoral,* para la cual también se producía alfabéticamente la lista Alfa-Unidad. A su vez, todas las unidades

de un precinto se compilaban en una lista Alfa-Precinto. La Comisión Estatal revisaba periódicamente tales listas a base de las transacciones mensuales de los electores. Esos datos eran suministrados al computador y, así actualizados, se llevaban al archivo maestro. T.E. Superior, págs. 495–497.

Para el año eleccionario 1988, el archivo maestro se cerró el 11 de julio. Toda nueva transacción posterior se extendió hasta el 19 de septiembre, fecha en que se prepararon las listas de electores que habían activado sus récord. Además, la Comisión Estatal autorizó un procedimiento para acreditar a aquellos electores que entendían tener derecho a votar. T.E. Superior, págs. 497–499. En resumen, hubo tres (3) fuentes para la confección de las listas: *principal o maestra, primera suplementaria* e *inclusión.* Íd., pág. 499.

Aclaró que *no* obstante estos procesos algunos electores quedaron fuera de las listas, porque las transacciones en las Juntas de Inscripción Permanentes (J.I.P.) tenían defectos de su faz —omisión o sustitución de una letra en los nombres o apellidos— y no entraron al sistema. A veces, cuando se detectaba ese tipo de error en el Centro de Cómputos de la Comisión Estatal podían haber transcurrido varios meses. Al final de ese trámite, la devolución del documento a la J.I.P. para que localizara al elector no era posible porque, entre otros factores, resultaba tardío.

Atestó que otras fallas pudieron deberse a defectos en la forma, *e.g.* transacciones que no eran procesadas por la Unidad de Control de Calidad. T.E. Superior, págs. 500–503.

Para subsanar las situaciones de electores que no aparecían en las listas, Bauzá Escobales atestiguó que el proyecto aprobado por la Comisión Estatal de *Solicitud de Inclusión por Omisión* autorizó que esos electores pudieran presentar su reclamación ante las comisiones locales a través de la J.I.P. Cuando los ciudadanos presentaban su tarjeta de identificación debidamente perforada en el espacio correspondiente a las elecciones de 1984, la J.I.P. buscaba en sus docu-

mentos para ver si había alguno que validara el reclamo de los ciudadanos. De no encontrar tal documento entre sus récord, J.I.P. tenía que solicitarle a la Secretaría de la Comisión Estatal de Elecciones en San Juan que localizara cualquier documento que así pudiera demostrarlo. Si se encontraba, una vez validado ese derecho, se le incluía como elector cualificado. La Comisión Estatal entonces notificaba a la Comisión Local y, a través de ésta, se ingresaba al elector en la lista de *inclusión* preparada por la Comisión Estatal hasta el 31 de octubre.

Cualquier elector que hiciera una reclamación con *posterioridad* al 31 de octubre no entró en esa lista preparada por el computador de la Comisión Estatal. En estas situaciones la Comisión Local tenía autorización para preparar unas listas a mano que debían entregar directamente a los colegios electorales. La razón para ello fue que no hubo tiempo suficiente, al extenderse el proceso hasta el 4 de noviembre, para que esos casos vinieran a San Juan, se prepararan las listas y se remitieran a los colegios. T.E. Superior, págs. 503–504.

Bajo este procedimiento, para poder ejercer su derecho al voto el 8 de noviembre el elector debía, si se le había preparado el documento en la Comisión Local, comparecer a la unidad electoral con una copia del mismo y su tarjeta de identificación electoral. Allí le llenaban y entregaban el formulario 01221 —tarjeta amarilla de autorización— para que pasara al último colegio de la unidad. Ahí presentaba su tarjeta electoral, más la tarjeta de autorización amarilla, prestaba una declaración jurada, firmaba la lista de electores, le perforaban la tarjeta de identificación electoral, le entintaban el dedo y le entregaban sus papeletas. También le entregaban un sobre *especial* para que, sin sellarlo, pusiera en su interior las papeletas una vez votadas. El elector debía salir de la caseta con las papeletas dobladas. Después debía depositarlas junto con la tarjeta de identificación electoral y la de

autorización en el sobre *especial*. El sobre *especial* tenía impresa una declaración jurada que debía ser cumplimentada y firmada por el elector, y la recusación al dorso para ser firmada por el recusador.

Una vez se sellaba el sobre *especial*, se ponía dentro de un sobre *mayor* que también contenía todos los sobres *especiales* de los electores que habían votado siguiendo el mismo sistema. Oportunamente, esos sobres *mayores* eran remitidos a la Comisión Estatal, ya que las papeletas no podrían adjudicarse en los colegios. T.E. Superior, pág. 508.

Este procedimiento pautado, por distintas razones, no fue observado en todos los colegios. En la mañana del día de las elecciones la Comisión Estatal comenzó a recibir quejas de que faltaban sobres *especiales* en los colegios. Lamentablemente no había más disponibles. Tampoco pudieron reproducirse esa mañana. Sólo se imprimieron limitadamente, como hojas separadas, los impresos correspondientes a las declaraciones juradas y las recusaciones que debían contener los sobres *especiales*. Como sólo se reprodujeron una cantidad limitada resultaron insuficientes para todos los colegios con problemas. T.E. Superior, págs. 509–510. En otros colegios, por error, los electores depositaron directamente las papeletas en las urnas y, en muchos, los funcionarios las mezclaron con las papeletas de electores que aparecían en las listas.

Estas situaciones tuvieron sus efectos durante el escrutinio y recuento. Una vez la Comisión Estatal estableció la Junta Especial para atender los casos de electores añadidos a mano, sus miembros comenzaron a percatarse de las dificultades resultantes de la inobservancia del procedimiento descrito en algunos colegios.

De la reunión de la Comisión Estatal de 3 de diciembre de 1988 —Identificación 67— surge un diálogo en que, si bien los protagonistas no están debidamente identificados, se arroja luz sobre el particular. A tal efecto, en esa fecha la

Comisión Estatal se confrontó con las situaciones que le presentó la Junta Especial relacionadas con diecinueve (19) electores que, aunque tenían tarjetas de identificación electoral, sus récord no aparecían o figuraban clasificados como inactivos por el computador y habían votado en las elecciones de 1980 y 1984. Se discutieron esos casos y la posibilidad de que, por fallas técnicas, la evidencia de las transacciones electorales procesadas se hubieren extraviado en la Comisión Estatal en vista de los "millones de documentos" que entraban al sistema. T.E. Comisión, págs. 15–20. En cuanto a las personas que aparecían *inactivas* por no haber votado en las pasadas elecciones, se llegó a sugerir incluso que ello podría deberse a que votaran en colegios distintos a los asignados o bajo el anterior sistema de añadidos a mano en 1984 (Colegios Especiales F–I). Íd., págs. 41–47. Además, que algunos podían haber quedado fuera de las listas, porque el *status* "foto cero" lo impedía. Íd., pág. 132. Finalmente, podemos concluir que esos casos fueron rechazados por la Comisión Estatal, porque sin conocer las razones específicas —aunque habían votado— aparecían inactivos en el impreso del terminal. Íd., págs. 133–137.

La realidad y dinámica expuestas explican satisfactoriamente porqué Bauzá Escobales en su declaración judicial atestó —previo el examen de las identificaciones 19 y 93, Caso Núm. 2835, asignado así en el libro de la Junta Especial en que se registraban los *sobres especiales*— que G.M.A.,(6) Núm. electoral _____, votó en el Precinto 4, Unidad 14; *era un elector activo con derecho a votar*. T.E. Superior, págs. 646–647. Esto motivó una objeción de los demandados Báez Galib y Acevedo Pérez en el sentido de que esta conclu-

---

(6) Optamos por identificar a los electores por sus iniciales con miras a mantener la secretividad del voto conforme nuestros pronunciamientos en *P.S.P., P.P.D., P.I.P. v. Romero Barceló*, 110 D.P.R. 248, 287 (1980). Por la misma razón, hemos dejado en blanco sus números electorales y direcciones exactas.

sión le correspondía hacerla al tribunal de instancia. T.E. Superior, pág. 648. Este planteamiento llevó a dicho foro a intervenir e inquirir sobre la mecánica seguida por la Junta Especial. A tal efecto, el testigo Bauzá Escobales aclaró que la Junta Especial no siempre tuvo todos los sobres de los electores durante su evaluación. La información con que contó era la que provenía del terminal del computador a través de sus impresos (*printout*). Íd., pág. 657. Cuando la Junta Especial comenzó sus trabajos *carecían* de esos impresos. No fue hasta cuatro (4) o cinco (5) días después que se cambiaron los terminales que antes mostraban sólo la imagen y por cuya razón habían dependido de las *anotaciones* a mano de los empleados. Íd., pág. 658.

Con referencia al caso de G.M.A. explicó que, aparte del impreso del terminal (de 7 de diciembre) que tenía ante sí, tenía que usar las listas de exclusiones para ver si dicho elector aparecía en ellas. T.E. Superior, pág. 659. No pudo contestar si el expediente que se utilizó para hacer la investigación, una vez se inició, volvió a la Junta Especial. Íd., pág. 661. Declaró desconocer si fue uno de los nueve (9) casos que trajo ante la Comisión Estatal el Comisionado Electoral González Rodríguez (P.N.P.) y que quedaron pendientes. Íd., pág. 662. La Junta Especial originalmente evaluó los casos sin abrir los *sobres especiales*, pues recibieron sólo el expediente con la Hoja de Control y una fotocopia de esos sobres *especiales*. Íd., pág. 668. *No fue hasta el 14 de diciembre que la Junta Especial tuvo los expedientes de investigación separados que contenían los sobres especiales con las papeletas.* Íd., pág. 669. Con las listas de excluidos podría determinar si habría que adjudicarlos o no. Íd., pág. 677.

A base de este testimonio y explicación, el licenciado González —abogado de Granados Navedo— argumentó que la prueba de que una persona estaba clasificada como elector activo A en los terminales del computador de la propia Comisión Estatal establecía su derecho a votar. T.E. Superior,

pág. 678. Luego de argumentarse, el tribunal de instancia resolvió finalmente que esos documentos no eran suficientes para derrotar la presunción de corrección administrativa de las actuaciones de la Comisión Estatal y de la Junta Especial de excluir a ese elector y que, por ende, eran inadmisibles. Íd., pág. 695.

Más adelante, también a preguntas del tribunal de instancia, Bauzá Escobales explicó que en la investigación y determinación, además de los impresos del terminal (*printout*), la Junta Especial utilizó las peticiones de inscripción (normal o especial), las transferencias, las solicitudes de cambio en el registro, las listas y actas electorales de 1984, y las resoluciones de los tribunales. T.E. Superior, pág. 718. Tomaron en cuenta también las listas de exclusiones e inclusiones. Íd., pág. 719. Todos estos documentos regresaban a la Junta Especial y allí se determinaba si el elector tenía derecho a que se le validara su voto. A los electores que no se les reconocía ese derecho se les anotaba "rechazado" en el expediente, sin ulterior trámite en cuanto al sobre *especial* y a la papeleta que estaba en el archivo. Íd., pág. 721.

De las identificaciones correspondientes podemos confirmar que efectivamente los *expedientes* de la Junta Especial son una recopilación de todos los documentos y anotaciones resultantes de ese trámite. Contiene, como primer documento, una *Hoja de Control* con el nombre de la persona, su número de registro electoral, precinto y unidad donde votó, su *status* según la investigación inicial, el informe de las distintas unidades expositivo de si se había o no encontrado documentos en el archivo de exclusiones, la solicitud de investigación por omisión, las lista y actas de noviembre de 1984, los casos posteriores al 1984, el sobrante del archivo general, las tarjetas sobrantes, el archivo y la lista de exclusiones o inclusiones, la Lista de TR o RU administrativa, y los documentos entrados al control de calidad. Se marcaba o anotaba en el encasillado pertinente si aparecía o no dicho docu-

mento, lo cual se verificaba por los funcionarios de los partidos. Oportunamente, con vista a ese trámite la Junta Especial resolvía.

*Erró el ilustrado tribunal de instancia. Así lo reconoce tímidamente la mayoría del tribunal, que opta por enviar el asunto al foro de instancia. Es innecesario. Expongamos los fundamentos.*

Hemos demostrado la existencia de ciertas fallas e ineficiencias del propio sistema electoral, no atribuibles a los electores, que motivaron que los llamados impresos del terminal del computador y demás documentos oficiales no siempre reflejaran la realidad. Ello, como veremos, ocasionó que en múltiples instancias —por razones no explicadas adecuadamente por la Comisión Estatal— electores cualificados con tarjetas de identificación electoral y que votaron en las anteriores elecciones aparecieran inactivos o sin récord. No debe extrañarnos.

Existe la idea generalizada de que toda información producida por un computador es exacta y precisa. Esta verdad es relativa. Los computadores no son panacea que todo lo resuelven. Como criaturas del género humano, arrastran también sus limitaciones. En términos generales, un computador está programado para realizar innumerables operaciones ordenadamente. En cuanto a eficiencia, se diferencia del ser humano en lo concerniente a la fantástica velocidad con que realiza su cometido. Acepta, almacena, procesa e integra datos, y los devuelve por medio de una pantalla o de manera impresa (*printout*). Sin embargo, sólo es capaz de generar información que se le haya suministrado anteriormente. Sigue fielmente las instrucciones o programas que se le ha brindado con gran precisión y, esencialmente, sin errores. Esto no garantiza la validez de los resultados. Como *no crea hechos*, pues meramente procesa datos, si la información con que se le alimenta es deficiente, incompleta o incorrecta, su incapacidad para producir y discriminar conlle-

vará que sus resultados sean igualmente deficientes, erró-
neos o inexactos. Así también arrastrará todos los errores
humanos cometidos en su operación. M.A. Dombroff, *Dom-
broff on Demonstrative Evidence*, Nueva York, John Wiley
& Sons, 1983, pág. 186; G.P. Joseph, *Modern Visual Evi-
dence*, Nueva York, Law Journal Seminars-Press, 1988, Cap.
7.

Con estas consideraciones elementales en mente, expon-
gamos lo que la prueba estableció en cuanto a los impresos
del terminal del computador (*printout*) de la Comisión Esta-
tal. Surge que el computador clasificaba el *status* de los elec-
tores del modo siguiente:

| | | |
|---|---|---|
| A | = | Activos; debía aparecer en las listas con derecho a votar |
| I | = | Inactivos |
| I1 | = | Inactivos (no votaron en 1980) |
| I2 | = | Inactivos (no votaron en 1984) |
| Foto 1 | = | Con fotografía de la tarjeta electoral |
| Foto 0 | = | No aparece fotografiado en los récord de la Comisión Estatal (T.E. Superior, pág. 494) |
| ER | = | Excluido por residencia (Íd., pág. 378) |

Se imponen unas expresiones en materia probatoria. La
*ausencia* ("no existe récord") del nombre de un ciudadano
en los impresos del terminal del computador (*printout*) y
demás récord de la Comisión Estatal establece la presunción
de que no es un elector cualificado. Igualmente ocurre
cuando los récord arrojan un *status* I (elector inactivo) o
cuando no existe evidencia de que se hubiese gestionado una
transferencia de precinto o reubicación de unidad electoral.
Definitivamente, el computador genera evidencia susceptible
de utilizarse para probar que ocurrió determinado evento
como la inscripción, transferencia del elector o solicitud para
que se le reactivara o excluyera por recusación u otras ra-
zones. También puede considerarse como prueba de que no

ocurrió el evento. Regla 65(F), (H) y (J) de Evidencia, 32 L.P.R.A. Ap. IV (Récord del negocio o actividad; Récord e informes oficiales; Ausencia de récord público).

Establecido así el hecho básico de no aparecer en los impresos de los terminales del computador ("no existe récord") o como elector *inactivo* o inscrito en otro lugar, sería mandatorio inferir que no era un elector cualificado. Ahora bien, estas presunciones son controvertibles. Puede presentarse evidencia —como se hizo en el caso de autos— para refutar o rebatir ese hecho presumido. Esa evidencia tendría el efecto de evitar que el juzgador hiciera tal inferencia —Chiesa, *op. cit.*, págs. 39–48— e incluso probar sus cualificaciones como elector con derecho a votar. Concentrémonos, pues, en esa otra evidencia.

La más sobresaliente es la tarjeta de identificación electoral, documento *oficial* expedido por la Comisión Estatal en virtud de una petición de inscripción. Se introdujo en Puerto Rico como salvaguarda contra la impostura para "implementar, fiscalizar y garantizar el sistema de colegio abierto . . .". *P.S.P., P.P.D., P.I.P. v. Romero Barceló*, 110 D.P.R. 248, 288 (1980), opinión concurrente y disidente. Constituye un requisito indispensable para ejercer el voto. Es de material plástico. Aparte del nombre y de la fotografía del ciudadano, como datos personales contiene —para la identificación fácil y precisa de su poseedor— la fecha de nacimiento, sexo, color de ojos y estatura. Indica asimismo las fechas de expedición y de expiración, al igual que un número de control y las firmas del Presidente de la Comisión Estatal y del elector. Art. 2.009 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3059. Conjuntamente con la expedición de esa tarjeta, la Comisión Estatal "preparará una tarjeta de archivo con la fotografía del elector, la cual contendrá por lo menos, los

mismos datos que la tarjeta de identificación". Íd. Cuando se expide un duplicado de la tarjeta, así ésta lo indica.(7)

Además de acreditar fehacientemente la capacidad potencial del ciudadano para votar, es igualmente evidencia de que el elector ha ejercitado antes el derecho al voto, pues así mandatoriamente se consigna en la perforación de los números 1 y subsiguientes que aparecen en su extremo inferior correspondientes a cada evento comicial. Dicha perforación produce en el material plástico una forma gráfica o figura distinta que identifica por separado cada una de las votaciones en las que su poseedor participó.

Tomamos *conocimiento judicial* de las distintas figuras con que se han perforado los números 1, 2 y 3 en las tarjetas de identificación electoral en las últimas tres (3) elecciones: (1) 1980, un trébol de cuatro hojas; (2) 1984, un corazón, y (3) 1988, un diamante. En síntesis, aunque la posesión de la tarjeta de identificación electoral no da necesariamente derecho a votar, sí es evidencia prima facie de que su poseedor goza de esa capacidad y que ha ejercido ese derecho en determinados eventos comiciales.

En este sentido, incuestionablemente la tarjeta de identificación electoral goza de un extraordinario valor evidenciario. En recta juridicidad no podemos ignorarla al momento de determinar —en unión a otros documentos— las cualificaciones de un sinnúmero de electores rechazados por la Junta Especial. De hecho, la prueba refleja que en muchos casos la Junta Especial, por no haberla tenido ante sí, no la tomó en consideración.

Lo expuesto nos permite dos (2) inferencias evidenciarias importantes en la solución del caso. Primero, la presentación

---

(7) La Regla 73 de Evidencia, 32 L.P.R.A. Ap. IV, dispone que "[u]n duplicado es tan admisible como el original a no ser que surja una genuina controversia en torno a la autenticidad del original o que, bajo las circunstancias del caso, sea injusto admitir el duplicado en lugar del original".

de la tarjeta de identificación electoral, debidamente perforada en los espacios correspondientes a las elecciones de 1980 ó 1984, es incompatible con una clasificación de elector inactivo I1 ó I2, fundada supuestamente en no haber dicho "elector votado" en esos años. Y segundo, esa perforación no es armonizable con la inexistencia de un récord ("no existe récord") en los impresos del terminal del computador. Después de todo, según indicado, la expedición de esta tarjeta está inextricablemente atada a una petición de inscripción, único trámite oficial para poseerla legalmente.

Al tener en mente este trasfondo fáctico y evidenciario, hemos podido evaluar —a base de la prueba documental identificada, admisible en evidencia, de carácter oficial y proveniente precisamente de los archivos y del computador de la Comisión Estatal— la procedencia y certeza de los reclamos de Granados Navedo. Específicamente, para fines de la acreditación o rechazo de estos electores, hemos tomado en cuenta toda la información pertinente que se desprende de los documentos oficiales y aquellos otros adicionales presentados e identificados como evidencia y que tuvo ante sí la Junta Especial o la Comisión Estatal.

No podemos refrendar una mal entendida presunción administrativa y sostener como correctas las determinaciones de *rechazo* de la Comisión Estatal o de la Junta Especial fundadas en que los impresos del terminal del computador consignan que "no existe récord" de un elector o lo clasifican I1, no obstante haberse probado con la tarjeta de identificación electoral todo lo contrario y que votó en las elecciones de 1980 y de 1984. *El Estado no puede exigir semejante prueba diabólica a sus ciudadanos. El derecho constitucional al sufragio no puede estar sujeto a errores burocráticos o a desaparecer en fracciones de segundos en la pantalla del computador.* Esas determinaciones no pueden sostenerse, pues son arbitrarias, irrazonables e ilegales. *Murphy Ber-*

*nabe v. Tribunal Superior*, 103 D.P.R. 692, 699 (1975), y casos citados.

La validación o no de estos electores, con vista a esa prueba, está fundada en los pronunciamientos vigentes esbozados en *P.P.D. v. Admor. Gen. de Elecciones*, supra, pág. 241, a saber, que no toda irregularidad puede justificar la confiscación del voto; que un voto no puede "anularse, ni menguarse su validez, por fallas de las que no puede responsabilizarse al elector" (íd., pág. 208); que los trámites de recusación son de estricto cumplimiento (íd., pág. 229); que la obligación de supervisar el trámite administrativo corresponde a la Comisión Estatal y *no al elector* (íd., pág. 244), y que, como organismo especializado, la Comisión Estatal debe *prever* y salvar las situaciones en que el elector —por su propio error, ignorancia o negligencia— cumplimenta un formulario en vez de otro, v.gr. solicitud de cambio o de transferencia en lugar de inscripción, y así aceptarlo. Íd., págs. 246–247.

En las circunstancias apuntadas —sin existir razón alguna para desviarnos de ese enfoque judicial liberal— hemos determinado la idoneidad del elector. En aquellos casos en que hemos estimado que en esta etapa la prueba es insuficiente para determinar, afirmativa o negativamente, la condición de elector cualificado o por quién votó, así lo hemos consignado.

Examinemos, pues, detallada y cuidadosamente la prueba documental que reflejan los distintos expedientes de la Junta Especial y, simultáneamente, expongamos nuestras conclusiones con arreglo a los criterios jurídicos antes expuestos.

N.C.A. —Núm. electoral _____— (Identificaciones 6 y 104, demandante.) Votó en el Precinto 1, Unidad 2, Colegio 8, bajo el sistema de añadidos a mano. Al hacerlo entregó su tarjeta de identificación electoral y la tarjeta de autorización. La Junta Especial no le adjudicó su voto, porque el im-

preso del terminal reflejaba un *status* de ER (excluida por residencia). En los récord de la Comisión Estatal aparecía *inscrita* como residente en la Calle Sol Núm. _____, Apto. _____, con derecho a votar en el Precinto 1, Unidad 2, Colegio 6.

A base de un trámite de recusación jurada y fechada el 8 de abril de 1988, por decisión unánime de la Comisión Local de 28 de abril de 1988, se ordenó eliminarla como electora por no estar domiciliada en la anterior dirección. El diligenciamiento fue negativo en esa misma dirección y se autorizó notificarla mediante edicto.

Surge, sin embargo, que el Comisionado Electoral González Rodríguez sometió a la Junta Especial una tarjeta oficial de la Comisión Estatal —Forma CEE-F1; *Autorización para corrección de otros datos pertinentes*— suscrita por ella el 21 de julio de 1979, donde solicitaba que se le acreditara su cambio de domicilio al Condominio La Puntilla _____, Apto. _____, San Juan. Su tarjeta de identificación electoral fue expedida el 30 de octubre de 1979 y aparece *perforada* en el espacio correspondiente a las elecciones de 1980, 1984 y 1988. Por razones inexplicadas, esa transacción electoral de transferencia no fue reportada en el sistema. Identificación 70, demandante; T.E. Comisión, págs. 73–74.

A la luz de lo expuesto, la determinación de la Junta Especial no puede sostenerse. La circunstancia representa sólo un cambio de domicilio *dentro* del mismo precinto y unidad electoral. Ella informó y tramitó el cambio de residencia y su corrección. Que no apareciera así en el sistema no es razón suficiente en derecho para negarle y confiscarle su voto. Art. 2.014 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3064.

Concluimos que es una electora cualificada y que su voto a favor de *Granados Navedo* debe adjudicarse. *P.P.D. v. Admor. Gen. de Elecciones*, supra, págs. 233–241.

E.B.R. —Núm. electoral _____— (Identificaciones 7 y 109, demandante.) La investigación inicial lo clasificó como ER. En el expediente de la Junta Especial hay una nota adherida que, en manuscrito, expresa que quedó pendiente de verificar el 6 de diciembre de 1988 en la Secretaría de la Comisión Estatal de Elecciones en San Juan.

Surge que fue excluido por la Comisión Local del Precinto 2 por no estar domiciliado en el Edif. _____, Apto. _____, Residencial Las Casas, Santurce. El trámite de recusación se hizo también mediante diligenciamiento negativo. El 28 de marzo la Comisión Local autorizó su citación mediante edicto y el 19 de abril lo excluyó del Precinto 2.

Votó añadido a mano en el Precinto 1. En su declaración jurada suscrita en ese momento consignó que estaba domiciliado en _____, Núm. ____, Pda. ____, Santurce. *No fue recusado.*

Desde el 8 de julio de 1988 había solicitado oficialmente su transferencia a su nuevo domicilio en el Precinto 1 y fue *autorizado* a votar por la Comisión Local del Precinto 104. En esa misma fecha se le expidió un *duplicado* de la tarjeta de identificación electoral Núm. ____.

Del Ap. 44 existente en el Recurso AC-88-571 ante este Foro —*P.N.P. y P.I.P. v. Rodríguez Estrada*, supra, del cual tomamos conocimiento judicial— surge una comunicación fechada el 22 de agosto de 1988, dirigida al Secretario de la Comisión, Néstor J. Colón Berlingeri, por Leonardo Flores Delgado, Supervisor de Control de Calidad, que acredita —entre otros— que este elector E.B.R. *hizo su transferencia a tiempo* e impartía las instrucciones correspondientes, pues esa transacción no había sido enviada a OSIPE para su actualización. El 11 de diciembre de 1988 el impreso del terminal (*printout*) lo clasificó como activo A1.

*Obviamente lo es.* Debe adjudicársele su voto a *Granados Navedo. P.P.D. v. Admor. Gen. de Elecciones*, supra.

L.R.V. —Núm. electoral _____— (Identificaciones 8 y 108, demandante.) Votó en el Precinto 1, Unidad 24, Colegio 6. La Junta Especial lo rechazó, pues no apareció en los casos problemas de 1984 ni entre las solicitudes de inclusión por omisión de 1988. *No fue recusado.* Para el 20 de noviembre, el impreso del terminal lo clasificaba como inactivo, con foto y sin haber votado en el 1980 (I1). Para el 4 de diciembre, según el impreso del terminal suplementario, no había récord a su favor.

Nuevamente, para el 22 de diciembre figuraba codificado con *status* I1, esto es, inactivo por no haber votado en las elecciones de 1980. Sin embargo, su tarjeta de identificación electoral *refleja* que fue expedida el 7 de julio de 1980 y que votó en esas elecciones y en las de 1984.

Concluimos que es un elector cualificado y que debe adjudicársele su voto a favor de *Granados Navedo. P.P.D. v. Admor. Gen. de Elecciones,* supra.

F.R. *Arzuaga* —Núm. electoral _____— (Identificación 9, demandante.) Votó en el Precinto 1, Unidad 25, papeleta íntegra por el P.N.P. En ese instante suscribió su declaración jurada como *Amaro.* La Junta Especial investigó su caso con el segundo apellido incorrecto de *Arzuaga* en lugar de *Amaro,* con dirección en el Condominio Sta. ____, Apto. ____, Río Piedras. La rechazó a base de que al 21 de noviembre aparecía excluida por residencia (ER) en el impreso del terminal. Se consignaba otra dirección. *No fue recusada al votar.* Su tarjeta de identificación electoral aparece debidamente perforada para las elecciones de 1980, 1984 y, claro está, 1988.

De la evidencia documental surge que la Junta Especial la investigó a base de un nombre incorrecto. Ello pone en entredicho la validez del rechazo. Adjudicamos su voto a *Granados Navedo.*

L.E.A.W. —Núm. electoral *no aparece*— (Identificaciones 10 y 110, demandante.) Votó en la Cárcel Regional de

Bayamón. Inexplicablemente, tanto su declaración jurada como su recusación aparecen firmadas por él. *Para fines decisorios, no fue válidamente recusado.* Fue rechazado por la Junta Especial porque no existía récord. Sin embargo, el impreso de terminal (*printout*) posterior fechado el 11 de diciembre de 1988 consignó una clasificación de A1. Adjudicamos su papeleta a favor de Granados Navedo.

J.A.N.S. —Núm. electoral _____— (Identificaciones 11 y 115, demandante.) Votó en el Precinto 2, Unidad 2. *No fue recusado.* El 22 de noviembre de 1988 la Junta Especial no acreditó su idoneidad. Para el 21 de noviembre y 10 de diciembre de 1988 su *status*, según los impresos del terminal, era Código A1, activo y con foto.

Con anterioridad a las elecciones había pedido un cambio en la foto y, el 19 de septiembre de 1988, la Unidad de Exclusiones de la Comisión Estatal, en su Informe de Inclusiones de Electores con corrección de datos, *lo certificó.*

En el *exhibit* 41, demandados —consistente de treinta y ocho (38) documentos (T.E. Superior, pág. 201)— existe una declaración jurada suscrita por este elector el 3 de diciembre de 1988, en donde hace constar que en junio de 1988 acudió a la J.I.P. Allí le llenaron una Solicitud de Cambio en el Registro, Núm. Control 346327, para tramitar la corrección. Su tarjeta de identificación electoral fue expedida como duplicado el 17 de junio de 1988. Regresó de nuevo a la J.I.P. Aun así se le obligó a votar añadido a mano. *Votó P.N.P. íntegro.*

Este es uno de los casos que el Comisionado Electoral del P.N.P., González Rodríguez, argumentó el 7 de diciembre ante la Comisión Estatal. Insistió en que debía contarse y el Presidente de la Comisión, licenciado Rodríguez Estrada, denegó la petición bajo el fundamento de que no cambiaba el resultado.

Resolvemos que está cualificado y debe adjudicársele su voto a *Granados Navedo. P.P.D. v. Admor. Gen. de Elecciones*, supra.

E.G.O. —Núm. electoral _____— (Identificaciones 12 y 119, demandante.) Depositó su voto en el Precinto 2, Unidad 2. El 22 de noviembre de 1988 la Junta Especial no acreditó su condición de elector por no aparecer récord que lo evidenciara. El Comisionado Electoral del P.N.P., González Rodríguez, solicitó el 2 de diciembre que así fuera acreditado, pero el Presidente de la Comisión, licenciado Rodríguez Estrada, se negó.

En el impreso del terminal (*printout*) del 9 de diciembre de 1988 aparece su status A1 y varios trámites previos realizados.

Anteriormente, desde el 25 de junio de 1988, había pedido corrección de datos (cambio de foto) y se le expidió *duplicado* de su tarjeta de identificación electoral, Núm. Control 186175. El 6 de octubre la Unidad de Exclusiones de Electores, en su Informe de Inclusiones, certificó *la procedencia de esa transacción.*

Esta evidencia lo cualifica como elector y debe adjudicársele a *Granados Navedo* su voto. *P.P.D. v. Admor. Gen. de Elecciones*, supra.

C.A.D. —Núm. electoral _____— (Identificaciones 13 y 114, demandante.) Emitió su voto en el Precinto 2, Unidad 2. El 22 de noviembre de 1988, la Junta Especial no acreditó su condición de electora. Aparece una nota escrita en el impreso del terminal de que fue recusada el 18 de septiembre en 28455150 Suplementario y figura con nuevo número. Para el 5 de diciembre aparecía con *status* A1. Para el 8 de diciembre y el 22 de diciembre, en los impresos del terminal del Archivo Maestro Suplementario, figura como A3.

En la declaración jurada suscrita el 5 de diciembre de 1988 (*exhibit* 41, demandados) afirmó que, luego de aparecer su nombre en la lista de excluidos publicada en el periódico, acudió a la J.I.P., Precinto 2, Calle Fernando Calder; se reinscribió, se retrató nuevamente y se le expidió la tarjeta de identificación Núm. Control 292390 (duplicado). Aun así,

fue obligada a votar bajo el sistema de añadidos a mano. Reside en la Calle _____, Ext. Roosevelt, desde hace más de diez (10) años.

Esa evidencia tiende a sostener sus cualificaciones. Su voto debe adjudicársele a *Granados Navedo. P.P.D. v. Admor. Gen. de Elecciones*, supra.

W.O.C. —Núm. electoral _____— (Identificaciones 14 y 120, demandante.) Votó bajo el sistema de añadidos a mano con tarjeta de identificación electoral expedida el 13 de octubre de 1984 —debidamente perforada en esas elecciones— y la tarjeta de autorización oficial. Su caso fue referido a la Comisión Estatal por la Junta Especial.

Su código de *status* para el 21 de noviembre y el 12 de diciembre era activo con foto (A1). El 13 de noviembre de 1987 había solicitado *oficialmente* la transferencia de San Juan 2, Unidad 32, a San Juan 3, Unidad 6. Así fue *autorizado* por los funcionarios de la Comisión Estatal. Los documentos oficiales acreditan su idoneidad como elector. Debe adjudicársele su voto a *Granados Navedo. P.P.D. v. Admor. Gen. de Elecciones*, supra.

M.E.L.H. —Núm. electoral _____— (Identificaciones 15 y 99, demandante.) La Junta Especial refirió su caso a la Comisión Estatal, porque aparentemente se excluyó de las listas al haberse duplicado su récord (ED). Su tarjeta de identificación electoral, expedida el 11 de agosto de 1980, refleja que votó en las elecciones de 1980 y 1984, y que apareció en la Lista Electoral de 1984.

Al emitir su voto el 8 de noviembre de 1988 en el Precinto 2, Unidad 25, Colegio 10, entregó su tarjeta de identificación electoral y la tarjeta de autorización. En el impreso del terminal (*printout*) de 22 de diciembre aparece con *status* de inactiva (I1), por razón de no haber votado en las elecciones de 1980. *Ello es irreconciliable con el hecho que se desprende de su tarjeta electoral, esto es, que votó en las elecciones de 1980 y 1984.*

De estos documentos concluimos que era una electora cualificada y que debe acreditarse su voto a *Granados Navedo. P.P.D. v. Admor. Gen. de Elecciones*, supra.

F.C.R. —Núm. electoral _____— (Identificación 16, demandante.) Votó en el Precinto 2, Unidad 28. El 23 de noviembre de 1988 la Junta Especial no acreditó su condición de electora. En el impreso del terminal de esa fecha apareció como recusada (ER).

El resultado de esta evidencia es *académico*, pues *su papeleta municipal aparece marcada únicamente a favor del candidato a asambleísta municipal Núm. 5 del P.I.P., Ángel Ortega.*

L.I.S.L. —Núm. electoral _____— (Identificaciones 17 y 118, demandante.) La Junta Especial rechazó su condición de electora. Votó añadida a mano en el Precinto 3, Unidad 12. Tenía otro récord electoral con el Núm. electoral _____ —mismo precinto y unidad— pero *no votó* bajo ese número.

El sobre especial correspondiente —Identificación 17— *no* contenía las papeletas. Hay una *nota* de los miembros de la Junta Especial expositiva de que se "tomó como error, como el caso 1890, el cual sí tenía derecho, en cambio este 1892, que a esta fecha no tiene aprobación, ya se depositaron las papeletas en la urna".

Todo tiene a indicar que era una electora cualificada y que su voto, aunque sin quererlo, fue *adjudicado* prematuramente. *Se desconoce a favor de quién votó.*

I.M.G.R. —Núm. electoral _____— (Identificaciones 18 y 97, demandante.) La Comisión Estatal rechazó su condición de electora. Según el impreso del terminal, para el 4 de diciembre no existía récord. Votó y entregó su tarjeta de identificación electoral y autorización sustituta.

Hay tres (3) impresos del terminal. El primero, de 25 de noviembre —con el Núm. electoral 81217— sin foto e inactivo (I2), por no haber votado en las elecciones de 1984. Los

otros dos (2) impresos, de 2 y de 12 de diciembre, tienen número *distinto* de elector (08635), ambos con foto y *status* ED (duplicado).

También hay una Solicitud de Cambio en el Registro (foto) oficial, cuya fecha no podemos precisar. Sin embargo, la situación queda aclarada, ya que le fue expedida tarjeta de identificación electoral el 19 de septiembre de 1988 que lógicamente sólo aparece perforada en estas elecciones de 1988.

De esta prueba documental concluimos que es electora cualificada. Debe adjudicársele su voto a *Granados Navedo. P.P.D. v. Admor. Gen. de Elecciones*, supra.

G.M.A. —Núm. electoral _____ — (Identificaciones 19 y 93, demandante.) Hay una nota adherida de Bauzá Escobales y demás miembros de la Junta Especial, de 19 de diciembre de 1988, en el sentido de que a esa fecha "[n]o aparece expediente". Así lo declaró Bauzá Escobales en el tribunal. T.E. Superior, pág. 646. Este elector votó y entregó su tarjeta de identificación electoral y la de autorización. La tarjeta de identificación electoral aparece legítimamente perforada para las elecciones de 1980 y 1984.

En el impreso del terminal (*printout*) de 7 de diciembre figura clasificado A1, esto es, elector *activo* con foto, e inscrito en el Precinto 4. Según antes indicado, así lo declaró Bauzá Escobales. T.E. Superior, págs. 646–647.

Con arreglo a nuestros pronunciamientos previos, no hay fundamento alguno en qué apoyar la decisión del foro de instancia de que esta prueba no era suficiente para derrotar la presunción de corrección del acuerdo de la Junta Especial.

Según indicado, en el impreso del terminal no consta dato alguno para especular —como lo hizo el foro de instancia— de que fuera un elector recusado. *Tampoco para sostener la determinación de la Junta Especial de rechazarlo porque no aparecía expediente o récord en el archivo de la Comisión Estatal. Su tarjeta de identificación electoral, que data de 1979, es demostrativa de que se inscribió para esa época.*

*Después votó en las elecciones de 1980 y 1984.* La información y datos dimanantes del impreso del terminal del computador y su *status* de A1 obviamente significan que entró al sistema del computador. *Es jurídicamente imposible negar esta realidad y no arribar a la inferencia lógica de que estaba cualificado.*

De la papeleta incluida en el sobre *individual* surge que emitió su voto íntegro bajo la insignia del P.P.D. Debe adjudicársele a *Acevedo Pérez. P.P.D. v. Admor. Gen. de Elecciones,* supra.

M.B.B. —Núm. electoral _____— (Identificaciones 20 y 112, demandante.) La Junta Especial anotó que "[n]o aparece expediente". Sin embargo, la evidencia demuestra que votó con tarjeta de identificación electoral expedida el 1ro de julio de 1988 y con la de autorización oficial. La papeleta fue íntegra al P.N.P. y depositada en el Precinto 4, Unidad 15, Colegio 9.

El impreso del terminal, para el 15 de diciembre, revela su condición de activo con foto (A1). Existe también unida una *solicitud de cambios en el registro* (Núm. Control 400266) que —aunque la fotocopia no revela su contenido— tiende a sostener una transacción electoral y la expedición de la tarjeta de identificación el 1ro de julio de 1988.

De esta prueba documental concluimos que era un elector cualificado. Debe adjudicársele a *Granados Navedo. P.P.D. v. Admor. Gen. de Elecciones,* supra.

F.L.G.S. —Núm. electoral _____— (Identificaciones 21 y 111, demandante.) El 28 de noviembre de 1988 la Junta Especial no acreditó su idoneidad como electora. En el impreso del terminal de esa fecha se consignó a manuscrito: "E Residencia." Sin embargo, en el impreso posterior de 22 de diciembre aparece como A1. En todos los impresos del terminal se consigna como dirección residencial la Calle _____, Jardines Metropolitanos.

Suscribió una declaración jurada (*Exhibit* 41, demandados) haciendo constar que residía en la Calle _____, Jardines Metropolitanos, Río Piedras, que era electora cualificada y que votó íntegramente por el P.N.P. y su candidato *Granados Navedo.* Debe así adjudicárse.

*Al votar consignó esa misma dirección,* entregó su tarjeta de identificación electoral perforada para las elecciones de 1980 y 1984, y también el permiso. Concluimos que no existe evidencia que sostenga su exclusión por residencia, que es electora cualificada y que debe adjudicársele su voto a *Granados Navedo. P.P.D. v. Admor. Gen. de Elecciones,* supra.

*Neidy* D.N. —Núm. electoral _____— (Identificaciones 22 y 100, demandante.) La *Comisión Estatal* rechazó su condición de electora bajo ese nombre, pues no apareció en las listas y actas de 1980.

Al votar, suscribió su declaración jurada con el primer nombre de *H*eidi, no *Neidy.* Entregó su tarjeta de identificación electoral expedida el 17 de octubre de 1984 con su nombre correcto *Heidi.* Surge debidamente perforada en el espacio correspondiente a 1984, así como la autorización para votar.

En los impresos del terminal fechados 28 de noviembre y 8 de diciembre la buscaron como *Neidy* y figuraba como I1 sin foto. En el impreso del Archivo Maestro Suplementario de 5 de diciembre se consigna que "[n]o existe récord". La razón para esta falla investigativa es evidente. En el impreso de 8 de diciembre hay una nota en manuscrito de que se debe verificar si la tarjeta electoral está perforada para 1980 y 1984, pues aunque poseía tarjeta de identificación electoral, para efectos de la Comisión Estatal nunca la ha tenido.

Aparentemente no se verificó. De lo contrario, la Comisión Estatal razonablemente no la hubiese rechazado. Hemos examinado la tarjeta de identificación electoral que de su faz resulta que es oficial y legítima. La determinación

de la Comisión Estatal no puede prevalecer. Los documentos expuestos acreditan su condición de electora cualificada y activa desde el 17 de octubre de 1984.

Según el *exhibit* 41, demandados, el 5 de diciembre de 1988 suscribió una declaración jurada con su primer nombre *H*eid*i*, haciendo constar que residía en _____ (antes en Urb. Río Piedras Heights, Precinto 5, Unidad 3, en la cual votó en 1980, 1984 y 1988); que nunca recibió notificación de haber sido excluida; que cotejó las listas de excluidos publicadas por la Comisión Estatal y no encontró su nombre, y que deseaba que se adjudicara su voto íntegro por el P.N.P.

Podemos concluir que, prima facie, era electora cualificada. Debe adjudicársele su voto a favor de *Granados Navedo. P.P.D. v. Admor. Gen. de Elecciones*, supra.

M.H.V.L. —Núm. electoral _____— (Identificación 23, demandante; Identificación 41, demandados.) El 1ro de diciembre de 1988 la Junta Especial la rechazó. Al votar entregó su tarjeta de identificación electoral *perforada* para 1980 y 1984, y la autorización para votar. Su nombre aparece añadida en la Lista Suplementaria de 1984, pág. 37, con residencia en la Urb. Millaville, y una nota de que "no votó" en esas elecciones.

En la declaración jurada que prestó el 4 de diciembre de 1988 —*Exhibit* 41, demandados— hizo constar que votó en el Palacio de los Trabajadores, Precinto 5, Unidad 6, Colegio 3, San Juan, añadida a mano y que había votado en 1984.

Hay un formulario oficial de la Comisión Estatal fechado el 8 de julio de 1984 —Solicitud de Reubicación Dentro del Precinto (0014485)— para moverse de la Unidad Electoral 28 a la Unidad Electoral 6. En esta última unidad, Colegio 3, fue que en estas elecciones emitió un voto íntegro por el P.N.P.

También existe un impreso del terminal, correspondiente al 6 de diciembre de 1988, en que figura con *status* I2, tran-

sacciones previas y una nota manuscrita de que la transferencia administrativa provocó que estuviera fuera de la lista.

En estas circunstancias, los documentos nos permiten concluir, sin margen de error, que votó en las elecciones de 1980 y 1984, que es electora cualificada y que debe adjudicársele su voto a *Granados Navedo. P.P.D. v. Admor. Gen. de Elecciones*, supra.

N.M.P. —Núm. electoral _____— (Identificación 24, demandante; *Exhibit* 41, demandados.) La Junta Especial no acreditó su condición de elector. Para el 5 de diciembre de 1988 el impreso del terminal señala que "[n]o existe récord". Sin embargo, del *exhibit* 41, demandados, surge un impreso de 6 de diciembre, Código I2 —inactivo por *no* votar en el 1984— con transacciones previas. Hay una nota manuscrita de que tenía "transferencia administrativa que provocó" que estuviera fuera de la lista.

El 4 de diciembre de 1988 este elector suscribió una declaración jurada en la que hacía constar que votó en el Palacio de los Trabajadores (Precinto 5, Unidad 6, Colegio 3) como elector añadido, que se le retuvo la tarjeta electoral y que había votado en 1984. *De su tarjeta electoral así perforada hemos confirmado que votó en las elecciones de 1980 y 1984.* Su voto fue íntegro para el P.N.P. Debe adjudicarse el voto a favor de *Granados Navedo. P.P.D. v. Admor. Gen. de Elecciones*, supra.

M.A.L.A. —Núm. electoral _____— (Identificaciones 25 y 107, demandante.) La Junta Especial rechazó su voto y su condición de electora cualificada. Votó añadida a mano en el Precinto 5, Unidad 7. Entregó su tarjeta de identificación electoral y de autorización perforada sólo para 1988. Para el 28 de noviembre y el 5 de diciembre de 1988 los impresos del terminal reflejaban que *no aparecía récord* de ella en la Comisión Estatal.

Surge, no obstante, que esta electora cumplimentó una *Petición de Inscripción* —la fecha no está clara— y que el 10

de febrero de *1984* la Comisión Estatal decidió activarla e incluirla en las listas. En estas elecciones de 1988 votó papeleta íntegra P.N.P.

Sin otro documento no podemos adjudicar su voto, ya que al no haber votado en las elecciones de 1984, sin ulterior transacción, no estaría cualificada.

E.R.T. —Núm. electoral _____— (Identificaciones 26 y 113, demandante.) En el sobre correspondiente aparece que el 19 de diciembre la Junta Especial le adhirió la nota siguiente: "No aparece expediente." Sin embargo, hay un impreso del terminal, fechado el 8 de diciembre, que refleja un *status* A1. Al votar entregó tarjeta de identificación electoral debidamente *perforada* para 1980 y 1984, y autorización en tarjeta sustituta. Votó papeleta íntegra por el P.N.P.

Con esta prueba documental concluimos que estaba cualificada. Debe adjudicársele su voto a *Granados Navedo. P.P.D. v. Admor. Gen. de Elecciones*, supra.

G.M.V. —Núm. electoral _____— (Identificaciones 27 y 103, demandante.) Votó en el Precinto 2, Unidad 2. El 3 de diciembre de 1988 fue rechazada por la Junta Especial porque supuestamente no votó en 1984. Para el 23 de diciembre el impreso del terminal la clasificó como I2.

Ella realizó una solicitud de cambios en el registro denominada *Inclusión Administrativa por Resolución de la C.E.E.* (Núm. Control 522956) el 1ro de noviembre de 1988. Al votar entregó su tarjeta de identificación electoral —*perforada para las elecciones de 1984*— y la autorización. Votó íntegro por el P.N.P. Debe adjudicársele a *Granados Navedo. P.P.D. v. Admor. Gen. de Elecciones*, supra.

D.C.R. —Núm. electoral _____— (Identificaciones 28 y 101, demandante.) El impreso del terminal de 29 de noviembre lo clasifica I1 sin foto. No fue acreditado por la Junta Especial el 3 de diciembre de 1988. No apareció en la lista de votantes de 1984. Para el 4 de diciembre, el impreso del terminal —Archivo Maestro Suplementario— consigna

que "[n]o existe récord". Sin embargo, al votar entregó su tarjeta de identificación electoral *debidamente perforada para 1984* y la de autorización. Su papeleta fue íntegra por el P.N.P.

Aun así, para el 20 de diciembre el impreso del terminal lo continuó clasificando I1 sin récord de fotografía. Ello es incompatible con la posesión de la tarjeta de identificación electoral válida que acredita que realizó una inscripción después de las elecciones de 1980 y votó en las elecciones de 1984. Podemos concluir que es elector cualificado y que debe adjudicársele el voto a *Granados Navedo. P.P.D. v. Admor. Gen. de Elecciones*, supra.

A.L.M.R. —Núm. electoral _____— (Identificaciones 29 y 102, demandante.) La Junta Especial no acreditó su cualificación como elector porque no apareció en la Lista de Votantes ni en las Actas de 1984. Los impresos del terminal para el 29 de noviembre de 1988 lo acreditan como elector inscrito en el Precinto 57 de Ponce, como I1 y sin récord de fotografía. Así surge también del impreso posterior de 22 de diciembre de 1988.

No obstante, se produjo constancia de una solicitud de cambios en el registro para transferencia de Ponce a San Juan y cambio de foto fechada el 18 de junio de 1988 (Núm. Control 399415).

Al votar entregó su tarjeta de identificación electoral duplicada expedida el 18 de junio de 1988 y la autorización oficial. Votó íntegro por el P.N.P. Procede adjudicársele su voto a *Granados Navedo. P.P.D. v. Admor. Gen. de Elecciones*, supra.

F.S.M. —Núm. electoral _____— (Identificaciones 30 y 105, demandante.) El caso fue referido por la Junta Especial a la Comisión Estatal y fue rechazado. No apareció en la Lista de Votantes ni en las Actas de 1984. Para el 5 de diciembre de 1988 el impreso del terminal expuso: "No existe récord." Para el 22 de diciembre tenía el *status* de I1 sin

récord de fotografía. Sin embargo, al votar entregó su tarjeta de identificación electoral debidamente *perforada* para 1980 y 1984, y la autorización oficial. Votó íntegro por el P.N.P. Concluimos que es elector cualificado y que debe adjudicársele su voto a *Granados Navedo. P.P.D. v. Admor. Gen. de Elecciones*, supra.

M.V.V. —Núm. electoral _____— (Identificaciones 31 y 106, demandante.) Fue también rechazada por la Comisión Estatal, pues no apareció en la Lista de Votantes ni en las Actas de 1984. Para el 4 de diciembre el impreso del terminal suplementario reflejó que no existía récord. En el correspondiente al 22 de diciembre, suplementario, indica *status* I1 y sin récord de fotografía.

No obstante, al votar entregó su tarjeta de identificación electoral, debidamente *perforada* para 1980 y 1984, y la autorización oficial. Votó íntegro P.N.P. Evidentemente es electora cualificada. Debe adjudicarse su voto a *Granados Navedo. P.P.D. v. Admor. Gen. de Elecciones*, supra.

J.R.H.B. —Núm. electoral _____— (Identificaciones 32 y 98, demandante.) El 19 de diciembre de 1988 fue rechazado por la Junta Especial. El impreso de 29 de noviembre lo clasificaba con foto y con *status* A3.

El 26 de abril de 1988 cumplimentó una solicitud de cambios en el registro, consistente de reubicación y foto. En esa misma fecha suscribió declaración jurada donde hacía constar que su tarjeta de identificación le había sido *robada.*

En los impresos aparecía con foto y con *status* A3. El sobre especial no contenía la tarjeta de identificación ni la autorización. *Su voto no fue recusado.* Votó íntegro por el P.N.P. en la Cárcel Regional de Bayamón.

Según memorando del Comisionado Electoral González Rodríguez de 12 de diciembre dirigido al Presidente de la Comisión, licenciado Rodríguez Estrada, el voto de este elector se contabilizó para Bayamón y no para San Juan. Así lo alegó Granados Navedo en su demanda, a la cual unió copia

de esa petición. En estas circunstancias debe adjudicársele a *Granados Navedo. P.P.D. v. Admor. Gen. de Elecciones*, supra.

J.M.H.O —Núm. electoral _____— (Identificaciones 33 y 96, demandante.) Fue rechazado por la Junta Especial. No apareció en la Lista de Votantes de 1984. Los impresos del terminal de 2 y de 22 de diciembre lo clasifican como I1 *sin récord* de fotografía.

No obstante, al votar entregó su tarjeta de identificación electoral expedida el 29 de agosto de 1984 —debidamente *perforada* para ese año— y la autorización oficial. Votó íntegro por el P.N.P. Concluimos que era elector cualificado y que debe adjudicársele el voto a *Granados Navedo. P.P.D. v. Admor. Gen. de Elecciones*, supra.

J.H.R. —Núm. electoral _____— (Identificaciones 34 y 95, demandante.) El 13 de diciembre la Junta Especial no acreditó su idoneidad. Para el 29 de noviembre el impreso del terminal consignaba su *status* I1 *con* foto. No apareció en la Lista de Votantes de 1984. Sin embargo, aparece una *Solicitud de Cambio en el Registro* (foto) de 5 de noviembre de 1988, debidamente cumplimentada (Núm. Control 538798). Además, la Comisión Local, Precinto 104, *unánimemente lo autorizó a votar* en la Unidad 14, Academia Adventista.

Su tarjeta de identificación electoral fue expedida el 5 de noviembre de 1988. Al votar la entregó conjuntamente con la autorización oficial. Concluimos que era un elector cualificado. Su papeleta municipal fue votada a favor de Acevedo Pérez y debe adjudicársele este voto. *P.P.D. v. Admor. Gen. de Elecciones*, supra.

M.M.C.E. —Núm. electoral _____— (Identificación 35, demandante.) El 3 de diciembre la Junta Especial rehusó acreditarla, pues *según la lista de 1984 no votó en aquellas elecciones*. Así fue clasificada en el impreso del terminal de 29 de noviembre de 1988.

Al votar añadida a mano, entregó su tarjeta de identificación electoral —perforada para las elecciones de 1980, pero *no* para las de 1984— y autorización oficial. *Votó papeleta íntegra por el P.P.D.*

En estas circunstancias, en ausencia de trámite o transacción ulterior, no podemos concluir si es o no electora cualficada.

V.L.H.M. —Núm. electoral _____— (Identificación 36, demandante.) Votó en el Precinto 2, Unidad 19. Fue rechazado por la Junta Especial el 23 de noviembre de 1988. No apareció en la Lista Electoral de 1984. El impreso refleja que fue excluido por residencia (ER).

Existe una *Solicitud de Cambios en el Registro* (foto) —Núm. Control 447355— debidamente cumplimentada el 11 de julio de 1988.

Al votar entregó la tarjeta de identificación electoral expedida el 11 de julio de 1988 y la autorización oficial. *No fue recusado.* Votó íntegro por el P.N.P. Determinamos que es elector cualificado y que debe adjudicársele su voto a *Granados Navedo. P.P.D. v. Admor. Gen. de Elecciones*, supra.

J.A.R.R. —Núm. electoral *no aparece*— (Identificaciones 39 y 125, demandante.) Votó en la Penitenciaría Estatal. Fue rechazado por la Junta Especial, pues el impreso del terminal de 4 de diciembre reflejaba que no tenía récord. Sin embargo, el correspondiente al 22 de diciembre lo acredita como A1. Sin su papeleta no podemos concluir por quién votó.

J.R.S.G. —Núm. electoral _____— (Identificaciones 40 y 124, demandante.) Votó en el Precinto 2 (Campamento El Zarzal). Fue rechazado por la Junta Especial por no existir récord. Sin embargo, en el impreso posterior del terminal de 27 de diciembre de 1988 tiene *status* A3. La información corresponde con la dirección en Villa Palmeras, Santurce, según a la que consignó en su declaración jurada al votar y a la

edad. Aun así, esta prueba no nos permite concluir por quién votó y adjudicar su papeleta.

M.C.C.T. —Núm. electoral _____— (Identificaciones 41 y 126, demandante.) Votó en el Precinto 2, Unidad 22. Fue rechazada por la Junta Especial el 1ro de diciembre de 1988. El impreso del terminal de esa fecha la codifica con *status* ER. Para el 22 de diciembre aparece como A5.

Existe fotocopia de una comunicación escrita dirigida a ella por la Comisión Estatal, con matasello de 4 de noviembre, cuyo texto *le informa* que una revisión *confirma* su *status* como electora autorizada a votar en el Precinto 2, Unidad 22, Colegio 51. Esta evidencia es suficiente para concluir que estaba cualificada. *Desconocemos por quién votó, pero debe adjudicarse su papeleta.*

P.H.A. —Núm. electoral _____— (Identificaciones 42 y 139, demandante.) Votó en el Precinto 2, Unidad 13. Fue rechazada por la Junta Especial. En el impreso del terminal de 25 de noviembre apareció que no votó en las elecciones de 1984.

No obstante, se presentó una Solicitud de Inclusión por Omisión. El 2 de noviembre de 1988 fue investigada por la J.I.P., y la Comisión Local *unánimemente* acreditó su derecho a votar y a que se le incluyera en la lista de inclusión. Debe adjudicársele su voto. Desconocemos por quién votó, pues no se acompañó su papeleta.

C.H.R. —Núm. electoral *no aparece*— (Identificación 43, demandante.) Votó en el Precinto 2, Colegio 7. La Junta Especial no acreditó su condición de electora, pues los impresos del terminal consignaron que no había récord a su nombre. Esta evidencia no es suficiente para concluir si era electora debidamente cualificada.

H.E.S. —Núm. electoral *no aparece*— (Identificación 44, demandante.) La Junta Especial rechazó su caso. El impreso del terminal suplementario, para el 4 de diciembre, consigna que no existía récord.

Surge que *no firmó la declaración jurada* al votar bajo el sistema de añadido a mano. Por esta razón su voto, cualquiera que sea, no puede adjudicarse.

N.R.A. —Núm. electoral _____— (Identificaciones 45 y 122.) Fue rechazada por la Junta Especial al no aparecer récord para el 4 de diciembre de 1988. No apareció tampoco en la Lista Electoral, en las Actas de Votantes de 1984 ni en otras fuentes.

En el impreso del terminal correspondiente al 20 de diciembre aparece con su *status* I1 sin récord de fotografía. Tampoco suscribió declaración jurada antes de votar. *Su voto no puede adjudicarse.*

G.O.M. —Núm. electoral _____— (Identificaciones 46 y 123, demandante.) Votó en el Precinto 1, Unidad 23. Fue rechazada por la Junta Especial. Al emitir su voto *no suscribió la declaración jurada.* Para el 20 de noviembre aparece codificada bajo I1 sin fotografía. Para el 4 de diciembre no apareció récord en la Lista Maestra Suplementaria.

Hay un documento denominado *Solicitud de Inclusión por Omisión* sometido a la J.I.P. el 3 de noviembre de 1988 —con sello de recibido en la Secretaría de la Comisión Estatal de Elecciones el 3 de noviembre— con nota al dorso de 7 de noviembre que especifica que no apareció en las listas. Existe copia de otro documento cuya información no es legible.

No se elevó su tarjeta de identificación electoral. De esta prueba documental no podemos concluir si definitivamente era o no electora cualificada. Hemos visto que *tampoco suscribió la declaración jurada antes de votar.* Su voto no puede ser adjudicado.

P.M.M.M. —Núm. electoral _____— (Identificaciones 47 y 132, demandante.) Fue rechazada por la Junta Especial, pues para el 5 de diciembre el impreso del terminal consignó que no existía récord. Sin embargo, para el 22 de diciembre figura como electora A1. Ambos hechos son irreconciliables.

Concluimos que es electora cualificada. Sin el examen de su papeleta no podemos adjudicar su voto.

F.M.D. —Núm. electoral _____— (Identificaciones 48 y 128, demandante.) Fue rechazado por la Junta Especial el 5 de diciembre porque no apareció récord. Tampoco figuró en la Lista Electoral ni en el Acta de Votantes de 1984. Para el 20 de diciembre tenía *status* I1. Sin la tarjeta de identificación electoral carecemos de suficientes elementos de juicio para arribar a una conclusión razonable de si estaba o no cualificado para votar.

J.A.P.R. —Núm. electoral _____— (Identificaciones 49 y 131.) Votó en el Precinto 2, Unidad 5. En su declaración jurada hizo constar su residencia en la Calle ____ SE, _____, Condominio Terrace. Fue rechazado por la Junta Especial el 2 de diciembre de 1988 por estar "excluido".

No obstante, para el 15 de diciembre aparece en el impreso del terminal con dirección postal Calle ____, Núm. ____, Barriada Tokío, Hato Rey, *status* A1 y varias transacciones anteriores. Sin otra prueba no podemos determinar si es o no elector cualificado. Desconocemos por quién votó.

J.R.H. —Núm. electoral _____— (Identificación 50, demandante.) Para el 28 de noviembre el impreso del terminal lo clasificaba como I1 sin foto. El 2 de diciembre de 1988 la Junta Especial lo rechazó. Para el 5 de diciembre el impreso del terminal consignaba: "No existe récord." Tampoco apareció en la Lista Electoral ni en el Acta de Votantes de 1984. *No suscribió declaración jurada al votar*. Esta prueba nos impide adjudicar su papeleta.

J.A.Ll.T. —Núm. electoral _____— (Identificaciones 51 y 129, demandante.) Fue rechazado por la Junta Especial, pues no apareció en la Lista Electoral ni en el Acta de Votantes de 1984. Para el 5 de diciembre no había récord en el Archivo Maestro Suplementario. Sin embargo, para el 16 de diciembre de 1988 el impreso del terminal lo acreditaba como A1 con foto.

Sin la papeleta no podemos adjudicar su voto.

J.R.P. God*reau* —Núm. electoral _____— (Identificaciones 52 y 133, demandante.) Votó en el Precinto 5, Unidad 4. Al suscribir la declaración jurada, firmó con su segundo apellido *Godreau* al momento de votar. La Junta Especial no acreditó su condición de elector. Surge que la investigación fue canalizada —así se desprende de los impresos del terminal— erróneamente como God*uan* en vez de God*reau*. Como consecuencia, para el 28 de noviembre no apareció con récord.

No obstante, para el 15 de diciembre el impreso del terminal consigna correctamente su apellido *Godreau* con *récord, status* A3 y varias transacciones realizadas. Esta evidencia tiende a sostener que es un elector cualificado. No hemos podido examinar su papeleta. Ello nos ha imposibilitado de adjudicar su voto.

M.V.B.L. —Núm. electoral _____— (Identificaciones 53 y 134, demandante.) La Junta Especial no la acreditó por no aparecer en la Lista Electoral ni en las Actas de Votantes de 1984. Tanto para el 28 de noviembre como para el 20 de diciembre de 1988, los impresos del terminal la clasifican como I1.

Sin la tarjeta de identificación electoral no podemos concluir si es o no electora cualificada.

L.B.L. —Núm. electoral _____— (Identificaciones 54 y 135, demandante.) Al ser rechazada por la Junta Especial, se hizo constar que no aparecía en la Lista Electoral ni en las Actas de Votantes 1984. En los impresos del terminal correspondientes al 28 de noviembre y al 20 de diciembre figura con el *status* I1.

Nuevamente, sin la tarjeta de identificación electoral no podemos concluir si estaba o no cualificada.

H.M.G.H. —Núm. electoral _____— (Identificaciones 55 y 137, demandante.) La Junta Especial refirió su caso a la Comisión Estatal, la cual no la acreditó por no aparecer en la

Lista Electoral ni en las Actas de Votantes de 1984. Para el 5 de diciembre no aparecía récord a su nombre. Para el 20 de diciembre figura con un *status* I1 sin fotografía.

Sin la tarjeta de identificación electoral tampoco podemos concluir si estaba o no cualificada.

R.O.A.S. —Núm. electoral _____— (Identificación 94, demandante.) Votó en el Precinto 104, Unidad 4, Colegio 4. El 3 de noviembre de 1988 suscribió una petición de inscripción como elector debidamente cumplimentada por los funcionarios. Fue *autorizado* a votar por la Comisión Local. En el impreso del terminal de 22 de diciembre figura como A8.

Concluimos que es un elector cualificado. Debemos contabilizar su voto para *Granados Navedo*, ya que es uno de los reclamantes en el foro federal. Debe adjudicarse el voto a *Granados Navedo*.

G.A.D.D. —Núm. electoral _____— (Identificación 116, demandante; *Exhibits* 41 y 84, demandados.) Votó en el Precinto 2, Unidad 16, Colegio 16, y en ese momento *no fue recusado*. Para el 8 de diciembre —según los documentos del *exhibit 41*, demandados— los impresos del terminal lo clasificaban de dos (2) modos diferentes e irreconciliables: uno como ER y otro como A1 con foto. Sin embargo, el impreso del terminal más reciente, de 22 de diciembre, lo clasificaba A1 con foto.

El 4 de diciembre suscribió una declaración jurada expositiva de que votó en las elecciones de 1984; que también lo hizo en las elecciones de 8 de noviembre pasado en la Escuela Federico Asenjo de Barrio Obrero, Santurce; que el número de su tarjeta electoral no concordaba con el que aparecía en lista electoral y que se le indicó que fuera a la junta localizada en Barrio Obrero; que allí una juez autorizó y ordenó que se le permitiese votar; que regresó al colegio electoral localizado en la Escuela Federico Asenjo, Precinto 2, Unidad 12, y que votó en el colegio Suplementario. A tales efectos, entregó su tarjeta de identificación electoral y la de

autorización. Sus papeletas, la tarjeta de identificación electoral, la tarjeta de autorización y la orden de la juez fueron puestos en un sobre amarillo prontamente cerrado.

Debe adjudicarse su voto a favor de *Granados Navedo*, pues es uno de los demandantes en el foro federal.

J.A.G.C. —Núm. electoral _____— (Identificación 117, demandante; Identificaciones 47 y 91, demandados.) Votó en el Precinto 2, Unidad 18. Fue rechazado por la Junta Especial por tener *status* ER. Sin embargo, el Tribunal de Distrito, Sala de San Juan, mediante Resolución de 4 de noviembre de 1988 (Civil Núm. 88-204), anuló el trámite de recusación por razón de residencia y ordenó a la Comisión Estatal garantizar su derecho al voto. De no haberse acabado, debe cumplirse con este mandato judicial y adjudicársele su papeleta.

A.T.H. —Núm. electoral _____— (Identificación 121, demandante; Identificaciones 47 y 91, demandados.) Votó en el Precinto 101, Unidad 12. El impreso del terminal suplementario, para el 14 de diciembre de 1988, la clasifica A4. Al votar *no* firmó su declaración jurada. No podemos adjudicar su voto.

D.M.V. —Núm. electoral _____— (Identificación 127, demandante; Identificación 85, demandados.) Votó en el Precinto 2, Unidad 22 (Cárcel Regional de Bayamón). Al emitir su voto *no fue recusado*. La Junta Especial lo rechazó porque el impreso del terminal lo clasificó ER. Es obvio que, si estaba en la cárcel, no procedía recusarlo por residencia. No podemos adjudicar su papeleta, pues desconocemos por quién votó.

O.H.R. —Núm. electoral _____— (Identificación 130, demandante.) Votó en el Precinto 4, Unidad 17. Para el 21 de diciembre de 1988 el impreso del terminal la clasificó A1 sin foto. Sin la papeleta no podemos adjudicar su voto.

A.M.P.R. —Núm. electoral _____— (Identificación 131, demandante.) Votó en el Precinto 2, Unidad 25. El im-

preso del terminal de 15 de diciembre lo clasificó como A1 con foto. Concluimos que es un elector cualificado. Como no existe constancia de por quién votó, no podemos adjudicar su voto.

F.M.S. —Núm. electoral _____— (Identificación 136, demandante.) Votó en el Precinto 4, Unidad 14. Para el 15 de diciembre el impreso del terminal reflejó *status* A1 con foto. Se trata de un elector cualificado según el impreso del terminal del computador de la Comisión Estatal. Se impone igual solución.

J.D.M. —Núm. electoral _____— (Identificación 133, demandante.) Votó en el Precinto 105, Unidad 19. Para el 20 de diciembre el impreso del terminal lo clasificó como I1 con foto. Con esta sola evidencia no es suficiente para acreditarlo. Tampoco conocemos por quién votó.

Adicional a estos expedientes, los demandados Báez Galib y Acevedo Pérez identificaron los expedientes de varios electores que también fueron rechazados por la Junta Especial. Como se recordará, en la defensa afirmativa Núm. 2, Acevedo Pérez adujo a unos votos que debieron adjudicarse a su favor. Con este objetivo, examinémoslos.

Z.O.C. —Núm. electoral _____— (Identificación 76, demandados.) No fue acreditada por la Junta Especial por *no* haber votado en las elecciones de 1984. Así lo consignó el impreso del terminal el 4 de diciembre de 1988. Aparece que ella suscribió una petición de inscripción el 3 de junio de 1984.

Sin la tarjeta de identificación electoral no podemos determinar si estaba cualificada para votar en estas últimas elecciones. De haber votado en el 1984 sería electora cualificada y debería adjudicarse su voto.

R.P.C. —Núm. electoral _____— (Identificación 77, demandados.) Fue rechazado por la Junta Especial el 2 de diciembre de 1988. En el impreso del terminal correspondiente al 28 de noviembre estaba clasificado como I2-1 con

fotografía. Para el 5 de diciembre no existía récord. Desconocemos si votó en las elecciones de 1984.

Con esta prueba, sin la tarjeta de identificación electoral, no podemos concluir si estaba o no cualificado.

S.S.S. —Núm. electoral _____— (Identificación 78, demandados.) No fue acreditado por la Junta Especial, pues apareció en el impreso del terminal de 29 de noviembre como ER-1. Esa sola prueba no es suficiente para dictaminar si estaba o no cualificado para votar.

A.I.L.R. —Núm. electoral _____— (Identificación 79, demandados.) El 2 de diciembre la Junta Especial lo rechazó, pues el impreso del terminal —fechado 29 de noviembre— la clasificaba como ER-1. Esta única prueba no nos permite concluir si estaba o no cualificada para votar.

J.A.R. —Núm. electoral _____— (Identificación 80, demandados.) El 3 de diciembre la Junta Especial no lo acreditó, pues en el impreso del terminal fue clasificado como ER-1. Tampoco podemos concluir si estaba o no cualificado.

J.B.G. —Núm. electoral _____— (Identificación 81, demandados.) La Junta Especial lo rechazó el 3 de diciembre por no haber votado en el 1984. Así lo clasificó el impreso del terminal correspondiente al 29 de noviembre de 1988. Para el 4 de diciembre no apareció récord a su nombre en el Archivo Maestro Suplementario.

Sin la tarjeta de identificación electoral, la prueba no es suficiente para determinar si era o no elector cualificado.

M.D.B. —Núm. electoral _____— (Identificación 82, demandados.) El 3 de diciembre fue rechazada por la Junta Especial por no haber votado en las elecciones de 1984. Así lo consignó el impreso del terminal correspondiente al 29 de noviembre.

Estos documentos —sin la tarjeta de identificación electoral— no nos permiten concluir si estaba o no cualificada para votar.

M.A.M. —Núm. electoral _____— (Identificación 83, demandados.) El 3 de diciembre la Junta Especial decidió no acreditarlo por no haber votado en las elecciones de 1984. Fue así clasificado (I2) en el impreso del terminal de 29 de noviembre.

Sin la tarjeta de identificación electoral esta prueba es insuficiente para determinar si estaba o no cualificado.

C.P.R. —Núm. electoral _____— (Identificación 91, demandados.) Votó en el Precinto 3, Unidad 5. No surge del expediente determinación alguna de la Junta Especial. El impreso del terminal de 14 de diciembre lo clasifica A1 con foto. Prima facie, esa clasificación tiende a indicar que es un elector cualificado.

En resumen, a base de la prueba documental examinada —expedientes y documentos oficiales de la Junta Especial, impresos del terminal del computador, declaraciones juradas, tarjetas de identificación electoral y papeletas disponibles— concluimos que Granados Navedo demostró que la Junta Especial y la Comisión Estatal erraron al rechazar veintinueve (29) electores cualificados. *De éstos, votaron a su favor veintisiete (27) electores cualificados y dos (2) que favorecieron a Acevedo Pérez. Así los hemos adjudicado.* Nos hemos abstenido de adjudicar los votos de once (11) electores, también cualificados, reclamados por Granados Navedo, pues desconocemos si votaron por él. De igual modo, una (1) papeleta del total de nueve (9) expedientes de electores que en evidencia presentó Acevedo Pérez.

## XII

*Papeleta de nominación directa ("write-in")*

Este voto —maletín Precinto 104, Unidad 16, Colegio 5; T.E. Superior, pág. 146— *conforme la prueba*, consiste de una papeleta municipal anulada en el colegio "votada bajo la insignia de La Palma y con nombres escritos en la columna

de Nominación Directa, bajo el espacio para la candidatura a alcalde, bajo José Granados *del Río*, Miembros de la Asamblea Municipal, en el número uno a Ramón Pitito Miranda, en el número 4, Enrique Ferreira y en el número 14 a Aida Avalo Collazo". (Énfasis suplido.) T.E. Superior, pág. 148; Identificaciones 57–58, demandante.

No albergamos dudas de su validez. De su faz surge la *intención* clara del elector de votar a favor de *Granados Navedo* y debió así adjudicarse. Nos explicamos. Primero, fue consignado en una papeleta municipal. No existe, pues, razón alguna para sostener que debió entenderse a favor de Baltasar Corrada del Río. Este último era candidato a la gobernación por el P.N.P. y no figuraba en la papeleta municipal. Segundo, el elector consignó correctamente el nombre y primer apellido del candidato a alcalde "José Granados". Era suficiente. Por razones desconocidas, cometió el error de sustituir su segundo apellido por el de "del Río". Más aún, hizo una cruz bajo el símbolo del encasillado del P.N.P. En resumen, es inconsecuente la inserción del apellido "del Río", pues su intención quedó manifestada prístinamente a favor de Granados Navedo.

La Regla 79 del propio Reglamento de Elecciones de 1988 considera como marcas válidas el uso de los nombres o de las iniciales de los candidatos. El espíritu que anima nuestra jurisprudencia es "la supremacía de la sustancia sobre la forma". Lo crucial y determinante es detectar cuál fue la verdadera intención del elector. *P.P.D. v. Admor. Gen. de Elecciones*, supra, pág. 264. Aquí quedó válidamente plasmada. Únicamente bajo un criterio riguroso de carácter confiscatorio —que declinamos refrendar— puede sostenerse su nulidad.

Sometemos la cuestión a un simple examen visual de la papeleta[8] en cuestión —que unimos como Apéndice A a este disenso— y a la inteligencia y al sentido común del lector. *P.S.P. v. Com. Estatal de Elecciones*, supra, págs. 429–435.

El error de la Comisión Estatal —susceptible de corrección durante el recuento— debió ser subsanado inmediatamente por este Tribunal. Este caso de nominación directa (*write-in*) demuestra cuán peligroso y absurdo sería llevar a términos absolutos la regla de unanimidad a todos los niveles, criterio en el que descansó el ilustrado foro de instancia para desestimar de plano éste y otros importantes reclamos de Granados Navedo. Dicho tribunal consignó: "Bien o mal, o sea, no estamos entrando en la corrección. No se . . . . Se adjudicó por unanimidad y en el proceso dentro del procedimiento electoral, no se cuestionó." T.E. Superior, pág. 894.

*Con esta evidencia ante nos es incomprensible que la mayoría del Tribunal, por lo menos, no le haya adjudicado a Granados Navedo esta papeleta. ¿Qué razones existen para no hacerlo? ¿Qué otra prueba hace falta? Discrepamos vehementemente de ese irrazonable proceder.*

### XIII

*Papeletas con doble marca*

En su demanda de impugnación, Granados Navedo cuestionó la adjudicación *indebida* de quince (15) papeletas con doble marca. Adujo que la decisión del Presidente de la Comisión, licenciado Rodríguez Estrada, a favor de Acevedo Pérez fue "arbitraria y caprichosa". Caso Núm. CE–89–30, *Exhibit* I, pág. 19. No compartimos *totalmente* esa apreciación. Nos explicamos.

---

[8] Al igual que todas las demás papeletas incluidas en los apéndices —para propósitos prácticos y de fácil manejo— las mismas fueron reducidas a tamaño legal al fotocopiarlas.

Sobre estas quince (15) papeletas no se reprodujo prueba testifical directa en el foro de instancia de las personas que declararon ante la Comisión Estatal o ante su Presidente. Sólo se le preguntó brevemente a éste. T.E. Superior, pág. 285. La razón fue que para el 19 de enero de 1989 —en vista de los anteriores dictámenes interlocutorios de carácter desestimable— los abogados de las partes manifestaron que las alegaciones al respecto, por sí solas, no alterarían el resultado. El demandante Granados Navedo, de prevalecer ante este Foro, se reservó el derecho de desfilar posteriormente prueba sobre la juridicidad de la decisión del Presidente Rodríguez Estrada. T.E. Superior, págs. 881–886.

Como sucede con sus otras alegaciones, ese trámite *no nos impide* examinar el planteamiento en vista de la abundante prueba documental disponible y admisible, a saber: la identificación 66, demandante; los Volúmenes I y II (correspondientes a la reunión e investigación realizada por la Comisión Estatal el 21 de noviembre); la *Exposición* de 30 de noviembre de 1988 y posterior informe del perito John F. McCarthy al Presidente de la Comisión, licenciado Rodríguez Estrada, y la Resolución de 2 de diciembre de 1988. Identificación 60, demandante; *Exhibit* 43, demandados.

En esencia, el 21 de noviembre de 1988 varios funcionarios de colegio —que actuaron en distintas capacidades y en representación de los tres (3) partidos políticos— fueron convocados y declararon sobre lo ocurrido ante la Comisión Estatal. No hubo acuerdo unánime entre los Comisionados Electorales en cuanto a la solicitud del Comisionado Electoral Báez Galib de que se adjudicaran todas las quince (15) papeletas con doble marca al P.P.D., y el Presidente de la Comisión tuvo que resolver. Falló a su favor.

En su resolución hizo constar así los hechos:

El 8 de noviembre de 1988, luego de cerrado el Colegio 3, se comenzó a realizar el escrutinio correspondiente por los fun-

cionarios de colegio representantes de los partidos políticos presentes.

Cuando en el colegio se abrió la urna que contenía las papeletas estatales (blancas) y se comenzó a contar, se notó al finalizar el conteo que faltaba una papeleta, ya que las papeletas encontradas en la urna no sumaban las firmas de los electores que votaron, según las listas electorales. El total de firmas de electores que votaron sumaron doscientas veintiuno (221) y las papeletas encontradas en la urna sumaron doscientas veinte (220).

Por acuerdo de los Inspectores del PPD, PNP y PIP se abr[ió] la urna con las papeletas municipales (amarillas), en la que aparecía la papeleta estatal, luego de lo cual se finalizó el cuadre de la urna estatal.

Comenzó y terminó el cuadre de las papeletas en la urna municipal, procediendo los funcionarios inmediatamente con la clasificación de dichas papeletas. En dicho procedimiento se percataron de que aparecieron un total de [nueve] (9) papeletas íntegras con dos (2) marcas. Una marca o cruz bajo la insignia del PPD y otra marca o cruz bajo la insignia de otro partido político. Véanse Anejos 1 al 9. [Nueve (9) papeletas con una marca bajo la insignia del PPD. Ocho (8) de ellas otra marca bajo la insignia del PNP y una (1) bajo la insignia del PIP.]

Al colocar, la Secretaria del PPD, dichas papeletas en el sobre de las papeletas protestadas y no adjudicadas se percató que entre dichas papeletas se enc[o]ntraba la papeleta votada por ella, ya que su voto fue recusado y dicha información aparece al dorso de la misma. Véase Anejo 1. *En su testimonio ante la Comisión, la Secretaria del PPD fue clara al indicar que sólo había hecho una marca bajo la insignia de su partido en la papeleta municipal y no está en controversia su voto, emitido bajo la insignia de su partido, en la papeleta estatal.*

Se encontraron, además, seis (6) "papeletas mixtas" con una marca bajo la insignia del PPD y otra marca en el espacio provisto para el retrato y nombre del candidato a alcalde por el PNP. Véanse Anejos 10 al 15.

Es oportuno señalar que, en adición a los lápices que se usan para la votación, en el salón de clases utilizado como Colegio 3 del Precinto 4, en la pizarra, había una cajita conteniendo lápices de los estudiantes de ese salón.

Como se sabe, para ejercer su voto al elector se le entregan dos (2) papeletas, una estatal, otra municipal *y un lápiz para marcar dichas papeletas*.

Ninguno de los funcionarios de colegio pudo percatarse de la persona o personas que en adición al elector marcaron las papeletas de referencia. La mayoría de los mismos se sorprendieron cuando se percataron de los hechos. (Énfasis suplido y notas omitidas.) Caso Núm. CE-89–30, *Exhibit* I, págs. 39–41.

Conjuntamente con esta prueba testifical, el Presidente de la Comisión evaluó *visualmente* las papeletas y, además, obtuvo el asesoramiento del técnico en Ciencias Forenses, señor McCarthy. Más tarde, en su resolución señalaría que dicho "perito pudo determinar una inconsistencia en las marcas hechas en la segunda columna de las papeletas comparadas con la marca de la primera columna, así como, que las mismas fueron hechas en períodos distintos en los Anejos 11, 1, 9, 8, 10, 7 y 3. *No obstante, no pudo certificar categóricamente lo anterior por carecer de muestras caligráficas suficientes para hacer las pruebas correspondientes que le permitieran opinar con certeza científica"*. (Énfasis suplido.) Caso Núm. CE-89–30, *Exhibit* I, pág. 41 esc. 2.

Con vista a esa prueba, determinó:

. . . [Q]ue las marcas hechas en el cuadrante bajo la insignia del PPD, Anejos 1 al 15, tienen características distintas a las marcas hechas en el cuadrante bajo la insignia del PNP y PIP. Es decir, las marcas que aparecían bajo la insignia del PPD parecen haber sido hechas con calma, pensadas, con seguridad y bajo las condiciones normales de una votación.

Sin embargo, las marcas hechas en la columna bajo la insignia del PNP y PIP, consistentemente demuestran por su forma y características haber sido realizadas subrepticiamente, con rapidez, en otro momento, sus ejes varían y tienen

un patrón diferente en comparación con la marca hecha bajo la insignia del PPD, lo que nos lleva a concluir que fueron hechas por un distinto autor.

Además, lo razonable sería que un elector bajo condiciones normales hubiese hecho dos (2) marcas en su papeleta con características iguales o similares y no con comportamientos distintos como los señalados.

En los Anejos 1, 3, 7, 8, 11, 12 y 14 las marcas en la primera columna a la derecha de las papeletas fueron trazadas con lápiz de material indeleble del que es usado para votar, a diferencia del utilizado en la segunda columna de las mismas.

Debemos señalar que del examen visual de la marca trazada en la segunda columna del Anejo 11 podemos concluir que se hizo luego de que la papeleta fue doblada por el elector, ya que trazos de dicha marca se proyectan en el doblez de la misma. Caso Núm. CE-89-30, *Exhibit* I, págs. 41-42.

Y como conclusiones de derecho —luego de citar varias disposiciones de la Ley Electoral de Puerto Rico— expuso:

El Hon. Tribunal Supremo ha expresado "La responsabilidad primaria de garantizar a los electores que se ha de contar cada voto en la forma y manera que sea emitido recae en la Comisión Estatal de Elecciones." [*P.N.P. y P.I.P v.*] *Rodríguez Estrada*, 88 JTS 128.

"[P]ara los funcionarios y organismos electorales llamados por ley a adjudicar un voto, debe ser norma irredicuble [sic] la de evaluarlo con el mayor respeto a la voluntad del elector y con el óptimo esfuerzo para salvar su intención si ésta encuentra apoyo en la inteligencia aplicada al examen de la papeleta, obviando inobservancias de índole formal que en ejercicio de entendimiento razonable no ocultan ni enredan en confusión la verdadera intención del votante". *Santos v. Comisión Estatal de Elecciones*, 111 D.P.R. 351[, 358] (1981) y casos allí citados.

Habiendo la funcionaria del PPD manifestado categóricamente y sin lugar a dudas que no hizo la marca en la segunda columna de su papeleta municipal, tomando en consideración la apreciación del calígrafo en cuanto a varias papeletas y todo lo anteriormente expuesto, en el delicado proceso de determinar cuál ha sido la voluntad del elector, conclu[i]mos que en las papeletas ante nuestra consideración, los electores expresa-

ron su preferencia marcando en el cuadrante de la primera columna. Las marcas hechas en cualquier otra columna en las papeletas en controversia, procedemos a excluirlas y a tenerlas por no puestas, ya que consideramos con razonable certeza que no fueron trazadas por el elector, por lo que se adjudican los votos de las quince (15) papeletas municipales en forma íntegra al PPD. Caso Núm. CE-89-30, *Exhibit* I, págs. 43-44.

En este dictamen, el Presidente de la Comisión, licenciado Rodríguez Estrada, ciertamente *no* tomó en cuenta y descartó el *informe* escrito del perito McCarthy, fechado 30 de noviembre de 1988. Identificación 60, demandante. Sobre el particular, en el mismo documento, el Presidente de la Comisión, licenciado Rodríguez Estrada, hizo constar que "' no . . . es necesario, ya que dispuse del caso tomando en cuenta prueba desfilada ante CEE'". T.E. Superior, pág. 285.

Como en el aspecto crucial —prueba documental y pericial— estamos en las mismas condiciones que el Presidente de la Comisión, licenciado Rodríguez Estrada, examinemos la corrección de esta resolución. Partimos de la premisa, pues así lo declararon todos los funcionarios del colegio ante la Comisión Estatal, *que ocurrió una irregularidad y que alguien deliberadamente intervino de forma ilegal con algunas papeletas después de los electores haber emitido sus respectivos votos.* Concluimos que, en *dos (2) casos*, la determinación del Presidente de la Comisión respecto a la adjudicación de estas quince (15) papeletas no encuentra apoyo en la prueba ni en las inferencias razonables. Veamos.

Hemos leído cuidadosamente la identificación 60, demandante, que consiste de la exposición del perito McCarthy ante el Presidente de la Comisión el 30 de noviembre de 1988, y examinado detenidamente estas papeletas. Apéndice B. De la exposición surge que dicho perito explicó francamente dos (2) limitaciones inherentes a su análisis *inicial*, a saber, la poca escritura en las papeletas y la carencia de

muestras para comparar. Afirmó que sólo podía comparar una marca "X" contra otra "X" y, de ambas, se confrontó con la dificultad de no saber cuál era la original. Ante esta situación trató de buscar un patrón *común* que pudiera aparecer en todas las quince (15) papeletas. T.E. Comisión, págs. 3–4.

Declaró que no pudo encontrar un patrón "único" en las quince (15) papeletas. T.E. Comisión, pág. 5. A modo de ejemplo explicó, en referencia a la columna 1 (P.P.D.), que era de esperarse que el voto bajo esa insignia en las diferentes papeletas fuera de diferentes electores, por lo tanto, que deberían ser "Xs" diferentes. Íd. Si presumía que la "X" en la columna 2 (P.N.P.) se hizo en corto tiempo y sospechosamente —esto es, la escribió una misma persona en forma rápida— debería aparecer entonces el mismo patrón, y ello no fue así. Hay diferentes patrones en esas columnas. Íd., pág. 6. Por lo tanto, le fue muy difícil concluir que las "Xs" en ambas columnas (P.P.D. y P.N.P.) fueron escritas por dos (2) individuos diferentes. Cada columna tiene sus variaciones. Íd.

También tuvo dificultad para concluir que hubo una "X" hecha por una sola persona en *todas* las papeletas —misma marca en la segunda columna— pues había muchas diferencias en los rasgos. Tampoco existió un mismo patrón. T.E. Comisión, págs. 6–7.

Sobre este extremo, explicó que con un análisis de laboratorio de las papeletas originales podía determinar si se usaron lápices diferentes. T.E. Comisión, pág. 10. Oportunamente, el Presidente de la Comisión lo autorizó y McCarthy rindió su informe. Identificación 60, demandante.

En vista del testimonio e informe escrito posterior de McCarthy sobre los resultados de la prueba de laboratorio en cuanto a lápices usados, y en virtud de nuestro propio examen visual de los originales de la papeletas (*exhibits* 33 y 34, demandante), estamos en *mejor* posición para adjudicar. Después de todo, Rodríguez Estrada no tomó en cuenta el

informe del análisis de laboratorio sobre los lápices y resolvió únicamente con la prueba que tenía hasta ese momento. Por vía de aclaración, repetimos, partimos de la premisa —igual concluyó el Presidente de la Comisión a base de la prueba— de que alguien intervino y marcó subrepticiamente algunas papeletas después de los electores haberlas depositado en las urnas.

*Anejo 1*

Refleja un cambio en los ejes de ambas "Xs"; no fue hecho al mismo tiempo y sólo por accidente podría ocurrir así. Íd. 35. Una es más rápida que otra. Íd. 30. La "X" bajo la insignia del P.P.D. parece ser hecha en el curso normal de una votación. Íd. 29. Son diferentes en tamaño, forma y destreza en la escritura. Íd. 30. La interpretación más razonable es que fueron hechas por diferentes personas. Íd. 59–60. Según el análisis de laboratorio y el informe escrito posterior, *ambas marcas fueron hechas con lápices diferentes.*

*Anejo 2*

La marca bajo la insignia del P.N.P. parece haber sido escrita bastante rápido. Íd. 36. La marca bajo la insignia del P.P.D. fue hecha por una persona diferente en el curso normal de una votación Íd. 31. *No pudo establecerse si se usaron lápices diferentes.*

*Anejo 3*

El perito McCarthy llega a las mismas conclusiones. Íd. 31, 36 y 59. *El análisis del laboratorio demostró que para hacer las marcas se usaron lápices diferentes.*

*Anejo 4*

Aunque las marcas son similares en tamaño (Íd. 34 y 36) y no son compatibles con el Anejo 6, por sus ejes aparentan ser de autores diferentes. Íd. 38. La marca bajo la insignia del

P.P.D. parece que fue hecha en el curso normal de una votación. Íd. 31. *No puede establecerse si se usaron lápices diferentes.*

*Anejo 5*

Ambas marcas son grandes. Íd. 34. La marca bajo la insignia del P.N.P. es rara por su localización. Los ejes de la "X", algo virada, están en el cuadrante del símbolo y sus líneas penetran más en el pequeño cuadrante del encasillado correspondiente a la candidatura de Granados Navedo. La marca bajo la insignia del P.P.D. parece ser hecha en el curso normal de una votación. Íd. 31. Esa "X" parece que fue escrita por su autor en posición frontal. *No pudo establecerse si se usaron lápices diferentes.*

*Anejo 6*

Ambas marcas, que son grandes, están en los cuadrantes P.P.D y P.I.P. Fueron hechas con la misma rapidez. Íd. 35–36. No hay concordancia con el Anejo 4. Íd. 37. El perito no estuvo seguro, pero parecen ser de electores diferentes. Íd. 59. La marca bajo el P.P.D. fue hecha por una persona diferente en el curso normal de una votación. Íd. 31. *No pudo establecerse si se usaron lápices diferentes.*

*Anejo 7*

La marca bajo la insignia del P.N.P. no es una "X" derecha. Íd. 41. Ambas parecen ser de diferentes electores. Íd. 59. *El análisis del laboratorio demostró que para hacer las marcas se usaron lápices diferentes.*

*Anejo 8*

La marca bajo la insignia del P.N.P. parece que fue hecha de forma lenta. La "X" parece una "esvástica". Íd. 41. Ambas marcas parecen ser de electores diferentes. *El análisis de laboratorio demostró que para hacer las marcas se usaron lápices diferentes.*

*Anejo 9*

La marca bajo la insignia del P.N.P. es extremadamente grande en comparación con la del P.P.D. Íd. 34. La primera fue hecha de manera más rápida. Íd. 41 La diferencia en grosor pudo deberse a que, al hacer la raya, se movió el lápiz. Íd. 43. *No pudo establecerse si se usaron lápices diferentes.*

*Anejo 10*

Hay diferencia entre ambas marcas; una es más rápida. Son incompatibles. Íd. 9–8. Parecen ser de diferentes electores. Íd. 59. *No pudo establecerse si se usaron lápices diferentes.*

*Anejo 11*

Sería muy raro que las marcas no fueran hechas en el mismo momento. Íd. 58–59. Hay más trazos comunes entre ambas. Íd. 11. La de Granados Navedo podría ser una marca hecha cuando la papeleta estaba doblada. Íd. 48–50. *El análisis de laboratorio demostró que para hacer las marcas se usaron lápices diferentes.*

*Anejo 12*

Al igual que la anterior, ambas marcas son totalmente incompatibles. Íd. 11. *El análisis de laboratorio demostró que para hacer las marcas se usaron lápices diferentes.*

*Anejo 13*

Aunque son marcas sospechosas, no puede concluirse que son diferentes, pues siguen unos patrones similares. Íd. 14. Las marcas fueron hechas por una misma persona. Íd. 59. *No pudo establecerse si se usaron lápices diferentes.*

*Anejo 14*

Ambas marcas, por sus rasgos comunes, son similares. Íd. 12. Fueron hechas por un mismo elector. Íd. 59. *El análi-*

*sis de laboratorio demostró que para hacer las marcas se usaron lápices diferentes.*

*Anejo 15*

Ambas marcas, por sus rasgos comunes, son similares. Íd. 12. Fueron hechas por un mismo elector. Íd. 59. *No pudo establecerse si se usaron lápices diferentes.*

La prueba desfilada sostiene, sin lugar a dudas, la conclusión de que efectivamente los votos de doble marca, identificados como los Anejos 1, 3, 7, 8, 11, 12 y 14, deben adjudicársele a Acevedo Pérez. El informe del análisis de laboratorio del perito McCarthy refleja que las marcas a favor de otros candidatos se hicieron con *lápices diferentes* a los que se usaron en las marcas a favor del P.P.D., y entre esas papeletas figuraba la de la funcionaria de dicho partido.

Obviamente el autor de las marcas espurias usó un lápiz diferente. Conforme al reglamento, al control de materiales y al procedimiento usual, lo normal es que el elector use únicamente el lápiz que le fue suministrado por los funcionarios electorales en el colegio para marcar sus preferencias en las papeletas. En términos de lógica y probabilidades, nos resulta difícil sostener que un elector utilice dos (2) lápices distintos en ese momento. Por ende, rechazamos todo argumento predicado en lo que consideramos un comportamiento extraño, peculiar e incomprensible en el curso regular y la dinámica del proceso de votación dentro de las casetas.

En lo concerniente a las papeletas identificadas como los Anejos 2, 4, 5, 6 y 9, la situación es más difícil. El análisis del laboratorio no pudo determinar si se usaron lápices diferentes. Aun así, a base de las apreciaciones del perito, de nuestro propio examen visual y de una evaluación *integral* de la prueba, estamos convencidos de que también deben adjudicársele a Acevedo Pérez. En todas estas papeletas las marcas bajo la insignia del P.N.P. son parecidas a las anteriores y muestran rasgos de que fueron hechas apresurada-

mente. En algunas, sus terminales voladores (*flying start and finish*) están trazados de tal modo que es razonable y permisible concluir que fueron escritas por una persona sin tener las papeletas de frente.

Respecto a los restantes votos, Granados Navedo reclama para sí las papeletas identificadas como Anejos 10, 13 y 15. De estas tres (3) papeletas, la primera tiene una marca debajo de la insignia del P.P.D. y otra en el cuadrante correspondiente a su candidatura. A base de la prueba pericial y de la apreciación visual, no podemos acceder a su pedido. En la papeleta correspondiente al Anejo 10 existe una inconsistencia notable entre ambas marcas apreciable a simple vista sin esfuerzo alguno. La marca hecha a su candidatura tiene rasgos claros de que fue escrita apresuradamente y, sobre todo —por sus terminales voladores— desde un ángulo distinto al que de ordinario el elector sitúa la papeleta al marcarla.

Finalmente, en cuanto a los Anejos 13 y 14, los rasgos y tamaños de las marcas son *similares*. No existe prueba de la cual podamos inferir que las marcas a favor de Granados Navedo fueran espurias o fraudulentas. Son el ejemplo clásico del voto *mixto. Deben adjudicárseles a su favor. En éstas incidió el Presidente de la Comisión, licenciado Rodríguez Estrada.*

En resumen, de las quince (15) papeletas con doble marca, trece (13) votos corresponden a Acevedo Pérez y dos (2) a Granados Navedo.

Las circunstancias antes apuntadas son inquietantes. Son demostrativas de que se intentó *perpetuar un fraude*, bajo la hipótesis errónea de que, por tratarse de una cruz, podía realizarse sin ser detectado. Fue un error. Y es que, en una papeleta electoral, "una cruz tiene características individuales" susceptibles de ser diferenciadas y evaluadas. R. Fernández Ruenes, *El examen de documentos, una nueva profesión*, Conferencia del Ateneo auspiciada por el Colegio

de Abogados de Puerto Rico, 1947, pág. 7. Un examen visual puede revelar incongruencias. A su vez, un análisis pericial comparativo puede demostrar diferencias o similitudes en los trazos, rasgos, terminales y finales, tamaño, dirección, enlaces de polos, inclinación, presión, proporcionalidad, regularidad, orden, velocidad y continuidad, conjuntamente con la forma de doblar las papeletas. J.V.P. Conway, *Evidential Documents*, 3ra ed., Illinois, Charles C. Thomas (Publisher), 1978, págs. 195–196.

Resolvemos que procede en derecho la adjudicación de todas estas papeletas de doble marca. *Disentimos de la opinión mayoritaria que, sin necesidad, remite esta cuestión al foro de instancia.* En el binomio elector-candidato que configura el sufragio, los electores no deben sufrir el menoscabo del valor real del voto y quedar a merced de la mano oculta fraudulenta. Este intento de fraude tampoco debe tener el efecto injusto de que no se cuenten los votos a favor de sus respectivos candidatos. *Además, no debe quedar impune. Debe el Departamento de Justicia iniciar la investigación correspondiente para fijar responsabilidades.*

Finalmente, después del examen y análisis visual de todas las demás papeletas no adjudicadas por razón de doble marca en los Precintos 1, 2 y 3 —que según la Ley Electoral de Puerto Rico no son votos mixtos o por candidatura— podemos concluir que no hemos podido detectar indicio alguno de fraude que pudiera justificar la petición del Comisionado Electoral González Rodríguez (P.N.P.) de que se revisaran las determinaciones previas adoptadas durante el recuento en esos precintos. Abona, además, a nuestra apreciación el hecho de que este fenómeno sólo lo observamos *esporádicamente* en una u otra papeleta por colegios, contrario a la situación de las quince (15) papeletas de doble marca en un *mismo colegio*, cuya adjudicación fue impugnada exitosamente por el P.P.D.

## XIV

*Causa de acción de papeletas con iniciales*

Según expuesto, el foro de instancia decidió que Granados Navedo estaba impedido de presentar prueba demostrativa de que los electores que estamparon sus iniciales al dorso de las papeletas lo hicieron *bona fide* —por instrucciones confusas o erróneas de los funcionarios de los colegios— y, por ende, que sus votos deberían adjudicarse. Aplicó la doctrina de cosa juzgada (*res judicata*), originalmente planteada en su contestación ante dicho tribunal sólo por el Presidente de la Comisión.

*El error es manifiesto.* Primero, aparte de que Granados Navedo no tenía capacidad jurídica para impugnar esa determinación hasta tanto se expidiera una certificación, en nuestro derecho vigente *la solidaridad no se presume.* No fue *parte* en el pleito KAC 88–1939, en que únicamente compareció el P.N.P. a cuestionar la validez jurídica de esa determinación y que una mayoría de este Tribunal sostuvo en *P.N.P. v. Rodríguez Estrada, Pres. C.E.E.*, 123 D.P.R. 1 (1988).

Segundo, en su Sentencia de 6 de diciembre de 1988 el Tribunal Superior (Hon. Ángel Hermida, Juez) fue muy cuidadoso al exponer el alcance de su decreto. *In fine* hizo "claro que la presente [s]entencia no expresa[ba] opinión de clase alguna en cuanto al derecho que pudiese tener cualquier candidato a elección de impugnar la certificación de cualquier otro candidato, conforme el trámite establecido en el [A]rt. 6.014 de la Ley Electoral vigente, 16 [L.P.R.A. sec.] 3274". Sentencia, Civil Núm. KAC 88–1939, pág. 9.

Tercero, durante el proceso ante el Tribunal Superior —frente a la demanda de impugnación— el Comisionado Electoral Báez Galib y el propio Acevedo Pérez, en sus respectivas contestaciones juradas de 27 de diciembre, *no levantaron afirmativamente la defensa de cosa juzgada.* Ello

es explicable. Desde el 23 de diciembre *ambos* habían *reconocido,* en memorial suscrito por el Lcdo. Lino J. Saldaña, que:

> *. . . no existe identidad entre las personas de los litigantes en el caso CE-88-722 y en el presente caso, ni tampoco existen los vínculos de solidaridad entre las partes requeridos bajo el artículo 1204 del Código Civil, 31 L.P.R.A. sec. 3343, resulta inaplicable al caso de autos la doctrina de la cosa juzgada.* Por la misma razón tampoco se aplica la del impedimento colateral por sentencia, tal y como ha sido adoptada en nuestro ordenamiento jurídico. La solidaridad que exige el artículo 1204 del Código Civil "es aquella capaz de situar en posición tal a las partes, como si fueran una sola en relación a las prestaciones que puedan estar en litigio, y es el mismo tipo de relación que se produce entre el causahabiente y el causante." *Los vínculos entre el PNP y el demandante Granados Navedo no son suficientes para lograr lo anterior, ya que sus intereses no son necesariamente idénticos.* Véase *A & P Gen[.] Contractor[s] v. Asoc[.] Caná,* 110 D.P.R. 753, 766 (1981) y *Negrón* v. *C.I.T. Fin[.] Serv[.],* 111 D.P.R. 657, 661 (1981). Por otro lado, las doctrinas de cosa juzgada y de impedimento colateral obedecen fundamentalmente a un principio de conveniencia y orden procesal. No deben aplicarse en forma inflexible "cuando hacerlo derrotaría los fines de la justicia, especialmente si se plantean consideraciones de interés público." Véase *Pagán Hernández* v. *U.P.R.,* 107 D.P.R. 720, 736 (1978). (Énfasis suplido.) A.O., 113.

Ese memorando no fue producto de la irreflexión. Tomó como trasfondo la decisión de este Tribunal en *P.N.P. v. Rodríguez Estrada, Pres. C.E.E.,* supra, emitida el 21 de diciembre de 1988.

En etapa más avanzada, el mismo tribunal de instancia —el 2 de enero de 1989— señaló que "[t]*odos estamos de acuerdo que no afecta, que hay què oir la prueba,* que el Juez Hermida expresamente dispuso que su dictamen no afectaría que se reprodujera las alegaciones en el caso de impugnación. *Así es que vamos a resolver a base de la*

*prueba que se nos desfile".* (Énfasis suplido.) T.E. Superior, pág. 143. Al día siguiente reiteró ese criterio y diferenció el alcance de las expresiones de este Tribunal en la antes mencionada decisión, pero aclaró que "no es la cuestión de [*res judicata*] *ni* [*collateral estoppel*] . . .". T.E. Superior, pág. 397.

No obstante, mediante memorando posterior con fecha de 12 de enero de 1989, Báez Galib y Acevedo Pérez variaron diametralmente sus posiciones. Con los mismos argumentos sostuvieron la aplicabilidad de la doctrina de cosa juzgada, esto es, a base de que las alegaciones eran las mismas y Granados Navedo, como candidato oficial nominado, estaba unido por vínculos de solidaridad con el P.N.P. y su Comisionado Electoral. El 17 de enero de 1989 el tribunal de instancia también modificó su criterio y desestimó por ese fundamento.

Y cuarto, el error cobra mayores proporciones en una situación en que la Asamblea Legislativa ha dictaminado que las acciones de impugnación ante los tribunales constituyen juicio *de novo.* Según antes esbozado, por excepción, *no* aplica la doctrina de cosa juzgada o impedimento colateral. 1B. *Moore's Federal Practice* Sec. 0.416 [3.–2], págs. 523–524.

En cuanto a los méritos del reclamo para dilucidar la validez de estas papeletas, es suficiente remitirnos a la decisión en *P.N.P. v. Rodríguez Estrada, Pres. C.E.E.,* supra. Aun bajo la interpretación restrictiva de la mayoría, el Juez Presidente Señor Pons Núñez reconoció que la nulidad decretada por la determinación del Presidente de la Comisión, licenciado Rodríguez Estrada, no era absoluta sino *relativa,* que no gozaba de credenciales de inapelabilidad y que podía ser impugnada en el tribunal. A tal efecto dijo:

La variante en el reglamento actual, que sustituyó la palabra "nula" por "protestada", tiene el propósito de *flexibilizar lo relativo a la anulación de esas papeletas, de suerte que en*

*lugar de decretarse inflexible y absolutamente su nulidad* en el escrutinio original, a ese nivel únicamente se protesten y se remitan dichas papeletas a la comisión en pleno para que sea ésta quien dilucide su adjudicación o rechazo. *Así, se le ofrece la oportunidad a quien reclame su adjudicación a presentar prueba en favor de su reclamo.* (Énfasis suplido.) *P.N.P. v. Rodríguez Estrada, Pres. C.E.E.*, supra, pág. 25.

Y más adelante expuso:

Por lo tanto, es sobre el *elector* que recae el peso de la prueba en este caso. *Le corresponde a éste demostrar que actuó de buena fe y que fue inducido a error por la orientación confusa de los funcionarios de colegio.* (Énfasis suplido.) *P.N.P. v. Rodríguez Estrada, Pres. C.E.E.*, supra, pág. 28.

Ese enfoque y oportunidad de reivindicar los votos de los electores que iniciaron sus papeletas por error y orientación confusa de los funcionarios de colegio (*bona fide*) quedó obliterada con la sentencia del tribunal de instancia. La opinión mayoritaria interpreta nuevamente hoy la cuestión y la remite a dicho foro con la *injusta camisa de fuerza* de que se "presum[a] que la decisión de la Comisión Estatal es válida". Opinión mayoritaria, pág. 36. *Es improcedente ese mandato.*

"La verdad es que toda interpretación es por necesidad material una recreación. Importa siempre, por su propia esencia, un diálogo, una comunicación entre la obra y el intérprete: éste pone en la interpretación tanto como la obra misma." A. Orgaz, *El problema de la interpretación de la ley*, XXIX (Núm. 1) Rev. Col. Abo. Buenos Aires 48 (1951). Acometamos esa empresa.

De la prueba documental admisible bajo los principios evidenciarios antes relacionados surge una dinámica que refleja que todos los miembros de la Comisión Estatal, incluso su Presidente, eran conscientes y estaban advertidos del problema de las papeletas iniciadas tanto en el recuento del Municipio de San Juan como en otro precinto de la isla.

La identificación 62, demandante —transcripción de evidencia de la reunión matutina de la Comisión Estatal de 15

de noviembre de 1988— alude a que "*ayer* se habían adjudicado, se había establecido que cualquier papeleta que tuviese iniciales al frente, *al dorso, que se pudiera corroborar que es un elector*, automáticamente la mesa tomaba acción sobre eso . . .". (Énfasis suplido.) T.E. Comisión, pág. 50.

Más tarde, la identificación 64, demandante —transcripción de los procedimientos posteriores *ese mismo día*— revela un diálogo, en el que no se identifican los interlocutores, sobre el problema de las papeletas con iniciales y la magnitud y extensión del fenómeno. Uno de los participantes expresó que ello había ocurrido "mucho en el pasado, cuando la _____ se supone que _____, pero en el pasado, en el '84 fue que la directriz se le daba a los electores de que las iniciales de los funcionarios quedan al dorso, *muchos entendieron que eran sus iniciales*". (Énfasis suplido.) T.E. Comisión, págs. 56–58.

Para el 3 de diciembre de 1988 el Secretario de la Comisión le informó a su Presidente y demás miembros del organismo que gestionaba la citación de los funcionarios de colegio de Toa Baja para identificar *la razón* por la cual "iniciaron los funcionarios una nota al calce de papeletas que estaban enviando por electores y en el caso de San Juan 2 para identificar también alguna inicial que aparec[e] al dorso que no se ha podido localizar la _____ con claridad si pertenece a un elector o no". Identificación 67, demandante; T.E. Comisión, pág. 2.

En resumen, es claro que desde el 14 de noviembre de 1988 se había planteado y discutido la situación de las papeletas iniciadas por electores debido a instrucciones erróneas, tanto en el Municipio de San Juan como en un precinto de Toa Baja, en los cuales paralelamente la Comisión Estatal realizaba recuentos. T.E. Superior, pág. 490. Puede concluirse también —conforme la Petición de Revisión (CE-89-30) ante este Foro por el P.N.P. y la oposición del licenciado Rodríguez Estrada— que fue el 17 de noviembre

que, sin investigación alguna, el Presidente de la Comisión adoptó la determinación de anularlas en el Municipio de San Juan. ¿Qué sucedió *después*?

La *respuesta* la brinda la identificación 68, demandante (transcripción de la reunión de la Comisión Estatal de 5 de diciembre de 1988). Dicho organismo decidió investigar el asunto y recibió el testimonio de los inspectores y secretarios de *todos* los partidos políticos de un colegio en Toa Baja. De esa transcripción diáfanamente se desprende que en *Toa Baja*, Precinto 12, Unidad 7, Colegio 1, *tales instrucciones fueron brindadas por los funcionarios de colegios a los electores y éstos las malinterpretaron. Un número sustancial de ellos (20 a 25) fueron confundidos por las instrucciones y pusieron sus iniciales al dorso de las papeletas.* Cuando los funcionarios se percataron de la situación fueron más específicos y cuidadosos, y aclararon sus instrucciones. *Ante esa situación, acordaron unánimemente adjudicar las papeletas como válidas.* Identificación 68, demandante; T.E. Comisión, págs. 33–38. Esa prueba también demostró que los funcionarios del colegio *fueron entrenados para dar tales instrucciones.* Identificación 68, demandante; T.E. Comisión, págs. 39–41. Ante esta evidencia, la Comisión Estatal, como excepción, se negó a anularlas inflexiblemente y *confirmó la validez de las papeletas con las iniciales de los electores.*

El Presidente de la Comisión, licenciado Rodríguez Estrada, *estuvo presente* en la reunión y, aunque no tuvo que votar porque los Comisionados Electorales decidieron por unanimidad no anular las papeletas así iniciadas (T.E. Superior, págs. 383–384), *fue testigo presencial de los hechos y circunstancias que allí relucieron.* Es interesante destacar que uno de los funcionarios del colegio en cuestión, al final de la sesión investigativa, antes de marcharse inquirió del Presidente de la Comisión si "¿esas instrucciones estaban bien, estaban mal, qué debemos de corregir?", y éste contestó:

"No, *lo hicieron a tiempo, correctamente. Parece que los instructores seguían con la misma tradición . . .*". (Énfasis suplido.) Identificación 68, demandante; T.E. Comisión, pág. 41. Más importante aún, en su declaración en el tribunal de instancia *admitió que en esa reunión de la Comisión Estatal vio las papeletas de Toa Baja iniciadas y validadas, y —en contraste con las anuladas por su anterior determinación— aceptó que planteaban una situación "[s]imilar, similar algunas de ellas"*. (Énfasis suplido.) T.E. Superior, pág. 385.

El examen visual que hemos realizado de tres (3) de esas papeletas municipales *confirma* esa similaridad. Identificación 59, demandante. Las papeletas Núms. 251 y 253 configuran lo que denominamos como *situación clásica*. En éstas, los electores pusieron sus iniciales en el lado izquierdo, inmediatamente debajo de las iniciales de los funcionarios del colegio. En la Núm. 252 el elector las escribió al lado opuesto, esto es, el derecho. Estos datos, como veremos, adquieren un patrón común y recurrente en las papeletas municipales de San Juan y evidencian razonablemente ser producto de las instrucciones erróneas y confusas a los electores. Esta prueba, *sin especulaciones*, demuestra los méritos del reclamo de Granados Navedo en cuanto a que ciertos funcionarios de colegio cursaron instrucciones erróneas que confundieron a algunos electores y los llevaron a consignar sus propias iniciales al dorso de la papeleta.

También corrobora su contención de que la Comisión Estatal, con conocimiento de la situación durante el recuento de San Juan —cuando simultáneamente se efectuaba un recuento en Toa Baja— aplicó arbitrariamente, *a situaciones iguales, trámites distintos y criterios sustantivos disímiles*. Ello atenta contra la norma jurídica de que una determinación administrativa no puede producir soluciones contradictorias para situaciones fundamentalmente idénticas. *Textile Dye Works, Inc. v. Srio. de Hacienda*, 95 D.P.R. 708, 715

(1968); *South P.R. Sugar Co. v. Junta,* 82 D.P.R. 847, 865 (1961).

No puede argumentarse que la no intervención del Presidente de la Comisión *desinstitucionaliza* las decisiones de la Comisión Estatal. No puede sostenerse jurídicamente la dicotomía de que los acuerdos unánimes de la Comisión Estatal o de sus organismos subordinados, que son conflictivos con los dictámenes de su Presidente cuando interviene por no haber ese consenso total, no son decisiones administrativas de la Comisión Estatal. Los derechos constitucionales de los electores no pueden quedar a merced de ese poliformismo tan desarticulado ni diluidos e inmersos en el proceso de una burocracia administrativa polivalente o pluralidad de criterios de los Comisionados Electorales y su Presidente, o de sus delegados. No podemos aceptar esos compartimentos sellados —ajenos y distanciados— del producto decisorio final. Semejante esquema sería inconstitucional. La Ley Electoral de Puerto Rico es clara. Si en la Comisión Estatal no hubiere "unanimidad de votos será decidida, en pro o en contra por el Presidente *cuya decisión se considerará como la decisión de la Comisión Estatal...".* (Énfasis suplido.) Art. 1.006(e) de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3014(e).

Sean bajo la regla de unanimidad o producto de una decisión de su Presidente, los acuerdos y dictámenes de la Comisión Estatal tienen que recoger y responder a criterios de uniformidad y legalidad. No pueden prevalecer normas para evaluar el derecho al voto de los electores en San Juan *distintas* a las que se siguieron en Toa Baja en situaciones similares. A fin de cuentas, se supone que sobre el Presidente de la Comisión recaiga la responsabilidad de "llevar a cabo y *supervisar los procesos electorales dentro de un ambiente de absoluta pureza e imparcialidad".* (Énfasis suplido.) Art. 1.011(A) de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3007(A).

En estas circunstancias, ¿por qué antes de certificar a Acevedo Pérez no replanteó esta anomalía decisoria en el seno de la Comisión Estatal y pidió que se investigara el reclamo de las papeletas iniciadas en San Juan que antes él había anulado? ¿Cómo justificar su decreto automático de nulidad, emitido sin la más mínima investigación para las papeletas con iniciales al dorso en el Municipio de San Juan, mientras se sostuvo la validez en otro precinto? Recuérdese que todavía no había terminado el escrutinio general de la isla y que, tanto en San Juan como en Toa Baja, se efectuaban recuentos.

¿Qué explicación existe para que la Comisión Estatal en un caso investigara y corroborara la realidad de que las iniciales fueron producto de unas instrucciones erróneas y, por otro lado, algunos de sus miembros y su Presidente negaran igual trato a los electores del Municipio de San Juan? ¿Por qué Báez Galib, Acevedo Pérez y el Presidente de la Comisión, Rodríguez Estrada, han insistido siempre en cerrar las puertas del recinto judicial e impedir la investigación de esos hechos y el afloramiento de la verdad?

Para corroborar la situación peculiar de estas papeletas, en el descargo de nuestra función adjudicadora, nos dimos a la laboriosa tarea de examinar los cinco (5) maletines que se elevaron a este Foro, contentivos de *todas* las papeletas no adjudicadas por la Comisión Estatal en el Municipio de San Juan. Identificaciones 1–5, demandante.

El resultado de este análisis que aparece detalladamente explicado en el Apéndice C lo hemos resumido del modo siguiente:

Identificación 1:

*San Juan 1*

| P.N.P. | P.P.D. | P.I.P. |
|:------:|:------:|:------:|
| 14 | 10 | 2 |

*San Juan 2*

| P.N.P. | P.P.D. | P.I.P. |
|---|---|---|
| 4 | 6 | 0 |

Identificación 2:

*San Juan 3*

| P.N.P. | P.P.D. | P.I.P. |
|---|---|---|
| 36 | 14 | 2 |

Identificación 3:

*San Juan 4*

| P.N.P. | P.P.D. | P.I.P. |
|---|---|---|
| 27 | 18 | 5 |

Identificación 4:

*San Juan 5*

| P.N.P. | P.P.D. | P.I.P. |
|---|---|---|
| 45 | 48 | 3 |

Identificación 5:

*San Juan 104*

| P.N.P. | P.P.D. | P.I.P. |
|---|---|---|
| 34 | 48 | 1 |

- - - - - - - - - - - - - - - - - - -

## TOTALES

|  | P.N.P. | P.P.D. | P.I.P. |
|---|---|---|---|
| San Juan 1 | 14 | 10 | 2 |
| San Juan 2 | 4 | 6 | 0 |
| San Juan 3 | 36 | 14 | 2 |
| San Juan 4 | 27 | 18 | 5 |
| San Juan 5 | 45 | 48 | 3 |
| San Juan 104 | 34 | 48 | 1 |
|  | 160 | 144 | 13 |

Diferencia: *16 votos a favor de Granados Navedo.*

La cuestión es trascendental en dos (2) vertientes. Una, para Granados Navedo el reclamo de las papeletas iniciadas votadas a su favor —en contraste con las de Acevedo Pérez— significa una ganancia neta de dieciséis (16) votos. La otra está relacionada con los verdaderos destinatarios de todo el proceso, a saber, aquellos electores que debido a esas instrucciones erróneas y confusas fueron privados del derecho al sufragio.

Según surge del análisis de estas papeletas —Apéndice C— se manifiesta y revela un patrón *repetitivo* que no es susceptible de ser atribuido a una mera coincidencia, sino al resultado de una combinación de factores en las que se destaca la actuación de los funcionarios electorales, pero principalmente la percepción de los electores.

En todas, las iniciales aparecen al dorso de la papeleta de forma tal que, al doblarse, las iniciales de los electores quedaron visibles. La inmensa mayoría de casos son clásicos: las iniciales aparecen en la parte superior, esquina izquierda de la papeleta, inmediatamente debajo o al lado de las iniciales de los funcionarios del colegio. Cuando los funcionarios pusieron sus iniciales al lado derecho muchos electores trasladaron las suyas a esa misma área. Otras papeletas contienen las iniciales en las esquinas, en su extremo derecho superior o inferior. Salvo pocos casos, una pluralidad de papeletas con iniciales tienen *como denominador común* la procedencia de los mismos colegios electorales.

De este examen visual, y en referencia al trámite pautado en la Regla 41B(6) del Reglamento de Elecciones de 1988, podemos arribar a varias conclusiones: Primero, por estar visibles las iniciales puestas por los electores es inevitable concluir que éstos no tuvieron la intención de ocultarlas a los inspectores de los colegios. De hecho, en un sinnúmero de casos, esas iniciales fueron hechas con letras grandes, lo cual excluye todo móvil dirigido a ese fin. Segundo, de haber se-

guido el trámite previsto en la aludida Regla 41B(6), *supra*, estos electores doblaron las papeletas con el propósito de asegurar que sus iniciales quedaran visibles y fueran mostradas a los inspectores del colegio. Tercero, de haber estado atentos los inspectores de los colegios, sin dificultad alguna podían haberse percatado de esas iniciales adicionales e impedir que dichas papeletas fueran así depositadas en las urnas.

*La situación es más grave. No sólo excluye la aplicación de la doctrina de cosa juzgada, sino que ameritaba una decisión de este Tribunal que dictaminara la validez de esas papeletas. La evidencia a la que nos hemos referido no estaba disponible al momento de quedar sometido, el 5 de diciembre de 1988, el Caso KAC 88-1939 (P.N.P. v. Rodríguez Estrada, Pres. C.E.E., supra), ante el Juez Ángel Hermida. La razón es sencilla. El acuerdo de la Comisión Estatal fue adoptado precisamente el 5 de diciembre de 1988, el mismo día en que el caso quedó ante él sometido. Esa cronología fue corta, esto es, un (1) día antes de que dicho magistrado diligentemente dictara su sentencia.*

Invocar en estas circunstancias y cronología la norma de *cosa juzgada* —cuando todavía oficialmente no se había configurado una violación a la norma de uniformidad administrativa y trato justo— *es un absurdo jurídico.* ¿Cómo aplicarle a Granados Navedo esa doctrina cuando su causa de acción es distinta —desigual trato bajo la ley— que se materializó *después* por hechos surgidos el día que el P.N.P. sometió el Caso KAC 88-1939? *¿Cómo puede todavía la mayoría del Tribunal reafirmar, a título de precedente, su decisión anterior y no validar esas papeletas bajo la doctrina de igual trato ante la ley?* Opinión mayoritaria, pág. 36. La remisión al foro de instancia no sólo es jurídicamente errónea, sino que traza un tortuoso y lento camino que inyecta un innecesario elemento probatorio *partidista* al caso.

Significará esencialmente abrir las puertas a que el asunto se torne en una pugna forense de credibilidad entre los funcionarios de los colegios de los distintos partidos políticos. Es natural y anticipable que, de uno u otro lado, expongan sus respectivos puntos de vista conforme a la ganancia electoral neta más conveniente.

La mayoría del Tribunal debió ser más explícita y resolver que la norma correcta y determinante para dilucidar esta cuestión no es la credibilidad de los funcionarios electorales, sino aquella fraguada al calor de la percepción de los verdaderos destinatarios del proceso: *los electores que pusieron sus iniciales*. A menos que así lo admitieran los funcionarios electorales, no es preciso mucho esfuerzo mental para arribar a la conclusión de que sólo ellos podrían realmente testificar si fueron o no confundidos.

La cuestión ha superado el debate sobre la facultad de este Tribunal para tomar conocimiento judicial —*P.N.P. v. Rodríguez Estrada, Pres. C.E.E.*, supra— y ha cobrado carácter fáctico. En resumen, no había regla en qué fundar la nulidad radical o absoluta, no fueron advertidos los electores de la misma (T.E. Superior, pág. 420), no medió resolución escrita al efecto del Presidente de la Comisión, licenciado Rodríguez Estrada (T.E. Superior, pág. 381) ni la Comisión Estatal avisó o apercibió oficialmente a los electores a través de la prensa de la oportunidad que tenían para reclamar la convalidación de los votos que se les había anulado por las iniciales al dorso (T.E. Superior, pág. 492); pero sobre todo, *con conocimiento*, a situaciones iguales la Comisión Estatal aplicó normas distintas y discriminatorias. *No nos explicamos cómo la mayoría del Tribunal ha podido darle la espalda a esta injusta realidad e ignorarla por segunda vez.*[9]

---

[9] En el trámite de revisión (CE-88-722) *P.N.P. v. Rodríguez Estrada, Pres. C.E.E.*, 123 D.P.R. 1 (1988), ante este Foro, el P.N.P. —a través de sus abogados

"El derecho es vivo y toma cuerpo de la dinámica del entretejido social." *P.N.P. v. Hernández, Srio. D.T.O.P.*, 122 D.P.R. 362, 385 (1988), opinión concurrente.

A esos efectos cobran virtualidad los siguientes pasajes de nuestra opinión disidente en *P.N.P. v. Rodríguez Estrada, Pres. C.E.E.*, supra, págs. 62–65:

Es necesario resaltar que la Regla 36(a) del Reglamento de Elecciones de 1988, contiene las *únicas instrucciones que debían* ofrecer los inspectores de colegio. Así lo admite en su comparecencia el Presidente de la Comisión Estatal de Elecciones. En lo pertinente, dispone que:

"a) Los Inspectores Propietarios del Partido Popular Democrático y del Partido Nuevo Progresista harán entrega de las dos papeletas de votación. El primero entregará la papeleta estatal y el segundo la municipal y le leerán las siguientes instrucciones:

'Le estamos entregando dos (2) papeletas. En la papeleta blanca aparecen los candidatos a los cargos de Gobernador, Comisionado Residente y Legisladores. En la papeleta amarilla aparecen los candidatos a Alcalde y Asambleíst[a] Municipal.'

La lectura de estas instrucciones serán alternadas entre estos dos (2) funcionarios.

Además, se cerciorarán que los electores depositen sus papeletas en la urna correspondiente. "Regla 36(a) del Reglamento de Elecciones de 1988, pág. 33."

---

Miguel Pagán y Eliezer Aldarondo Ortiz— el 12 de diciembre de 1988 acompañó unas declaraciones juradas y aludió al acuerdo de la Comisión Estatal que convalida las papeletas iniciadas en Toa Baja. El Presidente de la Comisión Estatal de Elecciones, en su comparecencia ante nos, objetó esa exposición y pidió que no se tomara en cuenta.

La mayoría de este Tribunal se negó a admitir tales documentos y, además, censuró a los abogados. Sobre este último aspecto, los licenciados Pagán y Aldarondo pidieron reconsideración. El Tribunal reiteró su dictamen.

En aquel momento discrepamos de ese proceder por los fundamentos expuestos en nuestra opinión disidente y posterior voto disidente de 13 de enero de 1989.

La decisión de hoy, en la medida en que la mayoría resuelve que no aplica la doctrina de cosa juzgada, constituye (aunque tardía e inconclusa) una rectificación parcial.

Sin embargo, por su parte, la Regla 41B(6) del mismo reglamento, pág. 41, dispone que:

"Una vez haya votado, pero antes de salir de la caseta de votación, *el elector doblará las papeletas electorales con varios dobleces* de manera que ninguna parte del frente de ellas quede expuesta a la vista, *asegurándose que las iniciales de los inspectores del colegio al dorso de éstas queden visibles.* Inmediatamente después de terminar con esta operación, saldrá de la caseta y en *presencia de los inspectores del colegio procederá a mostrar las iniciales al dorso de las papeletas* y depositará la papeleta estatal y la municipal en las urnas debidamente identificadas a estos fines. (Énfasis suplido.)"

Como puede apreciarse del texto, la regla antes citada contiene afirmativamente una directriz *específica* para los electores referente al momento, sitio y forma de doblar la papeleta. Sin embargo, aun cuando no fue concebida como *instrucción*, nos resulta difícil —por no decir incomprensible— entender la posición del Presidente de la Comisión Estatal de Elecciones cuando nos dice que es "inmaterial el hecho de la forma en que se doble la papeleta para depositarla en la urna". Alegato del correcurrido, pág. 12. ¿En qué quedamos? *¿No imponía la Regla 41B(6) del Reglamento de Elecciones de 1988 una mecánica específica con miras a exponer y dejar visibles las iniciales de los inspectores del colegio?*

Hemos visto que, inexplicablemente, el reglamento no proveyó disposición o instrucción alguna para que este mensaje fuera trasmitido verbalmente por los funcionarios de colegio. *Sin embargo, lógicamente alguien tenía que brindarla.* "Es elemental el axioma de que la ley no puede exigir cosas inútiles ni absurdas." *P.S.P. v. Com. Estatal de Elecciones*, supra, pág. 444. No cabe afirmar que los miles de electores que acudieron a votar conocían ese detalle reglamentario. Por ello, repetimos, muchos funcionarios electorales, *sua sponte*, optaron por instruirlos al respecto, en particular aquellos que ejercían su derecho por primera vez o inquirieron. La omisión de una instrucción en las papeletas, la ausencia de una campaña educativa y orientadora sobre este particular y una instrucción *general* en los colegios robustece la razonabilidad de la conclusión de que muchos electores desconocían la manera apropiada de doblar la papeleta.

No podemos, pues, convenir con la premisa del Presidente de la Comisión Estatal de Elecciones de "asumir . . . que los funcionarios cumplieron cabalmente con su obligación legal y reglamentaria, *y que no se dieron instrucciones adicionales ni distintas a las requeridas sobre dicho tema por el citado Reglamento*". Alegato del correcurrido, pág. 12. ¿Cómo sostener que no se brindaron tales instrucciones y, simultáneamente, lograr que los electores, *dentro de las casetas*, doblaran las papeletas con varios dobleces "asegurándose que las iniciales de los inspectores de colegio al dorso de éstas qued[aran] visibles"?

Lo razonable es todo lo contrario. "'Los Jueces no viven en un vacío. Sabemos lo que el resto de la comunidad sabe.' *Pueblo v. Marrero*, 79 D.P.R. 649, 658 (1956). A fin de cuentas, 'nuestro papel, aunque limitado, no se desarrolla en un *vacío*. Cuando los hechos son suficientemente *abrumadores*, hasta los tribunales pueden tomar conocimiento judicial de los mismos, y de ese modo evitar en parte la censura expresada por Bentham al efecto de que el arte de la jurisprudencia consiste en desconocer metódicamente *lo que todo el mundo sabe'*. (Énfasis suplido.) *Ballester v. Tribunal de Apelación*, 61 D.P.R. 474, 507–508 (1943)." *Noriega v. Gobernador*, 122 D.P.R. 650, 696 (1988), opinión de conformidad del Juez Asociado Señor Negrón García.

A su vez, la obligación del elector de *"mostrar las iniciales al dorso de las papeletas"* —(énfasis suplido) Regla 41B(6) del Reglamento de Elecciones de 1988, pág. 41— a los inspectores del colegio necesariamente imponía a éstos el *deber recíproco* de evitar que las papeletas que contenían otras iniciales —potencialmente protestables— fueran así depositadas en las urnas. *Ese era el momento para llamar la atención al elector de las consecuencias de tales iniciales.* Cabe señalar que la ley y el reglamento visualizan que los inspectores de colegio supervisen y velen por que los procedimientos se conduzcan apropiadamente. Regla 36(a) del Reglamento de Elecciones de 1988. Además, se prevee la posibilidad de que un elector dañe, "por accidente o equivocación", cualesquiera de las papeletas y se le reconoce el derecho entonces a sustituirla. Art. 5.029 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3232. La ausencia de advertencia escrita, unida a la omisión de

los funcionarios electorales, descartan toda posibilidad de —a priori o a posteriori— imponerle a los electores una presunción de fraude y la penalidad de nulidad radical del voto. Al decir de la opinión mayoritaria, "[n]o se puede presumir lo que la simple vista niega". Opinión mayoritaria, pág. 28. "Corresponde a los organismos del Estado hacer lo más viable posible el ejercicio del sufragio, fundamento esencial de la democracia, y no puede ni debe éste rehuir esa responsabilidad mediante el traslado de parte de la misma al elector." *P.N.P. y P.I.P. v. Rodríguez Estrada*, supra, pág. 504.

No puede desligarse la Comisión Estatal de Elecciones —como pretende su Presidente— de los "errores que hubiesen podido cometer" los inspectores de colegios al brindar las instrucciones. Menos, de las consecuencias de permitir, a ciencia y paciencia, que se depositaran en las urnas papeletas que visiblemente contenían iniciales adicionales. En *P.P.D. v. Admor. Gen. de Elecciones,* supra, pág. 240 esc. 31, desaprobamos semejante *contención* al declarar terminantemente que "recae sobre la Comisión la ineludible obligación de suplirles el material de trabajo, *brindarles orientación*, facilitarles manuales de instrucción *y mantener una estrecha supervisión del trabajo que realizan.* En fin, que en lugar de que la Comisión opere bajo la teoría de 'manos afueras', *debe ejercer un grado sumo de atención hacia la participación que la ley le tiene reservada a dichos funcionarios y absorber con mayor desvelo la responsabilidad que sus actos no fraudulentos ni delictivos acarrean".* (Énfasis suplido y en el original.)

En resumen, discrepamos vehementemente de la opinión mayoritaria que, sin tomar en cuenta las *distintas normas* adoptadas por la Comisión Estatal y su Presidente, licenciado Rodríguez Estrada, durante recuentos simultáneos en San Juan y Toa Baja "presume que la decisión de la Comisión Estatal es válida. Le corresponde al afectado presentar la prueba que relata en sus alegaciones". Opinión mayoritaria, pág. 36. *Ya Granados Navedo lo hizo. ¿Por qué exigirle más? ¿Qué fundamento jurídico hay para ignorar la realidad ocurrida y menoscabar inconstitucionalmente el voto de los electores de San Juan?*

## XV

*Otras papeletas válidas no adjudicadas*

El examen y análisis de las identificaciones 1-5, demandantes —papeletas protestadas y no adjudicadas por la Comisión Estatal durante el recuento— revela la validez de otras papeletas. En el Apéndice D de esta ponencia las hemos incluido.

A tal efecto, la *primera* papeleta —Sobre 1, Identificación 1, demandante— es un voto por candidatura a favor de *Granados Navedo* y de varios de los candidatos a asambleístas municipales de todos los partidos. De su faz es válida y debe adjudicársele.

La *segunda* papeleta corresponde al Precinto 1, Unidad 9, Colegio 1. Está marcada a favor de la candidatura de *Acevedo Pérez* y de diversos asambleístas de los otros partidos. De su faz es válida y debe adjudicarse a dicho candidato.

Igual ocurre con la *tercera* papeleta. Debe también computarse y acreditársele a *Acevedo Pérez.*

La *cuarta* papeleta proviene del Precinto 1, Unidad 9, Colegio 4. Tiene dos (2) marcas, una bajo la insignia del P.I.P. y otra en el encasillado de la candidatura de *Acevedo Pérez.* Debe adjudicársele a este último.

La *quinta* papeleta se originó en el Precinto 1, Unidad 9, Colegio 40. Fue votada igual que la anterior. Es un voto que corresponde a *Acevedo Pérez.*

La *sexta* papeleta corresponde al Precinto 1, Unidad 17, Colegio 2. Al igual que la dos (2) anteriores, es un voto mixto a favor del P.I.P. y de la candidatura de *Acevedo Pérez.* Debe acreditarse a favor de este candidato.

La *séptima* papeleta es del Precinto 1, Unidad 17, Colegio 2. El elector votó a favor del P.I.P., pero por la candidatura de *Granados Navedo.* Le corresponde este voto.

La *octava* papeleta se originó en el Precinto 1, Unidad 26, Colegio 8. Es un voto íntegro bajo la insignia del P.N.P. y debe adjudicársele a *Granados Navedo.*

La *novena* papeleta corresponde al Precinto 2, Unidad 10, Colegio 4. Fue declarada *nula*, ya que la marca bajo la insignia del P.P.D., en lugar de ser una "X" perfecta, se asemeja a un 4. Sólo bajo un enfoque restrictivo —que rechazamos— podría prevalecer esa determinación. Debe adjudicársele a *Acevedo Pérez.*

La *décima* papeleta de este grupo proviene del Precinto 2, Unidad 21, Colegio 9. Aparece votada bajo la insignia del P.N.P. Además, el elector marcó con "X" los encasillados correspondientes a Granados Navedo y a todos los asambleístas municipales de esa columna. Bajo la columna de nominación directa (*write-in*), en el encasillado Núm. 1, escribió el nombre de *Carlos Romero Barceló.* En estas circunstancias, sólo debió descontarse el voto a favor del asambleísta (1), Ramón "Pitito" Miranda Marzán. Sin embargo, prevalece el voto por *Granados Navedo.*

La *decimoprimera* papeleta se originó en el Precinto 5, Unidad 1, Colegio 1. Está votada sólo en la columna de nominación directa (*write-in*), donde el elector escribió en *todos* los encasillados las siglas P.N.P. La intención es obvia. Debe adjudicársele a *Granados Navedo.*

La *decimosegunda* papeleta —Precinto 5, Unidad 7, Colegio 7— es un voto mixto bajo la insignia del P.I.P. y la candidatura de *Acevedo Pérez.* Debe adjudicársele a éste.

La *decimotercera* papeleta es voto mixto bajo la insignia del P.P.D. y por un (1) asambleísta del P.I.P. Corresponde a Acevedo Pérez.

La *decimocuarta* papeleta corresponde al Precinto 5, Unidad 7, Colegio 7. También es un voto mixto a favor del P.I.P. y de la candidatura de *Granados Navedo.*

Y, finalmente, la *decimoquinta* papeleta es un voto a favor de Granados Navedo y de diversos candidatos asambleístas de los otros partidos. Tiene la peculiaridad de que el elector escribió en la columna de nominación directa (*write-in*), a modo de repetir, todos los nombres de los candidatos

por quienes había votado en las otras columnas, incluso el de Granados Navedo. Rehusamos otra vez anular una papeleta en la que la intención del elector es clara. Debe adjudicársele a *Granados Navedo*.

En resumen, de estas papeletas le corresponden siete (7) votos a Granados Navedo y ocho (8) a Acevedo Pérez.

## XVI

*Papeletas contaminadas no arrestadas*

Según hemos expuesto inicialmente, antes de la certificación de Acevedo Pérez el Comisionado Electoral González Rodríguez (P.N.P.) pidió sin éxito a la Comisión Estatal y a su Presidente, licenciado Rodríguez Estrada, examinar catorce (14) colegios electorales en que había papeletas mezcladas, esto es, *contaminadas no arrestadas*.

En su demanda, Granados Navedo alegó que el recuento reveló que en esos catorce (14) colegios electorales, de dos mil quinientas cincuenta y siete (2,557) papeletas —que le dieron una ventaja de doscientos cincuenta y cuatro (254) votos a Acevedo Pérez— *algunas* correspondientes a un número indeterminado de electores añadidos a mano sin haberse corroborado si tenían derecho a votar, fueron también *mezcladas* con las papeletas de electores cualificados que aparecían en las listas oficiales. Las denominó *papeletas contaminadas*.

Por su parte, el Presidente de la Comisión, licenciado Rodríguez Estrada, caracterizó como *definición clásica* de "*urna contaminada,* donde se *mezclaron los votos* de personas que tenían *derecho a votar*, que aparecían en la lista, *con* los añadidos a mano, *que no se había comprobado su derecho al voto*". (Énfasis suplido.) T.E. Superior, pág. 466.

Antes de que el tribunal de instancia desestimara su acción, Granados Navedo presentó los *exhibits* 1–26 para sostenerla, contentivos cada uno de documentos oficiales como

el informe del Colegio de la noche de las elecciones, el escrutinio general o recuento, las *Actas de Incidencias,* los cuadres y los originales de la *entrada* de datos al computador de las papeletas.

Estos documentos coinciden con el planteamiento original que al efecto hizo a la Comisión Estatal el 3 de diciembre el Comisionado Electoral González Rodríguez (P.N.P.) sobre los llamados votos *contaminados* (Identificación 67, demandante, 173–174), y que posteriormente reformuló el 7 de diciembre. Los colegios identificados (Identificación 70, demandante; T.E. Comisión, pág. 88) fueron los siguientes:

*Precinto 1*: Unidad 10, Colegio 8; Unidad 13, Colegio 5; Unidad 17, Colegio 2, y Unidad 20, Colegio 4.

*Precinto 2*: Unidad 7, Colegio 7; Unidad 13, Colegio 6; Unidad 25, Colegio 10, y Unidad 27, Colegio 4.

*Precinto 3*: Unidad 2, Colegio 6, y Unidad 20, Colegio 8.

*Precinto 4*: Unidad 20.

*Precinto 5*: Unidad 2, Colegio 10; Unidad 15, Colegio 2, y Unidad 31, Colegio 6.

En el juicio Granados Navedo probó, mediante el testimonio de Bauzá Escobales —y con vista a los *exhibits* 1, 2, 14 y 15, demandante, consistentes, según indicados, de las actas y listas del Precinto 1, Unidad 10, Colegio 8, al igual que las correspondientes a la Unidad 13, Colegio 5— que en las *urnas* se *mezclaron* las papeletas correspondientes a electores en las listas con algunas de los que votaron mediante el sistema de añadidos a mano. T.E. Superior, págs. 604 y 621–624; T.E. Supremo, pág. 75. Respecto al *exhibit* 14, demandante, atestó que, tanto de la lista principal suplementaria como la de inclusiones, surgió que aparecían *impresos* los nombres correspondientes a ciento cuarenta y tres (143) electores y que veinticuatro (24) *electores fueron añadidos a mano.* Bauzá Escobales aclaró que "hay una *anotación* de que se enviaron a la Comisión *solamente* 16 sobres de elec-

tores añadidos a mano". (Énfasis suplido.) T.E. Superior, pág. 623.

*La conclusión es obvia.* El número de electores que votaron añadidos a mano fue mayor que los sobres disponibles. Por ende, se mezclaron en las urnas las papeletas de algunos de estos electores con las de aquellos electores que aparecían en las listas.

Finalmente, Bauzá Escobales explicó que de las catorce (14) unidades contaminadas la Junta Especial *sólo* intervino con seis (6). Las demás fueron adjudicadas en el colegio o en el recuento de la Comisión Estatal. T.E. Superior, págs. 630–631.

El examen y la evaluación integral de los *exhibits* 1–26, demandante, nos ha permitido constatar la realidad, existencia y magnitud de las papeletas *contaminadas no arrestadas.* A tal efecto, de los *exhibits* 1 y 14, demandante —Precinto 1, Unidad 10, Colegio 8— surge que votaron ciento doce (112) electores que aparecían en las listas y *veinticuatro (24) electores que fueron añadidos a mano.* Del Acta de Incidencia del colegio surge que dos (2) de los añadidos a mano depositaron sus papeletas *directamente* en las urnas por error. *No* se adjudicaron diecinueve (19) papeletas en el colegio. Sólo una (1) papeleta fue referida a la Comisión Estatal y *ninguna fue enviada a la Mesa Especial.*

Los *exhibits* 2 y 15, demandante —Precinto 1, Unidad 13, Colegio 5— revelan que votaron ciento ochenta (180) electores, incluso los que estaban en las listas preimpresas, y *diecinueve (19) añadidos a mano. Todas las papeletas fueron adjudicadas en el colegio* y depositadas en la urna. *El caso fue referido a la Junta Especial, la cual determinó que las papeletas estaban mezcladas.*

De los *exhibits* 3 y 16, demandante, correspondientes al Precinto 1, Unidad 17, Colegio 2, se desprende que de los electores que figuraban en la Lista Principal votaron ciento sesenta y uno (161). *Los electores añadidos a mano ascen-*

*dieron a diecisiete (17)* y los de la Lista Suplementaria a treinta y cuatro (34). En el cuadre del colegio, durante el recuento, de ese total de doscientas doce (212) papeletas se adjudicaron y contaron *directamente* noventa y nueve (99) del P.N.P., ochenta y siete (87) del P.P.D. y trece (13) del P.I.P. Se anularon dos (2) y una (1) estaba en blanco. *Ninguno de los añadidos a mano fue remitido a la Junta Especial o a la Mesa Especial.*

De los *exhibits* 4 y 17, demandante —Precinto 1, Unidad 20, Colegio 4— aparece que en ese colegio votaron ciento ochenta (180) personas, de las cuales *cuarenta (40) fueron electores añadidos a mano.* Surge una nota de que en el recuento de esos cuarenta (40) electores añadidos a mano "no se encontró las papeletas". Sólo once (11) fueron referidas a la Comisión Estatal. No hay indicios de que se usaran los sobres de los electores añadidos a mano. Aparece que *no* fueron adjudicados en el colegio. *Ninguna fue enviada a la Junta Especial.*

Los *exhibits* 5 y 18, demandante —Precinto 2, Unidad 7, Colegio 7— reflejan que de doscientas quince (215) papeletas, *treinta y cinco (35) correspondían a electores añadidos a mano*, y que desde el colegio sólo se enviaron diez (10) sobres a la Junta Especial o a la Mesa Especial. El Acta de Incidencias del colegio consigna que "se incluyó sobre de votantes sin aparecer en la lista". *No* fueron adjudicados en el colegio.

De los *exhibits* 6 y 19, demandante —Precinto 2; Unidad 13, Colegio 6— se desprende que votaron ochenta y dos (82) electores, de los cuales *cuarenta y dos (42) fueron añadidos a mano. Todos fueron adjudicados* en el colegio *sin* enviar las papeletas a la Junta Especial o a la Comisión Estatal.

Los *exhibits* 7 y 20, demandante —Precinto 2, Unidad 25, Colegio 10— demuestran que se votaron doscientas cuarenta y ocho (248) papeletas. De éstas, una (1) fue dejada en blanco y cinco (5) anuladas en mesa. *Votaron veinte (20) personas*

*añadidas a mano.* El Acta de Incidencia del colegio consigna que se enviaron a la Comisión Estatal los sobres y la lista oficial, que votaron quince (15) electores añadidos a mano y que uno (1) depositó su papeleta en la urna. Se remitieron a la Comisión Estatal y a la Junta Especial quince (15) papeletas no adjudicadas en el colegio.

Según los *exhibits* 8 y 21, demandante —Precinto 2, Unidad 27, Colegio 4— figura que votaron ciento setenta y un (171) electores, entre ellos *veintiocho (28) añadidos a mano.* En la Lista de Inclusiones hay otros veinticuatro (24) añadidos a mano. *Ninguna* papeleta fue referida a la Junta Especial o a la Mesa Especial ni a la Comisión Estatal. *Todas fueron adjudicadas en el colegio.*

Los *exhibits* 9 y 22, demandante —Precinto 3, Unidad 2, Colegio 6— revelan que votaron doscientas ochenta y cuatro (284) papeletas, *entre ellas cuarenta (40) añadidas a mano. No* fueron adjudicadas en el colegio. En la Hoja de Cuadre de la Comisión Estatal se señaló que se enviaron cuarenta y una papeleta (41) a la Mesa Especial. Aparece que un sobre grande con dieciocho (18) papeletas sueltas, proveniente de esa Mesa Especial, se recobró. Se les anotó nombres y apellidos, número electoral y precinto, y así fue devuelto a la Junta Especial. En el colegio un elector depositó *directamente* su papeleta en la urna.

De los *exhibits* 10 y 23 —Precinto 3, Unidad 20, Colegio 8— surge que votaron cincuenta nueve (59) electores cuyos nombres estaban preescritos en las listas, y *treinta y siete (37) añadidos a mano.* El Acta de Incidencia del Colegio de Votación demuestra que *no se retuvieron las tarjetas de identificación electoral de veinticinco (25) electores.* De los treinta y siete (37) electores de la Lista Suplementaria, aparecen diecinueve (19) sobres de electores añadidos a mano y un (1) sobre con doce (12) tarjetas amarillas y con cinco (5) tarjetas de electores; además, cinco (5) papeletas estatales y cinco (5) papeletas municipales sin recusar en el mismo so-

bre abierto. En el colegio no se adjudicaron veinticuatro (24) papeletas que fueron remitidas a la Junta Especial. Aquí Acevedo Pérez obtuvo sesenta y tres (63) votos y Granados Navedo cuarenta y cinco (45) votos.

Los *exhibits* 11 y 24, demandante —Precinto 5, Unidad 2, Colegio 10— reflejan que se votaron ciento setenta y siete (177) papeletas, que incluye un total de *dieciocho (18) electores añadidos a mano*. Uno (1) depositó directamente las papeletas en la urna. En el colegio *no* se adjudicaron los votos añadidos a mano y fueron enviadas a la Junta Especial.

Los *exhibits* 12 y 25, demandantes —Precinto 5, Unidad 31, Colegio 6— demuestran que se votaron doscientas dos (202) papeletas, incluso las que se votaron bajo el sistema de añadidos a mano. En el Acta de Incidencia, se hizo constar como *deficiencia* que aparecieron *cuarenta (40) firmas en la lista de votantes a mano, mientras que el sobre exponía que sólo había nueve (9)*. Se enviaron a la Mesa Especial esos nueve (9) votos que no habían sido adjudicados en el colegio.

Los *exhibits* 13 y 26 —Precinto 5, Unidad 15, Colegio 2— demuestran que votaron ciento veinticuatro (124) papeletas, de las cuales *cinco (5) correspondían a electores añadidos a mano*. Hay una nota de que dos (2) electores votaron sin estar en la lista, pero no firmaron. Además, a *ninguno de los añadidos a mano se les retuvo la tarjeta electoral. Todos estos electores fueron adjudicados en el colegio, pues los sobres estaban vacíos*.

En síntesis, *la evidencia demuestra incontrovertidamente que en estas unidades electorales se contaminaron y mezclaron más de doscientas (200) papeletas de electores añadidos a mano*. Éstas fueron adjudicadas en los colegios el día de las elecciones. No pasaron a la consideración de· la Junta Especial y se desconoce si todos los votantes estaban cualificados. *Debido al trámite seguido en los colegios y en la Comisión Estatal, no hubo ni hay forma al presente de*

*precisar cuáles papeletas pertenecían a los electores idó-
neos y cuáles a personas no cualificadas.*

Concluimos que Granados Navedo *probó su alegación de
que la situación descrita es esencialmente igual a la de las
papeletas contaminadas arrestadas por la Comisión Esta-
tal.* No comprendemos por qué la mayoría del Tribunal se
niega así a reconocerlo. Opinión mayoritaria, pág. 47.

Tanto en el tribunal de instancia como ante este Foro, los
demandados Báez Galib y Acevedo Pérez han sostenido que
las papeletas *contaminadas* se diferencian de las doscientas
siete (207) papeletas *arrestadas* en que éstas *son exclusiva-
mente de electores añadidos a mano.* En contraste con las
arrestadas, argumentan que en las *contaminadas* la propor-
ción numérica de electores autorizados en las listas *impresas*
—cuyas cualificaciones y votos no estarían en entredicho—
es mayor. Por ende, aducen que "la contaminación" fue de
*minimus*, y por tal razón fue correcto que se contaran *todas.*
T.E. Supremo, págs. 103, 113 y 130.

La diferencia, más bien en su origen, no es determinante.
Simplemente unas fueron arrestadas y no contadas por la
Comisión Estatal y otras no. No varía ni elimina el problema
real que existe de *identificar los electores cualificados con
sus papeletas.* Repetimos, *la situación es esencialmente la
misma debido a que se mezclaron las papeletas.* Las pape-
letas *contaminadas*, al igual que las *arrestadas*, es imposible
que se puedan adjudicar fiel y correctamente. T.E. Supremo,
págs. 129–130. Por su número sustancial —más de dos-
cientas (200) papeletas— en una elección tan cerrada no
puede válidamente aceptarse la proposición de *minimus.*

Durante el proceso, y en las mesas de recuento, por una-
nimidad de los representantes de los partidos (incluso el
P.N.P.) estas papeletas fueron adjudicadas y contabilizadas.
*Ese trámite no desmerece el planteamiento.* La situación fue
sometida por el Comisionado Electoral González Rodríguez
(P.N.P.) para la consideración de la Comisión Estatal *el 7 de*

*diciembre.* Identificación 70; T.E. Comisión, pág. 70. Como indicáramos, los Comisionados Electorales no se pusieron de acuerdo, y el Presidente de la Comisión, licenciado Rodríguez Estrada, resolvió otra vez en contra de la petición del Comisionado Electoral González Rodríguez (P.N.P.). Nada impedía posponer por unas horas o días la certificación e investigar la cuestión. Después de todo, no puede argumentarse que la adjudicación en las mesas ponía punto final. Aplicar la regla de unanimidad a ultranza conllevaría mantener una decisión ilegal e incorrecta.

Constituyó un grave error del foro de instancia la desestimación de esta causa de acción. Granados Navedo invocó el principio de uniformidad y con razón —ante la situación descrita— reclamó igual trato: primero, que se anularan las papeletas *contaminadas no arrestadas* al igual que las *contaminadas arrestadas*, y después, como alternativa, que se adjudicaran las *contaminadas arrestadas* al igual que las *contaminadas no arrestadas*. Ese principio de uniformidad y desigual trato lo ha probado ante este Tribunal. *Sin embargo, la mayoría ha optado innecesariamente por no resolver el planteamiento y devolverlo al foro de instancia. ¿Para qué?*

## XVII

*Revocación de sentencia; gravedad de errores*

Los errores cometidos por el tribunal de instancia, hasta aquí discutidos, son graves y sustanciales. Ello ha llevado a la mayoría del Tribunal a revocar la sentencia y devolver el caso a dicho foro para trámites ulteriores. Discrepamos.

Hemos visto que la sentencia final desestimatoria *no le impidió totalmente a Granados Navedo presentar la prueba necesaria para sustanciar sus alegaciones principales.* Así, la evidencia documental y testifical examinada nos ha permitido adjudicar fielmente los aspectos más importantes y de-

terminantes en cuanto a la procedencia y adjudicación de veintisiete (27) electores indebidamente rechazados por la Junta Especial o la Comisión Estatal que le favorecían y varias papeletas más, y un sinnúmero de papeletas con iniciales *que le dan una ventaja mínima de dieciséis (16) votos sobre Acevedo Pérez.* Enfatizamos, no obstante, las cualificaciones de once (11) electores más añadidos a mano, que presumiblemente votaron por Granados Navedo, pero que sin el examen de sus papeletas no hemos podido contabilizar.

Es improcedente la devolución del caso a instancia. Hemos deliberado serenamente sobre ésta y otras alternativas con miras a acelerar su solución. "En general, las contiendas electorales deben ser resueltas con prontitud, pero hay que resolverlas cuidadosamente." *Towner, Gobernador v. Corte de Distrito,* 39 D.P.R. 505, 507 (1929).

Los abogados de las partes han estimado que, una vez devuelto, el litigio continuará por varios meses. T.E. Supremo, págs. 48–49. Aparte de los recursos que puedan suscitarse por decretos interlocutorios, una vez resuelto finalmente en instancia, es predecible que el caso retorne a este Foro apelativo. Después continuarán en el foro federal las tres (3) acciones que allí penden. Íd., pág. 49. Así sumado, el cómputo total de seis (6) meses a un (1) año más de dilación por trámites judiciales es realista y razonable. Íd. A ello debemos añadir los gastos sustanciales que conllevará para las partes y el costo que significará para el erario la intervención de la maquinaria judicial y gubernamental. La comparecencia de testigos que son empleados de gobierno y que actuaron como funcionarios de colegio o en otras capacidades implicará gastos de licencia judicial, dietas y millaje. *Mientras tanto, la opinión mayoritaria innecesariamente mantiene la incertidumbre de quién verdaderamente resultó electo Alcalde de San Juan y, aun así, Acevedo Pérez continuará en el cargo.*

Por experiencia, la "naturaleza de los casos de impugnaciones electorales requieren un gran número de testigos y un análisis pormenorizado de la prueba presentada". Informe C.E.R.P.E., pág. 18. La devolución al tribunal de instancia le impondrá la obligación de dirimir prueba, de desmenuzar y de evaluar integralmente cientos de documentos identificados y sometidos como evidencia. Ya nosotros lo hemos hecho.

Es anticipable que continúen los extensos debates forenses —algunos legítimos y otros estériles— sobre distintas cuestiones planteadas. Ni siquiera bajo el criterio mayoritario ha habido consenso definitivo para pautarlas *a priori*. El enfoque que ha prevalecido ha estado inspirado en unos juicios restrictivos.

Aun si descartamos nuestro análisis de la prueba, una vez resuelva el tribunal de instancia sobre los electores rechazados por la Comisión Estatal o Junta Especial —sea a favor de Acevedo Pérez o de Granados Navedo— ¿será inevitable que nos confrontemos nuevamente con el problema de las papeletas *contaminadas no arrestadas* y las *contaminadas arrestadas*? *Estamos, pues, ante una situación jurídica insuperable —hoy y mañana— que descarta la mera revocación y el mandato clásico de remitir el caso al tribunal de instancia.* Las papeletas *contaminadas no arrestadas* existen. Además, tenemos las papeletas *contaminadas arrestadas*. Se trata de una cuestión *pura de derecho* que constituye un verdadero *nudo gordiano*. Exploremos su dimensión procesal y sustantiva.

## XVIII

*Enmienda a la súplica o remedio*

Según expuesto en su Resolución de 19 de enero, el ilustrado tribunal de instancia denegó la solicitud de Granados Navedo a los efectos de que se adjudicaran y contaran los

doscientos siete (207) votos arrestados. Allí, y ante este Foro, las partes han discutido la cuestión bajo el prisma de que se trataba realmente de una enmienda a la demanda. Específicamente, los recurridos Acevedo Pérez y Báez Galib argumentan que Granados Navedo no puede invocar el llamado "principio de uniformidad" para derrotar la regla de que —una vez venció el término de diez (10) días dispuesto en el Art. 6.014 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3274— estaba impedido de *enmendar las alegaciones de su demanda y añadir una nueva causa de acción*. Aducen que "pudo haber incluido en la demanda que radicó el 19 de diciembre de 1988 una causa de acción fundada en que la Comisión no debió rechazar los llamados 'votos arrestados' y que los mismos debieron validarse y contarse. No lo hizo. No presentó esa causa de acción en su demanda de impugnación. Pudo haber invocado el principio de uniformidad en su demanda. Tampoco lo hizo. Luego de vencido el término para radicar la demanda de impugnación de elección, el recurrente no puede ampararse en el llamado 'principio de uniformidad' para evadir el término de 10 días que fija el referido Art. 6.014 de la Ley Electoral". Alegato de los recurridos, pág. 51.

Honestamente ese razonamiento es equivocado. Está apuntalado en la premisa errónea de que Granados Navedo no recogió esos hechos en su demanda de impugnación y menos invocó en su causa de acción el "principio de uniformidad". Aunque ciertamente sus alegaciones no son un modelo en claridad y exposición, sobre el particular —bajo el Acápite II— alegó lo siguiente:

Cuando se acabaron los sobres para los votos de los electores, sujetos a la determinación de su el[e]gibilidad, se pusieron estos en un s[o]lo sobre donde las papeletas fueron separadas de la evidencia que acompañaba a la misma para determinar la el[e]gibilidad del elector. Como consecuencia de lo anterior 207 papeletas fueron colocadas en seis (6) sobres

aparte de la evidencia que sometiese el elector en defensa de su el[e]gibilidad. *Estas 207 papeletas fueron "arrestadas" y anuladas por la CEE por considerar que habían sido mezcladas de tal forma que no se podía diferenciar entre aquellos electores que tenían derecho a votar de aquellos que no lo tenían.*

En catorce (14) otras unidades donde el número de sobres no fue suficiente para todos los electores a los que se les permitió votar añadidos a mano, sujeto a las restricciones impuestas por el Tribunal Supremo de Puerto Rico, los inspectores de los tres (3) partidos participantes en dichas elecciones (PNP, PPD, PIP), decidieron colocar estas papeletas en la urna utilizada generalmente por los electores que no tenían la obligación de establecer su el[e]gibilidad al voto. En dichas urnas se encuentran 2557 papeletas mezcladas, de aquellos electores regulares que no tenían la obligación de cumplir con el mandato del Tribunal Supremo de Puerto Rico, con aquellas papeletas de electores que por la evidencia que presentaron establecían su el[e]gibilidad al voto.

La condición de los 207 votos "arrestados" y no adjudicados en los sobres es *idéntica* a la condición de los 2557 votos en las urnas adjudicados, *por lo cual ambos grupos de papeletas votadas están igualmente* "contaminadas". Esto es por *un sinnúmero de papeletas de electores cuya el[e]gibilidad para ejercer el derecho al voto no ha sido ni podrá ser nunca establecida en ambas situaciones.*

De este grupo de 2557 votos surge un margen de ventaja a favor del candidato del PPD de 325 votos, según consta de los propios documentos de la CEE. *Ambas situaciones se encuentran en igual estado de "contaminación" y por ello este Honorable Tribunal debe aplicar el mismo criterio de invalidez para ambos grupos de papeletas.* Esta "contaminación" surge por la imposibilidad de identificar el voto emitido por el elector con pleno derecho, del voto emitido por el elector inhabilitado para votar.

Permitir que se cuente el voto de las 2557 papeletas "contaminadas" equivaldría a que electores no cualificados para votar puedan decidir la elección mancillándose la voluntad de los electores con pleno derecho al voto.

La anulación de los 2557 votos equivaldría a que el candidato del PNP José Granados Navedo tenga que ser declarado

como el candidato electo ya que le restaría la cantidad neta de 325 votos [al] candidato del PPD Héctor Luis Acevedo Pérez dándole una ventaja en estos momentos a José Granados Navedo de 296 votos.

Como consecuencia de lo anterior queda establecido el requisito impuesto por el Artículo 6.014 (16 LPRA 3274) de la Ley Electoral al efecto de que los hechos alegados bastarían para cambiar el resultado de la elección.

En la pág. 8, último párrafo de su demanda, consignó:

[A l]os electores [les fue] negad[a] la *igual protección de las leyes, ya que en algunos casos se contó el voto de electores inelegibles, mientras que el voto de electores elegibles fue inv[a]lidado.*

Y en la pág. 9, en su inciso (3) de remedios, *suplicó* al tribunal:

Ordene a la CEE evaluar el reclamo de todos los electores a quienes preliminarmente se les negó su capacidad electoral adjudicando las mismas cumpliendo así con el debido proceso de ley . . . . (Énfasis suplido y escolios omitidos.) Caso Núm. CE-89-30, *Exhibit* I, págs. 17–18, 21 y 22.

Las alegaciones transcritas sin duda alguna reflejan que en su demanda de impugnación Granados Navedo *afirmativamente* trajo a colación ante el foro judicial la situación creada por los doscientos siete (207) votos "arrestados" y anulados por el Presidente de la Comisión. Ello no se discute. *Lo único que no hizo fue pedir, expresa y directamente como remedio, que fueran validadas.* También incluyó alegaciones relativas a las dos mil quinientas cincuenta y siete (2,557) papeletas *contaminadas no arrestadas.* Específicamente adujo que ambos grupos estaban en *idéntica* situación y que el tribunal "deb[ía] aplicar el *mismo* criterio de *invalidez* para ambos grupos de papeletas". (Énfasis suplido.) Caso Núm. CE-89-30, *Exhibit* I, pág. 18.

Se advierte, pues, que el reclamo caracterizado por las partes y por el tribunal de instancia como una enmienda a las

alegaciones de su demanda no es correcto. Desde sus inicios la materia referente a los doscientos siete (207) votos arrestados fue objeto de alegaciones específicas y de la correspondiente discusión. Tan es así que en sus respectivas contestaciones *todos* los demandados —Báez Galib, Acevedo Pérez, el Presidente de la Comisión, Rodríguez Estrada, y los Comisionados Electorales González Rodríguez y Meléndez Rivera— *aceptaron* las alegaciones expositivas de que en algunos colegios las papeletas de electores añadidos a mano se mezclaron, lo que imposibilitaba determinar cuáles de esas correspondían a electores cualificados. Igualmente, Granados Navedo invocó el llamado *principio de uniformidad*, esto es, la aplicación de una misma regla para situaciones básicamente iguales.

*No hubo, pues, sorpresa alguna al respecto.* En ocasión de la vista judicial en instancia, los abogados se refirieron a las alegaciones de los doscientos siete (207) votos arrestados en distintos momentos. Desde sus comienzos, durante el proceso de identificación de documentos y paquetes, el Lcdo. Luis Sánchez Betances —uno de los abogados de Acevedo Pérez— las caracterizó como "*causa de acción, vamos a llamarla as[í], de los arrestados es una cuestión puramente de derecho si esos votos se deben contar o no se deben contar.* Si el Juez determina finalmente que esos votos se van a contar, pues entonces se abre el maletín y se cuenta, mientras tanto basta saber que el material de Canales y los votos arrestados están ahí". (Énfasis suplido.) T.E. Superior, pág. 78. De igual modo, se produjo en evidencia la resolución del Presidente de la Comisión de que esos votos no podían contarse (*Exhibit* 38, ambas partes) y, en múltiples ocasiones, las partes se refirieron directamente a los mismos. T.E. Superior, págs. 72–80 y 126–130.

Por todos es conocido que una enmienda sustancial a una demanda necesariamente implica que lo que se pretende traer son nuevos hechos o materia distinta y extraña antes

no alegada. En rigor científico-procesal, a estos nuevos hechos o materia extraña se le conoce como una nueva causa de acción o razón de pedir. *Miranda v. Sucn. López*, 58 D.P.R. 234 (1941); *González Reyes v. González*, 43 D.P.R. 826 (1932). "[L]os *hechos alegados* y la prueba presentada, y no el título o la súplica de la demanda, *constituyen la base determinante de la existencia de una causa de acción* . . . ." (Énfasis suplido.) *Corrada v. Asamblea Municipal*, 79 D.P.R. 365, 370 (1956).

En el caso de autos, la solicitud de Granados Navedo de que se le permitiera enmendar *su pedido* a los fines de que el tribunal declarara con lugar su impugnación por razón de no haberse anulado, esto es, no contados los doscientos siete (207) votos arrestados, no configura una situación de enmienda a la demanda. La misma discusión de los abogados en instancia confirma esta apreciación. El licenciado Rey expresó que las papeletas arrestadas no estaban en controversia, pues "lo que se ha *solicitado* en la demanda de impugnación no es que se cuenten . . .". (Énfasis suplido.) T.E. Superior, pág. 797. El licenciado Rivé argumentó que "en ningún lugar de la demanda se ha *pedido* hasta el día de hoy tal *remedio*. Lo único que se está *pidiendo* . . . en ningún lugar de la demanda se ha *solicitado* tal *remedio*". (Énfasis suplido.) Íd., pág. 798. El licenciado Herrero expuso que ese *remedio* lo había solicitado el Comisionado Electoral del P.N.P., González Rodríguez. Y, finalmente, el licenciado González, a preguntas del tribunal, contestó que se considerara como una enmienda a sus alegaciones, "[s]i así *fuere necesario*". (Énfasis suplido.) T.E. Superior, pág. 801.

Este trasfondo define la cuestión. En su justa dimensión presenta una *variante a la súplica o pedido* en cuanto al remedio, con apoyo en la Regla 70 de Procedimiento Civil, 32

L.P.R.A. Ap. III,[10] y en virtud de la insoslayable obligación de todo tribunal de dictar sentencia en atención al "principio de *hacer justicia* a la luz de los hechos de cada caso y el derecho aplicable, *aun cuando la teoría jurídica que se haya escogido esté equivocada*". (Énfasis suplido.) *Sánchez v. Eastern Air Lines, Inc.*, 114 D.P.R. 691, 695 (1983). Este principio elemental, aplicable también a este Foro apelativo, rechaza como arcaica la teoría de que una parte no puede, en instancia o en apelación, variar su teoría del caso. Íd.

Esta conclusión se impone, con mayor razón, en casos electorales —de interés público— en los que está en juego el prestigio, la seriedad y la confiabilidad de nuestro proceso democrático. "[C]uando de hacer justicia se trata, especialmente en áreas de *gran interés público*, no hay moldes técnicos que limiten o aprisionen los *remedios justos*." (Énfasis suplido.) *Negrón Rivera y Bonilla, Ex parte*, 120 D.P.R. 61, 73 (1987).

*Pérez et al. v. López, Juez de Distrito*, 18 D.P.R. 651, 655 (1912), citado por Acevedo Pérez y Báez Galib, no es precedente aplicable. *Allí se trataba de una demanda totalmente defectuosa desde sus inicios.* Ante esa situación resolvimos que no podía ser enmendada después de expirado el término de ley. *El caso de autos es distinto.* La demanda de impugnación de Granados Navedo fue presentada a tiempo y no tiene ese defecto fatal.

En buena juridicidad, el planteamiento no versa sobre una enmienda a las alegaciones, sino en cuanto al *remedio*. No podemos adoptar una interpretación restrictiva que derrote el ejercicio del sufragio.

*Como el tribunal de instancia y este Foro se han negado a dilucidar los méritos de ese pedido —de impacto para la*

---

[10] Esta Regla 70 de Procedimiento Civil, 32 L.P.R.A. Ap. III, incorpora la casuística citada. Dispone: "Cualquier defecto en la denominación del pleito o en la súplica del remedio, no será óbice para que el tribunal conceda el remedio que proceda de acuerdo con las alegaciones y la prueba."

*madurez constitucional de nuestro sistema democrático—
sin ambivalencias pasamos a considerarlo. Veamos su tras-
fondo.*

## XIX

*Papeletas contaminadas arrestadas; resolución del Presi-
dente de la Comisión Estatal de no contarlas*

Para comprender el verdadero alcance de la resolución
del Presidente de la Comisión, licenciado Rodríguez Estrada
—sobre estos votos emitidos por los electores añadidos a
mano conocidos como *arrestados*— vayamos en retrospec-
ción al 1ro de octubre de 1988.

En esa fecha, el P.N.P. y el P.I.P. —representados res-
pectivamente por sus Comisionados Electorales, González
Rodríguez y Meléndez Rivera— propusieron una enmienda
al Reglamento de Votación y Escrutinio. La misma iba diri-
gida a que los *electores cualificados* que el día de las elec-
ciones generales de 8 de noviembre de 1988 reclamaran su
derecho al voto *y no aparecieran en las listas electorales*
pudieran hacerlo, mediante la inserción a mano de su nom-
bre en las listas electorales correspondientes, por los funcio-
narios de los partidos políticos en los colegios de votación.

Desde su inicio, dicha enmienda fue tenazmente comba-
tida por el Comisionado Electoral del P.P.D., licenciado Báez
Galib, quien ante el seno de la Comisión Estatal y subsi-
guientemente en este Foro adujo que la enmienda era inne-
cesaria, pues se había realizado una campaña de orientación
masiva; que se había establecido un procedimiento especial
hasta el 4 de noviembre para subsanar tales omisiones; que
la experiencia en las elecciones pasadas reflejaba que sólo un
número reducido de electores quedaron excluidos, y que po-
dría prestarse al fraude. El Presidente de la Comisión, licen-
ciado Rodríguez Estrada —en actuación *ultra vires*— sus-
cribió esa posición y se negó a poner en vigor la enmienda en
la Resolución de 7 de octubre de 1988.

En apelación, el 20 de octubre de 1988 acogimos los reclamos del P.N.P. y del P.I.P., y sostuvimos la validez de la enmienda. En síntesis, este Tribunal —por voz del Juez Presidente Señor Pons Núñez— resolvió que esos votos serían *recusados* y rechazamos "los argumentos afincados en supuestas barreras u obstáculos de carácter técnico-burocrático . . .". *P.N.P. y P.I.P. v. Rodríguez Estrada*, supra, pág. 503. A renglón seguido, dijo:

La responsabilidad primaria de garantizar a los electores que se ha de *"contar cada voto en la forma y manera en que sea emitido"* recae sobre la C.E.E. Art. 1.002 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3002. *El trámite administrativo no debe ser obstáculo o barrera que impida a un elector el libre ejercicio del sufragio.* Corresponde a los organismos del Estado *hacer lo más viable posible el ejercicio del sufragio,* fundamento esencial de la democracia, y *no puede ni debe éste rehuir esa responsabilidad mediante el traslado de parte de la misma al elector.* Si se pueden proveer los mecanismos para que aun los electores que no actúen con diligencia puedan votar, *existe el deber de proveerlos,* siempre y cuando la C.E.E. provea las garantías necesarias para evitar que se conculque la integridad del proceso electoral. Mediante el mecanismo adoptado, a nuestro juicio, se cumple a cabalidad con esa obligación y se proveen las garantías necesarias para mantener la integridad del proceso electoral.

Las especulaciones sobre posibles problemas de trámite técnico-burocrático no pueden ser razón para no allanar al máximo el camino para que todos los ciudadanos, que puedan hacerlo, voten. Si se han previsto ya los posibles problemas de esa naturaleza, *la responsabilidad que pesa sobre la C.E.E. requiere que ésta tome las medidas necesarias para solucionarlos. Esa es su misión y su función.* (Énfasis suplido.) *P.N.P. y P.I.P. v. Rodríguez Estrada*, supra, págs. 503–504.

*Ese mandato claro y justiciero de superar los escollos administrativos no fue cumplido a cabalidad.*

De acuerdo con la resolución del Presidente de la Comisión, licenciado Rodríguez Estrada, en "los Precintos 1, 2 y 3

del Municipio de San Juan hubo respectivamente 27, 46 y 17 casos de electores correspondientes a varias unidades electorales o centros de votación de dichos precintos que los funcionarios de colegio, a pesar de que incluyeron los nombres, así como, las circunstancias personales y electorales de los mismos en un listado especial, depositaron las papeletas votadas por esos electores en un sobre o grupos de sobres sin la identificación correspondiente. Como consecuencia de lo anterior, una vez, se determine si los electores en cuestión están o no cualificados para votar, es imposible determinar qué papeleta votada pertenece a qué elector.

Las papeletas, a que hemos hecho referencia no están mezcladas con las papeletas regulares de los electores cualificados que aparecían en las listas electorales y que votaron en los colegios donde ocurrió la situación ante nuestra consideración. Se desconoce el contenido de las papeletas en controversia, ya que las mismas no han sido escrutadas". Caso Núm. CE-89-30, *Exhibit* VII, págs. 132–133.

Aparte de estas papeletas, según la identificación 61, demandante —transcripción de la reunión de la Comisión Estatal de 30 de noviembre— en el Residencial Nemesio Canales hubo tardanza en la entrega del material, discrepancias entre los funcionarios del P.P.D. y P.N.P., y serias irregularidades.

Esa transcripción demuestra —según determinó el Presidente de la Comisión Rodríguez Estrada en la aludida resolución— que:

. . . por iniciativa de los coordinadores se abrió un colegio adicional "Colegio 8" y se autorizó a votar mediante el sistema de "añadidos a mano" a ciento diez y siete (117) electores. *En este caso, no se cumplió con ninguno de los requisitos establecidos en el procedimiento autorizado, excepto que se verificó que el elector tenía la Tarjeta de Identificación Electoral y que no aparecía en las listas de exclu[i]dos.*

[En este Colegio 8 l]as papeletas votadas se depositaron en una urna y se hizo un escrutinio y adjudicación cuyo resultado

arrojó una ventaja de aproximadamente diez y siete (17) votos para el candidato a José Granados Navedo.

Los nombres y circunstancias de los electores fueron inclu[i]dos en una lista especial. Los coordinadores que administraron este colegio adicional fundamentaron, su actuación en que no tenían los materiales correspondientes para cumplir con el procedimiento establecido.

Como consecuencia de lo anterior, *resulta imposible identificar el voto emitido por el elector con pleno derecho del elector inhabilitado para votar.* (Énfasis suplido.) Caso Núm. CE-89-30, *Exhibit* VII, pág. 133.

En resumen, debido a la falta de materiales (sobres) los funcionarios de varios colegios en los Precintos 1, 2 y 3 no identificaron las papeletas votadas por noventa (90) electores añadidos a mano. En el Precinto 4 (Residencial Nemesio Canales) se abrió un colegio adicional y votaron ciento diecisiete (117) electores que tenían tarjeta electoral. Los funcionarios electorales no siguieron fielmente todo el procedimiento. *El escrutinio y adjudicación arrojó una ventaja de diecisiete (17) votos a favor de Granados Navedo.*

Según antes explicado, estas papeletas fueron denominadas *arrestadas*, pues desde los inicios del recuento la Comisión Estatal instruyó a las mesas de recuento y a la Junta Especial para que se abstuvieran de adjudicar los sobres en que estuvieran mezcladas las papeletas sin identificación de los electores añadidos a mano. Estos sobres serían entregados a la Comisión Estatal, la cual posteriormente, de ser necesario, resolvería si debían contarse las papeletas allí contenidas.

La transcripción de las deliberaciones en la Comisión Estatal (Identificación 66, demandante) es muy orientadora de la dinámica que prevaleció y de las posturas que asumieron los distintos Comisionados Electorales. Revela que desde el 21 de noviembre algunos mostraron seria preocupación en torno a la deseabilidad y necesidad de adoptar a priori un acuerdo y norma de si se iban o no a contar las papeletas

*arrestadas.* T.E. Comisión, págs. 268–284. A esa fecha, con relación a veintiséis (26) papeletas, todos hicieron constar *que nadie sabía cómo habían votado esos electores.* Íd., pág. 272.

Por esa misma razón, el Comisionado Electoral del P.I.P., Meléndez Rivera, señaló que para fines de aplicar una norma uniforme en todos los ciento cuatro (104) precintos debía decidirse en *ese momento.* Proféticamente, sostuvo que había "que contarlas todas . . . y [que] deber[í]a tomarse esa decisión *ahora* . . . [dentro] de las próximas 24 horas, o algo así, para que después que salga el tiro por donde salga . . . [.] Me explico. San Juan resultó —voy a hablar ahora en concreto— con una diferencia de 20 votos para entonces decidir si aplicamos o no los 20 votos de los 19 válidos . . . [.] *Porque esa determinación puede tomarse antes.* Mira, hay 26 papeletas, las dejamos para lo último, *desgraciadamente esas 26 papeletas van a ser decisivas, vamos a contarlas, salga el tiro por donde salga. Son ciegas, no las hemos visto, no sabemos de dónde son y que gane el que más votos tenga".* (Énfasis suplido.) T.E. Comisión, págs. 273–274. El Comisionado Electoral del P.N.P., González Rodríguez, coincidió con ese criterio y expuso su inquietud de que su postergación permitiría *identificar por nombres y apellidos a los electores con derecho a votar.* Íd., págs. 274–275 y 277–278. El Comisionado Electoral del P.P.D., Báez Galib, consignó su posición de que *no era menester por el momento actuar, pues existía la posibilidad de que la diferencia en los otros votos evitara tal dictamen.* Íd., págs. 268–284. Afirmó: "Yo tentativamente mantendría eso como en el Supremo, ¿para qué tú vas a adjudicar *una cuestión constitucional?"* Íd., pág. 270. Y más adelante explicó: "Yo creo que estamos entrando en un 'issue' innecesario. Si le validamos a los exclu[i]dos y a los que no tienen derecho, *invalidamos implícitamente algunos de los que tienen derecho"* (Énfasis suplido.) Íd., pág. 271.

Finalmente, estuvieron de acuerdo en dejar así el asunto (en suspenso) para otra ocasión con la esperanza de que el margen de diferencia final fuera tan amplio que tornara académica esa decisión. No fue así.

Para el 7 de diciembre, en horas de la tarde, Acevedo Pérez aventajaba a Granados Navedo por sólo veintinueve (29) votos. No habían concluido las investigaciones realizadas por la Junta Especial en cuanto al estado e idoneidad de *todos* los electores relacionados con esas papeletas *arrestadas*. Identificación 70, demandante; T.E. Comisión, págs. 62–71.

La Comisión Estatal, entonces, tuvo que confrontarse con lo imposponible. Y como se podía anticipar, se dividieron los Comisionados Electorales en cuanto a si los votos eran o no adjudicables. Ante esta situación intervino el Presidente de la Comisión. Hizo suyo el planteamiento del Comisionado Electoral Báez Galib (P.P.D.) y determinó que no se contaran. En su resolución, el licenciado Rodríguez Estrada concluyó:

> El permitir que se cuente el voto de los electores en controversia equivaldría a que electores *no cualificados* para votar *puedan decidir una elección vulnerándose la voluntad de los electores cualificados para votar.*
>
> El procedimiento establecido va dirigido a garantizar la seguridad, integridad y secretividad del voto por lo que es de estricto cumplimiento.
>
> De adjudicarse los votos de las papeletas en controversia *le restarían ser[i]amente credibilidad y certeza [al] resultado electoral contraviniendo* a lo expresado en la Constitución del Estado Libre Asociado y a la declaración de propósitos de la Ley Electoral.
>
> La Ley Núm. 4 del 20 de diciembre de 1977 enmendada conocida como la Ley Electoral de Puerto Rico no provee mecanismo alguno sobre la situación en controversia, *ni podría contemplarse el que se permitiera a estos electores emitir su voto nuevamente, ya que se estaría actuando en contrave[n]ción a la Ley Electoral[,]* supra.

Por todo lo antes mencionado se anulan los votos emitidos por los electores añadidos a mano conocidos como "arrestados". (Énfasis suplido.) Caso Núm. CE-89-30, *Exhibit* VII, págs. 135–136.

Las estadísticas disponibles de la Junta Especial —sometidas a la Comisión Estatal al otro día de la certificación— reflejan que de estos electores noventa y siete (97) no tenían derecho a votar por estar *inactivos, excluidos* o *no tener récord,* y que *ciento cincuenta y tres (153) eran electores activos,* esto es, *con derecho a votar. Como anomalía adicional, aparecieron doscientas una (201) papeletas. Exhibit* 42, demandados.

Su *desglose* revela que ese descuadre se debió a que en el Precinto 2, Unidad 29, aunque surge que votaron ciento trece (113) personas, aparecieron sólo veintiuna (21) papeletas y la Junta Especial confirmó setenta y ocho (78) electores *activos,* esto es, con derecho a votar. Contabilizadas estas papeletas a base de nuestro examen, Granados Navedo obtuvo once (11) y Acevedo Pérez diez (10). Y en el Precinto 4, Unidad 3, Colegio 8 (Residencial Nemesio Canales), aparecieron ciento diecisiete (117) papeletas, pero la Junta Especial únicamente localizó cincuenta y ocho (58) récord para verificar el derecho al voto de estos electores añadidos a mano. La investigación arrojó que sólo veintiún (21) electores tenían derecho a votar. Sobre esta última Unidad 3, Bauzá Escobales atestó en el tribunal de instancia que se les había informado que "aparentemente había un listado que no se nos proveyó [a la Junta Especial] en el momento de levantar esta estadística. Como la Comisión solamente nos ordenó el que levantáramos la estadística con lo que teníamos a mano, no acudimos a otras fuentes para buscar sobre el otro listado que sin duda no estaba aquí en el momento que hicimos la investigación". T.E. Superior, pág. 575. La Junta Especial sólo intervenía con los sobres que le enviaban, no

con todo el maletín del colegio y los documentos que contuviera. Íd., pág. 576.

*Como resultado de la resolución del Presidente de la Comisión, licenciado Rodríguez Estrada, no se contaron ni adjudicaron esos votos por falta de materiales, errores cometidos y actuaciones —bien o mal intencionadas— de algunos de los funcionarios electorales.*

En cuanto a las restantes unidades, del análisis surge una equivalencia normal y proporcional entre el número de papeletas y los récord de electores en los listados. Veamos.

Del Precinto 1, Unidad 26, se recibieron en la Comisión Estatal veintisiete (27) papeletas y se corroboró la existencia de veintiséis (26) récord de electores. Uno no pudo localizarse. *No existe controversia en cuanto a la idoneidad de diecinueve (19) electores activos.* En las papeletas mezcladas Granados Navedo obtuvo catorce (14) votos y Acevedo Pérez trece (13) votos.

En el Precinto 2, Unidad 6, votaron treinta (30) personas, se recibieron veinticinco (25) papeletas y se localizaron *todos* los récord. *Tampoco existe controversia sobre la idoneidad de veinticinco (25) electores.* Aquí, según las papeletas, Granados Navedo logró dieciséis (16) votos y Acevedo Pérez nueve (9) votos. Identificación 37, demandante.

En el Precinto 3, Unidad 33, se recibieron quince (15) papeletas, votó igual número de personas, se verificaron esos récord y *se comprobó que sólo cinco (5) electores estaban activos.* Granados Navedo logró diez (10) votos y Acevedo Pérez cinco (5) votos.

Y, finalmente, en el mismo Precinto 3, Unidad 20, aparecieron tres (3) papeletas, votaron ocho (8) personas, la Comisión Estatal localizó igual número de récord y *verificó que cinco (5) electores eran activos e idóneos.* Las papeletas reflejan que Granados Navedo obtuvo dos (2) votos y Acevedo Pérez ninguno (0).

En resumen, *excluyendo* los dos (2) colegios en que existe una desproporción entre papeletas, electores y récord —Precinto 2, Unidad 29, y Precinto 4, Unidad 3, Colegio 8 (Residencial Nemesio Canales), en los cuales la mayoría del Tribunal, por vía de escolio, sugiere un posible fraude (opinión mayoritaria, pág. 51 esc. 19)— la prueba demuestra *claramente* que en las restantes unidades votaron cincuenta y cuatro (54) electores *activos* (veintiuno (21) de ellos no cualificados) y se recibieron setenta (70) papeletas que fueron mezcladas en las urnas por falta de sobres. En estos cuatro (4) colegios la suma total refleja que Granados Navedo obtuvo cuarenta y dos (42) votos y Acevedo Pérez sólo veintisiete (27) votos; esto es, Granados Navedo prevaleció por quince (15) votos. *¿Por qué razón entonces la mayoría del Tribunal ordena que todo el asunto vuelva al foro de instancia y no lo resuelve? Opinión mayoritaria, pág. 49. Repetimos, en estos Colegios no existe el más mínimo indicio de posible fraude.*

Ante esta realidad es difícil aceptar el razonamiento del Presidente de la Comisión, licenciado Rodríguez Estrada. Y es que "los problemas jurídicos no se *viven* con la misma intensidad, ni con la misma *fuerza*, por un juez que por un jefe de negociado, y por la *sensibilidad jurídica* no alcanza el mismo *clímax* en los estrados de un tribunal que en una oficina administrativa". (Énfasis en el original.) A.M. del Burgo y Marchán, *La situación del magistrado ponente, disidente del criterio de la mayoría, en cuanto a la redacción de la sentencia*, 1979 (Núm. 1) Rev. Der. Proc. Ibero. 59 (1979).

En una elección tan *cerrada*, su decisión automáticamente le dio el triunfo a Acevedo Pérez y descualificó a cincuenta y cuatro (54) electores idóneos por acciones y omisiones de los funcionarios del colegio atribuibles a la Comisión Estatal. ¿No vulneró así la voluntad mayoritaria? Su dictamen, ¿no le restó más "credibilidad y certeza [al] resul-

tado electoral . . ."? Caso Núm. CE-89-30, *Exhibit* VII, pág. 136. Ciertamente, lo menos que podemos reconocer es que esa decisión tiene una *connotación de castigo* y es incompatible con nuestro enérgico mandato judicial en *P.N.P. y P.I.P. v. Rodríguez Estrada*, supra, en que rehusamos cerrarle las urnas a esos electores por excusas atribuibles a las fallas humanas o técnicas de la maquinaria electoral.

A tal efecto, al suscribir la decisión del Tribunal, en nuestra *concurrencia* expusimos:

"El propósito de las elecciones es obtener la expresión de la voluntad de los votantes que constituyen el cuerpo electoral de un país." *La Nueva Constitución de Puerto Rico*, Río Piedras, Ed. U.P.R., 1954, pág. 307. En el pasado, al imprimirle contenido a las variadas dimensiones de este postulado, hemos señalado que "contra la observancia de los preceptos constitucionales no pueden oponerse *escollos salvables* de tipo económico o *burocráticos*. Es menester mover los resortes de la maquinaria electoral en la consecución de tal fin. *P.S.P.* v. *Tribunal Electoral*, 104 D.P.R. 230 (1975). En la constelación de derechos fundamentales, el sufragio electoral goza de preeminencia sobre inconvenientes administrativos o económicos superables". (Énfasis suplido y en el original.) *Ortiz Angleró v. Barreto Pérez*, 110 D.P.R. 84, 112–113 (1980).

Hoy nuevamente revitalizamos ese derecho. La premisa que nos anima es sencilla: no es permisible corrernos el riesgo de que se vulnere un solo voto, máxime si existe la posibilidad real de que a priori ocurra. Después de todo, ese elector —rico o pobre, instruido o no— es el protagonista central del conglomerado sociopolítico de toda elección. La salvaguarda de su ejercicio no puede justificarse por consideraciones teóricas, técnicas o administrativas, aunque sean de la mejor buena fe. Ese elector, al presente innominado, es acreedor a esa garantía y el Estado tiene la ineludible responsabilidad de hacerla viable una vez ha demostrado afirmativamente su disposición a ejercer su voto. Si de lo concreto vamos a lo abstracto, el potencial numérico alegado por los apelantes P.N.P. y P.I.P., de que son miles los electores excluidos erróneamente de las listas, simplemente abona a esta conclusión. En

su verdadero sustrato, la justicia o injusticia del sistema pree-
lectoral, no se mide exclusivamente en términos cuantitativos.
*Es después de emitidos que se cuentan los votos. Ello no es
posible si se clausuran las urnas indebidamente y a des-
tiempo.*

.    .    .    .    . .    .    .    .

La legalidad, razonabilidad y necesidad de la enmienda re-
glamentaria adoptada queda demostrada al confrontar ciertos
principios elementales vislumbrados en la Ley Electoral de
Puerto Rico con referencia al derecho al voto y su ejercicio.
Veamos.

*Primero.* Por definición, un elector cualificado sencilla-
mente es una persona que *ha cumplido con los requisitos de
inscripción* y de *tarjeta electoral.* Art. 1.003(17) de la Ley
Electoral de Puerto Rico, 16 L.P.R.A. sec. 3003(17). *La ley no
le exige más.* Una vez formula a tiempo su petición de inscrip-
ción, de reubicación o de transferencia, corresponde a la
C.E.E., mediante su aparato burocrático, darle cabida y acre-
ditar esa condición. Desde el momento en que dicho ciudadano
cumple con los trámites previos y demás requisitos de ley, es
un elector capacitado para acudir a las urnas y depositar su
voto. Su omisión en el Registro Electoral o en la lista, produ-
cida por errores humanos, técnicos o atribuibles a las limita-
ciones de acceso o incapacidad de actualización del sistema
operado por la C.E.E., no es motivo válido para negarle ese
derecho.

*Segundo.* Estamos ante un derecho *fundamental,* el cual
nuestra Constitución ordena expresamente garantizar su
ejercicio. Art. II, Sec. 2, Const. E.L.A., L.P.R.A., Tomo 1. Es
claro, pues, que la omisión en la lista electoral *no puede cons-
titucionalmente ser fundamento para dicha negativa.* Las
listas electorales debidamente depuradas son meramente un
instrumento fehaciente más —útil y principal— para canali-
zar y hacer viable administrativamente el desarrollo del com-
plicado proceso eleccionario en todo el país. Por imperativo de
la magnitud y complejidades del evento, son imprescindibles.

Así entendido, carece de fuerza persuasiva la posición del
Presidente de la C.E.E. de que la Ley Electoral de Puerto
Rico no dispone la inclusión manual de electores que no apa-
rezcan en las listas. Asumió esa postura a base del lenguaje

del Art. 5.026 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3229, preceptivo de que antes de emitir el elector su voto *se localizará en la lista del colegio su nombre y,* en tres (3) minutos, se confrontarán los datos con la tarjeta electoral. De ahí infiere que si el elector no está en la lista no puede votar.

La interpretación es irrazonablemente incompleta. Eleva a categoría sacramental un *medio* documental. Convierte las listas en *sinónimo* de inscripción y cualificación electoral. El enfoque es erróneo. No hay equivalencia conceptual ni valorativa en qué sostener ese restrictivo razonamiento. Pasa por alto la verdadera disposición aplicable, a saber, el Art. 5.003 de la Ley Electoral de Puerto Rico que, sin ambages, prescribe que "[t]endrán derecho a votar en la elección general *los electores debidamente calificados* como tal[es], que a la fecha de la elección figuren en el Registro General de Electores". (Énfasis suplido.) 16 L.P.R.A. sec. 3203. *Ello impone el deber a la C.E.E. de mantener un registro al día y completo.*

*Tercero.* La Asamblea Legislativa —conocedora de esta situación y práctica— nunca la ha prohibido expresamente. Ni en el pasado ni al presente —por razones constitucionales obvias— ha autorizado *descualificación* al sufragio por errores u omisiones en el Registro Electoral, en las listas electorales u otros asientos análogos.

No existe en la Ley Electoral de Puerto Rico disposición alguna de la cual directa o indirectamente pueda avalarse la interpretación negativa del Presidente de la C.E.E. Por el contrario, al disponer el legislador que "[t]odas las listas de electores *con derecho a votar* en una elección se prepararán tomando como base tal Registro [Electoral]" —(énfasis suplido) Art. 2.012 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3062— partió del supuesto, allí previsto, de que toda la información sería procesada a tiempo y correctamente, esto es, que sus datos "se mantendr[ía]n, *en todo momento,* actualizados en cuanto a circunstancias modificatorias de cualquier inscripción". (Énfasis suplido.) Íd. No podemos, pues, atribuirle a la Asamblea Legislativa tal *brutum fulmen,* en particular en un área en que aspiraba al perfeccionamiento y mejoramiento institucional y, sin vacilaciones, rechazó toda tentativa erigida en el conformismo o en la mediocridad.

Repetimos, las listas electorales simplemente son un instrumento documental necesario, para que el Estado canalice or-

denadamente todo el proceso comicial. Pero en sí, no son un fin; menos, razón para excluir —pocos o muchos— electores cualificados que diligentemente cumplieron con la obligación de inscribirse o de solicitar un cambio.

*Cuarto.* El único mandato que claramente estableció la Asamblea Legislativa fue garantizar el derecho al voto. Así, en el Art. 2.006 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3056, prohibió terminantemente, "mediante regla, reglamento, orden, *resolución, interpretación* o *en cualquier otra forma,* rechazar, cancelar, invalidar o anular *el registro o inscripción legal de un elector o privar a uno debidamente calificado de su derecho al voto*". (Énfasis suplido.)

*Quinto.* No puede sostenerse la negativa a la enmienda en la campaña publicitaria que encomiablemente ha efectuado la C.E.E., en el argumento de que ello genera un deber de los electores de asegurarse que estén incluidos en las listas electorales. (Énfasis suplido y en el original.) *P.N.P. y P.I.P. v. Rodríguez Estrada,* supra, págs. 516–523.

## XX

*Inaplicabilidad al caso de la doctrina federal de irregularidades ordinarias ("garden variety")*

La perfección es atributo del Sumo Hacedor. Definitivamente el proceso eleccionario que involucra a miles de funcionarios y un potencial de más de dos (2) millones de ciudadanos, per se, es tarea difícil y compleja. Como tal, no está exento de problemas, defectos, fallas e irregularidades comunes. A esta realidad cierta jurisprudencia federal se ha referido como "irregularidades ordinarias" (*garden variety*).

Descartado el espectro de fraude —el cual *no* se presume— los defectos e irregularidades inherentes del evento comicial que no alcanzan categoría de errores que permean todo el sistema (*pervasive errors*) impiden que los electores puedan ejercitar una acción por la violación de sus derechos civiles. *Thompson v. Woodall,* 819 F.2d 1052 (11mo Cir. 1987); *Curry v. Baker,* 802 F.2d 1302 (11mo Cir. 1986); *Bodine v. Elkhart County Elec. Bd.,* 788 F.2d 1270 (7mo Cir.

1986); *Griffin v. Burns*, 570 F.2d 1065 (1er Cir. 1978); Anotación, *Actionability, Under 42 U.S.C.S. Sec. 1983, of Claim Arising out of Maladministration of Election*, 66 A.L.R. Fed. 750 (1984).

No obstante la sabiduría y pragmatismo judicial de ese enfoque federal, éste no puede ser aplicado al caso de autos. En primer lugar, su génesis responde a circunstancias muy particulares de la jurisdicción federal. Su propósito es evitar que los tribunales federales intervengan innecesariamente en los procesos inherentemente estatales. Esa abstención prudencial está apuntalada en el principio constitucionalmente reconocido de que los estados son primariamente responsables de sus propios eventos comiciales. *Hutchinson v. Miller*, 797 F.2d 1279 (4to Cir. 1986); *Thompson v. Woodall*, supra. Segundo, en Puerto Rico, a diferencia de la jurisdicción federal, irregularidades comunes u ordinarias (*garden variety*) en el proceso electoral —dependiendo de su proporción y extensión— pueden entrañar una violación constitucional. Aquí el derecho al voto opera *ex propio vigore* y tiene una especial protección constitucional. Su preeminencia es tal que es el único derecho que contiene un mandato tajante y directo de la Asamblea Constituyente, preceptivo de que las "*leyes garantizarán* la expresión de la voluntad del pueblo mediante el sufragio universal . . .". (Énfasis suplido.) Art. II, Sec. 2 de la Carta de Derechos, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 261. Y tercero, los graves errores, su magnitud y las múltiples irregularidades aquí habidas —en contraste con el escaso margen de veintinueve (29) votos de Acevedo Pérez o de dieciséis (16) votos de Granados Navedo— acarrean la violación sustancial de los derechos de los electores y son de naturaleza tal que excluyen por *irrazonable* la posibilidad de ese enfoque federal. Y es que sólo "[e]jercitando la facultad local y confiando en ella, y aprendiendo a virtud de sus éxitos o fracasos, es que se

asientan y funcionan debidamente las democracias". *Roca v. Junta Insular de Elecciones*, 35 D.P.R. 642, 649 (1926).

Ante las circunstancias apuntadas, ¿cómo privar del voto a ciento cincuenta y tres (153) —o cincuenta y cuatro (54)— electores válidamente cualificados por el solo hecho de que por errores de los funcionarios de colegio se entremezclaron sus papeletas con las de los no cualificados? ¿Por qué imponerles tan costoso gravamen? ¿No ha quedado trunco nuestro mandato unánime de *P.N.P. y P.I.P. v. Rodríguez Estrada*, supra?

## XXI

*Alternativas excluyentes*

*En buena juridicidad, el remedio justiciero y razonable no es privar radicalmente a esos electores de sus votos, según promovido por el P.P.D. y decretado por el Presidente de la Comisión; tampoco su adjudicación automática como originalmente pretendía Granados Navedo.* Cualquiera de esas alternativas lleva el *germen* de la *ilegalidad* y el peligro insuperable de declarar vencedor a uno (1) de los dos (2) candidatos con un cómputo que *incluye* noventa y siete (97) personas *no cualificadas* o *excluye* ciento cincuenta y tres (153) electores *activos* e *idóneos*. Sobre todo, si aplicamos cualquiera de esas dos (2) opciones —para declarar vencedor a Granados Navedo o a Acevedo Pérez— *subsistirá siempre la incógnita de cuál fue el verdadero ganador y si triunfó la mayoría democrática.*

Aun bajo la hipótesis improbable de que no prosperarán las alegaciones de Granados Navedo en torno a las papeletas con iniciales, que arrojan una ventaja de dieciséis (16) votos a su favor, nadie puede argumentar seriamente que, ante el pequeño margen de veintinueve (29) votos en que está fundada la Certificación expedida a Acevedo Pérez, el remanente de ciento cincuenta y tres (153) electores cualificados

en todas las seis (6) unidades arrestadas (o el de cincuenta y cuatro (54) electores hábiles, si excluimos la Unidad 29 y la Unidad 3, Colegio 8 (Residencial Nemesio Canales)), constituye un número sustancial que afecta directamente el resultado.

*Es imperativo que este Tribunal resuelva.* El asunto es urgente y de claro interés público. Debemos ejercer total y vigorosamente nuestra jurisdicción. La adjudicación definitiva del caso no puede postergarse más. *Escalona Vicenty v. C.E.E.*, 115 D.P.R. 529, 530–531 (1984).

Después de todo, no podemos pasar por alto que la razón que llevó a la Comisión Estatal a *arrestar* estas papeletas fue que sus miembros y su Presidente eran *conscientes* de que en una elección cerrada estos votos podían ser determinantes. Prefirieron no pasar juicio con la esperanza de que la ventaja numérica final del ganador tornara académico e hiciera innecesario ese dictamen. Lamentablemente no fue así. Tampoco ha sido así ante el foro judicial. Aparentemente, la decisión mayoritaria de este Tribunal así lo olvida y ha optado por seguir esa avenida, pasando por alto que reconocidamente es una cuestión *pura de derecho constitucional* —"exclusivamente jurídic[a]" (T.E. Supremo, pág. 135)— que retornará nuevamente. *Disentimos. No se resuelve una controversia de esta naturaleza y envergadura con su simple reconocimiento y posposición.*

Si todos los Comisionados Electorales y el Presidente de la Comisión reconocieron el carácter determinante y crucial de esas papeletas, ¿cómo puede este Tribunal ignorarlo? Ciertamente, dictaminarlo no es *académico*. Por el contrario, resolverlo dispondría del caso. Tampoco es a destiempo. Granados Navedo lo planteó en sus alegaciones y le hemos reconocido el derecho a hacerlo. Nos resulta un enigma conciliar ese pronunciamiento con la acción mayoritaria de *posponer* el resolver qué se va a hacer con los electores de las papeletas *arrestadas*. ¿Se les va a privar del derecho al su-

fragio en el mañana como resolvió el Presidente de la Comisión, licenciado Rodríguez Estrada, bajo la tesis de fraude?

La mayoría del Tribunal colma la copa judicial al concluir —obviamente a título de ilustración y luego de citar varios casos de jurisdicciones estatales de Estados Unidos (opinión mayoritaria, págs. 54–58)— lo siguiente:

> En estos casos, en ausencia de fraude no es suficiente que el candidato derrotado demuestre que se adjudicaron votos emitidos ilegalmente, *sino que se requiere que pruebe afirmativamente a favor de quién fueron adjudicados y demuestre así que la anulación de éstos cambiaría el resultado de la elección.* Ello podría probarse con el testimonio de los electores que votaron de forma ilegal. A éstos, contrario a lo que sucede con los electores plenamente capacitados, no les cobija el derecho a mantener en secreto su voto. De no cumplirse con lo anterior, la impugnación no procede aun cuando se haya establecido que en la elección se adjudicaron votos emitidos ilegalmente. *A contrario sensu,* de cumplir el candidato impugnador con los requisitos indicados, se reducirán dichos votos en la proporción correspondiente. Esta norma responde al interés público apremiante de impartir finalidad, estabilidad y certeza al proceso electoral. (Énfasis suplido.) Opinión mayoritaria, pág. 58.

Más adelante, con referencia a la secretividad del voto y al privilegio reconocido en la Regla 29 de Evidencia, 32 L.P.R.A. Ap. IV, sobre la no divulgación del voto, exponen:

> . . . [N]ingún elector que haya emitido su voto *legalmente* puede ser obligado a testificar en corte con relación al contenido de su voto. Ahora bien, si el elector emitió su voto de manera *ilegal,* dicho privilegio no le es de aplicación, por lo que sí podría presentarse prueba en cuanto al contenido de su voto. Por lo tanto, en un caso como el de autos, en que se impugna la certificación de un candidato por irregularidades en el proceso —que incluyen la adjudicación de votos emitidos ilegalmente— sería admisible el testimonio de los electores que votaron *ilegalmente* para probar a favor de quién se emitieron dichos votos ilegales. Esto *siempre y cuando el elector*

*no reclame válidamente el privilegio a la no autoincriminación.*

Igual norma han adoptado las jurisdicciones estatales de Estados Unidos que poseen un privilegio de no divulgación del voto similar al nuestro. Allí se ha resuelto —en casos de impugnación de la certificación de un candidato electoral en que se han adjudicado votos emitidos ilegalmente— que de establecerse la ilegalidad del voto los tribunales pueden obligar al elector que votó ilegalmente a testificar a favor de quién emitió su voto. De esta forma puede cumplir el candidato impugnador con el requisito de probar que se adjudicaron votos ilegales suficientes para variar el resultado y a favor de quién se emitieron los mismos. (Énfasis suplido.) Opinión mayoritaria, págs. 59–60.

Estos pronunciamientos ameritan un cuidadoso análisis. Veremos, como cuestión práctica y jurídica, que ponen punto final a las aspiraciones electorales de Granados Navedo. Después de esas expresiones, la mayoría del Tribunal debería prescindir de todo otro procedimiento y, simplemente, declararle sin lugar la demanda. Veamos.

Primero, adoptan el criterio más *estricto y riguroso* que existe para situaciones en las que está en controversia la adjudicación de votos ilegales. Según nuestra ley electoral —que autoriza a los tribunales a ordenar una nueva elección cuando no pueda determinarse quién resultó vencedor— ese enfoque es equivocado. Nos explicamos.

Cuando el margen de victoria del candidato ganador es menor que el número de votos ilegales inidentificables, el enigma puede resolverse judicialmente de cuatro (4) maneras diferentes: (1) invalidar la elección; (2) rechazar los votos del precinto o colegio donde ocurrió la irregularidad; (3) reducir prorrateadamente los votos ilegales de acuerdo con el número de votos adjudicados a los respectivos candidatos en ese distrito electoral, y (4) ignorar completamente la ilegalidad. De todas estas opciones, se ha sostenido que el único procedimiento *seguro* es declarar inválida la elección.

Anotación, *Treatment of Excess or Illegal Ballots When it is Not Known for Which Candidate or on Which Side of a Proposition They Were Cast,* 155 A.L.R. 677–678 (1945).

Sobre los dos (2) últimos cursos de acción se ha señalado "'que constituyen *actos puramente arbitrarios*: el resultado no estaría apoyado en hechos, *sino que sería uno fabricado por los tribunales*; y a la misma vez permitiría que un candidato que obtuvo menos votos legales resultase vencedor sobre la verdadera mayoría en virtud de *unos ajustes* de los votos ilegales. Como ilustración, si un candidato recibiera 220 votos legales y ninguno ilegal, pero el otro recibiera 210 votos legales y veinte ilegales, la mayoría legal del primer candidato sería diez votos. Pero el prorrateo de los veinte votos ilegales entre los dos candidatos, le aseguraría al segundo candidato una mayoría *ficticia* no menor de diez votos. . . . Ante una total ausencia de prueba tendente a demostrar por quién se emitieron los votos ilegales —en número suficiente para afectar los resultados— el deber de los tribunales deberá ser escoger, de la forma más sabia posible, *entre desatender esa ilegalidad o rechazar todo el precinto.* No debiera haber una presunción legal *arbitraria,* ya sea a los efectos de que todos los votos ilegales fueron adjudicados al partido político mayoritario, o que fueron emitidos por diferentes partidos en proporción a sus números. Descontar a un sólo candidato todos los votos ilegales o a varios candidatos a prorrata sería *no decidir, sino hacerle el caso a las partes*'". (Traducción nuestra y énfasis suplido.) Anotación, *Treatment of Excess or Illegal Ballots When it is Not Known for Which Candidate or on Which Side of a Proposition They Were Cast,* supra, pág. 678 esc. 1.

La alternativa del prorrateo —denominada por la mayoría como "proporción correspondiente" (opinión mayoritaria, pág. 58)— además de las desventajas prácticas y jurídicas que plantea, presenta serias deficiencias. Es una alternativa que ha sido utilizada en contextos históricos, políticos

y geográficos diferentes al nuestro. Sus virtudes, si alguna, son con respecto a elecciones pequeñas o ante pocos votos ilegales o fraudulentos. Más importante aún, es un remedio para sistemas jurídicos que no proveen la celebración de una nueva elección parcial o total.

Definitivamente, el curso de acción pautado por la mayoría del Tribunal no es el más confiable ni jurídicamente correcto para enfrentar las irregularidades en una elección en que participaron más de 200,000 electores en unos precintos que corresponden a la capital geográfica y política del país, y donde la tradición y experiencia electoral han permitido que la Asamblea Legislativa haya vislumbrado una nueva elección como esquema apropiado para salvar estas situaciones. ¿Por qué importar a nuestra isla remedios desprestigiados de otras latitudes cuando tenemos los recursos intelectuales, jurídicos, humanos y económicos para enfrentarnos airosamente a esta controversia?[11]

Segundo, advertimos que la Comisión Estatal, para situaciones básicamente iguales, en lugar de adoptar una norma uniforme —desatender la ilegalidad de las papeletas contaminadas o rechazarlas todas— aplicó criterios inconsistentes. A tal efecto, en una ocasión el Presidente de la Comisión, licenciado Rodríguez Estrada, rechazó todas las doscientas siete (207) papeletas *arrestadas* —que le daban una ventaja a Granados Navedo— y, en otra ocasión, se negó a examinar la situación de ilegalidad creada por las papeletas contaminadas *no arrestadas* en catorce (14) colegios electorales, en los cuales Acevedo Pérez obtuvo una ventaja de doscientos cincuenta y cuatro (254) votos.

Tercero, la adopción por la mayoría del Tribunal, como norma absoluta, de que no procede una acción de impugna-

---

[11] La regla de proporcionalidad sugerida por el Tribunal ha sido caracterizada como "una regla arbitraria que es incompatible con la teoría de un gobierno representativo elegido por el Pueblo". (Traducción nuestra.) *McCavitt v. Registrars of Voters of Brockton*, 434 N.E.2d 620, 631 (1982).

ción "aun cuando se haya establecido que en la elección se adjudicaron votos emitidos ilegalmente" es injusta y antidemocrática. Opinión mayoritaria, pág. 58. Mediante la misma le han impuesto a todo candidato derrotado —aquí Granados Navedo en virtud de una certificación apresurada e incompleta— que en acciones de impugnación pruebe: (1) que la Comisión Estatal adjudicó tales votos; (2) a favor de quién fueron adjudicados, y (3) que su anulación "cambiaría el resultado de la elección". Íd.

A poco reflexionemos, estos requisitos evidenciarios le exigen a Granados Navedo hacer precisamente lo que la Comisión Estatal no hizo respecto a las papeletas contaminadas no arrestadas. O sea, ante el foro judicial le obligan a determinar la idoneidad o no de aquellos electores que votaron bajo el sistema de añadidos a mano, función que hemos visto le correspondía a la Junta Especial de la Comisión Estatal. La irrazonabilidad de esa exigencia es patente.

Aparte de ello, en términos probatorios la tarea es *imposible*. Veamos. En la práctica este trámite significa, primero, que Granados Navedo debe identificar a priori aquellos electores que votaron ilegalmente y, claro está, afiliados al P.P.D. o no afiliados, que votaron a favor de Acevedo Pérez. De lo contrario, no podría cumplir con el requisito de que su anulación variara el resultado. Segundo, tiene que obligarlos a comparecer. Tercero, compelerlos a testificar y a admitir que votaron ilegalmente, esto es, que violaron la Ley Electoral de Puerto Rico. Y, finalmente, que lo hicieron a favor de Acevedo Pérez.

Lo *absurdo* de esta norma es evidente. Cobra proporciones de injusticia, pues todo este trámite tendría como propósito que ese testigo hostil —expuesto a esos riesgos— con su testimonio asuma dos (2) posturas en la silla testifical: una, de absoluta sinceridad y que admita que votó por Acevedo Pérez y, en consecuencia, *favorezca a Granados Navedo (candidato distinto por quien votó)*, y otra que, por ra-

zones partidistas, testifique que votó *por Granados Navedo* y de ese modo le anule un voto. Como opción final, podría negarse a declarar e invocar el privilegio de no autoincriminación, cuyo resultado inmediato sería, naturalmente, adverso a Granados Navedo.

Al decir de Biondo Biondi, el "absurdo jurídico no es el absurdo lógico, sino lo *injusto*". (Énfasis suplido.) *La ciencia del Derecho como arte de lo justo*, IX Anales de la Academia Matritense del Notariado 359 (1957). ¡Evitemos dar vueltas sobre el mismo circuito varias veces recorrido y siempre redescubierto!

Los contendientes principales Granados Navedo y Acevedo Pérez *coinciden* en que es imposible identificar los votos que pertenecían a los electores cualificados (T.E. Supremo, págs. 28–29, 95, 101–102 y 127–128) *y en que dichos votos son determinantes*. Para adjudicar esa cuestión *pura de derecho* no es necesario devolver el caso. Aun sin tomar en cuenta dos (2) de los colegios de votos arrestados —Precinto 1, Unidad 26, y Precinto 4, Unidad 3, Colegio 8 (Residencial Nemesio Canales), en que la mayoría del Tribunal adelanta la posibilidad de un fraude (opinión mayoritaria, pág. 51) que como mandato debe examinar el tribunal de instancia— *todavía subsistirá el derecho de cincuenta y cuatro (54) electores idóneos y cualificados a que se cuenten sus votos*. Dicho de otro modo, aun cuando por razón de fraude mañana se descartaran y marginaran del recuento de San Juan los electores cualificados del Precinto 1, Unidad 26, y Precinto 4, Unidad 3, Colegio 8 (Residencial Nemesio Canales), subsistiría el derecho incuestionable de los otros cincuenta y cuatro (54) electores activos de los restantes colegios *arrestados*, los cuales alteran cualesquiera de las mínimas diferencias logradas en votos por Granados Navedo o por Acevedo Pérez.

*La cuestión no depende de más prueba, sino de un simple pero resuelto ejercicio de voluntad judicial apelativa.*

"Hay una gramática política que hay que respetar en el país. Una cosa es lo que la matemática electoral permite en la frialdad marmórea de las normas, y otra, lo que la realidad fáctica tolera." A.E. Mooney, *La elección del Poder Ejecutivo nacional (legalidad versus legitimidad)*, 1985E Rev. Jur. Arg. La Ley 545, 548 (1985). Bajo nuestro diseño constitucional vigente, ¿cuál de *todos* estos foros es el llamado en última instancia a adjudicar una cuestión pura de derecho constitucional?

Nos corresponde, pues, desde este estrado apelativo enfrentarnos con las situaciones y disyuntivas que tuvieron ante sí la Comisión Estatal y el tribunal de instancia, a saber, ¿cómo evitar que se vulnere la voluntad de los electores cualificados, garantizar su sufragio y, a la par, imprimirle seriedad, credibilidad y certeza al proceso?

## XXII

*Nueva elección: parcial o total*

La prueba desfilada, según analizada, es clara evidencia de que las irregularidades y errores cometidos por la Comisión Estatal, por su Presidente y por varios funcionarios más son de tal naturaleza y magnitud que, tomados conjuntamente, afectan la integridad del proceso.

Este trasfondo es totalmente distinto del presentado en *P.P.D. v. Admor. Gen. de Elecciones*, supra. Allí no hubo instrucciones confusas y erróneas a electores como las que aquí motivaron las papeletas con iniciales. Tampoco cientos de papeletas *contaminadas no arrestadas*. Nunca estuvimos ante una situación indeterminable de papeletas *contaminadas arrestadas*. No cabe, pues, analogías para aprisionar expresiones de recta consciencia allí vertidas. Opinión mayoritaria, págs. 52–53. ¡Qué lástima que la fuerza persuasiva del interlocutor no permita ahora a la mayoría liberarse de su enfoque restrictivo!

El único y simple remedio es acudir de nuevo a las urnas. T.E. Supremo, pág. 137. Sabemos que esta ruta decisoria no es favorecida por ninguno de los dos (2) protagonistas principales. T.E. Supremo, págs. 25 y 72. La posición de Acevedo Pérez y de Báez Galib fue que si prevalecían en sus planteamientos de derecho ante este Foro no era necesario una nueva elección. T.E. Supremo, pág. 72. Por inferencia, una nueva elección no gozará de la simpatía de los círculos partidistas ni estará exenta de crítica pública. Esas posturas, en lo que atañe a este Tribunal, no son ni pueden ser determinantes.

Bajo el diseño constitucional vigente, ante todas las irregularidades apuntadas y su efecto acumulativo, pero sobre todo, por la incógnita dimanante de los ciento cincuenta y tres (153) —o ciento cincuenta y cuatro (154)— votos *arrestados* de electores activos y más de doscientas (200) papeletas *contaminadas no arrestadas*, y de quién realmente resultó electo, la única vía decisoria que garantiza que prevalezca verdaderamente el candidato de mayoría *es una nueva elección*. Ello no debe ser motivo de sorpresa. Así lo *visualizó la Asamblea Legislativa del país*, cuando en el Art. 6.015 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3275, autorizó a los tribunales a seguir ese curso de acción cuando éstos "no pudier[en] decidir" cuál de los candidatos resultó electo. El precepto dispone, en lo pertinente:

> En el caso de una elección de candidato a cargos que *no* fuesen de Senador o de Representante, *si se suscitare una impugnación* parcial o *total* de la votación entre *dos* o más candidatos para algún cargo o cargos, y el *Tribunal no pudiera decidir cu[á]l de ellos resultó electo, ordenará una nueva elección en el precinto o precintos afectados, la cual se celebrará de acuerdo a las normas reglamentarias que a tales efectos se prescriban.* (Énfasis suplido.) 16 L.P.R.A. sec. 3275.

En cuanto a una nueva elección, según el transcrito Art. 6.015 de la Ley Electoral de Puerto Rico, *supra*, la misma

puede ser parcial —limitada a determinados precintos— o general, esto es, que abarque a todo el Municipio de San Juan.

Concentrémonos en la elección *parcial*. Aunque el estatuto habla de precintos, creemos que su espíritu permite que la elección, como primera alternativa, *cubra únicamente los colegios y unidades de las papeletas contaminadas arrestadas y contaminadas no arrestadas*. Aunque es susceptible de abrirse a todos los electores, bajo esta primera opción serían convocados solamente aquellos cualificados que *ejercieron* el derecho al voto el 8 de noviembre por figurar en las listas o mediante el procedimiento de añadidos a mano. No estaría autorizado a votar ningún otro elector que, por cualesquiera razones, no ejerció en ese momento su derecho.

Los beneficios de esta elección limitada son evidentes. Los costos económicos para el erario y los gastos de los partidos políticos y candidatos serían menores que los de una elección municipal total. En una visión retrospectiva, en lo posible, aproximaría a los candidatos a una situación de igualdad de condiciones y reivindicaría el derecho de los electores marginados.

Ahora bien, no cabe duda de que al presente esa nueva y limitada elección impondría una inmensa presión psicológica sobre ese determinado número de electores quienes, además, estarían expuestos a otras influencias malsanas y a presiones externas indebidas.

Ante estas circunstancias, una vez reconocido por este Tribunal que el candidato novoprogresista Granados Navedo incluyó en la súplica de su demanda de impugnación que se ordenara la adjudicación de las doscientas siete (207) papeletas *contaminadas arrestadas*, nos vemos precisados a reafirmar que remitir ese planteamiento —el de las papeletas *contaminadas no arrestadas* y las otras cuestiones— al foro de instancia y posponer su solución, al igual que una *elección especial limitada a esos electores, son remedios inapro-*

*piados*. Además de fragmentar la controversia, tienen serias implicaciones. Nos explicamos.

Primero, esos remedios conllevan —incluyendo la revocación y devolución al tribunal de instancia— por imperativo lógico y jurídico, la *descertificación y vacante de Acevedo Pérez como Alcalde de San Juan*.([12]) Ello es así, porque las doscientas siete (207) papeletas (o sesenta (60)) de ciento cincuenta y tres (153) electores activos, no fueron adjudicadas ni tomadas en consideración en el cómputo "final" que arrojó la pequeña ventaja de veintinueve (29) votos a su favor. Aunque lo nieguen, *implica la aceptación por la mayoría del Tribunal de que la apresurada certificación de Acevedo Pérez es nula por excluir votos de electores legalmente cualificados que podían haber alterado el resultado de la elección.*

No podemos olvidar que la certificación, por sus propios términos, fue *cualificada*. Al suscribirla, el Presidente de la Comisión, licenciado Rodríguez Estrada, reconoció que no había finalizado el recuento y que el resultado de votos escrutados *no* incluía un número indefinido de "papeletas *pendientes de adjudicación en la Comisión o de electores añadidos a mano que se encuentran pendientes de ser adjudicadas conforme a la Ley,* antes de que *finalice* el Escrutinio General *pero que por su cantidad no afectará el resultado*

---

([12]) El Art. 3.01(f) de la Ley Orgánica de los Municipios de Puerto Rico, 21 L.P.R.A. sec. 3001(f), dispone que la Asamblea Municipal deberá, en consulta con el Alcalde, disponer el orden de sucesión interino para caso de muerte, renuncia, destitución, incapacidad total y permanente, *o por cualquier otra falta absoluta del Alcalde.*

De ocurrir la vacante sin que se haya dispuesto por *ordenanza* el orden de sucesión interino, el sucesor interino del Alcalde será *el funcionario administrativo de mayor jerarquía en el municipio*, en conformidad con lo así determinado por la Asamblea Municipal o el funcionario designado por el Alcalde.

Lo anterior aplica en todo caso de ausencia transitoria del Alcalde cuando éste no haya hecho la designación del funcionario conforme a lo dispuesto en el Art. 3.02 de la misma ley, 21 L.P.R.A. sec. 3002(3), esto es, cuando no haya notificado a la Asamblea Municipal el funcionario que le sustituirá durante su ausencia por vacaciones, enfermedad, viajes fuera de Puerto Rico o cualquier otra causa que le impida transitoriamente el ejercicio de sus funciones.

*expresado en esta Certificación".* (Énfasis suplido.) Apéndice I.

¿Puede argumentarse seriamente que al remitir la mayoría del Tribunal el caso al foro de instancia y dejar así en el *limbo jurídico* las papeletas *contaminadas arrestadas* y las *contaminadas no arrestadas,* no constituye una admisión implícita de que los votos de los electores involucrados tenían que adjudicarse y que afectan sustancialmente el resultado? Opinión mayoritaria, pág. 51.

Segundo, posponer la consideración de esta materia *pura de derecho* fragmenta innecesariamente el ejercicio de nuestra jurisdicción y la del Tribunal Superior. Mientras subsista la controversia de estas papeletas, este Tribunal Supremo vendrá posteriormente obligado a atender ese reclamo de Granados Navedo o de Acevedo Pérez. Ello nos pondría de nuevo frente a esta disyuntiva: de ser necesaria la nueva elección, ¿en qué fecha se celebraría?

*El factor tiempo es crucial. Tenemos la obligación judicial de evitar que la prolongación del litigio y la decisión final continúe en suspenso y que, a la larga, sea factor que beneficie exclusivamente a Acevedo Pérez, desde y por razón de las ejecutorias de su cargo.*

La reivindicación de derechos constitucionales y electorales está en juego. En estas circunstancias no debemos ni podemos procesalmente penalizar a Granados Navedo por haber tocado, *sin más rodeos,* las puertas de este Alto Foro judicial en una situación donde, según se ha indicado, la infracción legal era evidente, el daño constitucional estimablemente continuo, inminente, sustancial e irreparable, y el trámite en el tribunal de instancia se vislumbra como lento, incierto y avasallador. Ello simplemente constituye una injusticia.

Nuestro dictamen modificatorio sobre las quince (15) papeletas con doble marca —todas originalmente adjudicadas a Acevedo Pérez por el Presidente de la Comisión— dismi-

nuye de inmediato la ventaja del candidato popular a veintisiete (27) votos, pues habría que restarle dos (2) de sus votos y sumarlos a Granados Navedo. Si, además, contamos la adjudicación del voto (1) de nominación directa (*write-in*), más los veintisiete (27) votos de electores añadidos a mano —algunos presentados por el Comisionado Electoral González Rodríguez (P.N.P.) y rechazados por el Presidente de la Comisión bajo el criterio de que no eran suficientes para alterar el resultado— la ventaja de Acevedo Pérez desaparece. Si tomamos en cuenta las siete (7) y ocho (8) papeletas a favor, respectivamente, de Granados Navedo y Acevedo Pérez, la ventaja es de Granados Navedo por razón de los dieciséis (16) votos de las iniciadas. *Por esa ventaja Granados Navedo ganaría.*

Restarían aún por adjudicarse otras papeletas correspondientes a varios electores añadidos a mano, no adjudicadas, reclamadas tanto por Granados Navedo como por Acevedo Pérez. Sin embargo, su resultado numérico —si presumimos que algunas fueran a favor de uno u otro de los contendientes— no tornaría académico el verdadero nudo gordiano, de *doble atadura,* que son las doscientas siete (207) papeletas *contaminadas arrestadas* y las papeletas *contaminadas no arrestadas* que sobrepasan las doscientas (200).

*Ésta y otras consideraciones nos mueven a concluir que estamos ante un caso en el que realmente este Foro judicial, así como el tribunal de instancia, no puede adjudicar ni resolver quién verdaderamente ganó las elecciones. Su devolución es una futilidad que no supera este escollo y solamente atrasa su solución. Subsistirá siempre la ficha de tranque, que son las papeletas contaminadas no arrestadas y las contaminadas arrestadas. Hemos trocado la espada de la dama de la justicia por la espada de Dámocles y la hemos dejado en suspenso sobre Granados Navedo y Acevedo Pérez. Es imperativo que el remedio sea una nueva elección*

*total. Este es el único mecanismo compatible con la Ley Electoral de Puerto Rico y con nuestra Constitución ante la situación creada por esas y las papeletas con iniciales.* Véase *Betances v. Junta Insular de Elecciones*, 41 D.P.R. 130, 132 (1930).

Este *mecanismo* ha sido refrendado en múltiples jurisdicciones de Estados Unidos. *La casuística es impresionante.* "Cuando ante los tribunales se demuestra la existencia de irregularidades de gran magnitud, que ponen en entredicho la validez de la elección, procede como único remedio una nueva elección." (Traducción nuestra.) *Mickels v. Henderson*, 642 S.W.2d 661, 663 (1982). Igual enfoque prevalece si "el resultado de la elección original está rodeado de dudas". Íd. Véanse, además: *Buonanno v. DiStefano*, 430 A.2d 765, 771 (1981); *Larson v. Locken*, 262 N.W.2d 752 (1978); *Bell v. Southwell*, 376 F.2d 659 (5to Cir. 1967); *Coalition for Ed. Dist. One v. Board of Elec. City of N.Y.*, 370 F. Supp. 42, confirmada en 495 F.2d 1090 (2do Cir. 1974); *Ury v. Santee*, 303 F. Supp. 119 (Ill. 1969).

De particular importancia al caso de autos es la regla prevaleciente de que remedialmente se impone una nueva elección cuando se demuestra, de forma satisfactoria, "que se rechazaron votos válidos o se contaron votos ilegales, y debido a lo uno o a lo otro, o a ambos, *el resultado no corresponde a la voluntad del electorado, o se ha puesto en entredicho dicho resultado*". (Énfasis suplido, en el original y traducción nuestra.) *O'Neal v. Simpson*, 350 So. 2d 998, 1011 (1977).

"El corazón de nuestra forma de gobierno depende del principio moral y legal de que cada voto válido sea contado. En esta instancia, *no se presentó evidencia de que los electores cometieran el error*, ni hubo el más mínimo asomo de que esa evidencia existiera. Los electores pasaron el trabajo, invirtieron tiempo y esfuerzos para votar, y *debe dárseles la oportunidad de emitir sus votos, si sin culpa de ellos, los*

*originalmente depositados no pueden contarse.* A[u]n cuando este remedio limitado . . ., no sea el ideal, debido a que con el transcurso del tiempo algún elector pueda variar su mente y votar de manera distinta, *este remedio práctico sobrepasa el castigo de no contar su voto debido a errores incurridos por otros.* La ley y la equidad no favorecen la exclusión de electores que hayan cumplido con la ley, *cuando esa exclusión meramente ocurre debido a equivocación, error, o mala conducta de los oficiales electorales. Haggard v. Misko,* 164 Neb. 778, 83 N.W.2d 483 (1957)." (Énfasis suplido y traducción nuestra.) *State Ex Rel. Olson v. Bakken,* 329 N.W.2d 575, 580 (1983).

"Los errores y omisiones de los funcionarios electorales en el descargo de los deberes impuestos por la Ley Electoral pueden conllevar la nulidad de la elección." (Traducción nuestra.) *Hester v. Kamykowski,* 150 N.E.2d 196, 199 (1958).

*Akizaki v. Fong,* 461 P.2d 221 (Hawaii 1969), es de especial interés al caso de autos. Allí, el Tribunal sostuvo una nueva elección cuando diecinueve (19) votos invalidados fueron *mezclados* y contados con los votos válidos, y el margen entre los candidatos fue de sólo dos (2) votos.

Si los votos ilegales son tan numerosos que en la práctica es imposible determinar para quién fueron depositados y, por ende, definir la elección a base de los votos legales, en lugar de limitarse a determinados precintos debe anularse *toda* la elección. *Wells v. Wallace,* 337 S.W.2d 18, 20 (1959). Hemos de resolver las disputas electorales, en lo posible, a favor de los electores. *Santana v. Registrars of Voters of Worcester,* 425 N.E.2d 745, 749 (1981). El derecho al sufragio se torna ilusorio si no se cuenta. *Welch v. McKenzie,* 592 F. Supp. 1549 (S. D. Miss. 1984), confirmada en 765 F.2d 1311 (5to Cir. 1985). Es el más preciado de una democracia, porque preserva los otros derechos. *Vargas v. Calabrese,* 634 F. Supp. 910 (D. N.J. 1986); *Pitts v. Black,* 608 F. Supp. 696 (D. N.Y. 1984). Como tal, cualquier intento para restringirlo

atenta contra el corazón de la democracia y debe ser objeto de riguroso escrutinio judicial. *Crafts v. Quinn*, 482 A.2d 825 (1984).

Establecida la necesidad de una nueva elección, expongamos sus parámetros.

## XXIII

*Parámetros de la nueva elección; descertificación de Acevedo Pérez; candidatos y electores a participar*

La Ley Electoral de Puerto Rico, en estos casos, confiere a la Comisión Estatal la facultad de reglamentar una nueva elección. Esa disposición no excluye que en nuestro mandato definamos brevemente sus parámetros en cuanto a los electores con derecho a votar y a los candidatos a figurar en las papeletas.

A tal efecto es menester dar por sentada la premisa central condicionante de ese evento. De entrada aflora la realidad de *que la nueva elección está atada, constitucional y electoralmente, a las elecciones generales celebradas el pasado 8 de noviembre de 1988*. Sin embargo, está limitada al Municipio de San Juan y sólo al cargo de Alcalde. No se impugnaron, y nadie ha cuestionado, las elecciones de los asambleístas municipales debidamente certificados. Por lo tanto, sólo procedería descertificar a Acevedo Pérez.

Salvo que se justificara en contrario, a la nueva elección deberán convocarse —y podrán participar— todos los electores que estaban así cualificados —edad y demás requisitos— *y que eran acreedores al voto el pasado 8 de noviembre en los precintos correspondientes al Municipio de San Juan*. Ese derecho *no* queda afectado por los cambios de domicilio efectuados por los electores en, hacia o desde la demarcación del Municipio de San Juan. Repetimos, el punto de partida es y era su condición de elector cualificado para el 8 de noviembre en los precintos pertenecientes al Municipio de San Juan.

Como corolario, no tienen derecho a votar los electores que trasladaron su domicilio al Municipio de San Juan *después* de esa fecha, hayan o no ejercitado el sufragio en el municipio de origen. Lo contrario abriría las urnas a la impermisible práctica inconstitucional *de doble voto*, esto es, que pudieran votar dos (2) veces en un mismo evento electoral. Ello es contrario al principio *"un hombre, un voto"*. El elector que no votó en su municipio de origen, y después se mudó a San Juan, de nada puede quejarse. Tuvo la oportunidad de hacerlo y no lo hizo. No puede reclamarlo ahora, pues ese derecho dimanaba de su condición de elector en *ese* municipio.

Finalmente, sobre este extremo, basta aclarar que los electores serán aquellos que figuren válidamente en las listas y, claro está, aquellos que por omisión no fueron incluidos y que se acogieron al método dispuesto en *P.N.P. y P.I.P. v. Rodríguez Estrada*, supra. Como cuestión de hecho, nada impide que las listas sean actualizadas a base de nuestros pronunciamientos y de las investigaciones ya realizadas por la Junta Especial, y que prontamente —en un término razonable— la Comisión Estatal pueda culminar la segunda investigación, inconclusa, de los electores cualificados como *inactivos* correspondientes al Municipio de San Juan para el 8 de noviembre de 1988.

Aunque esta nueva elección sea producto de la sola impugnación de Granados Navedo —uno (1) de los tres (3) candidatos— obviamente conlleva el derecho a que figuren en la papeleta todos ellos, independientemente de la diferencia numérica —estrecha o amplia— que los resultados hayan arrojado. La Ley Electoral de Puerto Rico —Art. 6.010 (16 L.P.R.A. sec. 3270)— sólo limita las candidaturas por el criterio numérico de más votos en aquellas situaciones de elección especial por *empate. Esa no es la situación de autos.*

Los electores tienen el absoluto derecho de seleccionar cualesquiera de los tres (3) candidatos, ya sea reafirmando o

variando sus votos de 8 de noviembre. *Ni los tribunales ni la ley pueden exigir imposibles.* Podemos circunscribir legalmente la nueva elección al cuerpo de electores idóneos del Municipio de San Juan, pero no condicionar ni intervenir con sus conciencias. Los cambios valorativos y las fluctuaciones en las actitudes de los seres humanos son factores incontrolables cuya realidad no podemos ignorar. Es imposible detener judicialmente el tiempo y congelar en el espacio el evolutivo proceso psicológico y mental.

Cuando la Asamblea Legislativa vislumbró el juicio *de novo* como mecanismo de revisión de las decisiones post electorales de la Comisión Estatal, facultó a los tribunales no sólo a enjuiciar la corrección y juridicidad de las determinaciones de ese organismo administrativo, sino a diseñar los remedios adecuados para salvaguardar en última instancia el derecho al voto. Por esa razón, según la propia Ley Electoral de Puerto Rico, de no poder los tribunales desentrañar la madeja de errores o irregularidades electorales y estar impedidos de emitir una decisión razonable, inteligente y confiable de quién fue el verdadero ganador, podrán mandatar la celebración de una *nueva elección.*

La sabiduría, equivalencia conceptual lógica y justiciera de ese esquema, es evidente. Así, vuelven a ser precisamente los mismos electores, en ese peculiar *juicio "de novo" que constituye una nueva elección,* los que finalmente deciden la suerte de los candidatos políticos. La voluntad ciudadana regresa, vía los tribunales, a su fuente de origen. Se cumple de este modo el viejo y acendrado axioma democrático de que el pueblo, como *soberano,* en principio y fin es la única "fuente del poder público". *Preámbulo,* Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 251.

## XXIV

*Deficiencias del sistema electoral; efectos negativos en el derecho al voto*

Tradicionalmente se ha establecido una asociación entrañable entre el derecho al voto y la democracia. No se concibe que el sistema democrático sea realizable sin la presencia ineludible del ciudadano en la función determinante de expresarse directamente en las urnas. Esa verdad exige, sin embargo, que se fundamente una observación: es mandatorio aproximarnos al ideal de que el ejercicio del voto sea inteligente y reflexivo. Es decir, es preciso que el derecho al sufragio se ejerza conforme al uso más elevado de las facultades individuales de cada ciudadano. Una democracia no puede apuntalarse en un ejercicio irresponsable, inconsciente o ignorante, sino sobre los fundamentos más esmerados de la razón, inteligencia y voluntad.

A esos efectos, el Estado moderno tiene la función inexcusable de *educar*. Es pertinente recordar que a las urnas acuden por igual, con el mismo derecho, analfabetos y profesionales, gente medianamente instruida y otros que han alcanzado niveles más especializados de conocimiento. El universo es amplio. También se compone de personas de edad avanzada, retraídos y tímidos. La educación, pues, es clave y se impone como medio que asegure, repetimos, que el acto de votar represente una manifestación de sensatez y de prudencia en el sentido más elevado de la palabra. Parte importante de esta dinámica es el acto mecánico de votar o la forma correcta de marcar una papeleta sin que el voto sea invalidado por razones pueriles.

A fin de cuentas, el uso de las facilidades y estructuras de las escuelas del país tiene que tener un significado mayor. Las aulas educativas no deben limitarse a una mera necesidad circunstancial física. Más que simples estructuras de resguardo durante el día de las elecciones, tienen que repre-

sentar el núcleo desde el cual la ciudadanía, los políticos y el Estado impartan y reciban lecciones democráticas. Con perspectiva de lo ocurrido, en el caso de autos nos preocupa, y habremos de atender con proyección futura, el aspecto referente a la educación que es menester llevar a cabo para lograr una manera más inteligente de votar.

Nos anima la firme creencia de que el concepto constitucional "un hombre, un voto" trasciende la consigna matemática o cuantitativa. Su sustrato encierra, como premisa fundamental, que cada ciudadano tenga la oportunidad de hacer viable su voto para que tenga el mismo peso específico que el voto de los demás: ni vale más ni vale menos.

*No podemos impartir justicia con el discernimiento en tinieblas. La dama de la justicia con la venda en sus ojos —símbolo del equilibrio e imparcialidad en el acto de juzgar— puede en ocasiones representar una ceguera peligrosa que es necesario derrotar.*

El ejercicio del sufragio es el único momento existencial en que las democracias igualan a todos los seres humanos independientemente de su raza, color, origen, condición social, ideas políticas o religiosas. El otro gran momento lo constituye el inevitable acto de la muerte.

La cuestión trasciende la controversia entre Granados Navedo y Acevedo Pérez. Desde este estrado apelativo, su adjudicación tiene que significar un mejoramiento y crecimiento del sistema electoral y, por ende, de nuestra democracia.

Ya en 1980, en *P.S.P. v. Com. Estatal de Elecciones*, 110 D.P.R. 400, 433 (1980), expresamos preocupación sobre este particular:

La circunstancia de que en el sistema de colegio abierto, en contraste con el cerrado, no existe la oportunidad para que se impartan instrucciones generales y comunes a todos los electores de cómo votar . . . . El evento comicial envuelve a una población que excede el millón y medio de todo tipo de per-

sonas, de las más diversas posiciones sociales y condiciones intelectuales y académicas. Bajo esa óptica, hemos de recordar la admonición constitucional de que "[n]adie será privado del derecho al voto por no saber leer o escribir . . . .", Art. VI, Sec. 4[, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982]. En su correcta dimensión este postulado puede conllevar, en sus variadas manifestaciones, *una prohibición a que se anule el voto porque el elector no siga instrucciones que sólo afectan de manera mínima el interés legislativo que persigue reconocer la verdadera voluntad del elector.* (Énfasis suplido.)

Más recientemente, en *P.N.P. v. Rodríguez Estrada, Pres. C.E.E.*, supra, recalcamos que el derecho constitucional al voto no es renunciable por ignorancia, ya que ello atentaría contra el espíritu inmerso en el Art. VI, Sec. 4 de nuestra Constitución, L.P.R.A., Tomo 1. Menos puede estimarse renunciado si el Estado no instruye adecuadamente las razones por las cuales el voto puede ser anulado.

Para entender en toda su preeminencia este mandato constitucional es menester unas aclaraciones elementales. El medio documental inmediato utilizado en nuestro país para plasmar y dejar constancia del voto es la papeleta. La Asamblea Legislativa reguló celosamente en la Ley Electoral de Puerto Rico su impresión oficial y distribución. Art. 5.009 (16 L.P.R.A. sec. 3209). A tal efecto, dicha ley provee el sitio donde se imprimirá el nombre y el emblema del partido político, los nombres y el orden de los candidatos, los espacios a mantenerse, el tipo de papel y de tinta, y otros detalles. Refiere a la Comisión Estatal, vía reglamento, el diseño y texto impreso a usarse en cada elección. Además, prescribe que en "cada papeleta se imprimirán *instrucciones* sobre la forma de votar". (Énfasis suplido.) Art. 5.011 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3211.

Para las elecciones del pasado 8 de noviembre de 1988 se usaron dos (2) papeletas de colores diferentes: una *blanca* para los cargos estatales de Gobernador, Comisionado Residente y miembros de la Asamblea Legislativa, y otra *amari-*

*lla* para los candidatos a Alcaldes y a Asambleístas Municipales.

Aunque están así divididas y diseñadas —estatal y municipal— debe tenerse presente que cada papeleta tiene una proyección funcional múltiple. La impresión en una de las papeletas de todos los cargos estatales y, en la otra, los municipales, simplemente es un medio económico, sencillo y práctico de plasmar en dos (2) documentos los candidatos de cada partido político para que el elector pueda expresar su preferencia. En términos de cargos ejecutivos, de legisladores, de alcaldes y de miembros de la asamblea municipal, aunque poco económico y práctico, podrían imprimirse separadamente tantas papeletas como candidatos.

La proyección funcional múltiple aludida tiene varias consecuencias al momento de su adjudicación. Para fines de un *voto íntegro* —cruz o marca en el espacio bajo el emblema del partido— éste representa un voto para *todos* los candidatos bajo esa columna vertical. El *voto mixto* —cruz o marca en el espacio bajo el emblema del partido, más una marca al lado del nombre de un candidato *fuera* de la columna del partido— conlleva que no se contará el voto para el candidato correspondiente al partido. Y, finalmente, el elector puede votar por *candidatura*, esto es, omitiendo toda marca bajo el emblema del partido y marcando al lado de los candidatos de su preferencia. También puede apartarse de los nombres preimpresos y escribir aquellos correspondientes a cualesquiera otras personas en la columna de *nominación directa (write-in)*.

Bajo este diseño documental, y en lo referente a las candidaturas municipales, la Regla 52 del Reglamento Oficial para las Elecciones Generales de 1988 especifica los criterios para la adjudicación de papeletas mixtas o con más de una marca. Aunque cuando se marca más de un candidato a alcalde el voto no se le cuenta a ninguno, esta regla no es necesariamente similar cuando se trata de los cargos a asamble-

ístas. Se puede votar por dos (2) o más asambleístas en la misma línea si el elector no se excede del máximo de marcas a cargos disponibles.

El voto mixto en la papeleta municipal también es permitido. Un elector puede votar por candidatos a la asamblea municipal pertenecientes a partidos políticos distintos al partido del candidato a alcalde apoyado. Esta forma de votar de ninguna manera afecta el emitido correctamente por determinado candidato a alcalde.

El hecho de que se hagan más marcas que el máximo permitido para los cargos de asambleístas en el municipio correspondiente, tampoco afecta el voto emitido a favor de un candidato a alcalde.

Como expresáramos anteriormente, con miras a descargar adecuadamente nuestra función judicial, examinamos todos los sobres que contienen cientos de *papeletas protestadas y no adjudicadas* por la Comisión Estatal correspondientes al Municipio de San Juan. Identificaciones 1–5, demandantes. Esa tarea nos ha permitido —por primera vez en nuestra incumbencia en la magistratura— apreciar directamente la dinámica electoral representativa de un segmento sustancial de ciudadanos a quienes el sistema injustamente les ha anulado el voto por razón de haberse implantado el sistema de colegio *abierto*, en contraste con el colegio *cerrado*, sin adoptarse otras medidas cautelares.

Sobre todo, nos ha permitido detectar tres (3) grandes fallas en su aspecto operacional. Primero, la ausencia de una efectiva campaña pública que oriente a la ciudadanía sobre cómo evitar que se dañe la papeleta, lograr que se considere su intención y que su voto sea válidamente adjudicado. Podemos afirmar que las elecciones en San Juan han sido cerradas debido al alto número de papeletas dañadas por los electores, porque sus intenciones —aunque claramente consignadas— estuvieron acompañadas de borrones, tachaduras, palabras y marcas consideradas inválidas radical-

mente por la ley y el reglamento. Segundo, la omisión de advertir en la papeleta a los electores que no podían borrar, escribir palabras, firmar o plasmar marcas que, aunque válidas, conllevan doble voto. Y tercero, la falta de instrucciones adecuadas y advertencias a los electores por los funcionarios de colegio de las circunstancias antes mencionadas.

Las papeletas que forman el Apéndice E ilustran elocuentemente la realidad expuesta. Son situaciones reales, de carácter repetitivo, detectadas en numerosas papeletas durante nuestro estudio y análisis. La cuestión debe remediarse para dar sentido de derecho justo al concepto vital de igualdad que proclama nuestra democracia. La pugna entre Granados Navedo y Acevedo Pérez no debe relegarla a segundo plano o al pronto olvido. *Se avecinan otros eventos electorales de importancia histórica para el país. Para legitimarlos más allá de nuestras playas corresponde a quienes ostentan el poder público honrar efectivamente el postulado democrático de igualdad humana en su expresión en las urnas.* A fin de cuentas, "[p]art[imos] de la base de que el Estado no tiene inteligencia, ni voluntad, ni libertad; éstos son atributos de la persona; de la persona de carne y hueso, no de la moral ficticia. De modo que la voluntad del Estado es en realidad la de un hombre, o de un grupo de hombres. Estos hombres que dirigen el Estado, son los políticos. Cre[emos] —y afirm[amos] esto sin ningún género de reticencia— que los políticos son personas normales, como ustedes y como yo. Por ello, como cada cual, tienen su idea particular de la Justicia, y participan del deseo universal de conseguir un mundo mejor".[13]

---

[13] *La Seguridad Jurídica y el Notariado*, Academia Sevillana y el Notariado, Ed. Edersa, 1986, págs. 28–29.

## XXV

*Conclusiones*

Los fundamentos expuestos en este disenso y el factor tiempo nos impiden, judicial y prudencialmente, suscribir cualquier otro remedio que no sea la nueva elección. "Del filósofo alemán Josef Pieper, de su obra *La Prudencia*, recordamos que el *'prudente contempla, por una parte la realidad objetiva de las cosas* y, por otra, el querer y el hacer, pero en primer lugar la realidad y, *en virtud y a causa de ese conocimiento de la realidad, determina lo que debe hacer y lo que no debe hacer'*." (Énfasis en el original suprimido y énfasis suplido.) *Mundo Ríos v. Gobernador*, 121 D.P.R. 416, 428–429 (1988).

La decisión que hoy produce la mayoría del Tribunal es un peligroso y ambivalente paso retrógrado en materia electoral. Está apuntalada en una interpretación confiscatoria y en una visión incorrecta de la función adjudicativa de este Cuerpo. Hemos dedicado varias semanas a examinar y evaluar meticulosamente toda la prueba documental y testifical. En la soledad de nuestra consciencia hemos tratado de conciliar los intereses en conflicto entre Granados Navedo y Acevedo Pérez. Sobre todo, reivindicar derechos de electores que votaron y cuyas papeletas les fueron anuladas por irregularidades de los funcionarios de colegio; de electores que votaron e iniciaron sus papeletas por instrucciones confusas e incompletas; de electores que, debido a errores de la Comisión Estatal, tuvieron que votar una vez fueron añadidos a mano y que, sin ser notificados, se les anularon indebidamente sus votos, y de un (1) elector que erró al escribir el segundo apellido de su candidato.

*La decisión de la mayoría del Tribunal, en última instancia, favorece al candidato del P.P.D., Acevedo Pérez, para que éste permanezca usufructuando el cargo de Alcalde. Por nuestra parte, hemos demostrado que Granados*

*Navedo numéricamente recibió más votos; que la certifica-ción fue precipitada, errónea y nula, porque de un lado in-cluyó las papeletas contaminadas no arrestadas y, del otro, no consideró todas las papeletas arrestadas, y que estos votos matemáticamente cambian cualesquiera resultados.*

La mayoría del Tribunal se aparta de toda la progenie de casos electorales que, tanto en el pasado como reciente-mente, abonaron el derecho al sufragio electoral. *Claudio v. Gobernador*, 121 D.P.R. 744 (1988); *Rivera v. Gobernador*, 121 D.P.R. 558 (1988). Por lo demás, basta recordar que en política "'hay victorias sin alas' . . . Un triunfo en el Colegio Electoral, por la pura vía aritmética, escamoteando a la ma-yoría, sería un triunfo sin gloria, el triunfo de la liturgia so-bre la fe, de la ley sobre el derecho, del derecho sobre la justicia". Mooney, *op. cit.*, pág. 548.

Otra vez, "[i]njustamente se ha devaluado el valor del precedente judicial (*stare decisis*). Como dijimos en *P.I.P. v. C.E.E.*, 120 D.P.R. 580, 638–639 (1988), . . . '[l]amentable-mente nuestra prédica ha sido en el desierto. Con libertad para otro curso decisorio, la mayoría ha optado por sostener . . . un . . . enfoque . . . restrictivo e incompleto. Como camino decisorio intelectual, no logra superar el sentido de justicia ni da plena vigencia el *derecho vivo* apuntalado en un verda-dero principio de igualdad política. *La verdad jurídica nunca puede atentar contra la verdad humana. Después de todo, la verdad es como el agua, o es pura o no lo es'*. (Én-fasis suplido y en el original.) Es un eufemismo proclamar que la interpretación y decisión mayoritaria promueve el de-recho al voto. Opinión mayoritaria, pág. 30. Se han anulado y confiscado votos sin brindarle a los electores un mínimo de debido proceso de ley. *Ha prevalecido la forma sobre la sus-tancia; lo injusto sobre lo justo*". (Énfasis suplido y en el original.) *P.N.P. v. Rodríguez Estrada, Pres. C.E.E.*, supra, pág. 72.

La no adjudicación de las controversias relativas a las papeletas con iniciales, contaminadas no arrestadas y contaminadas arrestadas, *constituye una peligrosa alternativa no comprometida de resolución judicial.* Sin necesidad deja en manos del tribunal de instancia el evaluar la prueba documental, adjudicar y dirimir la prueba testifical, y resolver *interinamente* unas cuestiones de derecho. Así, se ha pospuesto la decisión crucial de unas nuevas elecciones. *Mientras tanto, el tiempo continuará transcurriendo. Ello no cumple nuestra misión rectora de corregir y resolver con urgencia casos de impugnación electoral y los abusos y errores administrativos cometidos por la Comisión Estatal. Se frustran así las expectativas públicas de una justicia rápida. Sin moverse en el terreno de lo creativo, aun dentro de las coordenadas de la Constitución y de la Ley Electoral de Puerto Rico, otro debió ser el camino recorrido.*

El principio de eficacia en la ley exige, en su primera aproximación, que nuestras decisiones sean coherentes y adecuadas a los fines del entorno social y objetivos de la Constitución. De ahí que rechazamos, por insuficiente, cualquier técnica jurídica, criterio interpretativo o curso de acción que propicie actuaciones administrativas o judiciales conculcadoras de esos derechos. Y es que, en la práctica, aquí se ha verificado esa conculcación. No es mera teoría forense. *Hemos visto cómo Granados Navedo numéricamente prevaleció sobre Acevedo Pérez.*

*No resolvemos esquivando respuestas. Ello genera una sensación pública de inseguridad y desconfianza institucional. La opinión de la mayoría lanza una carga innecesaria sobre el tribunal de instancia y sitúa la adjudicación de este importante caso en una lenta y costosa ruta de desprotección, a la vez que conoce que está predestinado a retornar.*

El principio de eficacia y tutela judicial encierra la exigencia metodológica de una proyección inmediata en la prác-

tica y una transformación real para remediar la situación que presenta el caso de autos. Comporta la adopción de medidas constatables y traducibles en hechos y derecho a tono con la auténtica realidad electoral. "A modo de epílogo, reproducimos el siguiente pensamiento: 'Todo el que se dice defensor de la Constitución o de una forma de gobierno y hace lo que es incompatible con ella, a nadie convence; mas despierta recelo y prevención. Por el contrario, el que señala las desviaciones y fallas en la práctica de las instituciones, y lo mismo en la concepción doctrinaria, pero ajusta su conducta a los preceptos que quiere ver respetados y afianzados, es innegable que presta un gran servicio a la causa que defiende. . . . Del Preliminar de *Reflexiones sobre Sistemas Políticos, Bielsa*, Universidad Nacional del Litoral, Santa Fe, 1941.' Citado en Luqui, *supra*, pág. 751." *P.N.P. v. Hernández, Srio. D.T.O.P.*, supra, pág. 389.

La mayoría del Tribunal ha convertido en *remiendo* el *remedio* judicial apropiado. Por tal razón, no vemos cómo puede pretenderse hablar de "unanimidad" en una decisión *dividida* (opinión mayoritaria, pág. 61) o insistir en caracterizar esta ponencia como una *concurrente y disidente*. Es un espejismo judicial creer, al decir de la mayoría, que "[n]o hay diferencia sustancial entre los miembros del Tribunal sobre los fundamentos que justifican dicho resultado, incluso sobre la naturaleza del juicio *de novo* y las normas y criterios que deben guiarnos al analizar el procedimiento de impugnación de una elección. *De haber alguna diferencia, estimamos que mayormente es de énfasis en el análisis de los problemas y en las normas a seguir*". (Énfasis suplido.) Íd., pág. 62.

En materia electoral, no podemos destejer en la noche lo que cuidadosamente tejimos ayer. *La única coincidencia es el epígrafe.* Las diferencias existen y son profundas y sustanciales. Comienzan en cuanto a la visión y naturaleza de la función judicial, se manifiestan a todo lo largo de nuestro análisis jurídico y evidenciario concienzudo, y subsiste per-

manentemente con las interrogantes que la mayoría se niega a contestar a la luz de la abrumadora prueba documental y testifical presentada por Granados Navedo.

*Sobre todo*, se distingue por la fina hebra que frágilmente sujeta la opinión mayoritaria, en forma de *una presunción de corrección*, constantemente invocada en tres (3) modalidades: una deferencia hacia la Comisión Estatal fundamentada en un supuesto conocimiento especializado (*expertise*) en materia de *derecho* electoral (opinión mayoritaria, pág. 20); el Certificado de Elección (íd., pág. 21), y la validez de la determinación que anuló las papeletas de los electores de San Juan que, *bona fide*, escribieron sus iniciales al dorso (íd., págs. 36–41).

"En la Sagrada Escritura, Eclesiastés nos recuerda que '[*h*]*ay un tiempo para cada cosa, y un momento para hacerla bajo el cielo*'." *In re Conferencia Judicial*, 122 D.P.R. 420, 449 (1988). Al aplicar este pensamiento al caso de autos es obvio *que el tiempo de las presunciones ya pasó. Con apoyo en la abrumadora prueba, hemos demostrado que no procedía la certificación de Acevedo Pérez y que Granados Navedo numéricamente prevaleció en las elecciones por dieciséis (16) votos. Al no reconocerlo, la mayoría del Tribunal ha cometido un error de naturaleza grave.* Subsiste, pues, un estado de *indefención electoral* por razón de *indefinición judicial*. Granados Navedo *sólo ha obtenido una victoria pírrica*. Mientras tanto, cada voto que no le fue adjudicado es una *injusticia*; la suma total, una *GRAN INJUSTICIA*.

Esa verdad no ha estado en la superficie. Descubrirla no ha sido fácil, sino ardua y trabajosa tarea judicial. Inevitablemente, encontrarla y exponerla en este disenso ha generado crítica recíproca. Naturalmente, ello encontrará eco más allá de este estrado. Es comprensible. "La verdad por la blancura de su pureza y su desinterés, suscita admiración,

pero también incita al tiro al blanco." Pemán, citado por Soto Nieto, *op. cit.*, pág. 116.

"'. . . Habrá quienes el simple abordar este tema les resultará ruborizante, mortificante o un tanto irritante. No es ese nuestro deseo. Tampoco será la primera ni última vez que el quehacer judicial genere tales reacciones'. *Ortiz Angleró [v. Barreto Pérez*, 110 D.P.R. 84, 105–106 (1980)]. Ninguna de esas u otras reacciones disonantes constituirán razones suficientes para el jurista abdicar su jurisdicción, empañar la nitidez de su óptica judicial, opacar la integridad de su ética o abjurar los dictados de su conciencia." *P.S.P., P.P.D., P.I.P. v. Romero Barceló*, 110 D.P.R. 248, 312 (1980).

Descartada por la mayoría del Tribunal la nueva elección,[14] debieron reconocer que Granados Navedo prevaleció entre el electorado del Municipio de San Juan. En este sentido es natural que, si no examinaron la prueba documental y testifical obrante en autos, dicho remedio alterno les resulte "un contrasentido" e, incluso, incomprensible. *No es función de jueces gestar justicia artificial, "in vitro"*.

Hasta aquí los términos de esta ponencia antes de ser remitida para su certificación. La misma fue previamente modificada en varias ocasiones para atender los cambios in-

---

[14] La analogía entre una nueva elección limitada —en los colegios y unidades electorales donde hubo irregularidades— y una elección general en un municipio pequeño debe ser objeto de ponderada meditación judicial. Aunque desde el punto estrictamente *cuantitativo* no pueden apreciarse diferencias, cuando abordamos el asunto en el orden cualitativo nos percatamos de que *no son absolutamente equiparables*. Y ello es así tanto por la propia naturaleza de esas elecciones, como por las circunstancias particulares en las que habrían de celebrarse.

Indudablemente, el esquema legislativo que propugna una nueva elección no consideró situaciones en que uno de los candidatos esté *usufructuando* el puesto, a pesar de que su certificación haya sido impugnada. El poder y los recursos derivados del puesto definitivamente ponen al incumbente en una posición de ventaja sobre sus contrincantes.

También existe una diferencia sustancial entre los cargos de gobernador y alcalde. El último, distinto al primero, por su proximidad y trabajo directo con los electores está en mejor posición de ejercer influencias excesivas que vicien el proceso.

troducidos en la opinión mayoritaria y replicar los señalamientos de las opiniones concurrentes y de conformidad.

Ello debió poner punto final al debate, a las críticas y a las discrepancias. Lamentablemente no ha sido así. En acción sin precedente, la Juez Asociada Señora Naveira de Rodón, en su opinión concurrente y de conformidad —a la que se unió el Juez Asociado Señor Hernández Denton— ha intentado persuadirnos de que eliminemos, sustituyamos o refraseemos determinados pasajes de nuestro disenso al insistir que los mismos constituyen lenguaje inflamatorio, provocador, poco edificante y nocivo a la imagen pública de esta institución. Incluso llegó al extremo de sugerir que cualquier ataque al Tribunal o acto de violencia que la decisión mayoritaria pudiera generar sería directamente atribuible a nuestro disenso. No sabemos con qué propósito pidió que ello se hiciera formar parte de la minuta del Pleno de hoy. Ese trámite oficial amerita una aclaración. El silencio de la mayoría y el nuestro pueden ser malinterpretados.

La apreciación aludida es totalmente equivocada. *Y es que, frente a los reclamos de posibles reacciones irracionales o de violencia, poco puede hacer el jurisprudente.* No es menester enumerar los peligros que impondría al proceso decisorio y a la *independencia judicial* el que la mayoría del Tribunal endosara esa visión.

*Debajo de la toga judicial hay que tener una coraza muy gruesa. Nuestra fortaleza espiritual es grande. Señalamientos de este tipo no habrán de desviar nuestra voluntad y conciencia, la cual se revitaliza ante la adversidad de los tiempos y los hombres.* "El buen juez, pues, evita toda conducta que mine la confianza pública en la neutralidad del Poder Judicial. Sabe que la suspicacia es el elemento corrosivo más dañino y difícil de subsanar de la estabilidad, convivencia y paz social. Descubre a tiempo que la metamorfosis del abogado al jurista se produce y se consuma no sólo con la opinión correcta en derecho o el discurso académico, sino

engalanada en una ejemplar conducta de moral, neutralidad y dignidad judicial." *P.S.P., P.P.D., P.I.P. v. Romero Barceló*, supra, pág. 311.

Como expusiéramos en el pasado, en instancias igualmente difíciles, "'[p]or lo demás, "reconocemos las discusiones intelectuales, jurídicas y políticas —serias, histéricas y apasionadas— que generan controversias de esta índole. Como Tribunal colegiado nuestros fallos no están inmunes a la crítica, sea constructiva, sana, injusta o viciosa".' *P.I.P. v. E.L.A.*, [109 D.P.R. 403, 415 (1980)]. La naturaleza y dinámica humanas son fluidas y sumamente complejas. Así pues, en una sociedad pluralista existe todo tipo de personalidades —simplistas y complicadas, inteligentes y cerradas, objetivas y prejuiciadas, fanáticas y tolerantes— portavoces que responden a una gama de intereses ideológicos particulares o de grupos, tanto profesionales como partidistas. Dependiendo del grado de convulsión social y la crudeza de las luchas de las distintas tendencias en determinado momento, el abanico de percepciones erróneas o distorsionadas y voces hostiles, aun entre y contra personas honorables y de prestigio, varía". *P.S.P., P.P.D., P.I.P. v. Romero Barceló*, supra, pág. 312.

# APÉNDICE A

Papeleta de nominación directa

(*Write-in*)

NOTA DE LA COMPILADORA:
    La indefinición gráfica se debe al tamaño reducido de los modelos. Los originales constan en el expediente de este caso en el Tribunal Supremo.

## APÉNDICE A

| PARTIDO POPULAR DEMOCRATICO | | PARTIDO NUEVO PROGRESISTA | | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | | NOMINACION DIRECTA (WRITE IN) |
|---|---|---|---|---|---|---|
| **ALCALDE** Héctor Luis Acevedo | | **ALCALDE** José Granados Navedo | | **ALCALDE** Ana María (Isa) Cerrada del Rio | | **ALCALDE** *JOSÉ Granades S. Ru* |
| Thilda Alvarado | 1 | Ramón "Pitín" Miranda Marxis | 1 | Carlos Fronteras | 1 | *Ramon "Pitín" Miran* |
| Manuel E. Andreu García | 2 | Démaris Sálvarez Reyes | 2 | Héctor Villarini | 2 | |
| Carmelo Bonnemort Calo | 3 | Miguel A. "Tito" González Rios | 3 | José Cruz | 3 | |
| Eric Colón Rodríguez | 4 | Enrique Ferreira Vélez | 4 | Otilio Ramada | 4 | *Enrique Ferreira* |
| Amadeo Cruz Cáceres | 5 | Nicolás Crespo Kerwright | 5 | Angel Ortega | 5 | |
| John Fusile | 6 | Samuel Méndez Cents | 6 | Justa Márquez | 6 | |
| Conrado González | 7 | Isidro Albino Serrano | 7 | José T. Quiñones | 7 | |
| Roberto Pérez Santos | 8 | Myriam Hardman Barraza | 8 | Gladys Castro | 8 | |
| Francisco (Paco) Luis Rivera | 9 | George McDougall | 9 | Victor Andino | 9 | |
| Diana Rodríguez | 10 | Rafael Uharri Acosta | 10 | Pablo Ortiz | 10 | |
| Dados Bajo | 11 | Sonia Pabón de Sotomayor | 11 | Diego Garbea | 11 | |
| Awilda Salcines | 12 | Luss Rivera Bremen | 12 | Domingo Elias Velázquez | 12 | |
| Arturo Silvagnoli | 13 | Héctor L. Schmidt Figueroa | 13 | Digna L. Osesio Rosario | 13 | |
| Zamira Vergas Colón | 14 | Aida Avaio Collazo | 14 | Felipe (Pipe) Rivera | 14 | *Aida Avala Collaz* |

## INSTRUCCIONES SOBRE LA FORMA DE VOTAR LA PAPELETA ELECTORAL MUNICIPAL

En esta papeleta usted tiene derecho a votar por un candidato a Alcalde y por el número exacto de Asambleístas que aparecen en una de las columnas. Si usted vota por más del número de candidatos a que tiene derecho para cada posición, usted anula su voto para dicha posición.

| **COMO VOTAR INTEGRO:** | **COMO VOTAR MIXTO:** | **COMO VOTAR POR CANDIDATURA:** |
|---|---|---|
| Votar íntegro es votar por todos los candidatos del partido de su preferencia y por ninguno otro.<br><br>Para votar íntegro usted hace una sola cruz "X" o marca válida en el espacio en blanco bajo la insignia del partido de su preferencia. Esa sola marca vale para todos los candidatos bajo la columna. | Si usted, además de votar bajo la insignia de un partido, tiene preferencia por uno o más candidatos de otros partidos para uno o más cargos, podrá hacer una cruz o marca válida al lado del nombre del candidato que prefiera fuera de la columna de su partido.<br><br>También puede votar por otras personas de su preferencia cuyos nombres no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.<br><br>Tenga en cuenta que sólo puede votar por un candidato para cada cargo. Cada voto así emitido contará solamente para el candidato expresamente marcado. | Cuando el elector desea votar exclusivamente por uno o más candidatos y no tiene interés en votar bajo la insignia de ningún partido, hará una marca al lado de los candidatos de su preferencia.<br><br>También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.<br><br>Tenga en cuenta que sólo puede votar por un candidato para cada cargo. |

COMISION ESTATAL DE ELECCIONES
## ELECCIONES GENERALES
# PAPELETA ELECTORAL MUNICIPAL
8 DE NOVIEMBRE DE 1988

Municipio de **SAN JUAN**

# APÉNDICE B

Papeletas de doble marca anuladas por el
Presidente de la Comisión Estatal
el 2 de diciembre de 1988

---

NOTA DE LA COMPILADORA:
    La indefinición gráfica se debe al tamaño reducido de los modelos. Los originales constan en el expediente de este caso en el Tribunal Supremo.

APÉNDICE B

ANEJO 1

|  |  |  | NOMINACION DIRECTA |
|---|---|---|---|
| | | ¡DATE A RESPETAR! | (WRITE IN) |
| | | | Se provee esta columna en blanco para que el elector anote en ella el nombre de cualquier otro candidato que desee nominar, fuera de los que aparecen en las columnas anteriores |
| **PARTIDO POPULAR DEMOCRATICO** | **PARTIDO NUEVO PROGRESISTA** | **PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO** | Artículo 5.611 Ley Electoral |
| ALCALDE | ALCALDE | ALCALDE | ALCALDE |
| Héctor Luis Acevedo | José Granados Navedo | Ana María (Ita) Corrada del Río | |
| Miembros de la Asamblea Municipal | Miembros de la Asamblea Municipal | Miembros de la Asamblea Municipal | Miembros de la Asamblea Municipal |
| 1 Thilda Alvarado | 1 Ramón "Pitito" Miranda Marrán | 1 Carlos Fronteras | 1 |
| 2 Manuel E. Andreu García | 2 Dámaris Sifuentes Reyes | 2 Héctor Villarini | 2 |
| 3 Carmelo Betancourt Cale | 3 Miguel A. "Tito" González Ríos | 3 José Cruz | 3 |
| 4 Eric Colón Rodríguez | 4 Enrique Ferreira Vélez | 4 Otilio Rosado | 4 |
| 5 Amadis Cruz Cáceres | 5 Nicolás Crespo Kortright | 5 Angel Ortega | 5 |
| 6 John Fucile | 6 Samuel Méndez Cuesta | 6 Jesús Márquez | 6 |
| 7 Conrado González | 7 Isidra Albino Serrano | 7 José T. Quiñones | 7 |
| 8 Roberto Pérez Santoni | 8 Myriam Herdman Barroso | 8 Gladys Cosme | 8 |
| 9 Francisco (Paco) Luis Rivera | 9 George McDougall | 9 Víctor Andino | 9 |
| 10 Diana Rodríguez | 10 Rafael Ubarri Acosta | 10 Pablo Ortiz | 10 |
| 11 Dafne Roя | 11 Sonia Pabón de Sotomayor | 11 Diego Gorbea | 11 |
| 12 Awilda Saldaña | 12 Luis Rivera Brenes | 12 Domingo Elías Velázquez | 12 |
| 13 Arturo Silvagnoli | 13 Héctor L. Schmidt Figueroa | 13 Digna L. Ocasio Rosario | 13 |
| 14 Zandra Vergne Colón | 14 Aida Avalo Collazo | 14 Felipe (Pipo) Rivera | 14 |

## INSTRUCCIONES SOBRE LA FORMA DE VOTAR LA PAPELETA ELECTORAL MUNICIPAL

En esta papeleta usted tiene derecho a votar por un candidato a Alcalde y por el número exacto de Asambleístas que aparecen en una de las columnas.
Si usted vota por más del número de candidatos a que tiene derecho para cada posición, usted anula su voto para dicha posición.

**COMO VOTAR INTEGRO:**

Votar íntegro es votar por todos los candidatos del partido de su preferencia y por ninguno otro.

Para votar íntegro usted hace una sola cruz "X" o marca válida en el espacio en blanco bajo la insignia del partido de su preferencia. Esa sola marca vale para todos los candidatos bajo la columna.

**COMO VOTAR MIXTO:**

Si usted, además de votar bajo la insignia de un partido, tiene preferencia por uno o más candidatos de otros partidos para uno o más cargos, podrá hacer una cruz o marca válida al lado del nombre del candidato que prefiera fuera de la columna de su partido.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo. Cada voto así marcado contará solamente para el candidato expresamente marcado.

**COMO VOTAR POR CANDIDATURA:**

Cuando el elector desea votar exclusivamente por uno o más candidatos y no tiene interés en votar bajo la insignia de ningún partido, hará una marca al lado de los candidatos de su preferencia.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo.

COMISION ESTATAL DE ELECCIONES
## ELECCIONES GENERALES
# PAPELETA ELECTORAL MUNICIPAL
### 8 DE NOVIEMBRE DE 1988

Municipio de   **SAN JUAN**

ANEJO 2

| PARTIDO POPULAR DEMOCRATICO | PARTIDO NUEVO PROGRESISTA | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | NOMINACION DIRECTA (WRITE IN) |
|---|---|---|---|
| ALCALDE Héctor Luis Acevedo | ALCALDE José Granados Navedo | ALCALDE Ana María (Ita) Corrada del Rio | ALCALDE |
| 1 Thilda Alvarado | 1 Ramón "Pitito" Miranda Marzán | 1 Carlos Fronteras | 1 |
| 2 Manuel E. Andreu García | 2 Dámaris Sifuentes Reyes | 2 Héctor Villarini | 2 |
| 3 Carmelo Betancourt Calo | 3 Miguel A. "Tito" González Rios | 3 José Cruz | 3 |
| 4 Eric Colón Rodríguez | 4 Enrique Ferreira Vélez | 4 Otilio Rosado | 4 |
| 5 Amadis Cruz Cáceres | 5 Nicolás Crespo Kortright | 5 Angel Ortega | 5 |
| 6 John Fucile | 6 Samuel Méndez Cuesta | 6 Jesús Márquez | 6 |
| 7 Conrado González | 7 Isidra Albino Serrano | 7 José T. Quiñones | 7 |
| 8 Roberto Pérez Santani | 8 Myriam Herdman Barroso | 8 Gladys Cosme | 8 |
| 9 Francisco (Paco) Luis Rivera | 9 George McDougall | 9 Victor Andino | 9 |
| 10 Diana Rodríguez | 10 Rafael Ubarri Acosta | 10 Pablo Ortiz | 10 |
| 11 Dafne Rays | 11 Sonia Pabón de Sotomayor | 11 Diego Gorbea | 11 |
| 12 Awilda Saldaña | 12 Luis Rivera Brenes | 12 Domingo Elías Velázquez | 12 |
| 13 Arturo Silvagneli | 13 Héctor L. Schmidt Figueroa | 13 Digna L. Ocasio Rosario | 13 |
| 14 Zandra Vergne Colón | 14 Aida Avalo Collazo | 14 Felipe (Pipo) Rivera | 14 |

## INSTRUCCIONES SOBRE LA FORMA DE VOTAR LA PAPELETA ELECTORAL MUNICIPAL

En esta papeleta usted tiene derecho a votar por un candidato a Alcalde y por el número exacto de Asambleístas que aparecen en una de las columnas. Si usted vota por más del número de candidatos a que tiene derecho para cada posición, usted anula su voto para dicha posición.

**COMO VOTAR INTEGRO:**

Votar íntegro es votar por todos los candidatos del partido de su preferencia y por ninguna otra.

Para votar íntegro usted hace una sola cruz "X" o marca válida en el espacio en blanco bajo la insignia del partido de su preferencia. Esa sola marca vale para todos los candidatos bajo la columna.

**COMO VOTAR MIXTO:**

Si usted, además de votar bajo la insignia de un partido, tiene preferencia por uno o más candidatos de otros partidos para uno o más cargos, pedirá hacer una cruz o marca válida al lado del nombre del candidato que prefiere fuera de la columna de su partido.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo. Cada voto así marcado contará solamente para el candidato expresamente marcado.

**COMO VOTAR POR CANDIDATURA:**

Cuando el elector desea votar exclusivamente por uno o más candidatos y no tiene interés en votar bajo la insignia de ningún partido, hará una marca al lado de los candidatos de su preferencia.

También puede votar por otras personas de su preferencia que no aparecen como candidatas, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo.

COMISION ESTATAL DE ELECCIONES
## ELECCIONES GENERALES
# PAPELETA ELECTORAL MUNICIPAL
8 DE NOVIEMBRE DE 1988

Municipio de  **SAN JUAN**

ANEJO 3

| PARTIDO POPULAR DEMOCRATICO | PARTIDO NUEVO PROGRESISTA | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | NOMINACION DIRECTA (WRITE IN) |
|---|---|---|---|
| **ALCALDE** Héctor Luis Acevedo | **ALCALDE** José Granados Navedo | **ALCALDE** Ana María (Ita) Corrada del Rio | **ALCALDE** |
| 1 Thilda Alvarado | 1 Ramón "Pitito" Miranda Marzán | 1 Carlos Fronteras | 1 |
| 2 Manuel E. Andreu García | 2 Dámaris Sifuentes Reyes | 2 Héctor Villarını | 2 |
| 3 Carmelo Betancourt Calo | 3 Miguel A. "Tito" González Rios | 3 José Cruz | 3 |
| 4 Eric Colón Rodriguez | 4 Enrique Ferreira Vélez | 4 Otilio Rosado | 4 |
| 5 Amadis Cruz Cáceres | 5 Nicolás Crespo Kortright | 5 Angel Ortega | 5 |
| 6 John Focile | 6 Samuel Méndez Cuesta | 6 Jesús Márquez | 6 |
| 7 Conrado González | 7 Isidra Albino Serrano | 7 José T. Quiñones | 7 |
| 8 Roberto Pérez Santesi | 8 Myriam Herdman Barrose | 8 Gladys Cosme | 8 |
| 9 Francisco (Paco) Luis Rivera | 9 George McDougall | 9 Victor Andino | 9 |
| 10 Diana Rodriguez | 10 Rafael Ubarri Acosta | 10 Pablo Ortiz | 10 |
| 11 Dafne Rojo | 11 Sonia Pabón de Sotomayor | 11 Diego Gorbea | 11 |
| 12 Awilda Saldaña | 12 Luis Rivera Brenes | 12 Domingo Elias Velázquez | 12 |
| 13 Arturo Silvagnoli | 13 Héctor L. Schmidt Figueroa | 13 Digna L. Ocaso Rosario | 13 |
| 14 Zandra Vergne Colón | 14 Aida Avale Collaso | 14 Felipe (Pipo) Rivera | 14 |

## INSTRUCCIONES SOBRE LA FORMA DE VOTAR LA PAPELETA ELECTORAL MUNICIPAL

En esta papeleta usted tiene derecho a votar por un candidato a Alcalde y por el número exacto de Asambleistas que aparecen en una de las columnas. Si usted vota por más del número de candidatos a que tiene derecho para cada posición, usted anula su voto para dicha posición.

**COMO VOTAR INTEGRO:**

Votar integro es votar por todas los candidatos del partido de su preferencia y por ninguno otro.

Para votar integro usted hace una sola cruz "X" o marca válida en el espacio en blanco bajo la insignia del partido de su preferencia. Esta sola marca vale para todas los candidatos bajo la columna.

**COMO VOTAR MIXTO:**

Si usted, además de votar bajo la insignia de un partido, tiene preferencia por uno o más candidatos de otros partidos para uno o más cargos, podrá hacer una cruz o marca válida al lado del nombre del candidato que prefiera fuera de la columna de su partido.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo. Cada voto así marcado contará solamente para el candidato expresamente marcado.

**COMO VOTAR POR CANDIDATURA:**

Cuando el elector desea votar exclusivamente por uno o más candidatos y no tiene interés en votar bajo la insignia de ningún partido, hará una marca al lado de los candidatos de su preferencia.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo.

COMISION ESTATAL DE ELECCIONES
## ELECCIONES GENERALES
# PAPELETA ELECTORAL MUNICIPAL
8 DE NOVIEMBRE DE 1988

Municipio de **SAN JUAN**

ANEJO 4

| PARTIDO POPULAR DEMOCRATICO | PARTIDO NUEVO PROGRESISTA | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | NOMINACION DIRECTA (WRITE IN) |
|---|---|---|---|
| **ALCALDE** Héctor Luis Acevedo | **ALCALDE** José Granados Navedo | **ALCALDE** Ana María (Ita) Corrada del Río | **ALCALDE** |
| Thilda Alvarado | 1 Ramón "Pitín" Miranda Marxis | 1 Carlos Fronteras | 1 |
| Manuel E. Andreu Garcia | 2 Dámaris Sifuentes Reyes | 2 Héctor Villarini | 2 |
| 3 Carmelo Betancourt Cale | 3 Miguel A. "Tito" Gonzáles Ríos | 3 José Cruz | 3 |
| 4 Eric Colón Rodríguez | 4 Enrique Ferreira Vélez | 4 Otilio Rosado | 4 |
| 5 Amadeo Cruz Cáceres | 5 Nicolás Crespo Kortright | 5 Angel Ortega | 5 |
| 6 John Fucile | 6 Samuel Méndez Cuesta | 6 Jesús Márquez | 6 |
| 7 Conrado González | 7 Isidra Albino Serrano | 7 José T. Quiñones | 7 |
| 8 Roberto Pérez Santoni | 8 Myriam Herdman Barroso | 8 Gladys Cosme | 8 |
| 9 Francisco (Paco) Luis Rivera | 9 George McDougall | 9 Víctor Andino | 9 |
| 10 Diana Rodríguez | 10 Rafael Ubarri Acosta | 10 Pablo Ortiz | 10 |
| 11 Dafne Rojas | 11 Sonia Pabón de Sotomayor | 11 Diego Gorbea | 11 |
| 12 Awilda Saldaña | 12 Luis Rivera Brenes | 12 Domingo Elías Velásquez | 12 |
| 13 Arturo Silvagnoli | 13 Héctor L. Schmidt Figueroa | 13 Digna L. Ocasio Rosario | 13 |
| 14 Zandra Vergne Colón | 14 Aida Avalo Collazo | 14 Felipe (Pipo) Rivera | 14 |

## INSTRUCCIONES SOBRE LA FORMA DE VOTAR LA PAPELETA ELECTORAL MUNICIPAL

En esta papeleta usted tiene derecho a votar por un candidato a Alcalde y por el número exacto de Asambleístas que aparecen en una de las columnas. Si usted vota por más del número de candidatos a que tiene derecho para cada posición, usted anula su voto para dicha posición.

**COMO VOTAR INTEGRO:**

Votar íntegro es votar por todos los candidatos del partido de su preferencia y por ninguno otro.

Para votar íntegro usted hace una sola cruz "X" o marca válida en el espacio en blanco bajo la insignia del partido de su preferencia. Esa sola marca vale por todos los candidatos bajo la columna.

**COMO VOTAR MIXTO:**

Si usted, además de votar bajo la insignia de un partido, tiene preferencia por uno o cada candidato de otros partidos para uno o más cargos, podrá hacer una cruz o marca válida al lado del nombre del candidato que prefiera fuera de la columna de su partido.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo. Cada voto así marcado contará solamente para el candidato expresamente marcado.

**COMO VOTAR POR CANDIDATURA:**

Cuando el elector desea votar exclusivamente por uno o más candidatos y no tiene interés en votar bajo la insignia de ningún partido, hará una marca al lado de los candidatos de su preferencia.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo.

COMISION ESTATAL DE ELECCIONES

# ELECCIONES GENERALES
## PAPELETA ELECTORAL MUNICIPAL
6 DE NOVIEMBRE DE 1988

Municipio de **SAN JUAN**

ANEJO 5

| PARTIDO POPULAR DEMOCRATICO | PARTIDO NUEVO PROGRESISTA | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | NOMINACION DIRECTA (WRITE IN) |
|---|---|---|---|
| **ALCALDE** Héctor Luis Acevedo | **ALCALDE** José Granados Navedo | **ALCALDE** Ana María (Ita) Corrada del Río | **ALCALDE** |
| 1 Thilda Alvarado | 1 Ramón "Pitito" Miranda Marzán | 1 Carlos Fronteras | 1 |
| 2 Manuel E. Andreu García | 2 Dámaris Sifuentes Reyes | 2 Héctor Villarini | 2 |
| 3 Carmelo Betancourt Caio | 3 Miguel A. "Tito" Gonzáles Ríos | 3 José Cruz | 3 |
| 4 Eric Colón Rodríguez | 4 Enrique Ferreira Vélez | 4 Otilio·Rosado | 4 |
| 5 Amadís Cruz Cáceres | 5 Nicolás Crespo Kortright | 5 Angel Ortega | 5 |
| 6 John Fuelle | 6 Samuel Méndez Cuesta | 6 Jesús Márquez | 6 |
| 7 Conrado Gonzáles | 7 Isidro Albino Serrano | 7 José T. Quiñones | 7 |
| 8 Roberto Pérez Santoni | 8 Myriam Herdman Barreso | 8 Gladys Cosme | 8 |
| 9 Francisco (Pase) Luis Rivera | 9 George McDougall | 9 Victor Andino | 9 |
| 10 Diana Rodríguez | 10 Rafael Ubarri Acosta | 10 Pablo Ortiz | 10 |
| 11 Dafne Rosa | 11 Sonia Pabón de Sotomayor | 11 Diego Gorbea | 11 |
| 12 Awilda Saldaña | 12 Luis Rivera Brenes | 12 Domingo Elías Velázquez | 12 |
| 13 Arturo Silvagnoli | 13 Héctor L. Schmidt Figueroa | 13 Digna L. Ocasio Rosario | 13 |
| 14 Zandra Vergne Colón | 14 Aída Avalo Collazo | 14 Felipe (Pipo) Rivera | 14 |

## INSTRUCCIONES SOBRE LA FORMA DE VOTAR LA PAPELETA ELECTORAL MUNICIPAL

En esta papeleta usted tiene derecho a votar por un candidato a Alcalde y por el número exacto de Asambleístas que aparecen en una de las columnas.
Si usted vota por más del número de candidatos a que tiene derecho para cada posición, usted anula su voto para dicha posición.

**COMO VOTAR INTEGRO:**

Votar íntegro es votar por todos los candidatos del partido de su preferencia y por ninguno otro.

Para votar íntegro usted hace una sola cruz "X" o marca válida en el espacio en blanco bajo la insignia del partido de su preferencia. Esa sola marca vale para todos los candidatos bajo la columna.

**COMO VOTAR MIXTO:**

Si usted, además de votar bajo la insignia de un partido, tiene preferencia por una o más candidatos de otros partidos para uno o más cargos, podrá hacer una cruz o marca válida al lado del nombre del candidato que prefiera fuera de la columna de su partido.

También puede votar por otras personas de su preferencia cuando no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo. Cada voto así marcado contará solamente para el candidato expresamente marcado.

**COMO VOTAR POR CANDIDATURA:**

Cuando el elector desea votar exclusivamente por una o más candidatos y no tiene interés en votar bajo la insignia de ningún partido, hará una marca al lado de los candidatos de su preferencia.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo.

COMISION ESTATAL DE ELECCIONES
## ELECCIONES GENERALES
# PAPELETA ELECTORAL MUNICIPAL
8 DE NOVIEMBRE DE 1988

Municipio de SAN JUAN

310

| PARTIDO POPULAR DEMOCRATICO | PARTIDO NUEVO PROGRESISTA | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | NOMINACION DIRECTA (WRITE IN) |
|---|---|---|---|
| **ALCALDE** Héctor Luis Acevedo | **ALCALDE** José Granados Navedo | **ALCALDE** Ana María (Ita) Corrada del Río | **ALCALDE** |
| Miembros de la Asamblea Municipal | Miembros de la Asamblea Municipal | Miembros de la Asamblea Municipal | Miembros de la Asamblea Municipal |
| 1 Thilda Alvarado | 1 Ramón "Pitito" Miranda Marzán | 1 Carlos Fronteras | 1 |
| 2 Manuel E. Andreu García | 2 Dámaris Sifuentes Reyes | 2 Héctor Villarini | 2 |
| 3 Carmelo Betancourt Caio | 3 Miguel A. "Tito" González Ríos | 3 José Cruz | 3 |
| 4 Eric Colón Rodríguez | 4 Enrique Ferreira Vélez | 4 Otilio Rosado | 4 |
| 5 Amadís Cruz Cáceres | 5 Nicolás Crespo Kortright | 5 Angel Ortega | 5 |
| 6 John Fucile | 6 Samuel Méndez Cuesta | 6 Jesús Márquez | 6 |
| 7 Conrado González | 7 Isidra Albino Serrano | 7 José T. Quiñones | 7 |
| 8 Roberto Pérez Santoni | 8 Myriam Herdman Barros | 8 Gladys Coams | 8 |
| 9 Francisco (Paco) Luis Rivera | 9 George McDougall | 9 Víctor Andino | 9 |
| 10 Diana Rodríguez | 10 Rafael Ubarri Acosta | 10 Pablo Oruz | 10 |
| 11 Dafne Rojo | 11 Sonia Pabón de Sotomayor | 11 Diego Gorbea | 11 |
| 12 Awilda Saldaña | 12 Luis Rivera Brenes | 12 Domingo Elías Velázquez | 12 |
| 13 Arturo Silvagnoli | 13 Héctor L. Schmidt Figueroa | 13 Digna L. Ocasio Rosario | 13 |
| 14 Zandra Vergne Colón | 14 Aida Avalo Collazo | 14 Felipe (Pipo) Rivera | 14 |

## INSTRUCCIONES SOBRE LA FORMA DE VOTAR LA PAPELETA ELECTORAL MUNICIPAL

En esta papeleta usted tiene derecho a votar por un candidato a Alcalde y por el número exacto de Asambleístas que aparecen en una de las columnas. Si usted vota por más del número de candidatos a que tiene derecho para cada posición, usted anula su voto para dicha posición.

**COMO VOTAR INTEGRO:**

Votar íntegro es votar por todos los candidatos del partido de su preferencia y por ninguno otro.

Para votar íntegro usted hace una sola cruz "X" o marca válida en el espacio en blanco bajo la insignia del partido de su preferencia. Esa sola marca vale para todos los candidatos bajo la columna.

**COMO VOTAR MIXTO:**

Si usted, además de votar bajo la insignia de un partido, tiene preferencia por uno o más candidatos de otros partidos para uno o más cargos, podrá hacer una cruz o marca válida al lado del nombre del candidato que prefiera fuera de la columna de su partido. También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa. Tenga en cuenta que sólo puede votar por un candidato para cada cargo. Cada voto así marcado contará solamente para el candidato expresamente marcado.

**COMO VOTAR POR CANDIDATURA:**

Cuando el elector desea votar exclusivamente por una o más candidatos y no tiene interés en votar bajo la insignia de ningún partido, hará una marca al lado de los candidatos de su preferencia. También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa. Tenga en cuenta que sólo puede votar por un candidato para cada cargo.

COMISION ESTATAL DE ELECCIONES
## ELECCIONES GENERALES
# PAPELETA ELECTORAL MUNICIPAL
8 DE NOVIEMBRE DE 1988

Municipio de  **SAN JUAN**

ANEJO 7

NOMINACION DIRECTA

(WRITE IN)

Se prevee esta columna en blanco para que e
elector anote en ella el nombre de cualquier
otro candidato que desee especificar, fuera de
los que aparecen en las columnas cace nueve.

Articulo 6.611
Ley Electoral

| PARTIDO POPULAR DEMOCRATICO | PARTIDO NUEVO PROGRESISTA | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | |
|---|---|---|---|
| **ALCALDE** Héctor Luis Acevedo | **ALCALDE** José Granados Navedo | **ALCALDE** Ana María (Ita) Corrada del Río | **ALCALDE** |
| Miembros de la Asamblea Municipal | Miembros de la Asamblea Municipal | Miembros de la Asamblea Municipal | Miembros de la Asamblea Municipal |
| 1 Thilda Alvarado | 1 Ramón "Pitito" Miranda Marzán | 1 Carlos Fronteras | 1 |
| 2 Manuel E. Andreu García | 2 Dámaris Sifuentes Reyes | 2 Héctor Villarini | 2 |
| 3 Carmelo Betancourt Calo | 3 Miguel A. "Tito" González Ríos | 3 José Cruz | 3 |
| 4 Eric Colón Rodríguez | 4 Enrique Ferreira Vélez | 4 Otilio Rosado | 4 |
| 5 Amadís Cruz Cáceres | 5 Nicolás Crespo Kortright | 5 Angel Ortega | 5 |
| 6 John Fucile | 6 Samuel Méndez Cuesta | 6 Jesús Márquez | 6 |
| 7 Conrado González | 7 Isidra Albino Serrano | 7 José T. Quiñones | 7 |
| 8 Roberto Pérez Santoni | 8 Myriam Herdman Barrose | 8 Gladys Cosme | 8 |
| 9 Francisco (Paco) Luis Rivera | 9 George McDougall | 9 Víctor Andino | 9 |
| 10 Diana Rodríguez | 10 Rafael Ubarri Acosta | 10 Pablo Ortiz | 10 |
| 11 Dafne Rojo | 11 Sonia Pabón de Sotomayor | 11 Diego Gorbea | 11 |
| 12 Awilda Saldaña | 12 Luis Rivera Brenes | 12 Domingo Elías Velázquez | 12 |
| 13 Arturo Silvagnoli | 13 Héctor L. Schmidt Figueroa | 13 Digna L. Ocasio Rosario | 13 |
| 14 Zandra Vergne Colón | 14 Aida Avalo Collazo | 14 Felipe (Pipo) Rivera | 14 |

## INSTRUCCIONES SOBRE LA FORMA DE VOTAR LA PAPELETA ELECTORAL MUNICIPAL

En esta papeleta usted tiene derecho a votar por un candidato a Alcalde y por el número exacto de Asambleístas que aparecen en una de las columnas.
Si usted vota por más del número de candidatos a que tiene derecho para cada posición, usted anula su voto para dicha posición.

**COMO VOTAR INTEGRO:**

Votar íntegro es votar por todos los candidatos del partido de su preferencia y por íntegras otra.

Para votar íntegro usted hace una sola cruz "X" o marca válida en el espacio en blanco bajo la insignia del partido de su preferencia. Esa sola marca vale para todas los candidatos bajo la columna.

**COMO VOTAR MIXTO:**

Si usted, además de votar bajo la insignia de un partido, tiene preferencia por uno o más candidatos de otros partidos para uno o más cargos, podrá hacer una cruz o marca válida al lado del nombre del candidato que prefiera fuera de la columna de su partido.
También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.
Tenga en cuenta que sólo puede votar por un candidato para cada cargo. Cada voto así marcado contará solamente para el candidato expresamente marcado.

**COMO VOTAR POR CANDIDATURA:**

Cuando el elector desea votar exclusivamente por uno o más candidatos y no tiene interés en votar bajo la insignia de ningún partido, hará una marca al lado de los candidatos de su preferencia.
También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.
Tenga en cuenta que sólo puede votar por un candidato para cada cargo.

COMISION ESTATAL DE ELECCIONES
## ELECCIONES GENERALES
# PAPELETA ELECTORAL MUNICIPAL
8 DE NOVIEMBRE DE 1988

Municipio de   SAN JUAN

ANEJO 8

| PARTIDO POPULAR DEMOCRATICO | PARTIDO NUEVO PROGRESISTA | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | NOMINACION DIRECTA (WRITE IN) |
|---|---|---|---|
| ALCALDE Héctor Luis Acevedo | ALCALDE José Granados Navedo | ALCALDE Ana María (Ita) Corrada del Río | ALCALDE |
| 1 Thilda Alvarado | 1 Ramón "Pítito" Miranda Marzán | 1 Carlos Fronteras | 1 |
| 2 Manuel E. Andreu García | 2 Dámaris Sifuentes Reyes | 2 Héctor Villarini | 2 |
| 3 Carmelo Betancourt Calo | 3 Miguel A. "Tito" González Ríos | 3 José Cruz | 3 |
| 4 Eric Colón Rodríguez | 4 Enrique Ferreira Vélez | 4 Otilio Rosado | 4 |
| 5 Amadis Cruz Cáceres | 5 Nicolás Crespo Kortright | 5 Angel Ortega | 5 |
| 6 John Fucile | 6 Samuel Méndez Cuesta | 6 Jesús Márquez | 6 |
| 7 Conrado González | 7 Isidra Albino Serrano | 7 José T. Quiñones | 7 |
| 8 Roberto Pérez Santoni | 8 Myriam Herdman Barroso | 8 Gladys Cosme | 8 |
| 9 Francisco (Paco) Luis Rivera | 9 George McDougall | 9 Víctor Andino | 9 |
| 10 Diana Rodríguez | 10 Rafael Ubarri Acosta | 10 Pablo Ortiz | 10 |
| 11 Dafne Roys | 11 Sonia Pabón de Sotomayor | 11 Diego Gorbea | 11 |
| 12 Awilda Saldaña | 12 Luis Rivera Brenes | 12 Domingo Elías Velázquez | 12 |
| 13 Arturo Silvagnoli | 13 Héctor L. Schmidt Figueroa | 13 Digna L. Ocasio Rosario | 13 |
| 14 Zandra Vergne Colón | 14 Aída Avalo Collazo | 14 Felipe (Pipo) Rivera | 14 |

## INSTRUCCIONES SOBRE LA FORMA DE VOTAR LA PAPELETA ELECTORAL MUNICIPAL

En esta papeleta usted tiene derecho a votar por un candidato a Alcalde y por el número exacto de Asambleístas que aparecen en una de las columnas. Si usted vota por más del número de candidatos a que tiene derecho para cada posición, usted anula su voto para dicha posición.

**COMO VOTAR INTEGRO:**

Votar íntegro es votar por todos los candidatos del partido de su preferencia y por ninguno otro.

Para votar íntegro usted hace una sola cruz "X" o marca válida en el espacio en blanco bajo la insignia del partido de su preferencia. Esa sola marca vale por todos los candidatos bajo la columna.

**COMO VOTAR MIXTO:**

Si usted, además de votar bajo la insignia de un partido, tiene preferencia por uno o más candidatos de otros partidos para uno o más cargos, podrá hacer una cruz o marca válida al lado del nombre del candidato que prefiera fuera de la columna de su partido.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo. Cada voto así marcado contará solamente para el candidato expresamente marcado.

**COMO VOTAR POR CANDIDATURA:**

Cuando el elector desea votar exclusivamente por uno o más candidatos y no tiene interés en votar bajo la insignia de ningún partido, hará una marca al lado de los candidatos de su preferencia.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo.

COMISION ESTATAL DE ELECCIONES
## ELECCIONES GENERALES
# PAPELETA ELECTORAL MUNICIPAL
5 DE NOVIEMBRE DE 1968

Municipio de   SAN JUAN

ANEJO 9

| PARTIDO POPULAR DEMOCRATICO | PARTIDO NUEVO PROGRESISTA | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | NOMINACION DIRECTA (WRITE IN) |
|---|---|---|---|
| **ALCALDE** Héctor Luis Acevedo | **ALCALDE** José Granados Navedo | **ALCALDE** Ana María (Ita) Corrada del Río | **ALCALDE** |
| 1 Thilda Alvarado | 1 Ramón "Pitito" Miranda Marrán | 1 Carlos Fronteras | 1 |
| 2 Manuel E. Andreu García | 2 Dámaris Sifuentes Reyes | 2 Héctor Villarini | 2 |
| 3 Carmelo Betancourt Cale | 3 Miguel A. "Tito" González Ríos | 3 José Cruz | 3 |
| 4 Eric Colón Rodríguez | 4 Enrique Ferreira Vélez | 4 Otilio Rosado | 4 |
| 5 Amadis Cruz Cáceres | 5 Nicolás Crespo Kortright | 5 Angel Ortega | 5 |
| 6 John Fócile | 6 Samuel Méndez Cuesta | 6 Jesús Márquez | 6 |
| 7 Conrado González | 7 Indra Albino Serrano | 7 José T. Quiñones | 7 |
| 8 Roberto Pérez Santoni | 8 Myriam Herdman Barrose | 8 Gladys Cosme | 8 |
| 9 Francisco (Paco) Luis Rivera | 9 George McDougall | 9 Víctor Andino | 9 |
| 10 Diana Rodríguez | 10 Rafael Ubarri Acosta | 10 Pablo Ortíz | 10 |
| 11 Daisa Rojo | 11 Sonia Pabón de Sotomayor | 11 Diego Gorbea | 11 |
| 12 Awilda Saldaña | 12 Luis Rivera Brenes | 12 Domingo Elías Velázquez | 12 |
| 13 Arturo Silvagnoli | 13 Héctor L. Schmidt Figueroa | 13 Digna L. Ocaso Rosario | 13 |
| 14 Zandra Vergne Colón | 14 Aida Avalo Collaso | 14 Felipe (Pipo) Rivera | 14 |

## INSTRUCCIONES SOBRE LA FORMA DE VOTAR LA PAPELETA ELECTORAL MUNICIPAL

En esta papeleta usted tiene derecho a votar por un candidato a Alcalde y por el número exacto de Asambleístas que aparecen en una de las columnas. Si usted vota por más del número de candidatos a que tiene derecho para cada posición, usted anula su voto para dicha posición.

**COMO VOTAR INTEGRO:**

Votar íntegro es votar por todos los candidatos del partido de su preferencia y por ninguno otro.

Para votar íntegro usted hace una sola cruz "X" o marca válida en el espacio en blanco bajo la insignia del partido de su preferencia. Esa sola marca vale para todos los candidatos bajo la columna.

**COMO VOTAR MIXTO:**

Si usted, además de votar bajo la insignia de un partido, tiene preferencia por uno o más candidatos de otros partidos para uno o más cargos, pedirá hacer una cruz o marca válida al lado del nombre del candidato que prefiere fuera de la columna de su partido.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo. Cada voto así marcado contará solamente para el candidato expresamente marcado.

**COMO VOTAR POR CANDIDATURA:**

Cuando el elector desea votar exclusivamente por uno o más candidatos y no tiene interés en votar bajo la insignia de ningún partido, hará una marca al lado de los candidatos de su preferencia.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo.

COMISION ESTATAL DE ELECCIONES
## ELECCIONES GENERALES
# PAPELETA ELECTORAL MUNICIPAL
8 DE NOVIEMBRE DE 1988

Municipio de **SAN JUAN**

¡DATE A RESPETAR!

ANEJO 10

NOMINACION DIRECTA

(WRITE IN)

Se provee esta columna en blanco para que elector anote en ella el nombre de cualquier otro candidato que desee encasillar, fuera de los que aparecen en las columnas anteriores

Artículo 5.011
Ley Electoral

| PARTIDO POPULAR DEMOCRATICO | PARTIDO NUEVO PROGRESISTA | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | |
|---|---|---|---|
| **ALCALDE** Héctor Luis Acevedo | **ALCALDE** José Granados Navedo | **ALCALDE** Ana María (Ita) Corrada del Río | **ALCALDE** |
| **Miembros de la Asamblea Municipal** | **Miembros de la Asamblea Municipal** | **Miembros de la Asamblea Municipal** | **Miembros de la Asamblea Municipal** |
| 1 Thilda Alvarado | 1 Ramón "Pitito" Miranda Marzán | 1 Carlos Fronteras | 1 |
| 2 Manuel E. Andreu García | 2 Dámaris Sifuentes Reyes | 2 Héctor Villarini | 2 |
| 3 Carmelo Betancourt Calo | 3 Miguel A. "Tito" González Ríos | 3 José Cruz | 3 |
| 4 Eric Colón Rodríguez | 4 Enrique Ferreira Vélez | 4 Otilio Rosado | 4 |
| 5 Amadis Cruz Cáceres | 5 Nicolás Crespo Kortright | 5 Angel Ortega | 5 |
| 6 John Fucile | 6 Samuel Méndez Cuesta | 6 Jesús Márquez | 6 |
| 7 Conrado González | 7 Isidra Albino Serrano | 7 José T. Quiñones | 7 |
| 8 Roberto Pérez Santoni | 8 Myriam Hardman Barroso | 8 Gladys Cosme | 8 |
| 9 Francisco (Paco) Luis Rivera | 9 George McDougall | 9 Víctor Andino | 9 |
| 10 Diana Rodríguez | 10 Rafael Ubarri Acosta | 10 Pablo Ortiz | 10 |
| 11 Dafne Rojo | 11 Sonia Pabón de Sotomayor | 11 Diego Gorbea | 11 |
| 12 Awilda Saldaña | 12 Luis Rivera Brenes | 12 Domingo Elías Velázquez | 12 |
| 13 Arturo Silvagnoli | 13 Héctor L. Schmidt Figueroa | 13 Digna L. Ocasio Rosario | 13 |
| 14 Zandra Vergne Colón | 14 Aída Avalo Collazo | 14 Felipe (Pipo) Rivera | 14 |

## INSTRUCCIONES SOBRE LA FORMA DE VOTAR LA PAPELETA ELECTORAL MUNICIPAL

En esta papeleta usted tiene derecho a votar por un candidato a Alcalde y por el número exacto de Asambleístas que aparecen en una de las columnas. Si usted vota por más del número de candidatos a que tiene derecho para cada posición, usted anula su voto por dicha posición.

**COMO VOTAR INTEGRO:**

Votar íntegro es votar por todos los candidatos del partido de su preferencia y por ninguno otro.

Para votar íntegro usted hace una sola cruz "X" o marca válida en el espacio en blanco bajo la insignia del partido de su preferencia. Esa sola marca vale para todos los candidatos bajo la columna.

**COMO VOTAR MIXTO:**

Si usted, además de votar bajo la insignia de un partido, tiene preferencia por uno o más candidatos de otros partidos para una o más cargos, podrá hacer una cruz o marca válida al lado del nombre del candidato que prefiera fuera de la columna de su partido.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo. Cada voto así marcado contará solamente para el candidato expresamente marcado.

**COMO VOTAR POR CANDIDATURA:**

Cuando el elector desea votar exclusivamente por uno o más candidatos y no tiene interés en votar bajo la insignia de ningún partido, hará una marca al lado de los candidatos de su preferencia.

También puede votar por otra persona de su preferencia que no aparece como candidato, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo.

COMISION ESTATAL DE ELECCIONES
## ELECCIONES GENERALES
# PAPELETA ELECTORAL MUNICIPAL
8 DE NOVIEMBRE DE 1988

Municipio de   SAN JUAN

ANEJO 11

NOMINACION DIRECTA

(WRITE IN)

Se prevee esta columna en blanco para qu. elector anote en ella el nombre de cualqi otro candidato que desee encasillar, fuer. los que aparecen en las columnas anterio

Artículo 4.011
Ley Electoral

| PARTIDO POPULAR DEMOCRATICO | | PARTIDO NUEVO PROGRESISTA | | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | | | |
|---|---|---|---|---|---|---|---|
| **ALCALDE** Héctor Luis Acevedo | | **ALCALDE** José Granados Navedo | | **ALCALDE** Ana María (Ita) Corrada del Río | | **ALCALDE** | |
| Miembros de la Asamblea Municipal | | Miembros de la Asamblea Municipal | | Miembros de la Asamblea Municipal | | Miembros de la Asamblea Municipal | |
| 1 | Thilda Alvarado | 1 | Ramón "Pitito" Miranda Marzán | 1 | Carlos Fronteras | 1 | |
| 2 | Manuel E. Andreu García | 2 | Dámaris Sifuentes Reyes | 2 | Héctor Villarini | 2 | |
| 3 | Carmelo Betancourt Calo | 3 | Miguel A. "Tito" González Ríos | 3 | José Cruz | 3 | |
| 4 | Eric Colón Rodríguez | 4 | Enrique Ferreira Vélez | 4 | Otilio Rosado | 4 | |
| 5 | Amadis Cruz Cáceres | 5 | Nicolás Crespo Kortright | 5 | Angel Ortega | 5 | |
| 6 | John Fucile | 6 | Samuel Méndez Cuesta | 6 | Jesús Márquez | 6 | |
| 7 | Conrado González | 7 | Isidra Albino Serrano | 7 | José T. Quiñones | 7 | |
| 8 | Roberto Pérez Santoni | 8 | Myriam Herdman Barroso | 8 | Gladys Cosme | 8 | |
| 9 | Francisco (Paco) Luis Rivera | 9 | George McDougall | 9 | Victor Andino | 9 | |
| 10 | Diana Rodríguez | 10 | Rafael Ubarri Acosta | 10 | Pablo Ortiz | 10 | |
| 11 | Dafne Rojo | 11 | Sonia Pabón de Sotomayor | 11 | Diego Gorbea | 11 | |
| 12 | Awilda Saldaña | 12 | Luis Rivera Brenes | 12 | Domingo Elías Velázquez | 12 | |
| 13 | Arturo Silvagnoli | 13 | Héctor L. Schmidt Figueroa | 13 | Digna L. Ocasio Rosario | 13 | |
| 14 | Zandra Vergne Colón | 14 | Aida Avalo Collazo | 14 | Felipe (Pipo) Rivera | 14 | |

## INSTRUCCIONES SOBRE LA FORMA DE VOTAR LA PAPELETA ELECTORAL MUNICIPAL

En esta papeleta usted tiene derecho a votar por un candidato a Alcalde y por el número exacto de Asambleístas que aparecen en una de las columnas. Si usted vota por más del número de candidatos a que tiene derecho para cada posición, usted anula su voto para dicha posición.

**COMO VOTAR INTEGRO:**

Votar íntegro es votar por todos los candidatos del partido de su preferencia y por ninguno otro.

Para votar íntegro usted hace una sola cruz "X" o marca válida en el espacio en blanco bajo la insignia del partido de su preferencia. Esa sola marca vale para todos los candidatos bajo la columna.

**COMO VOTAR MIXTO:**

Si usted, además de votar bajo la insignia de un partido, tiene preferencia por una o más candidatos de otros partidos para uno o más cargos, podrá hacer una cruz o marca válida al lado del nombre del candidato que prefiera fuera de la columna de su partido.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo. Cada voto así marcado contará solamente para el candidato expresamente marcado.

**COMO VOTAR POR CANDIDATURA:**

Cuando el elector desee votar exclusivamente por uno o más candidatos y no tiene interés en votar bajo la insignia de ningún partido, hará una marca al lado de los candidatos de su preferencia.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo.

COMISION ESTATAL DE ELECCIONES
# ELECCIONES GENERALES
## PAPELETA ELECTORAL MUNICIPAL
### 8 DE NOVIEMBRE DE 1988

Municipio de **SAN JUAN**

¡DATE A RESPETAR!

ANEJO 12

NOMINACION DIRECTA

(WRITE IN)

Se prevee esta columna en blanco para que el elector anote en ella el nombre de cualquier otro candidato que desee encasillar, fuera los que aparecen en las columnas anterior

Artículo 5.011
Ley Electoral

| PARTIDO POPULAR DEMOCRATICO | PARTIDO NUEVO PROGRESISTA | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | |
|---|---|---|---|
| **ALCALDE** Héctor Luis Acevedo | **ALCALDE** José Granados Navedo | **ALCALDE** Ana María (Ita) Corrada del Río | **ALCALDE** |
| Miembros de la Asamblea Municipal | Miembros de la Asamblea Municipal | Miembros de la Asamblea Municipal | Miembros de la Asamblea Municipal |
| 1 Thilda Alvarado | 1 Ramón "Pitito" Miranda Marzán | 1 Carlos Fronteras | 1 |
| 2 Manuel E. Andreu García | 2 Dámaris Sifuentes Reyes | 2 Héctor Villarini | 2 |
| 3 Carmelo Betancourt Calo | 3 Miguel A. "Tito" González Ríos | 3 José Cruz | 3 |
| 4 Eric Colón Rodríguez | 4 Enrique Ferreira Vélez | 4 Otilio Rosado | 4 |
| 5 Amadis Cruz Cáceres | 5 Nicolás Crespo Kurtright | 5 Angel Ortega | 5 |
| 6 John Fucile | 6 Samuel Méndez Cuesta | 6 Jesús Márquez | 6 |
| 7 Conrado González | 7 Isidra Albino Serrano | 7 José T. Quiñones | 7 |
| 8 Roberto Pérez Santoni | 8 Myriam Herdman Barross | 8 Gladys Cosme | 8 |
| 9 Francisco (Paco) Luis Rivera | 9 George McDougall | 9 Víctor Andino | 9 |
| 10 Diana Rodríguez | 10 Rafael Ubarri Acosta | 10 Pablo Ortiz | 10 |
| 11 Dafne Rojo | 11 Sonia Pabón de Sotomayor | 11 Diego Gorbea | 11 |
| 12 Awilda Saldaña | 12 Luis Rivera Brenes | 12 Domingo Elías Velázquez | 12 |
| 13 Arturo Silvagnoli | 13 Héctor L. Schmidt Figueroa | 13 Digna L. Ocasio Rosario | 13 |
| 14 Zandra Vergne Colón | 14 Aida Avalo Collazo | 14 Felipe (Pipo) Rivera | 14 |

## INSTRUCCIONES SOBRE LA FORMA DE VOTAR LA PAPELETA ELECTORAL MUNICIPAL

En esta papeleta usted tiene derecho a votar por un candidato a Alcalde y por el número exacto de Asambleístas que aparecen en una de las columnas. Si usted vota por más del número de candidatos a que tiene derecho para cada posición, usted anula su voto para dicha posición.

**COMO VOTAR INTEGRO:**

Votar íntegro es votar por todos los candidatos del partido de su preferencia y por ninguno otro.

Para votar íntegro usted hace una sola cruz "X" o marca válida en el espacio en blanco bajo la insignia del partido de su preferencia. Esa sola marca vale para todos los candidatos bajo la columna.

**COMO VOTAR MIXTO:**

Si usted, además de votar bajo la insignia de un partido, tiene preferencia por uno o más candidatos de otros partidos para uno o más cargos, podrá hacer una cruz o marca válida al lado del nombre del candidato que prefiera fuera de la columna de su partido.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo. Cada voto así marcado contará solamente para el candidato expresamente marcado.

**COMO VOTAR POR CANDIDATURA:**

Cuando el elector desee votar exclusivamente por uno o más candidatos y no tiene interés en votar bajo la insignia de ningún partido, hará una marca al lado de los candidatos de su preferencia.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo.

COMISION ESTATAL DE ELECCIONES
## ELECCIONES GENERALES
# PAPELETA ELECTORAL MUNICIPAL
### 8 DE NOVIEMBRE DE 1988

Municipio de   SAN JUAN

ANEJO 13

NOMINACION DIRECTA

(WRITE IN)

Se provee esta columna en blanco para el elector anote en ella el nombre de cualquiera otro candidato que desee escribir, fuera los que aparecen en las columnas anteriores

Artículo 6.011
Ley Electoral

| PARTIDO POPULAR DEMOCRATICO | PARTIDO NUEVO PROGRESISTA | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | |
|---|---|---|---|
| **ALCALDE** Héctor Luis Acevedo | **ALCALDE** José Granados Navedo | **ALCALDE** Ana María (Ita) Corrada del Río | **ALCALDE** |
| Miembros de la Asamblea Municipal | Miembros de la Asamblea Municipal | Miembros de la Asamblea Municipal | Miembros de la Asamblea Electoral |
| 1 Thilda Alvarado | 1 Ramón "Pitito" Miranda Marzán | 1 Carlos Fronteras | 1 |
| 2 Manuel E. Andreu García | 2 Dámaris Sifuentes Reyes | 2 Héctor Villarini | 2 |
| 3 Carmelo Betancourt Calo | 3 Miguel A. "Tito" González Ríos | 3 José Cruz | 3 |
| 4 Eric Colón Rodríguez | 4 Enrique Ferreira Vélez | 4 Otilio Rosado | 4 |
| 5 Amadis Cruz Cáceres | 5 Nicolás Crespo Kortright | 5 Angel Ortega | 5 |
| 6 John Fuciie | 6 Samuel Méndez Cuesta | 6 Jesús Márquez | 6 |
| 7 Conrado González | 7 Isidra Albino Serrano | 7 José T. Quiñones | 7 |
| 8 Roberto Pérez Santoni | 8 Myriam Herdman Barroso | 8 Gladys Coame | 8 |
| 9 Francisco (Paco) Luis Rivera | 9 George McDougall | 9 Victor Andino | 9 |
| 10 Diana Rodríguez | 10 Rafael Ubarri Acosta | 10 Pablo Ortiz | 10 |
| 11 Dafne Rojo | 11 Sonia Pabón de Sotomayor | 11 Diego Gorbea | 11 |
| 12 Awilda Saldaña | 12 Luis Rivera Brenes | 12 Domingo Elías Velázquez | 12 |
| 13 Arturo Silvagnoli | 13 Héctor L. Schmidt Figueroa | 13 Digna L. Ocasio Rosario | 13 |
| 14 Zandra Vergne Colón | 14 Aida Avalo Collazo | 14 Felipe (Pipo) Rivera | 14 |

## INSTRUCCIONES SOBRE LA FORMA DE VOTAR LA PAPELETA ELECTORAL MUNICIPAL

En esta papeleta usted tiene derecho a votar por un candidato a Alcalde y por el número exacto de Asambleistas que aparecen en una de las columnas. Si usted vota por más del número de candidatos a que tiene derecho para cada posición, usted anula su voto para dicha posición.

**COMO VOTAR INTEGRO:**

Votar íntegro es votar por todos los candidatos del partido de su preferencia y por ninguna otra.

Para votar íntegro usted hace una sola cruz "X" o marca válida en el espacio en blanco bajo la insignia del partido de su preferencia. Esa sola marca vale para todos los candidatos bajo la columna.

**COMO VOTAR MIXTO:**

Si usted, además de votar bajo la insignia de un partido, tiene preferencia por uno o más candidatos de otros partidos para uno o más cargos, pedirá hacer una cruz o marca válida al lado del nombre del candidato que prefiera fuera de la columna de su partido.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo. Cada voto así marcado contará solamente para el candidato expresamente marcado.

**COMO VOTAR POR CANDIDATURA:**

Cuando el elector desea votar exclusivamente por uno o más candidatos y no tiene interés en votar bajo la insignia de ningún partido, hará una marca al lado de los candidatos de su preferencia.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo.

COMISION ESTATAL DE ELECCIONES
## ELECCIONES GENERALES
# PAPELETA ELECTORAL MUNICIPAL
### 8 DE NOVIEMBRE DE 1988

Municipio de **SAN JUAN**

318

ANEJO 14

NOMINACION DIRECTA

(WRITE IN)

Se provee esta columna en blanco para que elector anote en ella el nombre de cualquier otro candidato que desee escrutiar, fuera de los que aparecen en las columnas anteriores

Articulo 5.011
Ley Electoral

| PARTIDO POPULAR DEMOCRATICO | | PARTIDO NUEVO PROGRESISTA | | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | | |
|---|---|---|---|---|---|---|
| **ALCALDE** Héctor Luis Acevedo | | **ALCALDE** José Granados Navedo | | **ALCALDE** Ana María (Ita) Corrada del Río | | **ALCALDE** |
| Miembros de la Asamblea Municipal | | Miembros de la Asamblea Municipal | | Miembros de la Asamblea Municipal | | Miembros de la Asamblea Municipal |
| 1 | Thilda Alvarado | 1 | Ramón "Pitito" Miranda Marzán | 1 | Carlos Fronteras | 1 |
| 2 | Manuel E. Andreu García | 2 | Dámaris Sifuentes Reyes | 2 | Héctor Villarini | 2 |
| 3 | Carmelo Betancourt Calo | 3 | Miguel A. "Tito" González Ríos | 3 | José Cruz | 3 |
| 4 | Eric Colón Rodríguez | 4 | Enrique Ferreira Vélez | 4 | Otilio Rosado | 4 |
| 5 | Amadis Cruz Cáceres | 5 | Nicolás Crespo Kortright | 5 | Angel Ortega | 5 |
| 6 | John Fucile | 6 | Samuel Méndez Cuesta | 6 | Jesús Márquez | 6 |
| 7 | Conrado González | 7 | Isidra Albino Serrano | 7 | José T. Quiñones | 7 |
| 8 | Roberto Pérez Santoni | 8 | Myriam Herdman Barrosa | 8 | Gladys Cosme | 8 |
| 9 | Francisco (Paco) Luis Rivera | 9 | George McDougall | 9 | Víctor Andino | 9 |
| 10 | Diana Rodríguez | 10 | Rafael Ubarri Acosta | 10 | Pablo Ortiz | 10 |
| 11 | Dafne Rojo | 11 | Sonia Pabón de Sotomayor | 11 | Diego Gorbea | 11 |
| 12 | Awilda Saldaña | 12 | Luis Rivera Brenes | 12 | Domingo Elías Velázquez | 12 |
| 13 | Arturo Silvagnoli | 13 | Héctor L. Schmidt Figueroa | 13 | Digna L. Ocasio Rosario | 13 |
| 14 | Zandra Vergne Colón | 14 | Aída Avalo Collazo | 14 | Felipe (Pipo) Rivera | 14 |

## INSTRUCCIONES SOBRE LA FORMA DE VOTAR LA PAPELETA ELECTORAL MUNICIPAL

En esta papeleta usted tiene derecho a votar por un candidato a Alcalde y por el número exacto de Asambleístas que aparecen en una de las columnas. Si usted vota por más del número de candidatos a que tiene derecho para cada posición, usted anula su voto para dicha posición.

**COMO VOTAR INTEGRO:**

Votar íntegro es votar por todos los candidatos del partido de su preferencia y por ninguno otro.

Para votar íntegro usted hace una sola cruz "X" o marca válida en el espacio en blanco bajo la insignia del partido de su preferencia. Esa sola marca vale para todos los candidatos bajo la columna.

**COMO VOTAR MIXTO:**

Si usted, además de votar bajo la insignia de un partido, tiene preferencia por uno o más candidatos de otros partidos para uno o más cargos, podrá hacer una cruz o marca válida al lado del nombre del candidato que prefiera fuera de la columna de su partido.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo. Cada voto así marcado contará solamente para el candidato expresamente marcado.

**COMO VOTAR POR CANDIDATURA:**

Cuando el elector desea votar exclusivamente por uno o más candidatos y no tiene interés en votar bajo la insignia de ningún partido, hará una marca al lado de los candidatos de su preferencia.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo.

COMISION ESTATAL DE ELECCIONES
# ELECCIONES GENERALES
# PAPELETA ELECTORAL MUNICIPAL
8 DE NOVIEMBRE DE 1988

Municipio de   SAN JUAN

ANEJO 15

NOMINACION DIRECTA

(WRITE IN)

Se provee esta columna en blanco para qu
elector anote en ella el nombre de cualqu
otro candidato que desee escuculiar, fuera
las que aparecen en las columnas externa:

Artículo 6.011
Ley Electoral

| | PARTIDO POPULAR DEMOCRATICO | | PARTIDO NUEVO PROGRESISTA | | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | | |
|---|---|---|---|---|---|---|---|
| |  ALCALDE **Héctor Luis Acevedo** | |  ALCALDE **José Granados Navedo** | |  ALCALDE **Ana María (Ita) Corrada del Río** | | ALCALDE |
| | Miembros de la Asamblea Municipal | | Miembros de la Asamblea Municipal | | Miembros de la Asamblea Municipal | | Miembros de la Asamblea Municipal |
| 1 | Thilda Alvarado | 1 | Ramón "Pitito" Miranda Marzán | 1 | Carlos Fronteras | 1 | |
| 2 | Manuel E. Andreu García | 2 | Dámaris Sifuentes Reyes | 2 | Héctor Villarini | 2 | |
| 3 | Carmelo Betancourt Calo | 3 | Miguel A. "Tito" González Ríos | 3 | José Cruz | 3 | |
| 4 | Eric Colón Rodríguez | 4 | Enrique Ferreira Vélez | 4 | Otilio Rosado | 4 | |
| 5 | Amadís Cruz Cáceres | 5 | Nicolás Crespo Kortright | 5 | Ángel Ortega | 5 | |
| 6 | John Fucile | 6 | Samuel Méndez Cuesta | 6 | Jesús Márquez | 6 | |
| 7 | Conrado González | 7 | Isidra Albino Serrano | 7 | José T. Quiñones | 7 | |
| 8 | Roberto Pérez Santoni | 8 | Myriam Herdman Barroso | 8 | Gladys Cosme | 8 | |
| 9 | Francisco (Paco) Luis Rivera | 9 | George McDougall | 9 | Víctor Andino | 9 | |
| 10 | Diana Rodríguez | 10 | Rafael Ubarri Acosta | 10 | Pablo Ortiz | 10 | |
| 11 | Dafne Roje | 11 | Sonia Pabón de Sotomayor | 11 | Diego Gorbea | 11 | |
| 12 | Awilda Saldaña | 12 | Luis Rivera Brenes | 12 | Domingo Elías Velázquez | 12 | |
| 13 | Arturo Silvagnoli | 13 | Héctor L. Schmidt Figueroa | 13 | Digna L. Ocasio Rosario | 13 | |
| 14 | Zandra Vergne Colón | 14 | Aida Avalo Collazo | 14 | Felipe (Pipo) Rivera | 14 | |

## INSTRUCCIONES SOBRE LA FORMA DE VOTAR LA PAPELETA ELECTORAL MUNICIPAL

En esta papeleta usted tiene derecho a votar por un candidato a Alcalde y por el número exacto de Asambleístas que aparecen en una de las columnas. Si usted vota por más del número de candidatos a que tiene derecho para cada posición, usted anula su voto para dicha posición.

**COMO VOTAR INTEGRO:**

Votar íntegro es votar por todos los candidatos del partido de su preferencia y por ninguno otro.

Para votar íntegro usted hace una sola cruz "X" o marca válida en el espacio en blanco bajo la insignia del partido de su preferencia. Esa sola marca vale para todos los candidatos bajo la columna.

**COMO VOTAR MIXTO:**

Si usted, además de votar bajo la insignia de un partido, tiene preferencia por uno o más candidatos de otros partidos para uno o más cargos, podrá hacer una cruz o marca válida al lado del nombre del candidato que prefiera fuera de la columna de su partido.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo. Cada voto así marcado contará solamente para el candidato expresamente marcado.

**COMO VOTAR POR CANDIDATURA:**

Cuando el elector desea votar exclusivamente por uno o más candidatos y no tiene interés en votar bajo la insignia de ningún partido, hará una marca al lado de los candidatos de su preferencia.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo.

COMISION ESTATAL DE ELECCIONES
## ELECCIONES GENERALES
# PAPELETA ELECTORAL MUNICIPAL
8 DE NOVIEMBRE DE 1988

Municipio de **SAN JUAN**

# APÉNDICE C

Análisis de las
papeletas con iniciales al dorso
protestadas y no adjudicadas
por la Comisión Estatal

## Identificación 1
## (Demandante)

Iniciadas

| San Juan | Unidad | Colegio |
|---|---|---|
| 2 | 3 | 2 |

(1) Candidatura Granados Navedo—
iniciales sólo de los funcionarios.

(1) P.P.D. íntegra—
iniciales: izquierda (arriba), clásica.

(1) P.N.P. íntegra—
iniciales: izquierda (debajo).

| San Juan | Unidad | Colegio |
|---|---|---|
| 2 | 10 | 4 |

(1) P.P.D. íntegra—
iniciales clásicas.

| San Juan | Unidad | Colegio |
|---|---|---|
| 2 | 12 | 2 |

(1) P.P.D. íntegra—
iniciales clásicas.

| San Juan | Unidad | Colegio |
|---|---|---|
| 2 | 12 | 4 |

(2) P.N.P. íntegras—
iniciales de los funcionarios a la derecha, iniciales del elector inmediatamente debajo en ese mismo lado.

| San Juan | Unidad | Colegio |
|---|---|---|
| 2 | 19 | 6 |

(2) P.P.D. íntegras—
iniciales del elector a la derecha de las iniciales de los funcionarios.

San Juan          Unidad          Colegio
2                    28                  4

(1)  P.P.D. íntegra—
     iniciales debajo de las de los funcionarios
     de forma vertical.

San Juan          Unidad          Colegio
2                    30                  5

(2)  P.P.D. íntegras—
     iniciales inmediatamente debajo de las de
     los funcionarios.

San Juan          Unidad          Colegio
1                    2                   2

(2)  P.N.P. íntegras—
     iniciales debajo de las de los funcionarios.

San Juan          Unidad          Colegio
1                    3                   4

(1)  P.N.P. íntegra—
     iniciales a la extrema derecha opuesta a
     las de los funcionarios.
(1)  P.N.P. íntegra—
     iniciales del elector entre las de los fun-
     cionarios (en medio de).

San Juan          Unidad          Colegio
1                    9                   3

(2)  P.N.P. íntegras—
     iniciales a la derecha opuestas a las de los
     funcionarios en ambas.

San Juan          Unidad          Colegio
1                    14                  9

(1)  P.I.P.—
     candidata a la Alcaldía.

San Juan        Unidad        Colegio
  1                24                5

   (1)  P.N.P.—
iniciales debajo, un poco hacia la derecha, de las de los funcionarios; iniciales del elector están a la inversa.

San Juan        Unidad        Colegio
  1                26                8

   (1)  P.P.D. íntegra—
iniciales de los funcionaros en la parte inferior derecha e iniciales del elector debajo de éstas.

   (1)  P.P.D. íntegra—
iniciales de los funcionarios arriba; iniciales del elector arriba al centro.

   (1)  P.N.P. íntegra—
iniciales hacia la derecha a mitad de la papeleta.

---

Sobre sin identificar colegio, anuladas en mesa C.E.E.

   (1)  P.N.P. íntegra—
iniciales clásicas.

San Juan        Unidad        Colegio
  1                28                6

   (2)  P.N.P. íntegras—
iniciales clásicas.

   (1)  P.N.P. íntegra—
iniciales arriba opuestas a las de los funcionarios.

   (1)  P.N.P. íntegra—
iniciales clásicas.
Variante: iniciales son extremadamente grandes.

San Juan        Unidad        Colegio (cont.)
   1               28             6

(1)  P.I.P. íntegra—
     caso clásico.

(1)  Mixta—
     candidatura de Acevedo Pérez; iniciales al
     centro de la papeleta.

(1)  P.P.D. íntegra—
     iniciales clásicas.

(1)  P.P.D. candidatura—
     iniciales clásicas.

San Juan        Unidad        Colegio
   1               15             4

(1)  P.N.P. íntegra—
     iniciales abajo.

(1)  P.P.D. íntegra—
     iniciales arriba al centro.

San Juan        Unidad        Colegio
   1               25             3

(1)  P.P.D. íntegra—
     iniciales al dorso y nota: "dañada por el
     elector".

---

### Identificación 2

San Juan        Unidad        Colegio
   3               33             1

(1)  P.P.D. íntegra—
     iniciada opuesta a las de los funcionarios
     (al lado derecho).

San Juan        Unidad        Colegio
   3               19             3

(1)  P.N.P. íntegra—
     iniciales en el lado opuesto a las de los
     funcionarios (al lado derecho).

San Juan·      Unidad     Colegio
  3               34         3

(1) P.N.P. íntegra—
iniciales (caso clásico) un poco más abajo.

San Juan       Unidad·    Colegio
  3               34         2

(1) P.P.D. íntegra—
iniciales con las de los funcionarios, extremo derecho.

San Juan       Unidad     Colegio
 .3             36         1

(2) P.N.P.—
candidatura de Granados Navedo; (1) iniciales opuestas a las de los funcionarios, (1) abajo extremo izquierdo.

San Juan       Unidad   Colegio
  3               36         1

(2) P.N.P.—
candidatura; (1) iniciales opuestas a las de los funcionarios; (1) abajo extremo izquierdo.

(3) P.N.P. íntegras—
(1) caso clásico; (2) iniciales abajo al lado derecho.

(1) P.P.D. íntegra—
iniciales arriba.

San Juan       Unidad     Colegio
  3               18         1

(1) P.N.P. íntegra—
iniciales clásicas.

San Juan     Unidad     Colegio
3     25     3

(1)   P.P.D.—
iniciales clásicas.

San Juan     Unidad     Colegio
3     26     2

(1)   P.N.P.—
candidatura de Granados Navedo; iniciales clásicas.

San Juan     Unidad     Colegio
3     1     5

(3)   P.N.P. íntegras—
(2) caso clásico; (1) inicial al lado izquierdo.

(1)   P.P.D. íntegra—
inicial abajo al lado derecho.

San Juan     Unidad     Colegio
3     5     5

(1)   P.N.P. íntegra—
iniciales del elector al lado derecho, al centro.

San Juan     Unidad     Colegio
3     9     5

(1)   P.N.P. íntegra—
iniciales clásicas.

San Juan     Unidad     Colegio
3     4     1

(1)   P.N.P. íntegra—
caso clásico.

San Juan     Unidad     Colegio
  3          5          2

(1)  P.N.P.—
     iniciales del elector al lado opuesto de las
     de los funcionarios.
(1)  Voto mixto: insignia P.N.P.—
     candidatura de Acevedo Pérez; iniciales al
     lado de las de los funcionarios.

San Juan     Unidad     Colegio
  3          7          3

(5)  P.N.P. íntegras—
     iniciales clásicas.
(1)  P.I.P. íntegra—
     caso clásico.

Se demuestra un patrón recurrente al mismo
colegio.

San Juan     Unidad     Colegio
  3          8          1

(1)  P.N.P. íntegra—
     iniciales del elector al centro bien
     grandes.
(1)  P.N.P. íntegra—
     iniciales abajo al lado derecho.

San Juan     Unidad     Colegio
  3          12         2

(1)  P.P.D. íntegra—
     el elector puso las iniciales dos veces, una
     al extremo arriba y otra en el medio.

San Juan     Unidad     Colegio
  3          13         4

(2)  P.N.P. íntegras—
     (1) iniciales a la derecha, opuestas a las de
     los funcionarios; (1) iniciales al lado de las
     de los funcionarios.

San Juan     Unidad     Colegio
3     13     1
(1)   P.N.P. íntegra—
caso clásico.

San Juan     Unidad     Colegio
3     24     1
(1)   P.N.P. íntegra—
(símbolo P.N.P. y "X" al lado de Granados
Navedo).

San Juan     Unidad     Colegio
3     21     5
(1)   P.P.D. íntegra—
iniciales clásicas.
(1)   P.I.P. íntegra—
iniciales clásicas.

San Juan     Unidad     Colegio
3     15     2
(1)   P.N.P. íntegra—
iniciales más abajo al lado izquierdo.

San Juan     Unidad     Colegio
3     15     4
(2)   P.N.P. íntegras—
(1) caso clásico; (1) caso clásico,
iniciales arriba de las de los funcionarios.

San Juan     Unidad     Colegio
3     17     2
(1)   P.P.D. íntegra—
iniciales al lado derecho.

San Juan     Unidad     Colegio
3     26     5
(2)   P.P.D. íntegras—
iniciales opuestas, al lado derecho.

San Juan     Unidad     Colegio (cont.)
   3          26        5

(1) P.P.D. íntegra—
     caso clásico.

(2) P.N.P. íntegras—
     caso clásico.

San Juan     Unidad     Colegio
   3          28        2

(1) P.N.P. íntegra—
     iniciales a la extrema derecha.

San Juan     Unidad     Colegio
   3          30        2

(1) P.P.D. íntegra—
     iniciales grandes en la parte de abajo de
     la papeleta, lado izquierdo.

San Juan     Unidad     Colegio
   3          29        4

(1) P.P.D. íntegra—
     iniciales opuestas.

(1) P.N.P. íntegra—
     caso clásico.

(1) P.N.P. íntegra—
     iniciales al lado izquierdo.

San Juan     Unidad     Colegio
   3          19        1

(1) P.N.P. íntegra—
     al dorso en la parte de abajo, dos iniciales
     tachadas y una tercera inicial.

## Identificación 3

San Juan     Unidad     Colegio
4     5     1

(1) P.P.D. íntegra—
iniciales al extremo derecho (dos veces iniciadas).

San Juan     Unidad     Colegio
4     4     2

(1) P.N.P. íntegra—
iniciales al lado de las de los funcionarios.

San Juan     Unidad     Colegio
4     2     6

(1) P.I.P. íntegra—
caso clásico.

(1) P.N.P. íntegra—
caso clásico.

(1) P.P.D. íntegra—
inicial a la extrema derecha.

San Juan     Unidad     Colegio
4     1     5

(1) P.P.D. íntegra—
caso clásico.

San Juan     Unidad     Colegio
4     5     3

(1) P.P.D. íntegra—
caso clásico.

San Juan     Unidad     Colegio
4     28     2

(1) P.N.P. íntegra—
inicial al lado de las de los funcionarios.

San Juan      Unidad      Colegio (cont.)
4      28      2

(1) P.P.D. íntegra—
caso clásico.

San Juan      Unidad      Colegio
4      10      8

(1) P.N.P. íntegra—
iniciales clásicas.

(1) P.P.D. íntegra—
iniciales más abajo de las de los funciona-
rios.

(1) P.P.D. íntegra—
iniciales clásicas.

(1) P.I.P. íntegra—
iniciales clásicas.

San Juan      Unidad      Colegio
4      22      8

(1) P.I.P. íntegra—
iniciales al lado derecho, parte inferior.

San Juan      Unidad      Colegio
4      8      8

(1) P.N.P. íntegra—
iniciales grandes al lado de la firma.

(1) P.N.P. íntegra—
iniciales a la derecha a la mitad de la pa-
peleta.

(1) P.N.P. íntegra—
iniciales a la extrema derecha.

San Juan      Unidad      Colegio
4      8      4

(2) P.N.P. íntegras—
caso clásico.

San Juan     Unidad     Colegio
4          6        2

(1)   P.P.D. íntegra—
inicial al medio de la papeleta; borrón en candidatura del asambleísta Núm. 9.

San Juan     Unidad     Colegio
4         17        2

(1)   P.N.P. íntegra—
iniciales arriba al centro.

(1)   P.N.P. íntegra—
caso clásico.

San Juan     Unidad     Colegio
4         15        4

(2)   P.N.P. íntegras—
iniciales en la parte inferior, lado derecho.

San Juan     Unidad     Colegio
4         16        4

(1)   Candidatura Granados Navedo—
iniciales en la parte inferior izquierda.

San Juan     Unidad     Colegio
4         15        3

(1)   P.N.P.—
candidatura de Granados Navedo; iniciales a la derecha.

(1)   P.P.D.—
candidatura de Acevedo Pérez; caso clásico.

(1)   P.N.P. íntegra—
iniciales bastante abajo de las de los funcionarios.

(1)   P.N.P. íntegra—
iniciales al lado derecho de las de los funcionarios.

San Juan     Unidad     Colegio (cont.)
4          15       3

(1) P.N.P. íntegra—
caso clásico.

San Juan     Unidad     Colegio
4          16       3

(1) P.P.D. íntegra—
iniciales al extremo derecho.

San Juan     Unidad     Colegio
4          14       5

(1) P.N.P.—
candidatura de Granados Navedo; iniciales en la parte inferior, lado derecho.

San Juan     Unidad     Colegio
4          15       5

(1) P.P.D.—
iniciales clásicas.

(1) P.P.D. íntegra—
iniciales al lado.

(1) P.P.D. íntegra—
iniciales al extremo derecho.

San Juan     Unidad     Colegio
4          17       1

(1) P.P.D. íntegra.

San Juan     Unidad     Colegio
4          18       1

(1) P.N.P. íntegra—
iniciada en la mitad de la parte izquierda.

(1) P.N.P. íntegra—
iniciales al borde, mitad de la papeleta, parte de arriba a la derecha.

San Juan     Unidad     Colegio
4          19         3

(1)   P.N.P. íntegra—
iniciales clásicas.

San Juan     Unidad     Colegio
4          20         3

(1)   P.P.D. íntegra—
iniciales clásicas pero en tinta.

San Juan     Unidad     Colegio
4          20         9

(1)   P.P.D. íntegra—
caso clásico.

San Juan     Unidad     Colegio
4          24         2

(2)   P.I.P. íntegras—
iniciales abajo al centro.

(1)   P.N.P. íntegra—
caso clásico.

(1)   P.N.P. íntegra—
caso clásico.

San Juan     Unidad     Colegio
4          27         2

(1)   P.P.D. íntegra—
iniciales clásicas.

San Juan     Unidad     Colegio
4          25         5

(1)   P.N.P. íntegra—
iniciales clásicas.

San Juan     Unidad     Colegio
4          28         3

(1)   P.N.P. íntegra—
iniciales clásicas.

| San Juan | Unidad | Colegio |
|----------|--------|---------|
| 4 | 24 | 4 |

(1) P.N.P. íntegra—
iniciales clásicas.·

| San Juan | Unidad | Colegio |
|----------|--------|---------|
| 4 | 25 | 2 |

(1) P.P.D. íntegra—
iniciales clásicas.

## Identificación 4
## (Maletín 4)

| San Juan | Unidad | Colegio |
|----------|--------|---------|
| 5 | 9 | 5 |

(1) P.P.D. íntegra—
iniciales al extremo derecho.

| San Juan | Unidad | Colegio |
|----------|--------|---------|
| 5 | 9 | 6 |

(1) P.P.D. íntegra—
iniciales abajo, extrema derecha.

| San Juan | Unidad | Colegio |
|----------|--------|---------|
| 5 | 18 | 5 |

(1) P.P.D. íntegra—
inicial abajo de la mitad de la papeleta.

(1) P.P.D. íntegra—
inicial al lado de las de los funcionarios.

| San Juan | Unidad | Colegio |
|----------|--------|---------|
| 5 | 31 | 4 |

(1) P.N.P. íntegra—
inicial al extremo derecho.

(1) P.P.D. íntegra—
iniciales clásicas.

San Juan | Unidad | Colegio (cont.)
5 | 31 | 4

(1) P.P.D. íntegra—
iniciales al lado de las de los funcionarios.

San Juan | Unidad | Colegio
4 | 14 | 8

(1) P.N.P. íntegra—
iniciales a la derecha.

San Juan | Unidad | Colegio
5 | 28 | 5

(1) P.N.P. íntegra—
iniciales clásicas.

San Juan | Unidad | Colegio
5 | 28 | 6

(1) P.P.D. íntegra—
iniciales clásicas.

San Juan | Unidad | Colegio
5 | 28 | 9

(1) P.I.P. íntegra—
iniciales abajo a la derecha.

San Juan | Unidad | Colegio
5 | 28 | 10

(1) P.P.D. íntegra—
iniciales clásicas.

San Juan | Unidad | Colegio
5 | 28 | 12

(2) P.N.P. íntegras—
iniciales clásicas.

(1) P.P.D. íntegra—
iniciales clásicas.

San Juan        Unidad        Colegio
5               29            2

(2) P.P.D. íntegra y otra candidatura de Acevedo Pérez—
iniciales clásicas.

(1) P.N.P. íntegra—
iniciales clásicas.

San Juan        Unidad        Colegio
5               29            3

(1) P.I.P.—
iniciales clásicas.

San Juan        Unidad        Colegio
5               30            2

(1) P.N.P.—
candidatura de Granados Navedo, escribió también en nominación directa (*write-in*) *José Granados*; iniciales al centro.

(1) P.N.P. íntegra—
iniciales clásicas.

San Juan        Unidad        Colegio
5               2             2

(1) P.N.P. íntegra—
iniciales clásicas.

San Juan        Unidad        Colegio
5               3             1

(1) P.N.P. íntegra—
iniciales al lado de las de los funcionarios.

(1) P.N.P. íntegra—
iniciales al lado, extremo derecho hacia el centro.

San Juan          Unidad          Colegio
5                  3                2
   (1)  P.N.P. íntegra—
iniciales en la esquina derecha inferior.
   (1)  P.P.D. íntegra—
iniciales en la esquina inferior izquierda.

San Juan          Unidad          Colegio
5                  3                3
   (1)  P.P.D. íntegra—
iniciales clásicas.

San Juan          Unidad          Colegio
5                  3                4
   (1)  P.N.P. íntegra—
iniciales clásicas.
   (1)  P.N.P. íntegra—
iniciales clásicas.
   (1)  P.N.P. íntegra—
iniciales clásicas.

San Juan          Unidad          Colegio
5                  3                9
   (1)  P.N.P. íntegra—
iniciales clásicas.

San Juan          Unidad          Colegio
5                  4                3
   (1)  P.N.P. íntegra—
iniciales a la extrema derecha bien grandes.

San Juan          Unidad          Colegio
5                  5                1
   (1)  P.P.D. íntegra—
iniciales clásicas.
   (1)  P.N.P. íntegra—
iniciales a mitad de la papeleta al lado derecho.

San Juan      Unidad     Colegio
    5           5         2

(1) P.N.P. íntegra—
iniciales clásicas.

(1) P.N.P. íntegra—
iniciales clásicas.

(1) P.P.D. íntegra—
iniciales clásicas.

(1) P.P.D. íntegra—
iniciales clásicas.

San Juan      Unidad     Colegio
    5           5         3

(1) P.P.D. íntegra—
iniciales clásicas.

San Juan      Unidad     Colegio
    5           7         1

(2) P.P.D. íntegras—
iniciales clásicas.

(1) P.N.P. íntegra—
iniciales a la extrema derecha.

(1) P.N.P.—
iniciales en la extrema derecha.

San Juan      Unidad     Colegio
    5           7         4

(1) P.P.D. íntegra—
iniciales a la extrema derecha.

San Juan      Unidad     Colegio
    5         27        2

(1) P.P.D. íntegra—
iniciales a la extrema derecha.

(2) P.N.P. íntegras—
iniciales clásicas.

San Juan      Unidad      Colegio
5           33           5

(4) P.P.D. íntegras—
iniciales clásicas.

(1) P.N.P. íntegra—
iniciales clásicas.

(1) Candidatura Granados Navedo—
iniciales clásicas.

San Juan      Unidad      Colegio
5           31           1

(1) P.P.D. íntegra—
iniciales de los funcionarios a la extrema
derecha; iniciales del elector a la extrema
izquierda.

San Juan      Unidad      Colegio
5           33           4

(1) P.P.D. íntegra—
iniciales clásicas.

San Juan      Unidad      Colegio
5           24           7

(1) P.N.P. íntegra—
iniciales clásicas.

(2) P.P.D. íntegras—
iniciales clásicas.

San Juan      Unidad      Colegio
5           24           5

(1) P.P.D. íntegra—
iniciales clásicas.

San Juan      Unidad      Colegio
5           24           3

(1) P.N.P. íntegra—
iniciales clásicas.

San Juan      Unidad      Colegio
    5            17          5
    (2)  P.P.D. íntegras—
        iniciales clásicas.
    (1)  P.N.P. íntegra—
        iniciales clásicas.

San Juan      Unidad      Colegio
    5             3          5
    (1)  P.N.P. íntegra—
        iniciales clásicas.

San Juan      Unidad      Colegio
    5             7          2
    (2)  P.N.P. íntegras—
        (1) iniciales clásicas, y (1) inicial al lado derecho.
    (1)  Mixta—
        a favor de Acevedo Pérez; símbolo P.I.P.
    (1)  P.P.D. íntegra—
        inicial al lado de las de los funcionarios.
    (1)  Candidatura Acevedo Pérez—
        iniciales clásicas.

San Juan      Unidad      Colegio
    5             7         9–51
    (1)  P.N.P. íntegra—
        iniciales clásicas.

San Juan      Unidad      Colegio
    5            10          2
    (1)  P.N.P. íntegra—
        iniciales clásicas.
    (1)  P.N.P. íntegra—
        iniciales clásicas.
    (1)  P.P.D. íntegra—
        iniciales clásicas.

San Juan      Unidad     Colegio
5           10        7
- (3) P.P.D. íntegras—
  iniciales clásicas.
- (1) P.N.P. íntegra—
  iniciales clásicas.

San Juan      Unidad     Colegio
5           11        2
- (1) P.P.D. íntegra—
  inicial a la extrema derecha.
- (1) P.N.P. íntegra—
  inicial en el cuadrante 4.

San Juan      Unidad     Colegio
5           11        3
- (1) P.P.D. íntegra—
  inicial en el cuadrante 1, abajo.

San Juan      Unidad     Colegio
5           11        5
- (1) P.N.P. íntegra—
  iniciales en el cuadrante 2, abajo.

San Juan      Unidad     Colegio
5           12        1
- (3) P.P.D. íntegras—
  iniciales clásicas.

San Juan      Unidad     Colegio
5           19        4
- (1) P.P.D. íntegra—
  iniciales clásicas.

San Juan      Unidad     Colegio
5           20        3
- (1) P.N.P. íntegra—
  iniciales clásicas.

San Juan     Unidad     Colegio
5     21     1

(1)   P.P.D. íntegra—
iniciales grandes entre los cuadrantes 2 y 4.

San Juan     Unidad     Colegio
4     9     7

(1)   P.N.P. íntegra—
iniciales en el cuadrante 4.

(1)   P.P.D. íntegra—
iniciales en el cuadrante 2.

San Juan     Unidad     Colegio
5     2     7

(2)   P.P.D. íntegras—
iniciales clásicas.

(1)   P.I.P. íntegra—
iniciales clásicas.

(3)   P.N.P. íntegras—
iniciales clásicas. (Patrón reiterado.)

San Juan     Unidad     Colegio
5     10     5

(1)   Candidatura Granados Navedo—
iniciales al centro, cuadrante 1.

## Identificación 5
### (Maletín 5)

San Juan     Unidad     Colegio
104     9     1

(3)   P.N.P. íntegras—
iniciales: (2) clásicas, y (1) en el cuadrante 2.

(3)   P.P.D. íntegras—
iniciales: (1) clásicas; (1) en el cuadrante 2 (mitad), y (1) al centro.

San Juan     Unidad     Colegio
104     8     2

(2) P.N.P. íntegras—
iniciales: (1) clásicas, y (1) en el cuadrante 2, esquina derecha abajo.

(2) P.P.D. íntegras—
iniciales clásicas.

San Juan     Unidad     Colegio
104     4     3

(1) P.N.P. íntegra—
iniciales clásicas.

(1) P.P.D. íntegra—
iniciales clásicas.

San Juan     Unidad     Colegio
104     9     4

(2) P.N.P. íntegras—
iniciales clásicas.

(2) P.P.D. íntegras—
iniciales clásicas.

San Juan     Unidad     Colegio
104     9     7

(1) P.P.D. íntegra—
iniciales clásicas.

San Juan     Unidad     Colegio
104     10     3

(1) P.N.P. íntegra—
iniciales clásicas.

(3) P.P.D.—
(1) candidatura de Acevedo Pérez; (1) iniciales clásicas, y (1) iniciales opuestas a la mitad del cuadrante 2.

San Juan     Unidad     Colegio
   104        12       3

(1) P.N.P. íntegra—
clásica 2.

(1) P.P.D. íntegra—
iniciales de los funcionarios en el cuadrante 2; iniciales del elector en el cuadrante 1, abajo.

San Juan     Unidad     Colegio
   104        12       6

(1) P.N.P. íntegra—
iniciales en el cuadrante 4, arriba.

(1) Candidatura Acevedo Pérez—
iniciales clásicas.

(1) P.P.D. íntegra—
iniciales clásicas.

San Juan     Unidad     Colegio
   104        13       7

(1) P.N.P. íntegra—
iniciales clásicas.

San Juan     Unidad     Colegio
   104        14       1

(1) P.N.P. íntegra—
iniciales clásicas.

San Juan     Unidad     Colegio
   104        14       4

(1) P.P.D. íntegra—
iniciales clásicas.

(1) P.P.D. (candidatura de Acevedo Pérez)—
iniciales clásicas.

San Juan     Unidad     Colegio
   104        14        3

(1)   P.P.D. íntegra—
iniciales opuestas.

(1)   P.P.D. íntegra—
iniciales en el cuadrante 4.

San Juan     Unidad     Colegio
   104        16        2

(1)   P.P.D. íntegra—
iniciales clásicas. Nota: el elector inició
dos veces, una en cursivo y la otra en letra
de molde.

San Juan     Unidad     Colegio
   104        20        1

(1)   Candidatura Acevedo Pérez—
iniciales clásicas.

San Juan     Unidad     Colegio
   104        14        2

(1)   P.N.P. íntegra—
iniciales clásicas.

(2)   P.P.D. íntegras—
iniciales clásicas.

San Juan     Unidad     Colegio
   104        19        1

(2)   P.N.P. íntegras—
iniciales en el cuadrante 2.

(3)   P.P.D. íntegras—
(2) iniciales clásicas en el cuadrante 2.

(1)   Candidatura Acevedo Pérez—
iniciales en el cuadrante 1, abajo.

San Juan      Unidad      Colegio
   104         21          1

(1)   P.N.P. íntegra—
iniciales clásicas.

(1)   P.N.P. íntegra—
iniciales en el cuadrante 3, abajo.

(1)   P.P.D. íntegra—
iniciales en el cuadrante 2, arriba.

San Juan      Unidad      Colegio
   104         3          1

(2)   P.P.D. íntegras—
iniciales clásicas; (1) en el cuadrante 2.

San Juan      Unidad      Colegio
   104        13          3

(1)   P.N.P. íntegra—
iniciales clásicas.

(2)   P.P.D. íntegras—
iniciales clásicas.

San Juan      Unidad      Colegio
   104        13         10

(4)   P.N.P. íntegras—
iniciales: (1) clásicas; (2) en el cuadrante y
abajo, y (1) en el cuadrante al lado dere-
cho, arriba.

San Juan      Unidad      Colegio
   104         21          2

(1)   P.N.P. íntegra—
iniciales clásicas.

San Juan      Unidad      Colegio
   104         3          2

(1)   P.N.P.—
iniciales clásicas.

San Juan     Unidad     Colegio
104       16        1

(1) P.N.P.—
iniciales clásicas.

San Juan     Unidad     Colegio
104       2        3

(1) P.N.P.—
iniciales clásicas.

(1) P.P.D.—
iniciales clásicas.

San Juan     Unidad     Colegio
104       3        3

(1) P.P.D.—
iniciales de los funcionarios y del elector
en el cuadrante 2 (caso clásico 2).

San Juan     Unidad     Colegio
104       2        5

(1) P.P.D. íntegra.

San Juan     Unidad     Colegio
104       2        8

(2) P.P.D.—
iniciales clásicas.

San Juan     Unidad     Colegio
104       2        9

(1) P.N.P. íntegra—
caso clásico 2 (todas las iniciales en el cua-
drante 2).

(1) P.P.D.—
caso clásico 2.

San Juan     Unidad     Colegio
104       6        3

(1) P.P.D.—
iniciales en el cuadrante 2 (bien tenues en
el borde al centro).

San Juan     Unidad    Colegio
104         6        1

(1)   P.P.D.—
iniciales clásicas.

San Juan     Unidad    Colegio
104         8        5

(3)   P.P.D.—
(2) iniciales clásicas, (1) en el cuadrante 2.

San Juan     Unidad    Colegio
104        13        5

(1)   P.P.D.—
iniciales clásicas.

(1)   Candidatura Ana M. Corrada Del Río—
iniciales clásicas.

San Juan     Unidad    Colegio
104         6        2

(2)   P.N.P.—
iniciales clásicas.

(1)   P.P.D.—
iniciales clásicas.

San Juan     Unidad    Colegio
104         2        7

(1)   P.P.D.—
iniciales clásicas.

San Juan     Unidad    Colegio
104         3        5

(1)   P.P.D.—
iniciales en el cuadrante 2, abajo al centro.

San Juan     Unidad    Colegio
104         5        1

(1)   P.N.P.—
iniciales clásicas.

San Juan      Unidad      Colegio (cont.)
    104           5           1

(2)   P.P.D.—
iniciales clásicas.

San Juan      Unidad      Colegio
    104           8           3

(2)   P.N.P.—
(1) iniciales clásicas, (1) en el cuadrante 1, abajo al centro.

San Juan      Unidad      Colegio
    104           8           7

(1)   P.N.P. (candidatura de Granados Navedo)—
iniciales clásicas.

# APÉNDICE D

Otras papeletas
válidas no adjudicadas

_____

NOTA DE LA COMPILADORA:
    La indefinición gráfica se debe al tamaño reducido de los modelos. Los origi-
nales constan en el expediente de este caso en el Tribunal Supremo.

## APÉNDICE D

| PARTIDO POPULAR DEMOCRATICO | | PARTIDO NUEVO PROGRESISTA | | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | | NOMINACION DIRECTA (WRITE IN) | |
|---|---|---|---|---|---|---|---|
| **ALCALDE** Héctor Luis Acevedo | | **ALCALDE** José Granados Navedo | X | **ALCALDE** Ana María (Ita) Corrada del Río | | **ALCALDE** | |
| Miembros de la Asamblea Municipal | | Miembros de la Asamblea Municipal | | Miembros de la Asamblea Municipal | | Miembros de la Asamblea Municipal | |
| 1 | Thilda Alvarado | 1 | Ramón "Pitito" Miranda Marrán | 1 | Carlos Fronteras | 1 | |
| 2 | Manuel E. Andreu García | 2 | Dámaris Sifontes Reyes X | 2 | Héctor Villarini | 2 | |
| 3 | Carmelo Betancourt Cale | 3 | Miguel A. "Tito" González Ríos X | 3 | José Cruz | 3 | |
| 4 | Eric Colón Rodríguez | 4 | Enrique Ferreira Vélez X | 4 | Otilio Resnde | 4 | |
| 5 | Amadis Cruz Cáceres X | 5 | Nicolás Crespo Kortright X | 5 | Angel Ortega | 5 | |
| 6 | John Fonle | 6 | Samuel Máximo Cuesta X | 6 | Jesús Márquez | 6 | |
| 7 | Conrado González | 7 | Isidra Albino Serrano X | 7 | José T. Quiñones | 7 | |
| 8 | Roberto Pérez Santoni | 8 | Myriam Hernánez Barroso X | 8 | Gladys Cosme | 8 | |
| 9 | Francisco (Paco) Luis Rivera | 9 | George McDougall X | 9 | Víctor Andino | 9 | |
| 10 | Diana Rodríguez | 10 | Rafael Ubarri Acosta | 10 | Pablo Ortiz X | 10 | |
| 11 | Daína Bajo | 11 | Sonia Pabón de Setanayor | 11 | Diego Gerken X | 11 | |
| 12 | Awilda Saldaña | 12 | Luis Rivera Brunes X | 12 | Domingo Ellen Velázquez | 12 | |
| 13 | Arturo Silvagneli | 13 | Héctor L. Schmidt Figueroa | 13 | Digna L. Ossie Bazario X | 13 | |
| 14 | Zandra Vergne Colón | 14 | Aída Avalo Collazo | 14 | Felipe (Pipe) Rivera X | 14 | |

## INSTRUCCIONES SOBRE LA FORMA DE VOTAR LA PAPELETA ELECTORAL MUNICIPAL

En esta papeleta usted tiene derecho a votar por un candidato a Alcalde y por el número exacto de Asambleístas que aparecen en una de las columnas. Si usted vota por más del número de candidatos a que tiene derecho para cada posición, usted anula su voto para dicha posición.

**COMO VOTAR INTEGRO:**

Votar íntegro es votar por todos los candidatos del partido de su preferencia y por ninguno otro.

Para votar íntegro usted hace una sola cruz "X" o marca válida en el encasillado en blanco bajo la insignia del partido de su preferencia. Esa sola marca vale para todos los candidatos bajo la columna.

**COMO VOTAR MIXTO:**

Si usted, además de votar bajo la insignia de un partido, tiene preferencia por uno o cada candidatos de otros partidos para uno o más cargos, podrá hacer una cruz o marca válida al lado del nombre del candidato con prefera fuera de la columna de su partido.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta cruz sola puede votar por un candidato para cada cargo. Cada voto así marcado contará solamente para el candidato expresamente marcado.

**COMO VOTAR POR CANDIDATURA:**

Cuando el elector desea votar exclusivamente por uno o cada candidato y no tiene interés en votar bajo la insignia de ningún partido, hará una marca al lado de los candidatos de su preferencia.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo.

COMISION ESTATAL DE ELECCIONES
### ELECCIONES GENERALES
## PAPELETA ELECTORAL MUNICIPAL
**8 DE NOVIEMBRE DE 1988**

Municipio de  SAN JUAN  Sobre #1, Ident 1 dte (No se sabe origen)

| PARTIDO POPULAR DEMOCRATICO | PARTIDO NUEVO PROGRESISTA | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | NOMINACION DIRECTA (WRITE IN) |
|---|---|---|---|
| ALCALDE Héctor Luis Acevedo | ALCALDE José Granados Navedo | ALCALDE Ana María (Ita) Corrada del Río | ALCALDE |
| Miembros de la Asamblea Municipal Thilda Alvarado | 1 Ramón "Pitito" Miranda Marzán | 1 Carlos Fronteras | 1 |
| Manuel E. Andreu García | 2 Dámaris Sifuentes Reyes | 2 Héctor Villarini | 2 |
| 3 Carmelo Betancourt Caló | 3 Miguel A. "Tito" González Ríos | 3 José Cruz | 3 |
| 4 Eric Colón Rodríguez | 4 Enrique Ferreira Vélez | 4 Otilio Rosado | 4 |
| 5 Amadis Cruz Cáceres | 5 Nicolás Crespo Kortright | 5 Angel Ortega | 5 |
| 6 Jelm Fuelle | 6 Samuel Méndez Cuesta | 6 Jesús Márquez | 6 |
| 7 Conrado González | 7 Isidra Albino Serrano | 7 José T. Quiñones | 7 |
| 8 Roberto Pérez Santoni | 8 Myriam Herdman Barreto | 8 Gladys Cosme | 8 |
| 9 Francisco (Pucci) Luis Rivera | 9 George MacDougall | 9 Víctor Andino | 9 |
| 10 Diana Rodríguez | 10 Rafael Ubarri Acosta | 10 Pablo Ortiz | 10 |
| 11 Dafne Rojo | 11 Sonia Pabón de Setenmayor | 11 Diego Gerber | 11 |
| 12 Awilda Saldaña | 12 Luis Rivera Brenes | 12 Domingo Elías Velázquez | 12 |
| 13 Arturo Silvagnoli | 13 Héctor L. Schmidt Figueroa | 13 Digna L. Ossio Rosario | 13 |
| 14 Zandra Vergne Colón | 14 Aída Avale Collazo | 14 Felipe (Pipe) Rivera | 14 |

## INSTRUCCIONES SOBRE LA FORMA DE VOTAR LA PAPELETA ELECTORAL MUNICIPAL

En esta papeleta usted tiene derecho a votar por un candidato a Alcalde y por el número exacto de Asambleístas que aparecen en una de las columnas.
Si usted vota por más del número de candidatos a que tiene derecho para cada posición, usted anula su voto para dicha posición.

**COMO VOTAR INTEGRO:**

Votar íntegro es votar por todos los candidatos del partido de su preferencia y por ninguno otro.

Para votar íntegro usted hace una sola cruz "X" o marca válida en el espacio en blanco bajo la insignia del partido de su preferencia. Esa sola marca vale para todos los candidatos bajo la columna.

**COMO VOTAR MIXTO:**

Si usted, además de votar bajo la insignia de un partido, tiene preferencia por uno o más candidatos de otros partidos para uno o más cargos, podrá hacer una cruz o marca válida al lado del nombre del candidato que prefiera fuera de la columna de su partido.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo. Cada voto así marcado contará solamente para el candidato expresamente marcado.

**COMO VOTAR POR CANDIDATURA:**

Cuando el elector desea votar exclusivamente por uno o más candidatos y no tiene interés en votar bajo la insignia de ningún partido, hará una marca al lado de los candidatos de su preferencia.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo.

COMISION ESTATAL DE ELECCIONES
### ELECCIONES GENERALES
## PAPELETA ELECTORAL MUNICIPAL
8 DE NOVIEMBRE DE 1988

Municipio de **SAN JUAN**   1-9-1

| PARTIDO POPULAR DEMOCRATICO | | PARTIDO NUEVO PROGRESISTA | | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | | NOMINACION DIRECTA (WRITE IN) |
|---|---|---|---|---|---|---|
| | | | | | | Se provee esta columna en blanco para que el elector anote en ella el nombre de cualquier otro candidato que desee consalfiar, fuera de los que aparecen en las columnas anteriores. |
| | | | | | | Artículo 4.411 Ley Electoral |
| **ALCALDE** | | **ALCALDE** | | **ALCALDE** | | **ALCALDE** |
| Héctor Luis Acevedo | | José Granados Navedo | | Ana María (Ita) Corrada del Río | | |
| Miembros de la Asamblea Municipal | | Miembros de la Asamblea Municipal | | Miembros de la Asamblea Municipal | | Miembros de la Asamblea Municipal |
| 1 | Thilda Alvarado | 1 | Ramón "Pitito" Miranda Marzán | 1 | Carlos Fronteras ✗ | 1 |
| 2 | Manuel E. Andreu García | 2 | Démaris Sifuentes Reyes ✗ | 2 | Héctor Villarini | 2 |
| 3 | Carmelo Betancourt Cale | 3 | Miguel A. "Tito" González Rico | 3 | José Cruz ✗ | 3 |
| 4 | Eric Colón Rodríguez | 4 | Enrique Ferrera Vélez | 4 | Otilio Resado ✗ | 4 |
| 5 | Amadís Cruz Cáceres | 5 | Nicolás Crespo Kortright ✗ | 5 | Angel Ortega | 5 |
| 6 | John Freria | 6 | Samuel Méndez Cuesta ✗ | 6 | Jesús Márquez | 6 |
| 7 | Conrado González | 7 | Isidra Albino Serrano ✗ | 7 | José T. Quiñones | 7 |
| 8 | Roberto Pérez Santoni | 8 | Myriam Herdman Barrosa ✗ | 8 | Gladys Cosme | 8 |
| 9 | Francisco (Paco) Luis Rivera | 9 | George McDougall ✗ | 9 | Víctor Andino | 9 |
| 10 | Diana Rodríguez | 10 | Rafael Uberri Acosta ✗ | 10 | Pablo Ortiz | 10 |
| 11 | Dafne Rojo ✗ | 11 | Sonia Pabón de Sotomayor | 11 | Diego Gerbea ✗ | 11 |
| 12 | Awilda Saldaña | 12 | Luis Rivera Brenes ✗ | 12 | Domingo Elías Velázquez | 12 |
| 13 | Arturo Silvagnoli | 13 | Héctor L. Schmidt Figueroa ✗ | 13 | Digna L. Ocasio Rosario | 13 |
| 14 | Zandra Vergne Colón | 14 | Aida Avalo Collazo | 14 | Felipe (Pipe) Rivera ✗ | 14 |

## INSTRUCCIONES SOBRE LA FORMA DE VOTAR LA PAPELETA ELECTORAL MUNICIPAL

En esta papeleta usted tiene derecho a votar por un candidato a Alcalde y por el número exacto de Asambleístas que aparecen en una de las columnas. Si usted vota por más del número de candidatos a que tiene derecho para cada posición, usted anula su voto para dicha posición.

**COMO VOTAR INTEGRO:**

Votar íntegro es votar por todos los candidatos del partido de su preferencia y por ninguno otro.

Para votar íntegro usted hace una sola cruz "X" o marca válida en el espacio en blanco bajo la insignia del partido de su preferencia. Esa sola marca vale para todos los candidatos bajo la columna.

**COMO VOTAR MIXTO:**

Si usted, además de votar bajo la insignia de un partido, tiene preferencia por uno o más candidatos de otras partidos para uno o más cargos, podrá hacer una cruz o marca válida al lado del nombre del candidato que prefiera fuera de la columna de su partido.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo. Cada voto así marcado contará solamente para el candidato expresamente marcado.

**COMO VOTAR POR CANDIDATURA:**

Cuando el elector desea votar exclusivamente por uno o más candidatos y no tiene interés en votar bajo la insignia de ningún partido, hará una marca al lado de los candidatos de su preferencia.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo.

COMISION ESTATAL DE ELECCIONES
## ELECCIONES GENERALES
# PAPELETA ELECTORAL MUNICIPAL
**6 DE NOVIEMBRE DE 1988**

Municipio de **SAN JUAN**           *1 - 9 - 1*

| PARTIDO POPULAR DEMOCRATICO | PARTIDO NUEVO PROGRESISTA | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | NOMINACION DIRECTA (WRITE IN) |
|---|---|---|---|
| **ALCALDE** ✗ Héctor Luis Acevedo | **ALCALDE** José Granados Navedo | **ALCALDE** Ana María (Ita) Corrada del Río | **ALCALDE** |
| Miembros de la Asamblea Municipal | Miembros de la Asamblea Municipal | Miembros de la Asamblea Municipal | Miembros de la Asamblea Municipal |
| 1 Thilda Alvarado | 1 Ramón "Pitito" Miranda Marzán | 1 Carlos Fronteras | 1 |
| 2 Manuel E. Andreu García | 2 Dámaris Sifuentes Reyes | 2 Héctor Villarini | 2 |
| 3 Carmelo Betancourt Cale | 3 Miguel A. "Tito" González Ríos | 3 José Cruz | 3 |
| 4 Eric Colón-Rodríguez | 4 Enrique Ferreira Vélez | 4 Otilio Besado | 4 |
| 5 Amadís Cruz Cáceres | 5 Nicolás Crespo Kortright | 5 Angel Ortega | 5 |
| 6 John Fusilé | 6 Samuel Méndez Ubeda | 6 Jesús Martínez | 6 |
| 7 Conrado González | 7 Isidra Albino Serrano | 7 José T. Quiñones | 7 |
| 8 Roberto Pérez Santoni | 8 Myriam Berdxaus Barrous | 8 Gladys Cosme | 8 |
| 9 Francisco (Paco) Luis Rivera | 9 George McDougall | 9 Víctor Andino | 9 |
| 10 Diana Rodríguez | 10 Rafael Ubarri Acosta | 10 Pablo Ortiz | 10 |
| 11 Daino Rejo | 11 Sonia Pabón de Setenmayor | 11 Diego Gorbea | 11 |
| 12 Awilda Saldaña | 12 Luis Rivera Brenes | 12 Domingo Elías Velázquez | 12 |
| 13 Arturo Silvagnolí | 13 Héctor L. Schmidt Figueroa | 13 Digna L. Ocasio Rosario | 13 |
| 14 Zandra Vergne Colón | 14 Aída Avais Collazo | 14 Felipe (Pipe) Rivera | 14 |

## INSTRUCCIONES SOBRE LA FORMA DE VOTAR LA PAPELETA ELECTORAL MUNICIPAL

En esta papeleta usted tiene derecho a votar por un candidato a Alcalde y por el número exacto de Asambleístas que aparecen en una de las columnas. Si usted vota por más del número de candidatos a que tiene derecho para cada posición, usted anula su voto para dicha posición.

**COMO VOTAR INTEGRO:**

Votar íntegro es votar por todos los candidatos del partido de su preferencia y por ninguno otro.

Para votar íntegro usted hace una sola cruz "X" o marca válida en el espacio en blanco bajo la insignia del partido de su preferencia. Esa sola marca vale para todos los candidatos bajo la columna.

**COMO VOTAR MIXTO:**

Si usted, además de votar bajo la insignia de un partido, tiene preferencia por uno o cada candidatos de otros partidos para una o más cargos, podrá hacer una cruz o marca válida al lado del nombre del candidato que prefiera fuera de la columna de su partida.

También puede votar por otras personas de su preferencia que no aparecen como candidatas, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo. Cada voto así marcado contará solamente para el candidato expresamente marcado.

**COMO VOTAR POR CANDIDATURA:**

Cuando el elector desea votar exclusivamente por uno o más candidatos y no tiene interés en votar bajo la insignia de ningún partido, hará una marca al lado de los candidatos de su preferencia.

También puede votar por otras personas de su preferencia que no aparecen como candidatas, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo.

| PARTIDO POPULAR DEMOCRATICO | PARTIDO NUEVO PROGRESISTA | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | NOMINACION DIRECTA (WRITE IN) |
|---|---|---|---|
| **ALCALDE** Héctor Luis Acevedo | **ALCALDE** José Granados Navedo | **ALCALDE** Ana María (Ita) Corrada del Río | **ALCALDE** |
| 1 Thilda Alvarado | 1 Ramón "Pitito" Miranda Marxis | 1 Carlos Fronteras | 1 |
| 2 Manuel E. Andreu García | 2 Démeris Sifeentes Reyes | 2 Héctor Villarini | 2 |
| 3 Carmelo Betancourt Calo | 3 Miguel A. "Tito" González Rios | 3 José Cruz | 3 |
| 4 Eric Colón Rodríguez | 4 Enrique Ferreira Vélez | 4 Otilio Essacio | 4 |
| 5 Amadis Cruz Cáceres | 5 Nicolás Crespo Kortright | 5 Angel Ortega | 5 |
| 6 John Foxile | 6 Samuel Méndez Cuesta | 6 Jesús Márquez | 6 |
| 7 Conrado González | 7 Isidra Albino Serrano | 7 José T. Quiñones | 7 |
| 8 Roberto Pérez Santoni | 8 Myriam Hernández Barrera | 8 Gladys Cosme | 8 |
| 9 Francisco (Paco) Luis Rivera | 9 George McDougall | 9 Víctor Andino | 9 |
| 10 Diana Rodríguez | 10 Rafael Ubarri Acosta | 10 Pablo Ortiz | 10 |
| 11 Dafne Bajo | 11 Sonia Paleón de Sotomayor | 11 Diego Gerben | 11 |
| 12 Awilda Saldaña | 12 Luis Rivera Brenes | 12 Domingo Elías Velásquez | 12 |
| 13 Arturo Silvagnoli | 13 Héctor L. Schmidt Figueroa | 13 Digna L. Ocasio Rosario | 13 |
| 14 Zandra Vergne Colón | 14 Aida Avala Collazo | 14 Felipe (Pipe) Rivera | 14 |

## INSTRUCCIONES SOBRE LA FORMA DE VOTAR LA PAPELETA ELECTORAL MUNICIPAL

En esta papeleta usted tiene derecho a votar por un candidato a Alcalde y por el número exacto de Asambleístas que aparecen en una de las columnas. Si usted vota por más del número de candidatos a que tiene derecho para cada posición, usted anula su voto para dicha posición.

**COMO VOTAR INTEGRO:**

Votar íntegro es votar por todos los candidatos del partido de su preferencia y por ninguno otro.

Para votar íntegro usted hace una sola cruz "X" o marca válida en el espacio en blanco bajo la insignia del partido de su preferencia. Esa sola marca vale para todos los candidatos bajo la columna.

**COMO VOTAR MIXTO:**

Si usted, además de votar la insignia de un partido, tiene preferencia por uno o más candidatos de otros partidos para uno o más cargos, podrá hacer una cruz o marca válida al lado del nombre del candidato que prefiera fuera de la columna de su partido.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo. Cada voto así marcado contará solamente para el candidato expresamente marcado.

**COMO VOTAR POR CANDIDATURA:**

Cuando el elector desee votar exclusivamente por uno o más candidatos y no tiene interés en votar bajo la insignia de ningún partido, hará una marca al lado de los candidatos de su preferencia.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo.

COMISION ESTATAL DE ELECCIONES
### ELECCIONES GENERALES
## PAPELETA ELECTORAL MUNICIPAL
3 DE NOVIEMBRE DE 1996

| PARTIDO POPULAR DEMOCRATICO. | PARTIDO NUEVO PROGRESISTA | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | NOMINACION DIRECTA. (WRITE IN) |
|---|---|---|---|

¡DATE A RESPETAR!

Se proveo esta columna en blanco para que el elector anote en ella el nombre de cualquier otro candidato que desee consignar, fuera de los que aparecen en las columnas anteriores.

Artículo 5.061
Ley Electoral

| ALCALDE | ALCALDE | ALCALDE | ALCALDE |
|---|---|---|---|
| Héctor Luis Acevedo | José Granados Navedo | Ana María (Ita) Corrada del Río | |
| **Miembros de la Asamblea Municipal** | **Miembros de la Asamblea Municipal** | **Miembros de la Asamblea Municipal** | **Miembros de la Asamblea Municipal** |
| 1 Thilda Alvarado | 1 Ramón "Pitito" Miranda Marzán | 1 Carlos Fronteras | 1 |
| 2 Manuel E. Andreu García | 2 Dámaris Sifontes Reyes | 2 Héctor Villarini | 2 |
| 3 Carmelo Betancourt Cale | 3 Miguel A. "Tite" González Ríos | 3 José Cruz | 3 |
| 4 Eric Colón Rodríguez | 4 Enrique Feurekes Vélez | 4 Otilio Biondo | 4 |
| 5 Amadís Cruz Cáceres | 5 Nivaldo Crespo Kindlegher | 5 Angel Ortega | 5 |
| 6 John Foelle | 6 Samuel Méndez Cuesta | 6 Jesús Márquez | 6 |
| 7 Conrado González | 7 Isidro Albino Serrano | 7 José T. Quiñones | 7 |
| 8 Roberto Pérez Santoni | 8 Myriam Herdman Beníteau | 8 Gladys Come | 8 |
| 9 Francisco (Paco) Luis Rivera | 9 George McDougall | 9 Víctor Avilés | 9 |
| 10 Diana Rodríguez | 10 Rafael Ubarri Acosta | 10 Pablo Ortiz | 10 |
| 11 Dafna Bajo | 11 Sonia Pabón de Sotomayor | 11 Diego Gerena | 11 |
| 12 Awilda Saldaña | 12 Luis Rivera Brenes | 12 Domingo Elías Velázquez | 12 |
| 13 Arturo Silvagnoli | 13 Héctor L. Schmidt Figueroa | 13 Digna L. Ossún Rosario | 13 |
| 14 Zandra Vergne Colón | 14 Aida Avala Collazo | 14 Felipe (Pipo) Rivera | 14 |

## INSTRUCCIONES SOBRE LA FORMA DE VOTAR LA PAPELETA ELECTORAL MUNICIPAL

En esta papeleta usted tiene derecho a votar por un candidato a Alcalde y por el número exacto de Asambleístas que aparecen en una de las columnas. Si usted vota por más del número de candidatos a que tiene derecho para cada posición, usted anula su voto para dicha posición.

**COMO VOTAR INTEGRO:**

Votar íntegro es votar por todos los candidatos del partido de su preferencia y por ninguno otro.

Para votar íntegro usted hace una sola cruz "X" o marca válida en el círculo en blanco bajo la insignia del partido de su preferencia. Esa sola marca vale para todos los candidatos bajo la columna.

**COMO VOTAR MIXTO:**

Si usted, además de votar bajo la insignia de un partido, tiene preferencia por uno o más candidatos de otros partidos para uno o más cargos, podrá hacer una cruz o marca válida al lado del nombre del candidato que prefiere fuera de la columna de su partido.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo. Cada voto así marcado contará solamente para el candidato expresamente marcado.

**COMO VOTAR POR CANDIDATURA:**

Cuando el elector desea votar exclusivamente por uno o más candidatos y no tiene interés en votar bajo la insignia de ningún partido, hará una cruz o marca al lado de los candidatos de su preferencia.

También puede votar por otras personas de su preferencia, que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo.

COMISION ESTATAL DE ELECCIONES
## ELECCIONES GENERALES
# PAPELETA ELECTORAL MUNICIPAL
5 DE NOVIEMBRE DE 1996

Municipio de **SAN JUAN**   /- /7-2

| PARTIDO POPULAR DEMOCRATICO | PARTIDO NUEVO PROGRESISTA | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | NOMINACION DIRECTA (WRITE IN) |
|---|---|---|---|

¡DATE A RESPETAR!

Se provee esta columna en blanco para que el elector anote en ella el nombre de cualquier otro candidato que desee nominar, fuera de los que aparecen en las columnas anteriores.

Artículo 5.011
Ley Electoral

| ALCALDE | ALCALDE | ALCALDE | ALCALDE |
|---|---|---|---|
| Héctor Luis Acevedo | José Granados Navedo | Ana María (Ita) Corrada del Río | |

| # | Miembros de la Asamblea Municipal | # | Miembros de la Asamblea Municipal | # | Miembros de la Asamblea Municipal | # | Miembros de la Asamblea Municipal |
|---|---|---|---|---|---|---|---|
| 1 | Thilda Alvarado | 1 | Ramón "Pitito" Miranda Marzán | 1 | Carlos Fronteras | 1 | |
| 2 | Manuel E. Andreu García | 2 | Dámaris Sifuentes Reyes | 2 | Héctor Villarini | 2 | |
| 3 | Carmelo Betancourt Cale | 3 | Miguel A. "Tito" González Ríos | 3 | José Cruz | 3 | |
| 4 | Eric Colón Rodríguez | 4 | Enrique Ferreira Vélez | 4 | Otilio Resudo | 4 | |
| 5 | Amadis Cruz Cáceres | 5 | Nicolás Crespo Kortright | 5 | Angel Ortega | 5 | |
| 6 | John Fuelle | 6 | Samuel Méndez Cuesta | 6 | Julio Márquez | 6 | |
| 7 | Conrado González | 7 | Isidra Albino Serrano | 7 | José T. Quiñones | 7 | |
| 8 | Roberto Pérez Santoni | 8 | Myriam Herchman Barrons | 8 | Gladys Cosme | 8 | |
| 9 | Francisco (Paco) Luis Rivera | 9 | George McDougall | 9 | Victor Andino | 9 | |
| 10 | Diana Rodríguez | 10 | Rafael Ubarri Acosta | 10 | Pablo Ortiz | 10 | |
| 11 | Dafne Rsyo | 11 | Sonia Pabón de Setemayer | 11 | Diego Gorbea | 11 | |
| 12 | Awilda Saldaña | 12 | Luz Rivera Brenes | 12 | Domingo Elías Velásquez | 12 | |
| 13 | Arturo Silvagnoli | 13 | Héctor L. Schmidt Figueroa | 13 | Digna L. Ocasio Rosario | 13 | |
| 14 | Zandra Vergne Colón | 14 | Aída Avale Collazo | 14 | Felipe (Pipe) Rivera | 14 | |

## INSTRUCCIONES SOBRE LA FORMA DE VOTAR LA PAPELETA ELECTORAL MUNICIPAL

En esta papeleta usted tiene derecho a votar por un candidato a Alcalde y por el número exacto de Asambleístas que aparecen en una de las columnas. Si usted vota por más del número de candidatos a que tiene derecho para cada posición, usted anula su voto para dicha posición.

**COMO VOTAR INTEGRO:**

Votar íntegro es votar por todas las candidatos del partido de su preferencia y por ninguno otro.

Para votar íntegro usted hace una sola cruz "X" o marca válida en el espacio en blanco bajo la insignia del partido de su preferencia. Esa sola marca vale para todos los candidatos bajo la columna.

**COMO VOTAR MIXTO:**

Si usted, además de votar bajo la insignia de un partido, tiene preferencia por uno o más candidatos de otros partidos para uno o más cargos, podrá hacer una cruz o marca válida al lado del nombre del candidato que prefiera fuera de la columna de su partido.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo. Cada voto así marcado contará solamente para el candidato expresamente marcado.

**COMO VOTAR POR CANDIDATURA:**

Cuando el elector desea votar exclusivamente por uno o más candidatos y no tiene interés en votar bajo la insignia de ningún partido, hará una marca al lado de los candidatos de su preferencia.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo.

COMISION ESTATAL DE ELECCIONES
## ELECCIONES GENERALES
# PAPELETA ELECTORAL MUNICIPAL
8 DE NOVIEMBRE DE 1988

Municipio de **SAN JUAN**

1-17-2

| PARTIDO POPULAR DEMOCRATICO | PARTIDO NUEVO PROGRESISTA | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | NOMINACION DIRECTA (WRITE IN) |
|---|---|---|---|
| **ALCALDE** Héctor Luis Acevedo | **ALCALDE** José Granados Navedo | **ALCALDE** Ana María (Ita) Corrada del Río | Artículo 4.011 Ley Electoral |
| Miembros de la Asamblea Municipal | Miembros de la Asamblea Municipal | Miembros de la Asamblea Municipal | **ALCALDE** Miembros de la Asamblea Municipal |
| 1 Thilda Alvarado | 1 Ramón "Pitito" Miranda Marzán | 1 Carlos Fronteras | 1 |
| 2 Manuel E. Andreu García | 2 Dámaris Sifuentes Reyes | 2 Héctor Villarini | 2 |
| 3 Carmelo Betancourt Cale | 3 Miguel A. "Tito" Gonzáles Ríos | 3 José Cruz | 3 |
| 4 Eric Colón Rodríguez | 4 Enrique Ferreira Vélez | 4 Otilio Bemés | 4 |
| 5 Amadis Cruz Cáceres | 5 Nicolás Crespo Kortright | 5 Angel Ortega | 5 |
| 6 John Fuxile | 6 Samuel Méndez Cuesta | 6 Jesús Márquez | 6 |
| 7 Conrado González | 7 Isidra Albino Serrano | 7 José T. Quiñones | 7 |
| 8 Roberto Pérez Santoni | 8 Myriam Herdman Barross | 8 Gladys Comas | 8 |
| 9 Francisco (Paco) Luis Rivera | 9 George McDougall | 9 Víctor Andino | 9 |
| 10 Diana Rodríguez | 10 Rafael Ubarri Acosta | 10 Pablo Ortiz | 10 |
| 11 Dafne Raja | 11 Sonia Pabón de Sotomayor | 11 Diego Gorbea | 11 |
| 12 Awilda Saldaña | 12 Luis Rivera Bruss | 12 Domingo Elías Velásquez | 12 |
| 13 Arturo Silvagnoli | 13 Héctor L. Schmidt Figueroa | 13 Digna L. Ocasio Rosario | 13 |
| 14 Zandra Vergne Colón | 14 Aida Avalo Collazo | 14 Felipe (Pipe) Rivera | 14 |

## INSTRUCCIONES SOBRE LA FORMA DE VOTAR LA PAPELETA ELECTORAL MUNICIPAL

En esta papeleta usted tiene derecho a votar por un candidato a Alcalde y por el número exacto de Asambleístas que aparecen en una de las columnas. Si usted vota por más del número de candidatos a que tiene derecho para cada posición, usted anula su voto para dicha posición.

**COMO VOTAR INTEGRO:**

Votar íntegro es votar por todos los candidatos del partido de su preferencia y por ninguno otro.

Para votar íntegro usted hace una sola cruz "X" o marca válida en el espacio en blanco bajo la insignia del partido de su preferencia. Esa sola marca vale para todos los candidatos bajo la columna.

**COMO VOTAR MIXTO:**

Si usted, además de votar bajo la insignia de un partido, tiene preferencia por uno o más candidatos de otros partidos para uno o más cargos, podrá hacer una cruz o marca válida al lado del nombre del candidato que prefiera fuera de la columna de su partido.

También puede votar por otras personas que no aparecen como candidatos, escribiendo el nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo. Cada voto así marcado contará solamente para el candidato expresamente marcado.

**COMO VOTAR POR CANDIDATURA:**

Cuando el elector desea votar exclusivamente por uno o más candidatos y no tiene interés en votar bajo la insignia de ningún partido, hará una marca al lado de las candidaturas de su preferencia.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo el nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo.

COMISION ESTATAL DE ELECCIONES
# ELECCIONES GENERALES
## PAPELETA ELECTORAL MUNICIPAL
**8 DE NOVIEMBRE DE 1988**

Municipio de SAN JUAN       1-26-8

NOMINACION DIRECTA

(WRITE IN)

Se provee esta columna en blanco para que el elector anote en ella el nombre de cualquier otro candidato que desee escribir, fuera de los que aparecen en las columnas anteriores.

Artículo 6.011
Ley Electoral

*4*

| PARTIDO POPULAR DEMOCRATICO | PARTIDO NUEVO PROGRESISTA | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | |
|---|---|---|---|
| ALCALDE Héctor Luis Acevedo | ALCALDE José Granados Navedo | ALCALDE Ana María (Ita) Corrada del Río | ALCALDE |
| Miembros de la Asamblea Municipal | Miembros de la Asamblea Municipal | Miembros de la Asamblea Municipal | Miembros de la Asamblea Municipal |
| 1 Thilda Alvarado | 1 Ramón "Pitito" Miranda Marzán | 1 Carlos Fronteras | 1 |
| 2 Manuel E. Andreu García | 2 Dámaris Sifuentes Reyes | 2 Héctor Villariní | 2 |
| 3 Carmelo Betancourt Cale | 3 Miguel A. "Tito" González Ríos | 3 José Cruz | 3 |
| 4 Eric Colón Rodríguez | 4 Enrique Ferreira Vélez | 4 Otilio Rosado | 4 |
| 5 Amadís Cruz Cáceres | 5 Nicolás Crespo Kortright | 5 Angel Ortega | 5 |
| 6 John Fucile | 6 Samuel Méndez Cuesta | 6 Jesús Márquez | 6 |
| 7 Conrado González | 7 Isidra Albino Serrano | 7 José T. Quiñones | 7 |
| 8 Roberto Pérez Santoni | 8 Myriam Hereaxan Barroso | 8 Gladys Cosme | 8 |
| 9 Francisco (Paco) Luis Rivera | 9 George McDougall | 9 Víctor Andino | 9 |
| 10 Diana Rodríguez | 10 Rafael Ubarri Acosta | 10 Pablo Ortiz | 10 |
| 11 Delfin Rojo | 11 Sonia Pabón de Sotomayor | 11 Diego Gorbea | 11 |
| 12 Awilda Saldaña | 12 Luis Rivera Breses | 12 Domingo Elías Velázquez | 12 |
| 13 Arturo Silvagnoli | 13 Héctor L. Schmidt Figueroa | 13 Digna L. Ocasio Rosario | 13 |
| 14 Zandra Vergne Colón | 14 Aida Avalo Collazo | 14 Felipe (Pipe) Rivera | 14 |

## INSTRUCCIONES SOBRE LA FORMA DE VOTAR LA PAPELETA ELECTORAL MUNICIPAL

En esta papeleta usted tiene derecho a votar por un candidato a Alcalde y por el número exacto de Asambleístas que aparecen en una de las columnas. Si usted vota por más del número de candidatos a que tiene derecho para cada posición, usted anula su voto para dicha posición.

**COMO VOTAR INTEGRO:**

Votar íntegro es votar por todos los candidatos del partido de su preferencia y por ninguno otro.

Para votar íntegro usted hace una sola cruz "X" o marca válida en el espacio en blanco bajo la insignia del partido de su preferencia. Esa sola marca vale para todos los candidatos bajo la columna.

**COMO VOTAR MIXTO:**

Si usted, además de votar bajo la insignia de un partido, tiene preferencia por uno o más candidatos de otros partidos para uno o más cargos, podrá hacer una cruz o marca válida al lado del candidato que prefiera fuera de la columna de su partido.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo. Cada voto así marcado contará solamente para el candidato expresamente marcado.

**COMO VOTAR POR CANDIDATURA:**

Cuando el elector desea votar exclusivamente por uno o más candidatos y no tiene interés en votar bajo la insignia de ningún partido, hará una marca al lado de los candidatos de su preferencia.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo.

COMISION ESTATAL DE ELECCIONES
## ELECCIONES GENERALES
# PAPELETA ELECTORAL MUNICIPAL
**3 DE NOVIEMBRE DE 1992**

Municipio de **SAN JUAN**          *2-10-4*

# 364

| PARTIDO POPULAR DEMOCRATICO | PARTIDO NUEVO PROGRESISTA | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | NOMINACION DIRECTA (WRITE IN) |
|---|---|---|---|
| **ALCALDE** Héctor Luis Acevedo | **ALCALDE** José Granados Navedo | **ALCALDE** Ana María (Ita) Corrada del Río | **ALCALDE** |
| 1 Thilda Alvarado | 1 Ramón "Pitito" Miranda Marzán | 1 Carlos Fronteras | 1 |
| 2 Manuel E. Andreu García | 2 Dámaris Sifuentes Reyes | 2 Héctor Villarini | 2 |
| 3 Carmelo Betancourt Cale | 3 Miguel A. "Tito" González Ríos | 3 José Cruz | 3 |
| 4 Eric Colón Rodríguez | 4 Enrique Ferreira Vélez | 4 Otilio Rasado | 4 |
| 5 Amadia Cruz Cáceres | 5 Nicolás Crespo Kortright | 5 Angel Ortega | 5 |
| 6 John Fusile | 6 Samuel Méndez Cuesta | 6 Jesús Márquez | 6 |
| 7 Conrado González | 7 Isidra Albino Serrano | 7 José T. Quiñones | 7 |
| 8 Roberto Pérez Santini | 8 Myriam Hardman Barroso | 8 Gladys Cosme | 8 |
| 9 Francisco (Paco) Luis Rivera | 9 George McDougall | 9 Víctor Andino | 9 |
| 10 Diana Rodríguez | 10 Rafael Ubarri Acosta | 10 Pablo Ortiz | 10 |
| 11 Dafne Rojo | 11 Sonia Pabón de Setenmayer | 11 Diego Gorbea | 11 |
| 12 Awilda Saldaña | 12 Luis Rivera Brenes | 12 Domingo Elías Velázquez | 12 |
| 13 Arturo Silvagnoli | 13 Héctor L. Schmidt Figueroa | 13 Digna L. Ocasio Rosario | 13 |
| 14 Zandra Vergne Colón | 14 Aida Avalo Collazo | 14 Felipe (Pipe) Rivera | 14 |

## INSTRUCCIONES SOBRE LA FORMA DE VOTAR LA PAPELETA ELECTORAL MUNICIPAL

En esta papeleta usted tiene derecho a votar por un candidato a Alcalde y por el número exacto de Asambleístas que aparecen en una de las columnas. Si usted vota por más del número de candidatos a que tiene derecho para cada posición, usted anula su voto para dicha posición.

**COMO VOTAR INTEGRO:**

Votar íntegro es votar por todos los candidatos del partido de su preferencia y por ninguno otra.

Para votar íntegro usted hace una sola cruz "X" o marca válida en el espacio en blanco bajo la insignia del partido de su preferencia. Esa sola marca vale para todos los candidatos bajo la columna.

**COMO VOTAR MIXTO:**

Si usted, además de votar bajo la insignia de un partido, tiene preferencia por uno o cada candidatos de otros partidos para uno o más cargos, podrá hacer una cruz o marca válida al lado del nombre del candidato que prefiera fuera de la columna de su partido.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo. Cada voto así marcado contará solamente para el candidato expresamente marcado.

**COMO VOTAR POR CANDIDATURA:**

Cuando el elector desea votar exclusivamente por uno o más candidatos y no tiene interés en votar bajo la insignia de ningún partido, hará una marca al lado de los candidatos de su preferencia.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo.

COMISION ESTATAL DE ELECCIONES
## ELECCIONES GENERALES
# PAPELETA ELECTORAL MUNICIPAL
### 8 DE NOVIEMBRE DE 1988

Municipio de **SAN JUAN**

  

| PARTIDO POPULAR DEMOCRATICO | PARTIDO NUEVO PROGRESISTA | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | NOMINACION DIRECTA (WRITE IN) |
|---|---|---|---|
| **ALCALDE** Héctor Luis Acevedo | **ALCALDE** José Granados Navedo | **ALCALDE** Ana María (Ita) Corrada del Río | **ALCALDE** $p_NQ$ |
| 1 Thilda Alvarado | 1 Ramón "Pitito" Miranda Marzán | 1 Carlos Fronteras | 1 $P_NP$ |
| 2 Manuel E. Andreu García | 2 Dámara Sifuentes Reyes | 2 Héctor Villarini | 2 $P_NP$ |
| 3 Carmelo Betancourt Cale | 3 Miguel A. "Tito" González Ríos | 3 José Cruz | 3 $P_NP$ |
| 4 Eric Colón Rodríguez | 4 Enrique Ferreira Vélez | 4 Otilio Rosado | 4 $P_NP$ |
| 5 Amadís Cruz Cáceres | 5 Nicolás Crespo Kortright | 5 Angel Ortega | 5 $P_NP$ |
| 6 John Fucile | 6 Samuel Méndez Cuesta | 6 Jesús Márquez | 6 $P_NP$ |
| 7 Conrado González | 7 Isidro Albino Serrano | 7 José T. Quiñones | 7 $P_NP$ |
| 8 Roberto Pérez Santoni | 8 Myriam Hernández Barrera | 8 Gladys Cosme | 8 $P_NP$ |
| 9 Francisco (Paco) Luis Rivera | 9 George McDougall | 9 Victor Añeses | 9 $P_NP$ |
| 10 Diana Rodríguez | 10 Rafael Ubarri Acosta | 10 Pablo Ortiz | 10 $P_NP$ |
| 11 Delne Bajo | 11 Sonia Pabón de Sotomayor | 11 Diego Gerbes | 11 $P_NP$ |
| 12 Awilda Saldaña | 12 Luis Rivera Brenes | 12 Domingo Elías Velázquez | 12 $P_NP$ |
| 13 Arturo Silvagnoli | 13 Héctor L. Schmidt Figueroa | 13 Digna L. Ossie Rosario | 13 $P_NP$ |
| 14 Zandra Vergne Colón | 14 Aida Avalo Collazo | 14 Felipe (Pipe) Rivera | 14 $P_r$ |

## INSTRUCCIONES SOBRE LA FORMA DE VOTAR LA PAPELETA ELECTORAL MUNICIPAL

En esta papeleta usted tiene derecho a votar por un candidato a Alcalde y por el número exacto de Asambleístas que aparecen en una de las columnas. Si usted vota por más del número de candidatos a que tiene derecho para cada posición, usted anula su voto para dicha posición.

**COMO VOTAR INTEGRO:**

Votar íntegro es votar por todos los candidatos del partido de su preferencia y por ninguno otro.

Para votar íntegro usted hace una sola cruz "X" o marca válida en el espacio en blanco bajo la insignia del partido de su preferencia. Esa sola marca vale para todos los candidatos bajo la columna.

**COMO VOTAR MIXTO:**

Si usted, además de votar bajo la insignia de un partido, tiene preferencia por uno o más candidatos de otros partidos para una o más cargos, podrá hacer una cruz o marca válida al lado del nombre del candidato que prefiera fuera de la columna de su partido.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo. Cada voto así marcado contará solamente para el candidato expresamente marcado.

**COMO VOTAR POR CANDIDATURA:**

Cuando el elector desea votar exclusivamente por uno o más candidatos y no tiene interés en votar bajo la insignia de ningún partido, hará una marca al lado de los candidatos de su preferencia.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo.

COMISION ESTATAL DE ELECCIONES
## ELECCIONES GENERALES
# PAPELETA ELECTORAL MUNICIPAL
5 DE NOVIEMBRE DE 1988

Municipio de **SAN JUAN**          005-017-01

| PARTIDO POPULAR DEMOCRATICO | PARTIDO NUEVO PROGRESISTA | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | NOMINACION DIRECTA (WRITE IN) |
|---|---|---|---|

¡DATE A RESPETAR!

**NOMINACION DIRECTA**

**(WRITE IN)**

Se provee esta columna en blanco para que el elector anote en ella el nombre de cualquier otro candidato que desee consolidar, fuera de los que aparecen en las columnas anteriores.

Artículo 4.011
Ley Electoral

| | ALCALDE | | ALCALDE | | ALCALDE | | ALCALDE |
|---|---|---|---|---|---|---|---|
| X | Héctor Luis Acevedo | | José Granados Navedo | | Ana María (Ita) Corrada del Río | | |

| | Miembros de la Asamblea Municipal | | Miembros de la Asamblea Municipal | | Miembros de la Asamblea Municipal | | Miembros de la Asamblea Municipal |
|---|---|---|---|---|---|---|---|
| 1 | Thilda Alvarado | 1 | Ramón "Pitito" Miranda Marxán | 1 | Carlos Fronteras | 1 | |
| 2 | Manuel E. Andreu García | 2 | Dámaris Sifuentes Reyes | 2 | Héctor Villarini | 2 | |
| 3 | Carmelo Betancourt Cala | 3 | Miguel A. "Tito" González Ríos | 3 | José Cruz | 3 | |
| 4 | Eric Colón Rodríguez | 4 | Enrique Ferreira Vélez | 4 | Otilio Rumba | 4 | |
| 5 | Amadís Cruz Cáceres | 5 | Nicolás Crespo Kertright | 5 | Angel Ortega | 5 | |
| 6 | John Purlie | 6 | Samuel Méndez Costa | 6 | Jesús Márquez | 6 | |
| 7 | Conrado González | 7 | Isidra Albino Serrano | 7 | José T. Quiñones | 7 | |
| 8 | Roberto Pérez Santoni | 8 | Myriam Herdman Barrosa | 8 | Gladys Cosme | 8 | |
| 9 | Francisco (Paco) Luis Rivera | 9 | George MaDougall | 9 | Víctor Andino | 9 | |
| 10 | Díaza Rodríguez | 10 | Rafael Ubarri Acosta | 10 | Pablo Ortiz | 10 | |
| 11 | Daisa Bajo | 11 | Sonia Pabón de Setamayor | 11 | Diego Gerbón | 11 | |
| 12 | Awilda Saldaña | 12 | Luis Rivera Brunes | 12 | Domingo Elías Velázquez | 12 | |
| 13 | Arturo Silvagnoli | 13 | Héctor L. Seinsidt Figueroa | 13 | Digna L. Ocasio Rosario | 13 | |
| 14 | Zandra Vergne Colón | 14 | Aída Avalo Collazo | 14 | Felipe (Pipe) Rivera | 14 | |

## INSTRUCCIONES SOBRE LA FORMA DE VOTAR LA PAPELETA ELECTORAL MUNICIPAL

En esta papeleta usted tiene derecho a votar por un candidato a Alcalde y por el número exacto de Asambleístas que aparecen en una de las columnas.
Si usted vota por más del número de candidatos a que tiene derecho para cada posición, usted anula su voto para dicha posición.

**COMO VOTAR INTEGRO:**

Votar íntegro es votar por todos los candidatos del partido de su preferencia y por ninguno otro.

Para votar íntegro usted hace una sola cruz "X" o marca válida en el espacio en blanco bajo la insignia del partido de su preferencia. Esa sola marca vale para todos los candidatos bajo la columna.

**COMO VOTAR MIXTO:**

Si usted, además de votar bajo la insignia de un partido, tiene preferencia por uno o más candidatos de otros partidos para ese o más cargos, podrá hacer una cruz o marca válida al lado del nombre del candidato que prefiera fuera de la columna de su partido.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo. Cada voto así marcado contará solamente para el candidato expresamente marcado.

**COMO VOTAR POR CANDIDATURA:**

Cuando el elector desee votar exclusivamente por uno o más candidatos y no tiene interés en votar bajo la insignia de ningún partido, hará una marca al lado de los candidatos de su preferencia.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo.

COMISION ESTATAL DE ELECCIONES
## ELECCIONES GENERALES
# PAPELETA ELECTORAL MUNICIPAL
8 DE NOVIEMBRE DE 1988

Municipio de SAN JUAN

| PARTIDO POPULAR DEMOCRATICO | PARTIDO NUEVO PROGRESISTA | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | NOMINACION DIRECTA (WRITE IN) |
|---|---|---|---|
| **ALCALDE** Héctor Luis Acevedo | **ALCALDE** José Granados Navedo | **ALCALDE** Ana María (Ita) Corrada del Río | Se provee esta columna en blanco para que el elector anote en ella el nombre de cualquier otro candidato que desee enmendar, fuera de los que aparecen en las columnas anteriores. Artículo 8.011 Ley Electoral |
| Miembros de la Asamblea Municipal | Miembros de la Asamblea Municipal | Miembros de la Asamblea Municipal | **ALCALDE** / Miembros de la Asamblea Municipal |
| 1 Thilda Alvarado | 1 Ramón "Pitito" Miranda Marzán | 1 ✓ Carlos Fronteras | 1 |
| 2 Manuel E. Andreu García | 2 Dámaris Sifuentes Reyes | 2 Héctor Villarini | 2 |
| 3 Carmelo Betancourt Calo | 3 Miguel A. "Tito" González Ríos | 3 José Cruz | 3 |
| 4 Eric Colón Rodríguez | 4 Enrique Ferreira Vélez | 4 Otilio Rosado | 4 |
| 5 Amadeo Cruz Cáceres | 5 Nicolás Crespo Kortright | 5 Angel Ortega | 5 |
| 6 John Fualle | 6 Samuel Méndez Cuesta | 6 Jesús Márquez | 6 |
| 7 Conrado Gonzáles | 7 Isidra Albino Serrano | 7 José T. Quiñones | 7 |
| 8 Roberto Pérez Santoni | 8 Myriam Herdman Barroso | 8 Gladys Cosme | 8 |
| 9 Francisco (Paco) Luis Rivera | 9 George McDougall | 9 Victor Andino | 9 |
| 10 Diana Rodríguez | 10 Rafael Ubarri Acosta | 10 Pablo Ortiz | 10 |
| 11 Dafne Rojo | 11 Sonia Pabón de Setaenayer | 11 Diego Gorbea | 11 |
| 12 Awilda Saldaña | 12 Luis Rivera Breuss | 12 Domingo Elías Velázquez | 12 |
| 13 Arturo Silvagnoli | 13 Héctor L. Schmidt Figueroa | 13 Digna L. Ocasio Rosario | 13 |
| 14 Zandra Vergne Colón | 14 Aída Avalo Collazo | 14 Felipe (Pipo) Rivera | 14 |

## INSTRUCCIONES SOBRE LA FORMA DE VOTAR LA PAPELETA ELECTORAL MUNICIPAL

En esta papeleta usted tiene derecho a votar por un candidato a Alcalde y por el número exacto de Asambleístas que aparecen en una de las columnas. Si usted vota por más del número de candidatos a que tiene derecho para cada posición, usted anula su voto para dicha posición.

**COMO VOTAR INTEGRO:**

Votar íntegro es votar por todos los candidatos del partido de su preferencia y por ninguno otro.

Para votar íntegro usted hace una sola cruz "X" o cruza válida en el espacio en blanco bajo la insignia del partido de su preferencia. Esa cruza marca vale para todos los candidatos bajo la columna.

**COMO VOTAR MIXTO:**

Si usted, además de votar bajo la insignia de un partido, tiene preferencia por uno o más candidatos de otros partidos para uno o más cargos, podrá hacer una cruz o marca válida al lado del nombre del candidato que prefiera fuera de la columna de ese partido.

También puede votar por otra persona de su preferencia que no aparezca como candidato, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo. Cada voto así marcado contará solamente para el candidato expresamente marcado.

**COMO VOTAR POR CANDIDATURA:**

Cuando el elector desea votar exclusivamente por uno o más candidatos y no tiene interés en votar bajo la insignia de ningún partido, hará una marca al lado de los candidatos de su preferencia.

También puede votar por otra persona de su preferencia que no aparezca como candidato, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo.

COMISION ESTATAL DE ELECCIONES
## ELECCIONES GENERALES
## PAPELETA ELECTORAL MUNICIPAL
**8 DE NOVIEMBRE DE 1988**

Municipio de **SAN JUAN**     005-07-07

| PARTIDO POPULAR DEMOCRATICO | PARTIDO NUEVO PROGRESISTA | ¡DATE A RESPETAR! PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | NOMINACION DIRECTA (WRITE IN) Se provee esta columna en blanco para que el elector anote en ella el nombre de cualquier otro candidato que desee nominar, fuera de los que aparecen en las columnas anteriores. Artículo 5.011 Ley Electoral |
|---|---|---|---|
| **ALCALDE** Héctor Luis Acevedo | **ALCALDE** José Granados Navedo | **ALCALDE** Ana María (Ita) Corrada del Río | **ALCALDE** |
| Miembros de la Asamblea Municipal | Miembros de la Asamblea Municipal | Miembros de la Asamblea Municipal | Miembros de la Asamblea Municipal |
| 1 Thilda Alvarado | 1 Ramón "Pitito" Miranda Marzán | 1 Carlos Fronteras | 1 |
| 2 Manuel E. Andreu García | 2 Dámaris Sifóentes Reyes | 2 Héctor Villarini | 2 |
| 3 Carmelo Betancourt Cale | 3 Miguel A. "Tito" González Ríos | 3 José Cruz | 3 |
| 4 Eric Calón Rodríguez | 4 Enrique Ferreira Vélez | 4 Otilio Rhonda | 4 |
| 5 Amadis Cruz Cáceres | 5 Nicolás Crespo Kertright | 5 Angel Ortega | 5 |
| 6 John Fozile | 6 Samuel Méndez Cuesta | 6 Jesús Márquez | 6 |
| 7 Conrado González | 7 Isidra Albino Serrano | 7 José T. Quiñones | 7 |
| 8 Roberto Pérez Santosi | 8 Myriam Hardman Barroso | 8 Gladys Cosme | 8 |
| 9 Francisco (Paco) Luis Rivera | 9 George McDougall | 9 Víctor Avellán | 9 |
| 10 Diana Rodríguez | 10 Rafael Ubarri Acosta | 10 Pablo Ortiz | 10 |
| 11 Deíno Rojo | 11 Sonia Pabón de Satanayor | 11 Diego Gerben | 11 |
| 12 Awilda Saldaña | 12 Luis Rivera Brunes | 12 Domingo Elías Velázquez | 12 |
| 13 Arturo Silvagnoli | 13 Héctor L. Schmidt Figueroa | 13 Digna L. Ocasio Rosario | 13 |
| 14 Zandra Vergne Colón | 14 Aida Avalo Collazo | 14 Felipe (Pipe) Rivera | 14 |

## INSTRUCCIONES SOBRE LA FORMA DE VOTAR LA PAPELETA ELECTORAL MUNICIPAL

En esta papeleta usted tiene derecho a votar por un candidato a Alcalde y por el número exacto de Asambleístas que aparecen en una de las columnas. Si usted vota por más del número de candidatos a que tiene derecho para cada posición, usted anula su voto para dicha posición.

**COMO VOTAR INTEGRO:**

Votar íntegro es votar por todos los candidatos del partido de su preferencia y por ninguno otro.

Para votar íntegro usted hace una sola cruz "X" o marca válida en el espacio en blanco bajo la insignia del partido de su preferencia. Esa sola marca vale para todos los candidatos bajo la columna.

**COMO VOTAR MIXTO:**

Si usted, además de votar bajo la insignia de un partido, tiene preferencia por uno o más candidatos de otras partidas para una o más cargos, podrá hacer una cruz o marca válida al lado del nombre del candidato que prefiera fuera de la columna de su partido.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo. Cada voto así marcado contará solamente para el candidato expresamente marcado.

**COMO VOTAR POR CANDIDATURA:**

Cuando el elector desea votar exclusivamente por uno o cada candidatos y no tiene interés en votar bajo la insignia de ningún partida, hará una cruz o marca al lado de los candidatos de su preferencia.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo.

COMISION ESTATAL DE ELECCIONES

# ELECCIONES GENERALES
## PAPELETA ELECTORAL MUNICIPAL
### 8 DE NOVIEMBRE DE 1988

Municipio de **SAN JUAN**          005- 7- 7

  

¡DATE A RESPETAR!

NOMINACION DIRECTA

(WRITE IN)

Se provee esta columna en blanco para que e elector escriba en ella el nombre de cualquier otro candidato que desee consignar, fuera de los que aparecen en las columnas anteriores

Artículo 5.011
Ley Electoral

| PARTIDO POPULAR DEMOCRATICO | PARTIDO NUEVO PROGRESISTA | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | |
|---|---|---|---|
| **ALCALDE** Héctor Luis Acevedo | **ALCALDE** José Granados Navedo | **ALCALDE** Ana María (Ita) Corrada del Río | **ALCALDE** Jose Gonzalo |
| Miembros de la Asamblea Municipal | Miembros de la Asamblea Municipal | Miembros de la Asamblea Municipal | Miembros de la Asamblea Municipal |
| 1 Thilda Alvarado | 1 Ramón "Pitito" Miranda Marcía | 1 Carlos Fronteras | 1 Ramon Pepe miranda |
| 2 Manuel E. Andreu García | 2 Dámaris Silvestres Reyes | 2 Héctor Villarini | 2 Manuel E. ... |
| 3 Carmelo Betancourt Cale | 3 Miguel A. "Tito" González Rios | 3 José Cruz | 3 miguel A. tito Gonzalez Rio |
| 4 Eric Colón Rodríguez | 4 Enrique Ferreira Vélez | 4 Otilio Rosado | 4 Otilio Rosado |
| 5 Amado Cruz Cáceres | 5 Nicolás Crespo Kortright | 5 Angel Ortega | 5 Nicolas Cruz Kortright |
| 6 John Furth | 6 Samuel Mániac Cuesta | 6 Jesús Márquez | 6 Samuel ... |
| 7 Conrado González | 7 Isidra Albino Serrano | 7 José T. Quiñones | 7 Conrado Gon |
| 8 Roberto Pérez Santoni | 8 Myriam Hardman Barreto | 8 Gladys Cosme | 8 Myriam H... |
| 9 Francisco (Paco) Luis Rivera | 9 George McDougall | 9 Víctor Andino | 9 George Mc L... |
| 10 Diana Rodríguez | 10 Rafael Ubarri Acosta | 10 Pablo Ortiz | 10 Pablo ... |
| 11 Daisy Bajo | 11 Sonia Pabón de Sotomayor | 11 Diego Gorbea | 11 Diego Gorbea |
| 12 Awilda Saldaña | 12 Luis Rivera Brenes | 12 Domingo Elias Velázquez | 12 Awilda Sald... |
| 13 Arturo Silvagnoli | 13 Héctor L. Schmidt Figueroa | 13 Digna L. Ossado Rosario | 13 Hector L. Schm... |
| 14 Zandra Vergne Colón | 14 Aída Avalo Collazo | 14 Felipe (Pipe) Rivera | 14 Felipe (Pipe) ... |

## INSTRUCCIONES SOBRE LA FORMA DE VOTAR LA PAPELETA ELECTORAL MUNICIPAL

En esta papeleta usted tiene derecho a votar por un candidato a Alcalde y por el número exacto de Asambleístas que aparecen en una de las columnas. Si usted vota por más del número de candidatos a que tiene derecho para cada posición, usted anula su voto para dicha posición.

**COMO VOTAR INTEGRO:**

Votar íntegro es votar por todos los candidatos del partido de su preferencia y por ninguno otro.

Para votar íntegro usted hace una sola cruz "X" o marca válida en el espacio en blanco bajo la insignia del partido de su preferencia. Esa sola marca vale para todos los candidatos bajo la columna.

**COMO VOTAR MIXTO:**

Si usted, además de votar bajo la insignia de un partido, tiene preferencia por uno o más candidatos de otros partidos para una o más cargos, podrá hacer una cruz o marca válida al lado del nombre del candidato que prefiere fuera de la columna de su partido.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo. Cada voto así marcado contará solamente para el candidato expresamente marcado.

**COMO VOTAR POR CANDIDATURA:**

Cuando el elector desea votar exclusivamente por uno o más candidatos y no tiene interés en votar bajo la insignia de ningún partido, hará uso una cruz al lado de los candidatos de su preferencia.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo.

# APÉNDICE E

Papeletas ilustrativas de deficiencias
en el sistema electoral;
efectos negativos en el derecho al voto

NOTA DE LA COMPILADORA:
    La indefinición gráfica se debe al tamaño reducido de los modelos. Los origi-
nales constan en el expediente de este caso en el Tribunal Supremo.

## APÉNDICE E

| PARTIDO POPULAR DEMOCRATICO | PARTIDO NUEVO PROGRESISTA | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | NOMINACION DIRECTA (WRITE IN) |
|---|---|---|---|
| **ALCALDE** Héctor Luis Acevedo | **ALCALDE** José Granados Navedo | **ALCALDE** Ana María (Ita) Corrada del Río | **ALCALDE** |
| Thilda Alvarado | 1  Ramón "Pitito" Miranda Marzán | 1  Carlos Fronteras | 1 |
| Manuel E. Andreu García | 2  Dámaris Sifuentes Reyes | 2  Héctor Villarini | 2 |
| Carmelo Betancourt Calo | 3  Miguel A. "Tito" González Ríos | 3  José Cruz | 3 |
| Eric Colón Rodríguez | 4  Enrique Ferreira Vélez | 4  Otilio Rosado | 4 |
| Amadís Cruz Cáceres | 5  Nicolás Crespo Kortright | 5  Angel Ortega | 5 |
| John Fuente | 6  Samuel Méndez Cuesta | 6  Jesús Márquez | 6 |
| Conrado González | 7  Isidra Albino Serrano | 7  José T. Quiñones | 7 |
| Roberto Pérez Santoni | 8  Myriam Berdman Barros | 8  Gladys Cosme | 8 |
| Francisco (Paco) Luis Rivera | 9  George McDougall | 9  Victor Andino | 9 |
| Diana Rodríguez | 10  Rafael Ubarri Acosta | 10  Pablo Ortiz | 10 |
| Dafne Rojo | 11  Sonia Pabón de Sotomayor | 11  Diego Gorbea | 11 |
| Awilda Saldaña | 12  Luis Rivera Brenes | 12  Domingo Elías Velázquez | 12 |
| Arturo Silvagnoli | 13  Héctor L. Schmidt Figueroa | 13  Digna L. Ocasio Rosario | 13 |
| Zandra Vergne Colón | 14  Aida Avalo Collaso | 14  Felipe (Pipo) Rivera | 14 |

NOMINACION DIRECTA (WRITE IN)

Se provee esta columna en blanco para que el elector anote en ella el nombre de cualquier otro candidato que desee eumnlitar, fuera de los que aparecen en las columnas anteriores.

Artículo 5.011 Ley Electoral

## INSTRUCCIONES SOBRE LA FORMA DE VOTAR LA PAPELETA ELECTORAL MUNICIPAL

En esta papeleta usted tiene derecho a votar por un candidato a Alcalde y por el número exacto de Asambleístas que aparecen en una de las columnas. Si usted vota por más del número de candidatos a que tiene derecho para cada posición, usted anula su voto para dicha posición.

**COMO VOTAR INTEGRO:**

Votar íntegro es votar por todos los candidatos del partido de su preferencia y por ninguno otro.

Para votar íntegro usted hace una sola cruz "X" o marca válida en el espacio en blanco bajo la insignia del partido de su preferencia. Esa sola marca vale para todos los candidatos bajo la columna.

**COMO VOTAR MIXTO:**

Si usted, además de votar bajo la insignia de un partido, tiene preferencia por uno o más candidatos de otros partidos para uno o más cargos, podrá hacer una cruz o marca válida al lado del nombre del candidato que prefiera fuera de la columna de su partido.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que solo puede votar por un candidato para cada cargo. Cada voto así marcado contará solamente para el candidato expresamente marcado.

**COMO VOTAR POR CANDIDATURA:**

Cuando el elector desee votar exclusivamente por uno o más candidatos y no tiene interés en votar bajo la insignia de ningún partido, hará una marca al lado de los candidatos de su preferencia.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo en nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo.

COMISION ESTATAL DE ELECCIONES
## ELECCIONES GENERALES
# PAPELETA ELECTORAL MUNICIPAL
8 DE NOVIEMBRE DE 1968

Municipio de   **SAN JUAN**

¡DATE A RESPETAR!

**NOMINACION DIRECTA**

**(WRITE IN)**

Se provee esta columna en blanco para que e elector anote en ella el nombre de cualquier otro candidato que desee consellar, fuera de los que aparecen en las columnas anteriores

Artículo 5.011
Ley Electoral

| PARTIDO POPULAR DEMOCRATICO | | PARTIDO NUEVO PROGRESISTA | | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | | | |
|---|---|---|---|---|---|---|---|
| **ALCALDE**  Héctor Luis Acevedo | | **ALCALDE** José Granados Navedo | | **ALCALDE** Ana María (Ita) Corrada del Río | | **ALCALDE** | |
| *Miembros de la Asamblea Municipal* Thilda Alvarado | | *Miembros de la Asamblea Municipal* | *Miembros de la Asamblea Municipal* | *Miembros de la Asamblea Municipal* | | | |
| | | 1 | Ramón "Pitito" Miranda Marzán | 1 | Carlos Fronteras | 1 | |
| Manuel E. Andreu García | | 2 | Dámaris Sifuentes Reyes | 2 | Héctor Villarini | 2 | |
| Carmelo Betancourt Calo | | 3 | Miguel A. "Tito" González Ríos | 3 | José Cruz | 3 | |
| Eric Colón Rodríguez | | 4 | Enrique Ferreira Vélez | 4 | Otilio Rosado | 4 | |
| Amadís Cruz Cáceres | | 5 | Nicolás Crespo Kortright | 5 | Angel Ortega | 5 | |
| John Fuzile | | 6 | Samuel Méndez Cuesta | 6 | Jesús Márquez | 6 | |
| Conrado González | | 7 | Isidra Albino Serrano | 7 | José T. Quiñones | 7 | |
| Roberto Pérez Santoni | | 8 | Myriam Hardman Barroso | 8 | Gladys Cosme | 8 | |
| Francisco (Paco) Luis Rivera | | 9 | George McDougall | 9 | Víctor Andino | 9 | |
| Diana Rodríguez | | 10 | Rafael Ubarri Acosta | 10 | Pablo Ortiz | 10 | |
| Dafne Rojo | | 11 | Sonia Pabón de Sotomayor | 11 | Diego Gorbea | 11 | |
| Awilda Saldaña | | 12 | Luis Rivera Brenes | 12 | Domingo Elías Velázquez | 12 | |
| Arturo Silvagnoli | | 13 | Héctor L. Schmidt Figueroa | 13 | Digna L. Ocasio Rosario | 13 | |
| Zandra Vergne Colón | | 14 | Aída Avalo Collazo | 14 | Felipe (Pipo) Rivera | 14 | |

## INSTRUCCIONES SOBRE LA FORMA DE VOTAR LA PAPELETA ELECTORAL MUNICIPAL

En esta papeleta usted tiene derecho a votar por un candidato a Alcalde y por el número exacto de Asambleístas que aparecen en una de las columnas.
Si usted vota por más del número de candidatos a que tiene derecho para cada posición, usted anula su voto para dicha posición.

**COMO VOTAR INTEGRO:**

Votar íntegro es votar por todos los candidatos del partido de su preferencia y por ninguno otro.

Para votar íntegro usted hace una sola cruz "X" o marca válida en el espacio en blanco bajo la insignia del partido de su preferencia. Esa sola marca vale para todos los candidatos bajo la columna.

**COMO VOTAR MIXTO:**

Si usted, además de votar bajo la insignia de un partido, tiene preferencia por uno o más candidatos de otros partidos para uno o más cargos, podrá hacer una cruz o marca válida al lado del nombre del candidato que prefiera fuera de la columna de su partido.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo. Cada voto así marcado contará solamente para el candidato expresamente marcado.

**COMO VOTAR POR CANDIDATURA:**

Cuando el elector desee votar exclusivamente por uno o más candidatos y no tiene interés en votar bajo la insignia de ningún partido, hará una marca al lado de los candidatos de su preferencia.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo.

COMISION ESTATAL DE ELECCIONES
## ELECCIONES GENERALES
# PAPELETA ELECTORAL MUNICIPAL
### 3 DE NOVIEMBRE DE 1965

Municipio de **SAN JUAN**

¡DATE A RESPETAR!

NOMINACION DIRECTA

(WRITE IN)

Se proveen esta columna en blanco para que el elector anote en ella el nombre de cualquier otro candidato que desee nominar, fuera de los que aparecen en las columnas anteriores

Artículo 5.011
Ley Electoral

| PARTIDO POPULAR DEMOCRATICO | | PARTIDO NUEVO PROGRESISTA | | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | | |
|---|---|---|---|---|---|---|
| **ALCALDE** | | **ALCALDE** | | **ALCALDE** | | **ALCALDE** |
| Héctor Luis Acevedo | | José Granados Navedo | | Ana María (Ita) Corrada del Río | | |
| **Miembros de la Asamblea Municipal** | | **Miembros de la Asamblea Municipal** | | **Miembros de la Asamblea Municipal** | | **Miembros de la Asamblea Municipal** |
| Thilda Alvarado | | 1 Ramón "Pitito" Miranda Marxán | | 1 Carlos Fronteras | | 1 |
| Manuel E. Andreu García | | 2 Dámaris Sifuentes Reyes | | 2 Héctor Villarin | | 2 |
| Carmelo Betancourt Calo | | 3 Miguel A. "Tito" González Ríos | | 3 José Cruz | | 3 |
| Eric Colón Rodríguez | | 4 Enrique Ferreira Vélez | | 4 Otilio Rosado | | 4 |
| Amadis Cruz Cáceres | | 5 Nicolás Crespo Kortright | | 5 Angel Ortega | | 5 |
| John Fucile | | 6 Samuel Méndez Cuesta | | 6 Jesús Márquez | | 6 |
| Conrado González | | 7 Isidra Albino Serrano | | 7 José T. Quiñones | | 7 |
| Roberto Pérez Santoni | | 8 Myriam Herdman Barroso | | 8 Gladys Cosme | | 8 |
| Francisco (Paco) Luis Rivera | | 9 George McDougall | | 9 Víctor Andino | | 9 |
| Diana Rodríguez | | 10 Rafael Ubarri Acosta | | 10 Pablo Ortiz | | 10 |
| Dafne Rojo | | 11 Sonia Pabón de Sotomayor | | 11 Diego Gorbea | | 11 |
| Awilda Saldaña | | 12 Luis Rivera Brenes | | 12 Domingo Elías Velázquez | | 12 |
| Arturo Silvagnoli | | 13 Héctor L. Schmidt Figueroa | | 13 Digna L. Ocasio Rosario | | 13 |
| Zandra Vergne Colón | | 14 Aida Avalo Collazo | | 14 Felipe (Pipo) Rivera | | 14 |

## INSTRUCCIONES SOBRE LA FORMA DE VOTAR LA PAPELETA ELECTORAL MUNICIPAL

En esta papeleta usted tiene derecho a votar por un candidato a Alcalde y por el número exacto de Asambleístas que aparecen en una de las columnas.
Si usted vota por más del número de candidatos a que tiene derecho para cada posición, usted anula su voto para dicha posición.

**COMO VOTAR INTEGRO:**

Votar íntegro es votar por todos los candidatos del partido de su preferencia y por ninguno otro.

Para votar íntegro usted hace una sola cruz "X" o marca válida en el espacio en blanco bajo la insignia del partido de su preferencia. Esa sola marca vale para todos los candidatos bajo la columna.

**COMO VOTAR MIXTO:**

Si usted, además de votar bajo la insignia de un partido, tiene preferencia por uno o más candidatos de otros partidos para uno o más cargos, podrá hacer una cruz o marca válida al lado del nombre del candidato que prefiera fuera de la columna de su partido.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo. Cada voto así marcado contará solamente para el candidato expresamente marcado.

**COMO VOTAR POR CANDIDATURA:**

Cuando el elector desea votar exclusivamente por uno o más candidatos y no tiene interés en votar bajo la insignia de ningún partido, hará una marca al lado de los candidatos de su preferencia.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo.

COMISION ESTATAL DE ELECCIONES

## ELECCIONES GENERALES

# PAPELETA ELECTORAL MUNICIPAL

3 DE NOVIEMBRE DE 1968

Municipio de **SAN JUAN**

¡DATE A RESPETAR!

**NOMINACION DIRECTA**

**(WRITE IN)**

Se provee esta columna en blanco para que el elector anote en ella el nombre de cualquier otro candidato que desee encasillar, fuera de los que aparecen en las columnas anteriores.

Artículo 5.011
Ley Electoral

| PARTIDO POPULAR DEMOCRATICO | PARTIDO NUEVO PROGRESISTA | | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | | | |
|---|---|---|---|---|---|---|
| **ALCALDE** Héctor Luis Acevedo | **ALCALDE** José Granados Navedo | | **ALCALDE** Ana María (Ita) Corrada del Río | | **ALCALDE** | |
| *Miembros de la Asamblea Municipal* Thilda Alvarado | *Miembros de la Asamblea Municipal* Ramón "Pitito" Miranda Marzán | 1 | *Miembros de la Asamblea Municipal* Carlos Fronteras | 1 | *Miembros de la Asamblea Municipal* | 1 |
| Manuel E. Andreu García | Dámaris Sifuentes Reyes | 2 | Héctor Villarini | 2 | | 2 |
| Carmelo Betancourt Calo | Miguel A. "Tito" González Ríos | 3 | José Cruz | 3 | | 3 |
| Eric Colón Rodríguez | Enrique Ferreira Véler | 4 | Otilio Rosado | 4 | | 4 |
| Amadis Cruz Cáceres | Nicolás Crespo Kortright | 5 | Angel Ortega | 5 | | 5 |
| John Fucile | Samuel Méndez Cuesta | 6 | Jesús Márquez | 6 | | 6 |
| Conrado González | Isidra Albino Serrano | 7 | José T. Quiñones | 7 | | 7 |
| Roberto Pérez Santoni | Myriam Herdman Barrose | 8 | Gladys Cosme | 8 | | 8 |
| Francisco (Paco) Luis Rivera | George McDougall | 9 | Victor Andino | 9 | | 9 |
| Diana Rodríguez | Rafael Ubarri Acosta | 10 | Pablo Ortiz | 10 | | 10 |
| Dafne Rojo | Sonia Pabón de Sotomayor | 11 | Diego Gorbea | 11 | | 11 |
| Awilda Saldaña | Luis Rivera Brenes | 12 | Domingo Elías Velázquez | 12 | | 12 |
| Arturo Silvagnoli | Héctor L. Schmidt Figueroa | 13 | Digna L. Ocasio Rosario | 13 | | 13 |
| Zandra Vergne Colón | Aida Avalo Collazo | 14 | Felipe (Pipo) Rivera | 14 | | 14 |

## INSTRUCCIONES SOBRE LA FORMA DE VOTAR LA PAPELETA ELECTORAL MUNICIPAL

En esta papeleta usted tiene derecho a votar por un candidato a Alcalde y por el número exacto de Asambleístas que aparecen en una de las columnas. Si usted vota por más del número de candidatos a que tiene derecho para cada posición, usted anula su voto para dicha posición.

**COMO VOTAR INTEGRO:**

Votar íntegro es votar por todos los candidatos del partido de su preferencia y por ninguna otra.

Para votar íntegro usted hace una sola cruz "X" o marca válida en el espacio en blanco bajo la insignia del partido de su preferencia. Esa sola marca vale para todos los candidatos bajo la columna.

**COMO VOTAR MIXTO:**

Si usted, además de votar bajo la insignia de un partido, tiene preferencia por uno o más candidatos de otros partidos para uno o más cargos, pedirá hacer una cruz o marca válida al lado del nombre del candidato que prefiera fuera de la columna de su partido.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo. Cada voto así marcado contará solamente para el candidato expresamente marcado.

**COMO VOTAR POR CANDIDATURA:**

Cuando el elector desea votar exclusivamente por uno o más candidatos y no tiene interés en votar bajo la insignia de ningún partido, hará una marca al lado de los candidatos de su preferencia.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo.

**COMISION ESTATAL DE ELECCIONES**
# ELECCIONES GENERALES
# PAPELETA ELECTORAL MUNICIPAL
8 DE NOVIEMBRE DE 1968

Municipio de **SAN JUAN**

¡DATE A RESPETAR!

NOMINACION DIRECTA

(WRITE IN)

Se proveen esta columna en blanco para que el elector anote en ella el nombre de cualquier otro candidato que desee aquedillar, fuera de los que aparecen en las columnas anteriores

Artículo 5.011
Ley Electoral

| PARTIDO POPULAR DEMOCRATICO | | PARTIDO NUEVO PROGRESISTA | | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | | NOMINACION DIRECTA | |
|---|---|---|---|---|---|---|---|
| ALCALDE | | ALCALDE | | ALCALDE | | ALCALDE | |
| Héctor Luis Acevedo | | José Granados Navedo | | Ana María (Ita) Corrada del Río | | | |
| Miembros de la Asamblea Municipal | | Miembros de la Asamblea Municipal | | Miembros de la Asamblea Municipal | | Miembros de la Asamblea Municipal | |
| Thilda Alvarado | | Ramón "Pitito" Miranda Marzán | 1 | Carlos Fronteras | 1 | | 1 |
| Manuel E. Andreu García | | Dámaris Sifuentes Reyes | 2 | Héctor Villarini | 2 | | 2 |
| Carmelo Betancourt Calo | | Miguel A. "Tito" González Ríos | 3 | José Cruz | 3 | | 3 |
| Eric Colón Rodríguez | | Enrique Ferreira Vélez | 4 | Otilio Rosado | 4 | | 4 |
| Amadis Cruz Cáceres | | Nicolás Crespo Kortright | 5 | Angel Ortega | 5 | | 5 |
| John Pueile | | Samuel Méndez Cuesta | 6 | Jesús Márquez | 6 | | 6 |
| Conrado González | | Isidra Albino Serrano | 7 | José T. Quiñones | 7 | | 7 |
| Roberta Pérez Santori | | Myriam Herdman Barroso | 8 | Gladys Coame | 8 | | 8 |
| Francisco (Paco) Luis Rivera | | George McDougall | 9 | Victor Andino | 9 | | 9 |
| Diana Rodríguez | | Rafael Ubarri Acosta | 10 | Pablo Ortiz | 10 | | 10 |
| Dafne Rojo | | Sonia Pabón de Sotomayor | 11 | Diego Gorbea | 11 | | 11 |
| Awilda Saldaña | | Luis Rivera Brenes | 12 | Domingo Elías Velázquez | 12 | | 12 |
| Arturo Silvagnoli | | Héctor L. Schmidt Figueroa | 13 | Digna L. Ocasio Rosario | 13 | | 13 |
| Zandra Vergne Colón | | Aida Avaio Collazo | 14 | Felipe (Pipo) Rivera | 14 | | 14 |

## INSTRUCCIONES SOBRE LA FORMA DE VOTAR LA PAPELETA ELECTORAL MUNICIPAL

En esta papeleta usted tiene derecho a votar por un candidato a Alcalde y por el número exacto de Asambleístas que aparecen en una de las columnas.
Si usted vota por más del número de candidatos a que tiene derecho para cada posición, usted anula su voto para dicha posición.

**COMO VOTAR INTEGRO:**

Votar íntegro es votar por todos los candidatos del partido de su preferencia y por ninguno otro.

Para votar íntegro usted hace una sola cruz "X" o marca válida en el espacio en blanco bajo la insignia del partido de su preferencia. Esa sola marca vale para todos los candidatos bajo la columna.

**COMO VOTAR MIXTO:**

Si usted, además de votar bajo la insignia de un partido, tiene preferencia por uno o más candidatos de otros partidos para uno o más cargos, podrá hacer una cruz o marca válida al lado del nombre del candidato que prefiera fuera de la columna de su partido.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo. Cada voto así marcado contará solamente para el candidato expresamente marcado.

**COMO VOTAR POR CANDIDATURA:**

Cuando el elector desea votar exclusivamente por uno o más candidatos y no tiene interés en votar bajo la insignia de ningún partido, hará una marca al lado de los candidatos de su preferencia.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo.

COMISION ESTATAL DE ELECCIONES
# ELECCIONES GENERALES
# PAPELETA ELECTORAL MUNICIPAL
8 DE NOVIEMBRE DE 1968

Municipio de **SAN JUAN**

X

*Sonrie Popular*
*vamos a ganar*

## PARTIDO POPULAR DEMOCRATICO

## PARTIDO NUEVO PROGRESISTA

¡DATE A RESPETAR!

## PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO

### NOMINACION DIRECTA

#### (WRITE IN)

Se provee esta columna en blanco para que el elector escriba en ella el nombre de cualquier otro candidato que desee escmulSar, fuera de los que aparecen en las columnas anteriores

Artículo 5.011
Ley Electoral

| ALCALDE Héctor Luis Acevedo | | ALCALDE José Granados Navedo | | ALCALDE Ana María (Ita) Corrada del Río | | ALCALDE | |
|---|---|---|---|---|---|---|---|
| **Miembros de la Asamblea Municipal** | | | | | | **Miembros de la Asamblea Municipal** | |
| Thilda Alvarado | | Ramón "Pitito" Miranda Marzán | 1 | Carlos Fronteras | 1 | | 1 |
| Manuel E. Andreu García | | Dámaris Sifuentes Reyes | 2 | Héctor Villarini | 2 | | 2 |
| Carmelo Betancourt Calo | | Miguel A. "Tito" González Ríos | 3 | José Cruz | 3 | | 3 |
| Eric Colón Rodríguez | | Enrique Ferreira Vélez | 4 | Otilio Rosado | 4 | | 4 |
| Amadis Cruz Cáceres | | Nicolás Crespo Kortright | 5 | Angel Ortega | 5 | | 5 |
| John Fucile | | Samuel Méndez Cuesta | 6 | Jesús Márquez | 6 | | 6 |
| Conrado González | | Isidra Albino Serrano | 7 | José T. Quiñones | 7 | | 7 |
| Roberto Pérez Santoni | | Myriam Herdman Barroso | 8 | Gladys Cosme | 8 | | 8 |
| Francisco (Paco) Luis Rivera | | George McDougall | 9 | Victor Andino | 9 | | 9 |
| Diana Rodríguez | | Rafael Ubarri Acosta | 10 | Pablo Ortiz | 10 | | 10 |
| Daine Rojo | | Sonia Pabón de Sotomayor | 11 | Diego Gorbea | 11 | | 11 |
| Awilda Saldaña | | Luis Rivera Brenes | 12 | Domingo Elias Velázquez | 12 | | 12 |
| Arturo Silvagnoli | | Héctor L. Schmidt Figueroa | 13 | Digna L. Ocasio Rosario | 13 | | 13 |
| Zandra Vergne Colón | | Aida Avalo Collazo | 14 | Felipe (Pipo) Rivera | 14 | | 14 |

## INSTRUCCIONES SOBRE LA FORMA DE VOTAR LA PAPELETA ELECTORAL MUNICIPAL

En esta papeleta usted tiene derecho a votar por un candidato a Alcalde y por el número exacto de Asambleístas que aparecen en una de las columnas. Si usted vota por más del número de candidatos a que tiene derecho para cada posición, usted anula su voto para dicha posición.

### COMO VOTAR INTEGRO:

Votar íntegro es votar por todos los candidatos del partido de su preferencia y por ninguno otro.

Para votar íntegro usted hace una sola cruz "X" o marca válida en el espacio en blanco bajo la insignia del partido de su preferencia. Esa sola marca vale para todos los candidatos bajo la columna.

### COMO VOTAR MIXTO:

Si usted, además de votar bajo la insignia de un partido, tiene preferencia por uno o más candidatos de otros partidos para uno o más cargos, podrá hacer una cruz o marca válida al lado del nombre del candidato que prefiera fuera de la columna de su partido.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo. Cada voto así marcado contará solamente para el candidato expresamente marcado.

### COMO VOTAR POR CANDIDATURA:

Cuando el elector desea votar exclusivamente por uno o más candidatos y no tiene interés en votar bajo la insignia de ningún partido, hará una marca al lado de los candidatos de su preferencia.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo.

## COMISION ESTATAL DE ELECCIONES
# ELECCIONES GENERALES
# PAPELETA ELECTORAL MUNICIPAL
### 8 DE NOVIEMBRE DE 1988

Municipio de **SAN JUAN**

| PARTIDO POPULAR DEMOCRATICO | PARTIDO NUEVO PROGRESISTA | | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | | NOMINACION DIRECTA (WRITE IN) |
|---|---|---|---|---|---|
| | | | | | Se provee esta columna en blanco para que el elector anote en ella el nombre de cualquier otro candidato que desee encasillar, fuera de los que aparecen en las columnas anteriores Artículo 5.011 Ley Electoral |
| **ALCALDE** Héctor Luis Acevedo | **ALCALDE** José Granados Navedo | | **ALCALDE** Ana María (Ita) Corrada del Río | | **ALCALDE** |
| *Miembros de la Asamblea Municipal* Thilda Alvarado | Ramón "Pitito" Miranda Marzán | 1 | *Miembros de la Asamblea Municipal* Carlos Fronteras | 1 | *Miembros de la Asamblea Municipal* 1 |
| Manuel E. Andreu García | Dámaris Sifuentes Reyes | 2 | Héctor Villarini | 2 | 2 |
| Carmelo Betancourt Calo | Miguel A. "Tito" González Ríos | 3 | José Cruz | 3 | 3 |
| Eric Colón Rodríguez | Enrique Ferreira Vélez | 4 | Otilio Rosado | 4 | 4 |
| Amadis Cruz Cáceres | Nicolás Crespo Kortright | 5 | Angel Ortega | 5 | 5 |
| John Fucile | Samuel Méndez Cuesta | 6 | Jesús Márquez | 6 | 6 |
| Conrado González | Isidra Albino Serrano | 7 | José T. Quiñones | 7 | 7 |
| Roberto Pérez Santori | Myriam Herdman Barros | 8 | Gladys Cosme | 8 | 8 |
| Francisco (Paco) Luis Rivera | George McDougall | 9 | Victor Andino | 9 | 9 |
| Diana Rodríguez | Rafael Ubarri Acosta | 10 | Pablo Ortiz | 10 | 10 |
| Dafne Rojo | Sonia Pabón de Sotomayor | 11 | Diego Gorbea | 11 | 11 |
| Awilda Saldaña | Luis Rivera Brenes | 12 | Domingo Elías Velázquez | 12 | 12 |
| Arturo Silvagnoli | Héctor L. Schmidt Figueroa | 13 | Digna L. Ocasio Rosario | 13 | 13 |
| Zandra Vergne Colón | Aida Avalo Collazo | 14 | Felipe (Pipo) Rivera | 14 | 14 |

## INSTRUCCIONES SOBRE LA FORMA DE VOTAR LA PAPELETA ELECTORAL MUNICIPAL

En esta papeleta usted tiene derecho a votar por un candidato a Alcalde y por el número exacto de Asambleístas que aparecen en una de las columnas. Si usted vota por más del número de candidatos a que tiene derecho para cada posición, usted anula su voto para dicha posición.

**COMO VOTAR INTEGRO:**

Votar integro es votar por todos los candidatos del partido de su preferencia y por ninguno otro.

Para votar integro usted hace una sola cruz "X" o marca válida en el espacio en blanco bajo la insignia del partido de su preferencia. Esa sola marca vale para todos los candidatos bajo la columna.

**COMO VOTAR MIXTO:**

Si usted, además de votar bajo la insignia de un partido, tiene preferencia por uno o más candidatos de otros partidos para uno o más cargos, pedirá hacer una cruz o marca válida al lado del nombre del candidato que prefiera fuera de la columna de su partido.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo. Cada voto así marcado contará solamente para el candidato expresamente marcado.

**COMO VOTAR POR CANDIDATURA:**

Cuando el elector desea votar exclusivamente por uno o más candidatos y no tiene interés en votar bajo la insignia de ningún partido, hará una marca al lado de los candidatos de su preferencia.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo.

COMISION ESTATAL DE ELECCIONES
## ELECCIONES GENERALES
# PAPELETA ELECTORAL MUNICIPAL
8 DE NOVIEMBRE DE 1988

Municipio de **SAN JUAN**

ESTADIDAD · SEGURIDAD · PROGRESO

PIP
¡DATE A RESPETAR!

NOMINACION DIRECTA

(WHITE IN)

Se provee esta columna en blanco para que el elector anote en ella el nombre de cualquier otro candidato que desee consaltbr, frente de los que aparecen en las columnas anteriores

Artículo 5.611
Ley Electoral

'ue Dios lo Bendiga

| PARTIDO POPULAR DEMOCRATICO | PARTIDO NUEVO PROGRESISTA | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | |
|---|---|---|---|
| ALCALDE Héctor Luis Acevedo | ALCALDE José Granados Navedo | ALCALDE Ana María (Ita) Corrada del Río | ALCALDE |
| Miembros de la Asamblea Municipal Thilda Alvarado | Miembros de la Asamblea Municipal 1. Ramón "Pitita" Miranda Marxis | Miembros de la Asamblea Municipal 1 Carlos Frontaras | Miembros de la Asamblea Municipal 1 |
| Manuel E. Andreu García | 2. Dámaris Sifuentes Reyes | 2 Héctor Villarini | 2 |
| Carmelo Betancourt Cale | 3 Miguel A. "Tito" González Ríos | 3 José Cruz | 3 |
| Eric Colón Rodríguez | 4. Enrique Ferreira Vélez | 4 Otilio Rosado | 4 |
| Amadís Cruz Cáceres | 5. Nicolás Crespo Kortright | 5 Angel Ortega | 5 |
| John Fozile | 6 Samuel Méndez Cuesta | 6 Jesús Márquez | 6 |
| Conrado González | 7. Isidra Albino Serrano | 7 José T. Quiñones | 7 |
| Roberto Pérez Santoni | 8. Myriam Hardman Barruso | 8 Gladys Cessna | 8 |
| Francisco (Paco) Luis Rivera | 9. George McDougall | 9 Víctor Audino | 9 |
| Diana Rodríguez | 10. Rafael Ubarri Acosta | 10 Pablo Ortiz | 10 |
| Dafne Reje | 11 Sonia Palón de Sotomayor | 11 Diego Garbos | 11 |
| Awilda Saldaña | 12. Luis Rivera Brenes | 12 Domingo Elías Velázquez | 12 |
| Arturo Silvagnoli | 13 Héctor L. Schmidt Figueroa | 13 Digna L. Ocasio Rosario | 13 |
| Zandra Vergne Colón | 14 Aída Avais Collazo | 14 Felipe (Pipe) Rivera | 14 |

## INSTRUCCIONES SOBRE LA FORMA DE VOTAR LA PAPELETA ELECTORAL MUNICIPAL

En esta papeleta usted tiene derecho a votar por un candidato a Alcalde y por el número exacto de Asambleistas que aparecen en una de las columnas. Si usted vota por más del número de candidatos a que tiene derecho para cada posición, usted anula su voto para dicha posición.

**COMO VOTAR INTEGRO:**

Votar íntegro es votar por todos los candidatos del partido de su preferencia y por ninguno otro.

Para votar íntegro usted hace una sola cruz "X" o marca válida en el espacio en blanco bajo la insignia del partido de su preferencia. Esa sola marca vale para todos los candidatos bajo la columna.

**COMO VOTAR MIXTO:**

Si usted, además de votar bajo la insignia de un partido, tiene preferencia por uno o más candidatos de otros partidos para uno o más cargos, podrá hacer una cruz o marca válida al lado del nombre del candidato que prefiera fuera de la columna de su partido.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo. Cada voto así marcado contará solamente para el candidato expresamente marcado.

**COMO VOTAR POR CANDIDATURA:**

Cuando el elector desea votar exclusivamente por uno o más candidatos y no tiene interés en votar bajo la insignia de ningún partido, hará una marca al lado de los candidatos de su preferencia.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo.

COMISION ESTATAL DE ELECCIONES
## ELECCIONES GENERALES
# PAPELETA ELECTORAL MUNICIPAL
3 DE NOVIEMBRE DE 1988

Municipio de    SAN JUAN

| PARTIDO POPULAR DEMOCRATICO | PARTIDO NUEVO PROGRESISTA | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | NOMINACION DIRECTA (WRITE IN) |
| --- | --- | --- | --- |
| ALCALDE | ALCALDE | ALCALDE | ALCALDE |
| Héctor Luis Acevedo | José Granados Navedo | Ana María (Ita) Cerrada del Río | |
| Miembros de la Asamblea Municipal | Miembros de la Asamblea Municipal | Miembros de la Asamblea Municipal | Miembros de la Asamblea Municipal |
| Thilda Alvarado | 1 Ramón "Pitin" Miranda Marxia | 1 Carlos Fronteras | 1 |
| Manuel E. Andreu García | 2 Damaris Sifontes Reyes | 2 Héctor Villarini | 2 |
| Carmelo Betancourt Calo | 3 Miguel A. "Tito" González Ríos | 3 José Cruz | 3 |
| Eric Colón Rodríguez | 4 Enrique Ferreira Vélez | 4 Otilio Rosado | 4 |
| Amelia Cruz Cáceres | 5 Nicolás Crespo Kortright | 5 Angel Ortega | 5 |
| John Pusilo | 6 Samuel Méndez Cuarto | 6 Jesús Márquez | 6 |
| Conrado González | 7 Isidro Albino Serrano | 7 José T. Quiñones | 7 |
| Roberto Pérez Santoni | 8 Myriam Hernández Barroso | 8 Gladys Cosme | 8 |
| Francisco (Paco) Luis Rivera | 9 George McDougall | 9 Victor Andino | 9 |
| Diana Rodríguez | 10 Rafael Utsarri Acosta | 10 Pablo Ortiz | 10 |
| Delmo Bajo | 11 Sonia Pabón de Sotomayor | 11 Diego Garbus | 11 |
| Awilda Saldaña | 12 Luis Rivera Bruno | 12 Domingo Elias Velázquez | 12 |
| Arturo Silvagnoli | 13 Héctor L. Schmidt Figueroa | 13 Digna L. Osasio Rosario | 13 |
| Zenaida Vergne Colón | 14 Aída Avalo Collazo | 14 Felipe (Pipo) Rivera | 14 |

## INSTRUCCIONES SOBRE LA FORMA DE VOTAR LA PAPELETA ELECTORAL MUNICIPAL

En esta papeleta usted tiene derecho a votar por un candidato a Alcalde y por el número exacto de Asambleístas que aparecen en una de las columnas. Si usted vota por más del número de candidatos a que tiene derecho para cada posición, usted anula su voto para dicha posición.

**COMO VOTAR INTEGRO:**

Votar íntegro es votar por todos los candidatos del partido de su preferencia y por ninguno otro.

Para votar íntegro usted hace una sola cruz "X" o marca válida en el espacio en blanco bajo la insignia del partido de su preferencia. Esa sola marca vale para todos los candidatos bajo la columna.

**COMO VOTAR MIXTO:**

Si usted, además de votar bajo la insignia de un partido, tiene preferencia por uno o más candidatos de otros partidos para uno o más cargos, podrá hacer una cruz o marca válida al lado del nombre del candidato que prefiera fuera de la columna de su partido.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo. Cada voto así marcado contará solamente para el candidato expresamente marcado.

**COMO VOTAR POR CANDIDATURA:**

Cuando el elector desea votar exclusivamente por uno o más candidatos y no tiene interés en votar bajo la insignia de ningún partido, hará una marca al lado de los candidatos de su preferencia.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo.

COMISION ESTATAL DE ELECCIONES

# ELECCIONES GENERALES
## PAPELETA ELECTORAL MUNICIPAL
### 5 DE NOVIEMBRE DE 1996

Municipio de **SAN JUAN**